## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARTHA WRIGHT**
4206 12th Place
Washington, DC 20017

**ANNETTE WADE**
4287 6th Street, SE
Washington, DC 20032

**DOROTHY WADE**
647 "G" Street, SE
Washington, DC 20003

**ETHEL PEOPLES**
555 14th Street, SE
Washington, DC 20003

**EVELYN MINOR**
2613 Bowen Road, SE, Apt. 201
Washington, DC 20020

**MATTIE LUCAS**
1210 Bohae Lane
Accokeek, MD 20607

**LAURIE LAMANCUSA**
63 N. Hatford Avenue
Youngstown, OH 44509

**WINSTON BLISS**
1241 S. 13th Avenue
Hollywood, FL 33019

**SHEILA TAYLOR**
3038 Brightseat Road
Landham, MD 20764

**GAFFNEY & SCHEMBER**
1666 Connecticut Avenue, NW, Suite 225
Washington, DC 20009

**M. ELIZABETH KENT**
601 Indiana Avenue, NW, Suite 605
Washington, DC 20004

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No.**

**FILED**

FEB 1 6 2000

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Class Action Complaint**

**Demand for Jury Trial**

JUDGE: June L. Green

DECK TYPE: Civil General

DATE STAMP: 02/16/2000

CASE NUMBER 1:00CV00293

JURY ACTION

1

**CLARA MCCORMICK**  )
**3203 West Franklin Street**  )
**Evansville, Indiana 47712**  )
  )
**SHONTE SARGENT**  )
**2350 Hillside**  )
**Indianapolis, Indiana 46218**  )
  )
**ROSEMARY CROOM**  )
**1834 Roosevelt Avenue**  )
**Indianapolis, Indiana 46218**  )
  )
**JOHN C. BROWN**  )
**617 Jewell**  )
**Columbus, Indiana 47203**  )
  )
**BETTYE LOCKLEAR**  )
**3421 N. 21st Street**  )
**Milwaukee, Wisconsin 53206**  )
  )
**DEDRE EMMONS**  )
**23910 West Loomis Road, No. 6**  )
**Muskego, Wisconsin 53150**  )
  )
**KATHARINE GORAY**  )
**5451 Williamsburg Way, #106**  )
**Madison, Wisconsin 53719**  )
  )
**JACKIE LUCAS – DCDC No. 197-604**  )
**CCA Northeast Ohio Detention Center**  )
**2240 Hubbard Road**  )
**Youngstown, OH 44505**  )
  )
**ULANDIS FORTE – DCDC No. 254-437**  )
**CCA Central Arizona Detention Center**  )
**1155 North Pinal Parkway**  )
**Florence, AZ 85232**  )
  )
**CHARLES WADE – DCDC No. 990-373**  )
**CCA Torrance Detention Facility**  )
**209 E. Alan Ayers Avenue**  )
**Estancia, NM 80716**  )
  )
  )

**EARL PEOPLES – DCDC No. 224-846** )
**CCA Northeast Ohio Detention Center** )
**2240 Hubbard Road** )
**Youngstown, OH 44505** )
)
**DARRELL NELSON – DCDC No. 234-583** )
**CCA Central Arizona Detention Center** )
**1155 North Pinal Parkway** )
**Florence, AZ  85232** )
)
**MELVIN TAYLOR – DCDC No. 208-941** )
**CCA Central Arizona Detention Center** )
**1155 North Pinal Parkway** )
**Florence, AZ  85232** )
)
**PETER BLISS – DCDC No. 191-399** )
**CCA Torrance Detention Facility** )
**209 E. Alan Ayers Avenue** )
**Estancia, NM 80716** )
)
**On behalf of themselves and all others** )
**similarly situated** )
)
**Plaintiffs** )
)
**v.** )
)
)
**CORRECTIONS CORPORATION OF** )
**AMERICA** )
**10 Burton Hills Boulevard** )
**Nashville, Tennessee 37215** )
)
**AMERICAN TELEPHONE & TELEGRAPH** )
**295 North Maple Avenue** )
**Basking Ridge, NJ 07920** )
)
**EVERCOM INC.** )
**8201 Tristar Drive** )
**Irving, TX 75063** )
)
**MICROWAVE COMMUNICATIONS, INC.-** )
**WORLDCOM COMMUNICATIONS** )
**1133 19th Street, NW** )
**Washington, DC 20036** )

3

|  |  |
|---|---|
| **PIONEER TELEPHONE COOPERATIVE** | ) |
| **P.O. Box 779** | ) |
| **King Ficher, OK  73750** | ) |
|  | ) |
| **GLOBAL TELECOMMICATIONS LINK,** | ) |
| **2609 Cameron Street** | ) |
| **Mobile, Alabama  36607** | ) |
|  | ) |
| **Defendants** | ) |
|  | ) |

## COMPLAINT

### PRELIMINARY STATEMENT

This class action is brought by family members, loved ones, legal counsel and others who receive telephone calls from people incarcerated in prisons and jails owned and operated in the United States by a private corporation, **CORRECTIONS CORPORATION OF AMERICA** (hereafter **CCA**). Defendant **CCA** operates 82 prisons and jails in 26 states pursuant to agreements with state and local governments under which persons under the jurisdiction and control of those governments are transferred to a **CCA** facility for incarceration.

Plaintiffs seek to enjoin, declare illegal, and recoup damages resulting from conspiracies between defendant, **CCA,** and defendant telephone companies, **EVERCOM, INC.** (hereafter **EVERCOM) MCI-WORLDCOM COMMUNICATIONS** (hereafter, **MCI-WORLDCOM**), **PIONEER TELEPHONE CORPORATIVE** (hereafter **PIONEER), AMERICAN TELEPHONE &TELEGRAPH** (hereafter **AT&T**), and **GLOBAL TELECOMMUNICATIONS LINK** (hereafter **GLOBAL TEL LINK**).

Defendant **CCA** has entered into a series of exclusive dealing agreements with these telephone companies to provide inmate telephone service at **CCA** prisons and jails. Under these

4

exclusive dealing agreements, plaintiffs cannot choose which telephone carrier to use to communicate with people confined in CCA prisons. If they want to talk by phone they must use the single telephone service the defendants provide. As a result, the defendants can manipulate the plaintiffs to earn higher profits and prevent plaintiffs from using the telephone services of their choice. This prohibition on choice cannot be justified by additional security features needed in prison; indeed, many non-CCA prisons use high security telephone systems at ordinary profit margins. Moreover, many bill-payer plaintiffs have pre-existing contracts for telephone services with different carriers, but the defendants prohibit use of alternative contracts for telephone service in CCA facilities.

In short, the defendants are using their position of power over prisoners to take advantage of bill-paying plaintiffs over whom they have no legal power. They are using their control over a "captive" audience to unjustly enrich themselves.

These unconscionable arrangement violates the plaintiffs' rights to speech and association, and rights to foster and maintain family relations under the First Amendment to the U.S. Constitution; their rights to due process and equal protection of law under the Fifth and Fourteenth Amendments to the U.S. Constitution; their rights to unimpaired freedom to contract under Article 1, § 10 of the U.S. Constitution. The exclusive agreements further violate the Sherman Anti-Trust Act, 15 U.S.C. § 1 *et. seq.*, the Communications Act, 47 U.S.C. § 151 *et seq.*, and other laws of the United States and the District of Columbia. Plaintiffs in this lawsuit also include a class of inmates in CCA facilities, and their rights are independently violated by virtue of the actions of the defendants.

5

## JURISDICTION

1. Jurisdiction for the federal constitutional claims is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4), and under 42 U.S.C. § 1983.

2. Jurisdiction for claims seeking declaratory and injunctive relief is pursuant to 28 U.S.C §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3. Jurisdiction for plaintiffs' federal antitrust claims are conferred under the Sherman Act, 15 U.S.C. §§ 2, 15 and 26, and 28 U.S.C. § 1337(a). The challenged actions of the defendants are within the flow of interstate trade and commerce and have a direct, substantial effect on trade and commerce.

4. Jurisdiction is also conferred under the federal Communications Act, 47 U.S.C. § 151 *et seq.* Section 207 permits persons injured by any violation thereunder to file suit in the United States District Court, and § 206 allows for the recovery of damages and attorney fees.

5. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over all state and District of Columbia statutory and common law claims because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

6. Many plaintiffs reside in the District of Columbia and the defendants transact business in the District of Columbia. Venue is proper for the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1391(a), (b) and (c).

7. With particular regard to the federal antitrust claims, the interstate commerce described herein is conducted into, within, and from the District of Columbia. Thus, venue is appropriate pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391 (b)(c) and 1392.

6

## JURY DEMAND

8. Plaintiffs demand trial by jury in this action on each and every one of their claims as alleged herein.

## PARTIES

### Families, Lawyers and Other Bill Payer Plaintiffs

9. Plaintiff **MARTHA WRIGHT** is a resident of Washington, D.C. Her grandson, Ulandis Forte, a resident of Washington, D.C., is presently incarcerated at Central Arizona Detention Center, which is owned and operated by the defendant **CCA** in Florence, Arizona. At present, the only way plaintiff communicates or can communicate by telephone with her grandson is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her grandson must purchase at the prison commissary from **EVERCOM**. **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Central Arizona Detention Center. Prior to being housed at the Central Arizona Detention Center, Mr. Forte had been housed in the Torrance County Detention Facility, which is owned and operated by **CCA**, in September or October of 1998, and at the Northeast Ohio Correctional Center, which is owned and operated by **CCA**, between May 1997 and September or October of 1998. Mrs. Wright accepted collect calls or contributed to debit cards during the time of incarceration in **CCA** facilities.

10. Plaintiff **DOROTHY WADE** is a resident of Washington, D.C. Her son, Charles Wade, a resident of Washington, D.C., is presently incarcerated at Torrance County Detention Facility, which is owned and operated by the defendant **CCA** in Estancia, New Mexico. At present, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit

7

cards her son must purchase at the prison commissary from **EVERCOM**. **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Torrance County Detention Facility. Prior to being housed at the Torrance County Detention Facility, Mr. Wade had been housed in Northeast Ohio Correctional Center from approximately November 1997 through February 1999. Mrs. Wade accepted collect calls or contributed to debit cards during the time of incarceration in **CCA** facilities.

11. Plaintiff **ANNETTE WADE** is a resident of Washington, D.C. Her husband, Charles Wade, a resident of Washington, D.C., is presently incarcerated at Torrance County Detention Facility, which is owned and operated by the defendant **CCA** in Estancia, New Mexico. At present, the only way plaintiff communicates or can communicate by telephone with her husband is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her husband must purchase at the prison commissary from **EVERCOM** . **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Torrance County Detention Facility. Prior to being housed at the Torrance County Detention Facility, Mr. Wade had been housed in Northeast Ohio Correctional Center from approximately November 1997 through February 1999. Mrs. Wade accepted collect calls or contributed to debit cards during the time of incarceration in **CCA** facilities .

12. Plaintiff **ETHEL PEOPLES** is a resident of Washington, D.C. Her son, Earl Peoples, a resident of Washington, D.C., is presently incarcerated at Northeast Ohio Correctional Center, which is owned and operated by the defendant **CCA** in Youngstown, Ohio. At present, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her son must purchase at the prison commissary from **EVERCOM**. **EVERCOM** is a party to an

8

exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Northeast Ohio Correctional Facility. Mr. Peoples has been housed at the Northeast Ohio Correctional Center since approximately May of 1997. During the entire period of her son's incarceration at that facility, the only way plaintiff could communicate by telephone with him was to accept collect calls or contribute to debit cards permitted under the contract at that time.

13. Plaintiff **EVELYN MINOR** is a resident of Washington, D.C. Her brother, also a resident of Washington, D.C., is presently incarcerated at the Correctional Treatment Facility, which is owned and operated by defendant **CCA**, in Washington, D.C. The only way plaintiff communicates or can communicate by telephone with her brother is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM. EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Correctional Treatment Facility.

14. Plaintiff **MATTIE LUCAS** is a resident of Accockeek, Maryland. Her son, Jackie Lucas, a resident of Washington, D.C., is presently incarcerated at Northeast Ohio Correctional Center, which is owned and operated by the defendant **CCA** in Youngstown, Ohio. At present, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her son must purchase at the prison commissary from **EVERCOM** . **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Northeast Ohio Correctional Facility. Mr. Lucas has been housed at the Northeast Ohio Correctional Center since approximately May of 1997. During the entire period of her

9

son's incarceration at that facility, the only way plaintiff could communicate by telephone with him was to accept collect calls permitted under the contract at that time.

15. Plaintiff **LAURIE LAMANCUSA** is a resident of Youngstown, Ohio. Her fiancé, Darrell Nelson, was moved from his home in Washington, D.C., to the Central Arizona Detention Center, which is owned and operated by the defendant **CCA** in Florence, Arizona. At present, the only way plaintiff communicates or can communicate by telephone with her fiancé is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her fiancé must purchase at the prison commissary from **EVERCOM** . **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Central Arizona Detention Center. Prior to being housed at the Central Arizona Detention Center, Mr. Nelson had been housed at the Northeast Ohio Correctional Center from approximately May 1997 through October 1998. Ms. Lamancusa accepted collect calls or contributed to the purchase of debit cards beginning in Decmeber 1997.

16. Plaintiff **WINSTON O. BLISS** is a resident of Hollywood, Florida. His brother, Peter Bliss, is a resident of Olney, Maryland. Mr. Bliss was moved from the Washington, D.C. area to the State of New Mexico to the Torrance County Detention Facility, which is owned and operated by the defendant **CCA.** He is presently incarcerated in Estancia, New Mexico. At present, the only way plaintiff communicates or can communicate by telephone with his brother is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her son must purchase at the prison commissary from **EVERCOM**. **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Torrance County Detention Facility. Prior to being housed at the Torrance County Detention Center, Mr. Bliss had been housed in defendant **CCA**'s Northeast Ohio

Correctional Facility from approximately May 1997 through January 1999. Mr. Winston Bliss accepted collect calls or contributed to the purchase of debit cards at that time.

17. Plaintiff **SHEILA TAYLOR** is a resident of Lanham, Maryland. Her brother-in-law, Melvin Taylor, a resident of Washington, D.C., is presently incarcerated at Central Arizona Detention Center, which is owned and operated by the defendant **CCA** in Florence, Arizona. At present, the only way plaintiff communicates or can communicate by telephone with her brother-in-law is to accept calls placed by him and billed to plaintiff by defendant **EVERCOM** or through debit cards her brother-in-law must purchase at the prison commissary from **EVERCOM**. **EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the Central Arizona Detention Center. Prior to being housed at the Central Arizona Detention Center, Mr. Taylor was housed in defendant **CCA's** Northeast Ohio Correctional Center, from approximately May 1997 through September or October 1998. Ms. Taylor accepted collect calls or contributed to the purchase of debit cards at that time.

18. Plaintiff **GAFFNEY & SCHEMBER, P.C.** is a small civil rights law firm in the District of Columbia with a substantial prisoners' rights practice. **GAFFNEY & SCHEMBER, P.C.** represents and assists clients confined in the D.C.'s Correctional Treatment Facility, the Northeast Ohio Correctional Center, the Central Arizona Detention Center and the Torrance County Detention Facility, all of which are owned and operated by defendant **CCA**. At present, the only way the lawyers of **GAFFNEY & SCHEMBER, P.C.** can communicate by telephone with clients in CCA prisons is to accept calls placed by their clients and billed to plaintiff by defendants or through debit cards their clients must purchase at the prison commissary from

11

**EVERCOM. EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the above mentioned facilities.

19. Plaintiff **M. ELIZABETH KENT**, **ESQ.** maintains a law office in Washington, D.C. She represents District of Columbia offenders in their criminal appeals. Ms. Kent, presently has a client housed at the Torrance County Detention Facility, in Estancia, N.M., and a client housed in the Central Arizona Detention Center. Both of these facilities are owned and operated by defendant **CCA.** The only way she can communicate by telephone with her clients while they are in prison is to accept calls placed by her clients and billed to plaintiff by **EVERCOM** or through debit cards her clients must purchase at the prison commissary from **EVERCOM. EVERCOM** is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone services for people confined in the above mentioned facilities. In the past, plaintiff Kent has had clients confined at defendant **CCA**'s Northeast Ohio Correctional Center, as well as other prisons owned and operated by **CCA**, and in each case the only way she can communicate by telephone with her clients while they are in prison is to accept calls placed by her clients and billed by the telephone service provider for that prison at that time.

20. Plaintiff **CLARA McCORMICK** is a resident of Evansville, Indiana. Her son, Joseph Daniel Floyd, was transported from his home state of Indiana to a correctional facility owned and operated by the defendant, **CCA.** He is presently incarcerated in Hazard, Kentucky. At the present time and At all relevant times, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant, **PIONEER,** which is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone service for inmates at the Watonga facility. Prior to his incarceration at Watonga, Ms. McCormick's son was incarcerated at a **CCA** facility in Whiteville, Tennessee.

12

During his incarceration at Whiteville Ms. McCormick accepted collect calls or contributed to the purchase of debit cards.

21. Plaintiff **SHONTE SARGENT** is a resident of Indianapolis, Indiana. Her husband, Dwight, was moved from his home state of Indiana and is presently incarcerated at the Watonga facility, which is owned and operated by defendant **CCA**. At the present time and At all relevant times, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant, **PIONEER,** which is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone service for inmates at the Watonga facility. Prior to his incarceration at Watonga, he was incarcerated at a **CCA** prison in Whiteville, Tennessee. Prior to his incarceration at Whiteville, he was incarcerated in the Marion County, Indiana Jail, also operated by **CCA.** Ms. Sargent accepted collect calls or contributed to the purchase of debit cards during her husband's entire time of confinement in **CCA** prisons.

22. Plaintiff **ROSEMARY CROOM** is a resident of Indianapolis, Indiana. Her son, Dwight, is presently incarcerated at the Watonga facility, which is owned and operated by defendant **CCA**. At the present time and At all relevant times, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant, **PIONEER,** which is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone service for inmates at the Watonga facility. Prior to his incarceration at Watonga, he was incarcerated at a **CCA** prison in Whiteville, Tennessee. Prior to his incarceration at Whiteville, he was incarcerated in the Marion County, Indiana Jail, also operated by **CCA.** Ms. Croom accepted collect calls or contributed to the purchase of debit cards during her son's entire time of confinement in **CCA** prisons.

13

23. Plaintiff **JOHN C. BROWN** is a resident of Columbus, Indiana. His son, John L. Brown, was moved from his home state of Indiana and is currently incarcerated at the Watonga correctional facility, which is owned and operated by defendant **CCA**. At the present time and At all relevant times, the only way plaintiff communicates or can communicate by telephone with his son is to accept calls placed by him and billed to plaintiff by defendant, **PIONEER,** which is a party to an exclusive dealing agreement with defendant, **CCA,** governing telephone service for inmates at the Watonga facility. Prior to his incarceration at Watonga, he was incarcerated at a **CCA** prison in Whiteville, Tennessee. Mr. Brown accepted collect calls or contributed to the purchase of debit cards during his son's entire time of confinement in **CCA** prisons.

24. Plaintiff **BETTYE LOCKLEAR** is a resident of Milwaukee, Wisconsin. Her husband, Michael, was moved from his home state of Wisconsin and is currently incarcerated at a correctional facility owned and operated by defendant **CCA** in Sayre, Oklahoma. At the present time and At all relevant times, the only way plaintiff communicates or can communicate by telephone with her son is to accept calls placed by him and billed to plaintiff by defendant **AT&T,** which is a party to an exclusive dealing agreement with defendant, **CCA,** governing telephone service for inmates at the Sayre facility. Ms. Locklear accepted collect calls or contributed to the purchase of debit cards during her husband's entire time of confinement in **CCA** prisons.

25. Plaintiff **DEDRA EMMONS** is a resident of Muskego, Wisconsin. She communicates by telephone with Jay Bennett, who is incarcerated at the Whiteville Correctional facility in Nashville, Tennessee, which is owned and operated by defendant, CCA. At the present time and At all relevant times, the only way plaintiff can communicate with Mr. Bennett has been to accept collect calls placed by him and billed to the plaintiff by defendant, **GLOBAL**

14

**TEL LINK**, a telephone company located in Mobile, Alabama, which is a party to an exclusive dealing agreement with defendant, **CCA**, governing telephone service at the Whiteville facility.

26. Plaintiff **KATHARINE GORAY** is a resident of Madison, Wisconsin. She communicates by telephone with her fiancé, who is incarcerated at the Sayre, Oklahoma facility which is owned and operated by defendant, CCA. At the present time and At all relevant times, the only way plaintiff is able to communicate with her fiance has been to accept collect calls placed by him and billed to the plaintiff by defendant, **AT&T,** which is a party to an exclusive dealing agreement with defendant, **CCA,** governing telephone service at the Sayre facility.

### Prisoner Plaintiffs

27. Plaintiffs **ULANDIS FORTE, CHARLES WADE, EARL PEOPLES, DARRELL NELSON, MELVIN TAYLOR, JACKIE LUCAS,** and **PETER BLISS**, are presently, or have been at relevant times, incarcerated in correctional institutions operated by defendant **CCA** at places such as the Northeast Ohio Correctional Center in Ohio, the Central Detention Center in Arizona and the Torrance County Detention Facility in New Mexico. As a result of the exclusive dealing agreements between the defendants, these plaintiffs have been subjected to an unreasonable burden on their right to communicate with their families, loved ones, lawyers and prisoner assistance organizations. In addition, the defendants have taken excessive amounts of the prisoner plaintiffs' personal assets by restricting access to less expensive telephone services not controlled by the exclusive dealing agreements.

### Defendants

28. Defendant **CCA** is a Tennessee corporation doing business in the District of Columbia and throughout the United States. Pursuant to contracts it has entered into with numerous state and local governments, **CCA** operates prisons and jails in twenty six states

15

throughout the United States. Defendant **CCA** performs the governmental functions of a prison
and thus acts under color of state law. Defendant **CCA** has entered into a series of exclusive
dealing agreements with various telephone companies, including, but not limited to, defendants,
**EVERCOM, MCI-WORLDCOM, PIONEER, AT&T** and **GLOBAL TEL LINK**. These
exclusive contracts arrange for the provision of telephone services to inmates via collect or debit
cards under which bill payer and prisoner plaintiffs are required to pay exorbitant charges and
are forbidden to enter into contracts of their own with telephone services of their choice, even
though equivalent alternative competitive services are available.

29. Defendant **EVERCOM, INC.** is a Texas corporation engaged in the business of
providing telephone service to persons in the District of Columbia and throughout the United
States. **EVERCOM** has recently merged with and assumed liability for Invision Telecom,
Security Telecom, Mother of God Telephone Services and Ameritel. **EVERCOM** was and
continues to be a party to certain exclusive dealing agreements with defendant, **CCA**, under
which it provides the sole means for people in a CCA prison to place telephone calls to the
outside world. At all relevant times, **EVERCOM** performs governmental functions and/or is a
party to a contract or conspiracy with others performing governmental functions and thus acts
under color of state law.

30. Defendant **PIONEER** is an Oklahoma corporation engaged in the business of
providing telephone service to persons in the District of Columbia and throughout the United
States. At various times, it was and continues to be a party to certain exclusive dealing
agreements with defendant, **CCA**, under which it provides the sole means for people in a CCA
prison to place telephone calls to the outside world. At all relevant times, **PIONEER** performs

16

governmental functions and/or is a party to a contract or conspiracy with others performing governmental functions and thus acts under the color of state law.

31. Defendant **MCI-WORLDCOM** is a Maryland corporation engaged in the business of providing telephone service to persons in the District of Columbia and throughout the United States. Recently, Microwave Communications Inc. (MCI) merged with L.D.D.S. and Worldcom Corporation, and the new entity, **MCI-WORLDCOM**, assumed the liabilities of these companies. **MCI-WORLDCOM** was and continues to be a party to certain exclusive dealing agreements with defendant, **CCA**, under which it provides the sole means for people in a CCA prison to place telephone calls to the outside world. At all relevant times, **MCI-WORLDCOM** performs governmental functions and/or is a party to a contract or conspiracy with others performing governmental functions and thus acts under the color of state law.

32. Defendant **GLOBAL TELECOMMICATIONS LINK** is an Alabama corporation engaged in the business of providing telephone service. At various times, it was and continues to be a party to certain exclusive dealing agreements with defendant, **CCA**, under which it provides the sole means for people in a CCA prison to place telephone calls to the outside world. At all relevant times, **GLOBAL TELECOMMICATIONS LINK** performs governmental functions and/or is a party to a contract or conspiracy with others performing governmental functions and thus acts under the color of state law.

33. Defendant **AT&T**, is a New Jersey corporation engaged in the business of providing telephone service to persons in the District of Columbia and throughout the United States. At various times, it was and continues to be a party to certain exclusive dealing agreements with defendant, **CCA**, under which it provides the sole means for people in a **CCA** prison to place telephone calls to the outside world. At all relevant times, **AT&T** performs governmental

17

functions and/or is a party to a contract or conspiracy with others performing governmental functions and thus acts under the color of state law.

## CLASS ACTION ALLEGATIONS

34. Plaintiffs bring this case as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of two classes:

**Class (1): Families, Friends, Lawyers and Other Bill Payer Plaintiffs**, defined as all persons, corporations and organizations billed for telephone calls initiated by people who presently are, have been or will be confined to a correctional facility operated by **CCA**.

**Class (2): Prisoner Plaintiffs**, defined as all persons who presently are, have been, or will be incarcerated in correctional institutions operated by **CCA.**

35. The case meets all the requirements of Rule 23 of the Federal Rules of Civil Procedure.

36. Each class is so numerous that joinder is impracticable. **CCA** incarcerates approximately 73,000 individuals and constitutes, in itself, the fourth largest correctional system in the country. Furthermore, every individual in **CCA** prisons has numerous family, friends and/or legal counsel that seek or may seek telephone contact with the individual. As a result, the number of people affected by the issues in this action number in the hundreds of thousands, far too numerous to join in one suit.

37. Common questions of law and fact exist as to all class members and dominate those questions that affect only individual members. These common questions of law and fact include but are not limited to: (a) whether the defendants' exclusive dealing agreements violate plaintiffs' rights to speech and association, access to courts, equal protection of law, and freedom to contract guaranteed by the U.S. Constitution; (b) whether the defendants' exclusive dealing

18

agreements violate the statutory protections of the Sherman Anti-Trust Act and the
Communications Act; (c) whether the defendants' exclusive dealing agreements are
unconscionable or constitute unjust enrichment or violate other statutory and common law
protections; (d) whether any purported security concerns unique to prisons requires the use of
such exclusive dealing agreements; (e) whether alternative agreements exist that could satisfy
purported security concerns; (f) whether the fees imposed by the defendants represent a fair
market value for the services or the exploitation of an illegal monopoly; (g) whether the
defendants are using the government's special power of imprisonment for private gain; and (h)
whether the defendants' conduct has created anti-competitive effects that restrict the market for
inmate-initiated phone calls or raise barriers to the entry of new participants to the market.

38. The claims of the plaintiffs are typical of the claims of the classes.

39. The plaintiffs will adequately and vigorously represent the interests of each class.
Furthermore, counsel knows of no conflicts among class members or between the attorneys and
class members.

40. A class action here is superior to other available means for the fair and efficient
adjudication of the claims herein, and will prevent the imposition of undue financial,
administrative and procedural burdens on the parties and Court that individual litigation would
impose. The class action provides an effective method for enforcing the rights of plaintiffs and
the class members they represent without unnecessary expense or duplication.

41. The plaintiff classes should be certified pursuant to Rule 23(b)(2) for determination of
liability because the defendants have acted on grounds generally applicable to the respective
classes, thus making class-wide injunctive relief and other equitable relief appropriate. The

19

plaintiff class should be certified pursuant to Rule 23(b)(3) for determination of the damage claims of class members.

## STATEMENT OF FACTS

42. People who seek to speak to prisoners in **CCA** facilities can do so, but only under severe restrictions. First, they can only receive phone calls initiated by inmates; they cannot initiate phone calls themselves. Second, the inmate-initiated phone calls are subject to restrictions on timing and identification, as well as restrictions on telephone service providers. Most importantly, plaintiffs are prohibited from using telephone services other than those established by the defendants' exclusive dealing agreements, at the terms established under those agreements. Plaintiffs have no choice but to use the single service that has a lock on the person they seek to contact. Plaintiffs cannot use the numerous alternative options presently available. They cannot use 1-800 or 1- 888 services, call-around services such as 10-10-811, debit cards other than those provided by the sole-source contractor, or in some cases any debit card at all.

43. Persons paying for telephone contact with **CCA** inmates often have ongoing contracts with carriers that provide varied options for telephone service. However, those services cannot be used. Thus, persons paying for calls from inmates cannot take advantage of the numerous options available to all other consumers of telephone service in the District of Columbia and throughout the United States.

44. For collect telephone calls, the amount charged by defendants is for "operator assisted" calls even though no live operator is involved in placing or managing the call. The entire call is made and completed by computer. These spurious "operated assisted" calls routinely cost five to eight times as much as "unassisted" calls. The debit cards purchased under exclusive contract provide less value than other debit cards available to the general public.

20

45. In addition, persons accepting collect calls are not given the same sevice or access to service that is provided to persons receiving telephone calls from persons other than inmates. The telephone company defendants refuse to respond to complaints or inquiries concerning problems such as frequent disconnections raised by persons accepting collect calls from inmates. Attempts to contact these defendants do not lead to a constructive response or an adjustment to a bill. Rather, the customer service department has simply told the customer to take his or her complaint to the prison.

46. The disconnections are especially problematic because if the inmate redials, the bill-payer is subject to a new connection surcharge at the "operated assisted" rate, often in excess of $2 for each connection.

47. Many of the debit cards sold are defective. The prisoner plaintiffs purchasing debit cards often wait for weeks for the customer service department to replace a defective debit card. Furthermore, the debit card system is often unavailable for the prisoner plaintiffs to use, and they must resort to the collect calling system to speak with their family members or attorneys.

48. The defendants cannot provide any valid penological reason for imposing the most expensive telephone system on the plaintiffs. In early 1996, the American Correctional Association, the organization of prison and jail administrators throughout the United States, adopted a *Resolution on Excessive Phone Tariffs*, which states as follows:

>WHEREAS, correctional professionals have a fundamental responsibility to encourage and support activities which foster the maintenance of family and community ties between offenders and the free world;

>THEREFORE BE IT RESOLVED, that correctional agencies should discourage profiteering on tariffs placed on phone calls which are far in excess of the actual cost of the call, and which could discourage or hinder family or community contacts.

21

Thus, the exclusive dealing agreements established by defendants are expressly contrary to legitimate penological concerns such as maintaining family ties and increasing the probability of successful reentry upon release.

49. Security functions such as call monitoring and blocking are not advanced by exclusive dealing systems that arbitrarily charge bill payers the highest possible calling rate. Security functions operate independently and can be effectuated no matter what type of telephone system is used. The defendants can implement necessary security functions whether or not a call is collect, a debit card from a different provider is used, and whether or not the telephone company has an exclusive dealing agreement. The essential purpose of the telephone system established by the defendants is not to achieve any valid penological goals, but instead to enable the defendants to reap as great a profit as possible off the backs of persons trapped in a captive audience without options available to other consumers.

50. The direct consequences of the exorbitant charges imposed on the recipients or inmate-initiated calls are obvious: fewer and shorter calls resulting in less access for the inmates to their family, counsel, and other bill payer plaintiffs and the class they represent. The system restricts meaningful choices and confers an undeserved benefit to the defendants.

51. Plaintiff **MARTHA WRIGHT** is a 75-year-old grandmother on a fixed income. Her long distance service company presently is Sprint; previously it was AT&T. Mrs. Wright is blind and the one time she was able to go to Arizona to visit the grandson she raised, she needed to bring her sister so she could safely move around. She has not seen her grandson in over a year. She can only talk to the grandson she raised, **ULANDIS FORTE**, twice a month because it costs $16.50 each time he calls. Mrs. Wright reports that her telephone bill averaged $144 a month. As a result of these high bills, Mrs. Wright needed to request that her grandson call less often. Mrs.

22

Wright also sends her grandson money to assist him in paying for debit cards. If Mrs. Wright wants to speak with her grandson over the telephone she must either accept a collect call or assist him in paying for debit cards through the exclusive telephone services contract operating at the CCA facility that confines Mr. Forte. The defendants have eradicated all other choices for her.

52. Plaintiff **DOROTHY WADE** speaks to her son Charles Wade as often as she can. Mrs. Wade has not seen her son for about one year. Once the collect calls from her son reach $200, a block is placed on her telephone lines, preventing further collect calls, until she can pay down the bill. The last time she reached the $200 block, Mrs. Wade was required to pay $129.00 before the company would lift the block. Mrs. Wade is still paying down a bill of $229. Her bills have been as high as $300 for a month. Mrs. Wade presently contracts with MCI to provide long distance service; previously she contracted with AT&T. Mrs. Wade sends her son money to assist him in purchasing debit calling cards under the exclusive telephone services contract. If Mrs. Wade wants to speak with her son over the telephone she must either accept a collect call or assist him in paying for debit cards through the exclusive telephone services contract operating at the CCA facility that confines Mr. Wade. The defendants have eradicated all other choices for her.

53. Plaintiff **ANNETTE WADE** speaks to her husband, Mr. Charles Wade, as often as she can. Mr. Wade calls using a debit card approximately three times a month. Mrs. Wade also speaks with her husband at her mother-in-law's home who has a little more money to accept collect calls. The couple have four children. Mr. Wade speaks briefly with them approximately twice a week in an effort to maintain a role in their upbringing. Mr. Wade has not seen his children since he was shipped from the Northeast Ohio Correctional Center in Youngstown, Ohio in approximately March of 1999. Mrs. Wade has not seen her husband for approximately

23

one year. Previously, Mrs. Wade had a contract with AT&T to provide long distance service.

Bell Atlantic placed Mrs. Annette Wade on the "B Plan" when her telephone bill totaled $700.

On the "B Plan," Mrs. Wade's long distance service was canceled and she could not accept

collect calls. She paid $500 of the debt and was eventually released from the "B Plan." However,

if her collect calls total $50 or more, her telephone is blocked from accepting further collect calls

until she can pay down her debt. Mrs. Annette Wade also sends her husband money to assist him

in purchasing debit calling cards. If Mrs. Wade wants to speak with her husband over the

telephone she must either accept a collect call or assist him in paying for debit cards through the

exclusive telephone services contract operating at the **CCA** facility that confines Mr. Wade. The

defendants have eradicated all other choices for her.

54. Plaintiff **ETHEL PEOPLES** is a retired mother on a fixed income. She gets to see

her son at the Northeast Ohio Correctional facility approximately three times a year. Previously,

she contracted with L.C.I. to provide long distance service; later she contracted with MCI. Now

she uses 10-10-811 to save money on her long distance telephone bills. Her son Earl Peoples

calls his mother on average once a week. When he calls collect they speak for fifteen minutes at

a cost of $9.75. She sends him money for things he needs and he can spend it on debit cards if he

needs to buy one. Mrs. Peoples does not write letters as it is physically difficult for her to do so.

If Mrs. Peoples wants to speak with her son over the telephone she must either accept a collect

call or assist him in paying for debit cards through the exclusive telephone services contract

operating at the **CCA** facility that confines Mr. Peoples. The defendants have eradicated all other

choices for her.

55. Plaintiff **EVELYN MINOR** lives in Washington, D.C. and her brother is

incarcerated just a metro ride away, in the local Correctional Treatment Facility operated by

24

CCA. She pays $1.75 for each local call. Ms. Minor estimates that her telephone bills are approximately $50.00 more a month. If Ms. Minor wants to speak with her son over the telephone she must accept a collect call through the exclusive telephone services contract operating at CTF. The defendants have eradicated all other choices for her.

56. Plaintiff **MATTIE LUCAS** is a seventy-year-old mother on a limited income. Her chosen long distance company is Sprint. She has had telephone bills as high as $500 and $700 dollars. The cost of a 15 minute collect call from her son Jackie Lucas, housed at **CCA's** Northeast Ohio Correctional Center is $9.75. She does not block her son's calls as she cannot visit with him and is desperately worried about his safety. Mrs. Lucas has only been able to visit her son once since May 1997. The cost of the collect calls is difficult for her, and she is contemplating asking her son to call less often because of the cost. If Mrs. Lucas wants to speak with her son over the telephone she must accept prices set by the exclusive contract operating at the CCA facility that confines Mr. Lucas. The defendants have eradicated all other choices for her.

57. Plaintiff **LAURIE LAMANCUSA** last saw her fiancé in December 1999. In the past, her chosen long distance providers have been MCI and Sprint. In the roughly one year between February 6, 1999 and January 21, 2000, Ms. Lamancusa spent $2,590 in long distance collect calls, solely from her fiancé locked in a CCA prison. Because of her high bills, when Ms. Lamancusa's telephone bill reached $222.45 in collect calls, a block for further collect calls was placed on her line. At that point in time, Ms. Lamancusa began making payments in advance to cover the cost of collect telephone calls. Ms. Lamancusa also sends her fiancé money to assist with the purchase of debit cards. If Ms. Lamancusa wants to speak with her fiancé over the telephone she must either accept a collect call or assist him in paying for debit cards through the

25

exclusive telephone services contract operating at the **CCA** facility that confines him. The defendants have eradicated all other choices for her.

58. Plaintiff **WINSTON O. BLISS** speaks with his brother Peter Bliss only on holidays, birthdays, and rare occasions. Mr. Peter Bliss tries not to call too often because the cost is so high. Mr. Winston Bliss has not seen his brother since the early 1990's. Mr. Winston Bliss' chosen long distance company is MCI. If he wants to speak with his brother over the telephone he must accept prices set by the exclusive contract operating at the CCA facility that confines him. The defendants have eradicated all other choices for him.

59. Plaintiff **SHEILA TAYLOR** has chosen AT&T for her long distance company**.** She speaks with her brother-in-law, Melvin Taylor, approximately five times a month. She accepted his collect calls when he was in the Northeast Ohio Correctional Facility as well as now in the Central Arizona Detention Facility. If Ms. Taylor wants to speak with her brother-in-law over the telephone she must either accept a collect call or assist him in paying for debit cards through the exclusive telephone services contract operating at the **CCA** facility that houses Mr. Taylor. The defendants have eradicated all other choices for her.

60. Plaintiff **GAFFNEY & SCHEMBER, P.C.**, has chosen Cable and Wireless for their long distance company. Bell Atlantic supplies plaintiff's local telephone service and bills plaintiff for a variety of additional charges, including collect calls from prison facilities. Because of its substantial prisoners' rights practice, **GAFFNEY & SCHEMBER, P.C.** has a long-standing policy to accept all incoming collect calls. Beginning in May 1997, when the District of Columbia prisoner plaintiffs first arrived in the Northeast Ohio Correctional Center in Youngstown, Ohio, **GAFFNEY & SCHEMBER, P.C.**'s telephone costs approximately doubled, from an average of $300 to $500 per month to $700 to $900 per month. In August

26

1997, for example, **GAFFNEY & SCHEMBER, P.C.** paid $660.12 in long distance collect calls from the Northeast Ohio Correctional Facility alone. As a result of the substantial increase in telephone bills, the firm altered its policy on accepting all collect calls. The firm imposed conditions on prisoners calling and also changed the mechanism by which it answered incoming calls. The effect of these measures was to reduce both the monthly phone bill and the prisoners access to counsel. Plaintiff **GAFFNEY & SCHEMBER, P.C.** also accepts collect calls from the Correctional Treatment Facility in Washington, D.C., which costs $1.75 for each ten-minute client call.

61. Plaintiff **M. ELIZABETH KENT, ESQ.** accepts collect calls from the clients she represents on criminal appeals. As a result of the high cost of communicating by phone with people confined in CCA facilities, she has opted to communicate in writing rather than by phone whenever possible, which makes it more difficult for her to adequately represent her clients.

62. Prisoner plaintiffs, **ULANDIS FORTE, CHARLES WADE, EARL PEOPLES, DARRELL NELSON, MELVIN TAYLOR, JACKIE LUCAS,** and **PETER BLISS** have initiated collect calls and purchased debit cards with the assistance of family members in an effort to maintain contact with family, friends, lawyers, and prisoner assistance organizations. They can only purchase the debit cards of the exclusive telephone services vendor. The value of these debit cards is less than the value similar services available to the general public. The defendants have eliminated all other choices from the prisoner plaintiffs. Moreover, the prisoner plaintiffs have limited abilities to earn money. Prison jobs, when they are available, typically pay in the range of twenty to sixty cents per hour, far less than the minimum wage and far less than can support minimal telephone use under the terms imposed by the defendants.

27

63. Plaintiff **McCORMICK**'s son was moved by **CCA** from a facility in Watonga, Oklahoma, to the Otter Creek Correctional Facility in Hazard, Kentucky. Now, when her son calls her from Kentucky, the charge is now $4.05 for the first minute and 55 cents per minute thereafter. Ms. **McCormick** is being billed by **MCI**.

64. Plaintiff **CROOM** has found it difficult to visit her son, and plaintiff **SARGENT,** has found it equally difficult to visit her husband because they are both incarcerated so far away from home. The telephone calls from Watonga have been approximately $10 for a 30 minute call. Plaintiff **SARGENT** has been unable because of the cost to speak with her husband from her own home and has frequently been required to speak with him at her mother-in-law's home to save on the surcharge that is assessed for each call.

65. Plaintiff **BROWN** needs to pay approximately $10 to have a 30 minute telephone call with his son and thus has been unable to speak to him more than twice a month. Prior to his son's transfer to the **CCA** facilities in Oklahoma and Tennessee, plaintiff was able to visit his son because he was incarcerated in Indiana, much closer to home. Now, it is extremely costly for plaintiff to visit his son and difficult to maintain a close relationship by letter. Thus, the telephone calls have been the only meaningful way in which plaintiff **BROWN** has been able to maintain family ties with his son.

66. Plaintiff **LOCKLEAR** has been billed $11.25 by defendant **AT&T** for a fifteen minute telephone call with her husband. A one minute telephone call costs $4.54. Plaintiff tried to change her long distance carrier to make her calls with her husband less expensive but was informed that she could not do so and was required to deal exclusively with **AT&T** as the sole carrier for telephone calls from her husband.

28

67. Plaintiff **EMMONS** presently is charged $13.50 for a 30 minute collect call with Mr. Bennett. She frequently is disconnected in the middle of the telephone calls and, although she has tried to contact defendant **GLOBAL TELECOMMICATIONS LINK**, to obtain service for this problem, there is nothing that has been done to correct this problem or to give her a credit for the surcharge when another call must be placed by Mr. Bennett. A block is put on her telephone every few months even though she has not been late in making her payments.

68. Because her fiancé is incarcerated so far from where she lives, plaintiff **GORAY** has only been able to visit him once since his transfer to a **CCA** facility in Oklahoma. Although she and her fiancé write daily, constant telephone communication has been crucial to the development and maintenance of their relationship since his imprisonment. Letters are often inadequate, lead sometimes to miscommunication and have a delayed response. Because of the enormous financial drain these telephone charges have placed on plaintiff, she has been required to work two jobs in order to get herself back on her feet.

69. Because of the lack of choice in telephone services from people in prison, attorneys and others who provide aid and service to prisoners have been impeded in their work and mission. These impediments reduce the access to the courts of people in prison for civil actions as well as criminal matters in which liberty is at stake.

70. Many people in both the prisoner-plaintiff class and the bill-paying family memberclass have limited writing skills. Furthermore, prisoners are often imprisoned hundreds or even thousands of miles away from their families so personal visits require substantial time and resources. As a result, telephone communication is the most viable way for communication between families and their loved ones.

71. Communication with family members is a well-recognized and accepted principle of rehabilitation for prisoners.

**72.** Communicating with parents who have erred is a widely recognized means to help children to avoid mistakes of their own.

## COUNT I
## FIRST AMENDMENT CLAIMS
## BY FAMILIES, LAWYERS AND OTHER BILL PAYER PLAINTIFFS

73. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

74. Under the First and Fourteenth Amendments to the United States Constitution, all Plaintiff bill payers and the class members they represent have constitutionally protected rights of freedom of speech and association, and rights to foster and maintain family relations.Under the exclusive dealing agreements created by defendants, plaintiffs and other members of the class are required to use telephone systems that burden more speech than necessary to serve defendants' legitimate governmental interests. The system provides poor quality service, unduly restricts plaintiffs' ability to receive phone calls, imposes baseless surcharges and is prohibitively expensive. The system excludes alternative means of telephone communication that are no more burdensome to defendants' penological interests and are significantly less burdensome to plaintiffs' expressive and associational rights. As a result, the First Amendment rights of plaintiffs and other members of the class have been unlawfully burdened and impaired.

75. The surcharges placed on inmate-initiated telephone calls impose an unlawful toll on the exercise of plaintiff bill payers' First Amendment rights. By mandating the acquisition of significant revenue from the operation of the prison telephone systems, defendants have singled out the friends and families of inmates for special tax treatment. Such treatment has not been authorized by the state or local legislatures with whom defendant **CCA** has contracted to provide

30

prison telephone services, and has a chilling effect on communication by plaintiffs and other members of the class they represent. To the extent that defendant telephone companies' rates for inmate telephone service are higher than they would otherwise have been but for surcharges, plaintiff bill payers are subject to a regulatory fee that bears no relation to the actual administrative and enforcement costs incurred in facilitating inmate telephone service.

76. Defendants have implemented, enforced, encouraged, and sanctioned the actions, policies, practices and/or customs of creating an exclusive telephone service franchise and employing the collect-call only and debit card telephone systems that unlawfully burden the First Amendment rights of bill payer plaintiffs and members of the plaintiff class they represent.

77. Defendants' constitutional abuses and violations were and are directly and proximately caused by the actions, policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive dealing telephone contracts for the provision of inmate telephone services to CCA correctional facilities thereby eliminating all competition for the provision of such services; (b) the imposition and maintenance of the unduly restrictive inmate telephone systems; (c) the institution of a special toll on the First Amendment rights of plaintiff bill payers in the form of surcharges agreed upon by defendant CCA and defendant telephone companies; and (d) the provision of inadequate telephone services to plaintiffs and the class members they represent, further inhibiting them in the exercise of their First Amendment rights.

78. Defendants have acted with deliberate indifference to the First Amendment rights of the bill payer plaintiffs and other members of the class they represent. As a direct and proximate result of the aforesaid acts and omissions of defendants, the First Amendment rights of the bill payer plaintiffs and other class members have been violated. By acting under color of State law

31

to deprive the named bill payer plaintiffs and other class members of their First Amendment rights, defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of State law of rights secured under the Constitution and the laws of the United States.

79. Defendants' actions, policies, practices and/or customs have directly and proximately caused such constitutional abuses. Defendants' telephone systems determine the ability of plaintiffs and other members of the class to communicate with family members and others incarcerated in CCA correctional facilities. Thus, a real and immediate threat exists that the First Amendment rights of the bill payer plaintiffs and other class members will be violated by defendants in the future. Indeed, because defendants' telephone systems determine the mode of telephone communication — and all communication for some class members — the bill payer plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of defendants.

80. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from maintaining the present telephone systems.

### COUNT II
### FIRST AMENDMENT CLAIMS
### BY PRISONER PLAINTIFFS

81. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

82. Under the First and Fourteenth Amendments to the United States Constitution, all prisoner plaintiffs and the class members they represent have constitutionally protected rights of freedom of speech and association.

83. Under the exclusive dealing agreements created by defendants, the inmate plaintiffs and other members of the class are required to use telephone systems that burden more speech

32

than necessary to serve defendants' legitimate governmental interests and restricts access to the courts. The system provides poor quality service, unduly restricts plaintiffs' ability to make phone calls, imposes baseless surcharges and is prohibitively expensive. The system excludes alternative means of telephone communication that are no more burdensome to defendants' penological interests, can equally serve defendants' security concerns at little or no additional cost, have negligible additional impact on the allocation of prison resources generally, and are significantly less burdensome to plaintiffs' expressive and associational rights. As a result, the First Amendment rights of the inmate plaintiffs and other members of the class have been unlawfully burdened and impaired.

84. Defendants have implemented, enforced, encouraged, and sanctioned the actions, policies, practices and/or customs of creating exclusive telephone service agreements that limit collect call and debit card options, and that unlawfully burdens the First Amendment rights of prisoner plaintiffs and members of the plaintiff class they represent.

85. Defendants' constitutional abuses and violations were and are directly and proximately caused by the actions, policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive dealing telephone contracts for the provision of inmate telephone services to CCA correctional facilities thereby eliminating all competition for the provision of such services; (b) the imposition and maintenance of the unduly restrictive inmate telephone systems; and (c) the provision of inadequate telephone services to plaintiffs and the class members they represent, further inhibiting them in the exercise of their First Amendment rights.

86. Defendants have acted with deliberate indifference to the First Amendment rights of the prisoner plaintiffs and other members of the class they represent. As a direct and proximate

33

result of the aforesaid acts and omissions of defendants, the First Amendment rights of the prisoner plaintiffs and other class members have been violated. By acting under color of State law to deprive the named prisoner plaintiffs and other class members of their First Amendment rights, defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of State law of rights secured under the Constitution and the laws of the United States.

87. Defendants' actions, policies, practices and/or customs have directly and proximately caused such constitutional abuses. Defendants' telephone systems determine the ability of prisoner plaintiffs and other members of the class to communicate with friends, family members and lawyers while they are incarcerated in CCA correctional facilities. Thus, a real and immediate threat exists that the First Amendment rights of the prisoner plaintiffs and other class members will be violated by defendants in the future. Indeed, because defendants' telephone systems determine the mode of telephone communication — and all communication for some class members — the prisoner plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of defendants.

88. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from maintaining the present telephone systems.

**COUNT III**
**EQUAL PROTECTION CLAIMS**
**BY FAMILIES, LAWYERS, PRISONERS AND BILL PAYER PLAINTIFFS**

89. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

90. Under the First and Fourteenth Amendments to the United States Constitution, the family, prisoners, and bill payer plaintiffs and class members have constitutionally protected rights of freedom of speech and association. They bring this claim against all defendants for

34

violating those rights under the Equal Protection Clause of the Fourteenth Amendment, which
applies to District of Columbia residents through the Fifth Amendment of the United States
Constitution. Prisoner plaintiffs are similarly situated to prisoners in other correctional
institutions using a debit card system that provides value similar to that on the available to the
general public. All plaintiffs and the class members they represent have constitutionally
protected rights to be treated equally as similarly situated telephone customers.

91. Defendants have implemented and enforced actions, policies, practices and/or
customs of requiring, engaging in, and maintaining exclusive telephone service contracts
mandating the use of collect call-only and debit card telephone systems. These constraints and
charges unlawfully burden the plaintiffs' First Amendment rights and are not imposed upon
other similarly situated telephone service customers. As a result, defendants' policies, practices
and/or customs violate the Equal Protection Clause of the Fourteenth Amendment, which applies
to District of Columbia residents through the Fifth Amendment.

92. Defendant CCA, acting in concert and conspiracy with telephone company
defendants, has established discriminatory and excessive surcharges and rates for inmate
telephone calls, prohibited less costly calling options, and denied plaintiffs the same service
afforded other consumers of telephone services in the District of Columbia and throughout the
United States. Such policies and practices operate as a special discriminatory tax or fee and an
undue burden placed on persons who receive phone calls from prisoners, thus constituting an
invidious and unreasonable classification in violation of the equal protection clause of the
Fourteenth Amendment of the United States Constitution.

93. Defendants' constitutional abuses and violations were and are directly and
proximately caused by the actions, policies, practices and/or customs devised, implemented,

35

enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive dealing telephone contracts for the provision of inmate telephone services to **CCA** correctional facilities thereby eliminating all competition for the provision of such services; (b) the imposition and maintenance of the unduly restrictive inmate telephone systems; (c) the institution of a special toll on the First Amendment rights of plaintiff bill payers in the form of surcharges agreed upon by defendant CCA and defendant telephone companies; and (d) the provision of inadequate telephone services to plaintiffs and the class members they represent, further inhibiting them in the exercise of their First Amendment rights.

94. Defendants have acted with deliberate indifference to the Fourteenth Amendment rights of the bill payer plaintiffs and other members of the class they represent. As a direct and proximate result of the aforesaid acts and omissions of defendants, the Fourteenth Amendment rights of the bill payer plaintiffs and other class members have been violated. By acting under color of State law to deprive the named bill payer plaintiffs and other class members of their Fourteenth Amendment rights, defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of State law of rights secured under the Constitution and the laws of the United States.

95. Defendants' actions, policies, practices and/or customs have directly and proximately caused such constitutional abuses. Defendants' telephone systems determine the ability of plaintiffs and other members of the class to communicate with family members and others incarcerated in **CCA** correctional facilities. Thus, a real and immediate threat exists that the Fourteenth Amendment rights of the bill payer plaintiffs and other class members will be violated by defendants in the future. Indeed, because defendants' telephone systems determine the mode of telephone communication — and all communication for some class members — the

36

bill payer plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of defendants.

96. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from maintaining the present telephone systems.

## COUNT IV
### DUE PROCESS CLAIMS
### BY FAMILY AND INMATE PLAINTIFFS

97. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

98. Under the First, Fifth and Fourteenth Amendments to the United States Constitution, plaintiffs who are the parents, children, siblings, and spouses of persons incarcerated in CCA correctional facilities have a liberty interest in and a constitutionally protected right of familial association.

99. Under the exclusive telephone service agreements created by defendants, family member and inmate plaintiffs are required to use telephone systems provides poor quality service, unduly restricts plaintiffs' ability to receive phone calls, imposes baseless surcharges and is prohibitively expensive. The system excludes alternative means of telephone communication that are no more burdensome to defendants' penological interests and are significantly less burdensome to plaintiffs' expressive and associational rights. As a result, the First Amendment rights of plaintiffs and other members of the class have been unlawfully burdened and impaired.

100. Defendants have implemented, enforced, encouraged, and sanctioned actions, policies, practices and/or customs of creating an exclusive telephone service franchise and employing telephone systems that unlawfully burden the Fifth and Fourteenth Amendment Due

37

Process rights of the family member and inmate plaintiffs and other members of the class they represent.

101. Defendants' constitutional abuses and violations were and are directly and proximately caused by the actions, policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive dealing telephone contracts for the provision of inmate telephone services to **CCA** correctional facilities thereby eliminating all competition for the provision of such services; (b) the imposition and maintenance of the unduly restrictive inmate telephone systems; (c) the institution of a special toll on the First Amendment rights of plaintiff bill payers in the form of surcharges agreed upon by defendant CCA and defendant telephone companies; and (d) the provision of inadequate telephone services to plaintiffs and the class members they represent, further inhibiting them in the exercise of their Fifth and Fourteenth Amendment rights.

102. Defendants have acted with deliberate indifference to the Fifth and Fourteenth Amendment Due Process rights of the family member and inmate plaintiffs and other members of the class they represent. As a direct and proximate result of the aforesaid acts and omissions of the defendants the Fifth and Fourteenth Amendment rights of plaintiffs and other class members have been violated. By acting under color of State law to deprive the named plaintiffs and other class members of their Fifth and Fourteenth Amendment rights, defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of State law of rights secured under the Constitution and the laws of the United States.

103. Defendants' actions, policies, practices and/or customs have directly and proximately caused such constitutional abuses. Defendants' telephone systems determine the ability of the family member and inmate plaintiffs and other members of the class they represent

to associate with their family members who are incarcerated in **CCA** correctional facilities, and to make important marital, parental, and familial decisions. Thus, a real and immediate threat exists that the Fifth and Fourteenth Amendment Due Process rights of Plaintiff and other class members will be violated by defendants in the future. Indeed, because defendants' telephone systems determine the mode of telephone communication — and all communication for some class members — plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of defendants.

104. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from maintaining the present telephone systems.

## COUNT V
## DUE PROCESS CLAIMS
## BY BILL PAYER PLAINTIFFS

105. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

106. Under the Fifth and Fourteenth Amendments of the United States Constitution, the families, lawyers, other bill payers and class members have the right not to have their property confiscated without due process of law.

107. Defendants have implemented and enforced actions, policies, practices and/or customs of requiring, engaging in, and maintaining exclusive telephone service franchises and mandating the use of collect call-only and debit card telephone systems. These agreements unlawfully burden the bill payer plaintiffs' First Amendment rights, impose on them exorbitant rates for services, and prohibit the use of less costly alternatives for telephone calls by inmates from **CCA** correctional facilities. Such agreements, and their effects, constitute a confiscation of

plaintiffs' property in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

108. Defendants' constitutional abuses and violations were and are directly and proximately caused by the actions, policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive dealing telephone contracts for the provision of inmate telephone services to **CCA** correctional facilities thereby eliminating all competition for the provision of such services; (b) the imposition and maintenance of the unduly restrictive inmate telephone systems; (c) the institution of a special toll on the First Amendment rights of plaintiff bill payers in the form of surcharges agreed upon by defendant CCA and defendant telephone companies; and (d) the provision of inadequate telephone services to plaintiffs and the class members they represent, further inhibiting them in the exercise of their Fifth and Fourteenth Amendment rights.

109. Defendants have acted with deliberate indifference to the Fifth and Fourteenth Amendment rights of the bill payer plaintiffs and other members of the class they represent. As a direct and proximate result of the aforesaid acts and omissions of defendants the Fifth and Fourteenth Amendment rights of plaintiffs and other class members have been violated. By their acts and omissions, defendants have acted under color of State law to deprive the named bill payer plaintiffs and other class members of their Fifth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

110. Defendants' actions, policies, practices and/or customs have directly and proximately caused such constitutional abuses. Defendants' telephone systems determine the ability of plaintiffs and other members of the class to communicate with their family members, friends, and clients who are incarcerated in **CCA** correctional facilities, and also determine the

40

terms under which that communication occurs. Thus, a real and immediate threat exists that the Fifth and Fourteenth Amendment rights of the bill payer plaintiffs and other class members will be violated by defendants in the future. Indeed, because defendants' telephone systems determine the mode of telephone communication — and all communication for some class members —plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of defendants.

111. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from maintaining the present telephone systems.

## COUNT VI
## CLAIM OF UNCONSTITUTIONAL IMPAIRMENT OF CONTRACT
## BY FAMILIES, LAWYERS AND OTHER BILL PAYER PLAINTIFFS

112. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

113. Under Article I § 10 of the United States Constitution, the family, counsel, and other bill payer plaintiffs and class members have constitutionally protected rights not to have contractual relationships impaired. Article I § 10 of the U.S. Constitution is made applicable to the District of Columbia by D.C. Code §1-204.

114. At all relevant times herein, the bill payer plaintiffs and other class members have had and continue to have ongoing contracts with particular telephone companies for the provision of telephone services. These contracts specify the services to be provided, billing rates, calling options, and other services. Under these agreements, the bill payer plaintiffs are entitled to specified rates for collect call and other services.

115. Defendants' actions, policies, practices and/or customs of requiring, engaging in, and maintaining exclusive telephone service agreements and mandating the use of predetermined

41

telephone systems by select companies unlawfully interferes with plaintiffs' existing contracts

for telephone service. As a result of such interference, plaintiffs lose the benefit of those

contracts on each and every collect telephone call that they receive from an individual

incarcerated in a CCA correctional facilities, and are compelled to purchase these services from

a separate telephone company not of their selection. These restrictions and requirements

constitute a substantial impairment of plaintiffs' contractual relationship with others in violation

of Article I, § 10 of the United States Constitution.

116. Defendants' constitutional abuses and violations were and are directly and

proximately caused by the actions, policies, practices and/or customs devised, implemented,

enforced, encouraged, and sanctioned by defendants, including: (a) the creation of exclusive

dealing telephone contracts for the provision of inmate telephone services to CCA correctional

facilities thereby eliminating all competition for the provision of such services; (b) the

imposition and maintenance of the unduly restrictive inmate telephone systems; (c) the

institution of a special toll on the First Amendment rights of plaintiff bill payers in the form of

surcharges agreed upon by defendant CCA and defendant telephone companies; and (d) the

provision of inadequate telephone services to plaintiffs and the class members they represent,

further inhibiting them in the exercise of their Fifth and Fourteenth Amendment rights.

117. Defendants have acted with deliberate indifference to constitutional right to contract

of the bill payer plaintiffs and other members of the class they represent. As a direct and

proximate result of the aforesaid acts and omissions of defendants the rights of plaintiffs and

other class members to unimpaired freedom to contract have been violated. By their acts and

omissions, defendants have acted under color of State law to deprive the named bill payer

42

plaintiffs and other class members of their Fifth and Fourteenth Amendment rights in violation of

Article I, § 10 of the United States Constitution.

118. Defendants' actions, policies, practices and/or customs have directly and

proximately caused such constitutional abuses. Defendants' telephone systems determine the

ability of plaintiffs and other members of the class to communicate with their family members,

friends, and clients who are incarcerated in CCA correctional facilities, and also determine the

terms under which that communication occurs. Thus, a real and immediate threat exists that

constitutional right to contract of the bill payer plaintiffs and other class members will be

violated by defendants in the future. Indeed, because defendants' telephone systems determine

the mode of telephone communication — and all communication for some class members —

plaintiffs and other class members cannot alter their behavior to avoid future violations of their

constitutional and civil rights at the hands of defendants.

119. Plaintiffs and other members of the class have no adequate remedy at law and will

suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined

from maintaining the present telephone systems.

## COUNT VII
## SHERMAN ACT CLAIMS
## BY FAMILIES, LAWYERS AND OTHER BILL PAYER PLAINTIFFS

120. Plaintiffs reallege and incorporate paragraphs 1 through 72 of this complaint.

121. The defendants, acting jointly and in concert, contracted, combined and/or conspired

with each other and entered into exclusive dealing agreements regarding inmate telephone

service. These exclusive agreements restrict access of consumers who seek alternative means to

communicate with people confined in CCA facilities from using the competitive choices

generally available in the telephone market, and generate gross profits for the defendants. In

43

adopting these agreements, the defendants have intentionally acquired and attempted to acquire monopoly power in the market for inmate-initiated telephone services at CCA facilities.

122. The foregoing conduct of these defendants has produced adverse anti-competitive effects within the market for inmate-initiated telephone calls in the District of Columbia and other markets throughout the United States. Moreover, the conduct has had a substantial and direct effect on interstate commerce and unreasonably restrained trade.

123. By entering the grossly profitable exclusive dealing agreements, the defendants have all become participants in the market for inmate-initiated telephone calls. However, they have not acted pursuant to any clearly articulated and affirmatively expressed state policy to displace competition in the market for inmate-initiated telephone services in CCA facilities.

124. By virtue of the forgoing conduct, defendants have unlawfully monopolized and attempted to monopolize telephone services in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 2.

125. As a result of the foregoing unlawful conduct, the plaintiffs and class have suffered proximate injury, having paid unjustified, exorbitant and unreasonable charges for telephone calls received from inmates and have been prevented from choosing other options of telephone service for use in receiving telephone calls from inmates incarcerated in the CCA prisons. Plaintiffs have been and continued to be injured in their business and property in violation of 15 U.S.C. §4.

126. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm unless defendants are enjoined from maintaining the present telephone systems.

## COUNT VIII

44

## CLAIMS UNDER THE COMMUNICATIONS ACT
## BY FAMILIES, LAWYERS AND OTHER BILL PAYER PLAINTIFFS

127. Plaintiffs reallege and incorporate herein paragraphs 1 through 72 of this complaint.

128. The telephone company defendants are common carriers and defendant, **CCA**, is an aggregator, subject to the terms of the Communications Act, 47 U.S.C. § 151 et seq. Section 201(a) of the Communications Act provides: "It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefore." Section 201(b) of the Communications Act requires that all "charges, practices, classifications and regulations for and in connection with such communication service shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful."

129. The charges, practices, classifications and regulations which are imposed on plaintiffs as authorized by the illegal arrangement between the defendants herein are "unjust" and "unreasonable" in violation of § 201(b) of the Communications Act.

130. Section 202(a) of the Communications Act makes it unlawful for the defendants herein "to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class or persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage." The charges, practices, classifications, regulations, facilities, or services that are imposed on

45

plaintiffs as authorized by the illegal arrangement between the violate § 202(a) of the

Communications Act.

131. Plaintiffs and other members of the class have no adequate remedy at law and will

suffer serious and irreparable harm unless defendants are enjoined from maintaining the present

telephone systems.

**COUNT IX**

**CLAIMS UNDER DISTRICT OF COLUMBIA COMMON LAW**
**TORTIOUS INTERFERENCE WITH CONTRACT AND UNJUST ENRICHMENT**
**BY FAMILIES, LAWYERS AND OTHER BILL PAYER PLAINTIFFS**

132. Plaintiffs incorporate herein paragraphs 1 through 72of this compliant.

133. At all relevant times, the plaintiffs and class members have had contracts with

particular telephone companies for local and long distance telephone services. These contracts

specify the services to be provided, billing charges, and calling options. Under these contracts,

the plaintiffs and class members have bargained for and are entitled to specified charges for

collect call and calling card services.

134. Defendants' knew or should have known that plaintiffs and class members had

contracts for long distance and local telephone services. Defendants' actions, policies, practices,

and/or customs of requiring, engaging in, and maintaining restrictive telephone systems,

unlawfully interferes with the plaintiffs' and class members existing contracts for telephone

services. As a result of this interference, plaintiffs lose the benefit of their own contracts on each

and every collect call and debit card call they receive from individuals incarcerated in **CCA**

facilities. The plaintiffs and class members are compelled to purchase these services from

defendant telephone companies, which are not the telephone companies of their selection. The

actions taken by defendant **CCA** and defendant telephone companies creating an exclusive

46

telephone services contract for collect calls and debit cards were and are the direct and proximate cause of the harm suffered by plaintiffs and class members.

135. By restricting the plaintiffs and class members to purchasing telephone services only from defendant telephone companies — which are not telephone companies of the plaintiffs' choice and which charge significantly more than the plaintiffs bargained for — the exclusive dealing agreements conferred upon the defendants a benefit that they were not entitled to receive at the expense of the plaintiffs and class members. By interfering with the contracts for telephone services that plaintiffs contracted for, plaintiffs and class members paid defendants for services the defendants were not entitled to receive. As a direct result of the actions of the defendants, the defendants were unjustly enriched. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm unless defendants are enjoined from maintaining the present telephone systems.

## COUNT X
## CLAIMS OF D.C. COMMON LAW UNCONSCIONABILITY
## BY FAMILIES, LAWYERS, PRISONERS AND OTHER BILL PAYER PLAINTIFFS

136. Plaintiffs incorporate herein paragraphs 1 through 72 of this complaint.

137. Defendants' actions, policies, practices, and/or customs of requiring, engaging in, and maintaining restrictive telephone systems, creates the sole means for prisoner plaintiffs, plaintiffs and class members to have any telephone contact with their family members or clients. If all plaintiffs and class members do not agree to accept the terms offered by the defendants, they cannot have any telephone contact with their family members or clients. As a direct result of the defendants actions, all plaintiffs and class members are without any meaningful choice about whether or not to enter into the agreement to accept exorbitantly high collect calls and assist in purchasing inflated cost debit cards.

47

138. Additionally, the terms of the contract for services are unreasonably favorable to defendant **CCA** and the defendant telephone companies. Defendant **CCA** and defendant telephone companies are requiring payment for "operator assisted" calls without providing the benefits of a live operator. The calls are placed, managed, and completed by a computer. No human intervention is provided to assist with making the collect telephone call. The agreement for the use a debit card is also highly favorable to the defendants and without providing any additional service to all plaintiffs and class members.

139. The actions taken by defendant **CCA** and defendant telephone companies creating an exclusive telephone services contract for collect calls and debit cards prevented all plaintiffs and member class from any meaningful choice whether or not to accept the terms offered if they wish to speak with their family members or clients. The actions taken by defendant **CCA** and defendant telephone companies created terms of an agreement that was unreasonably favorable to the defendants. As a result, the agreement created by the defendants and accepted by all plaintiffs and class members is unconscionable.

140. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm unless defendants are enjoined from maintaining the present telephone systems.

## COUNT XI
## CLAIMS UNDER THE D.C. CONSUMER PROTECTION PROCEDURES ACT
### D.C. CODE § 28-3901 et. seq.
### BY FAMILY, LAWYERS AND OTHER BILL PAYER PLAINTIFFS

141. Plaintiffs herein incorporate paragraphs 1 through 72 of complaints.

142. Defendants, by their actions, policies, practices, and/or customs of requiring, engaging in, and maintaining restricted telephone systems, are making and enforcing

48

unconscionable terms of sale under the D.C. Consumer Protection Procedures Act. The defendants prevent plaintiffs and class members from having access to telephone services of higher value than the ones being offered by the defendants. The telephone services offered by the defendants are of a lesser value than the telephone services plaintiffs and class members may obtain from other service providers. Defendant telephone companies charge plaintiffs and class members for operator services not received and refuse to respond to complaints or inquiries concerning problems raised by persons accepting collect calls from inmates. The debit cards offered by the defendant telephone companies are often defective, and collect calls are often disconnected. At other times the debit system is unavailable to the inmate plaintiffs and class members. Additionally, the services offered by the defendants are much more expensive than similar services available to the plaintiffs, inmate plaintiffs, and class members when they are not subject to the exclusive dealing agreements.

143. Defendant CCA and defendant telephone companies have compelled plaintiffs and class members to use the services of less value in order to speak with their incarcerated family members with the knowledge that services of higher value are readily available to the plaintiffs and class members. Defendants made and enforced unconscionable terms of sale in violation of D.C. Code § 28-3904(r)(3).

144. In addition, the defendants have violated D.C. Code § 28-3904 by enforcing terms that are unconscionable under common law.

145. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm unless defendants are enjoined from maintaining the present telephone systems.

49

## COUNT XII
## CLAIMS UNDER THE DISTRICT OF COLOMBIA ANTITRUST ACT
### D.C. CODE §28-4501 et. seq.
### BY FAMILIES, LAWYERS AND BILL PAYER PLAINTIFFS

146. Plaintiffs reallege and incorporate paragraphs 1 through 72 of this complaint.

147. The defendants, acting jointly and in concert, contracted, combined and/or conspired with each other and entered into exclusive dealing agreements regarding inmate telephone service. These exclusive agreements restrict access of consumers who seek alternative means to communicate with people confined in CCA facilities from using the competitive choices generally available in the telephone market.

148. The foregoing conduct of these defendants has produced adverse anti-competitive effects within the market for inmate-initiated telephone calls in the District of Columbia and have unreasonably restrained trade in interstate commerce, and constitute monopolization and attempts to monopolize under D. C. Code §28-4501 et.seq.

149. By virtue of the forgoing conduct, defendants have violated D.C. Code §§ 28-4501, 28-4502, and § 28-4503. Plaintiffs are entitled to relief pursuant to D.C. Code §§ 28-4508 and 28-4509.

150. By virtue of the foregoing unlawful conduct, the plaintiffs and class have suffered proximate injury, having paid unjustified, exorbitant and unreasonable charges for telephone calls received from inmates and have been prevented from choosing other options of telephone service for use in receiving telephone calls from inmates incarcerated in the CCA prisons. Plaintiffs and other members of the class have no adequate remedy at law and will suffer serious and irreparable harm unless defendants are enjoined from maintaining the present telephone systems.

50

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.    Certify this case as a class action.

B.    Issue a declaratory judgment that the agreements, acts and practices alleged herein
      are illegal.

C.    Preliminarily and permanently enjoin the agreements, acts and practices found to
      be illegal herein and order the defendants to provide to the plaintiffs and members
      of the plaintiff class telephone service which is legal and proper; and issue such
      other injunctive relief as will remedy the violations of plaintiffs' rights herein and
      assure that telephone service provided to inmates hereafter is just lawful, and non-
      discriminatory.

D.    Order the defendants to provide restitution to the plaintiffs and members of the
      plaintiff class for all losses they have incurred herein.

E.    Award to plaintiffs and members of the plaintiff class compensatory and punitive
      damages, and treble damages under the Sherman Act and D.C. Code §§ 28-4508
      and 28-4509.

F.    Award to plaintiffs and members of the plaintiff class compensatory and punitive
      damages to be determined at trial.

G.    Award plaintiffs and the plaintiff class their attorneys' fees, costs and expenses.

H.    Provide for such other relief as is just and proper.

Date: February 16, 2000

_(signature)_

Eric Lotke, Local Counsel for Plaintiffs

_(signature)_

Marie-Ann Sennett, Local Counsel for Plaintiffs

Eric R. Lotke (D.C. Bar #446706)
Marie-Ann Sennett (D.C. Bar #462200)
D.C. Prisoners' Legal Services Project, Inc.
1400 20th Street, N.W.
Suite 117
Washington, D.C. 20036
(202) 775-0323

Michael E. Deutsch (New York Bar # MED 1644)
1180 North Milwaukee Avenue
Chicago, IL 60622
(773) 235-0070

Stephen G. Seliger (Illinois Bar #2547074)
Laurie S. Elkin
Patrick D. Dolan
Seliger, Elkin & Dolan, Ltd.
155 North Michigan Avenue
Suite 500
Chicago, IL 60601
(312) 616-4244

Barbara J. Olshansky (New York Bar # BO3635)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464 x 439

Jan Susler
John Stainthorp (Illinois Bar #3128243)
People's Law Office
1180 North Milwaukee Avenue
Chicago, IL 60622
(773) 235-0070

52

James Bradtke
Soule & Bradtke
155 North Michigan Avenue
Suite 500
Chicago, Illinois 60601
(312) 616-4422