# ATTACHMENT A

**Federal Communications Commission**                                    **FCC 14-158**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| | ) | |

**SECOND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted:  October 17, 2014**                          **Released:  October 22, 2014**

**Comment Date:  [45 days after date of publication in the Federal Register]**
**Reply Comment Date:  [60 days after date of publication in the Federal Register]**

By the Commission: Chairman Wheeler and Commissioners Clyburn and Rosenworcel issuing separate
          statements; Commissioners Pai and O'Rielly concurring in part, dissenting in part
          and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                   Paragraph #

I.   INTRODUCTION ....................................................................................................... 1
II.  BACKGROUND ......................................................................................................... 7
III. DISCUSSION ........................................................................................................... 19
     A. Payments to Correctional Facilities ................................................................... 20
        1. Restrictions on Payments to Correctional Facilities ..................................... 21
        2. Legal Authority ............................................................................................. 29
        3. Possible Reforms to Site Commissions ........................................................ 37
     B. Interstate and Intrastate ICS Rate Reform ......................................................... 47
        1. Proposals for a Unitary Rate ......................................................................... 61
        2. Tiered Rate Caps ........................................................................................... 67
        3. Additional Considerations Related to ICS Rates .......................................... 73
     C. Reforms to Ancillary Charges ........................................................................... 80
        1. Background .................................................................................................... 80
        2. Legal Authority for Ancillary Charge Reform ............................................. 85
        3. Discussion ..................................................................................................... 87
           a. Prohibition of Certain Ancillary Charges ................................................ 87
           b. Rate Caps for Ancillary Charges ............................................................. 94
           c. Charges for Other Services ...................................................................... 98
           d. Consumer Disclosures ............................................................................. 109
           e. Other Issues ............................................................................................. 111
     D. Additional Ways to Promote Competition ......................................................... 113
     E. Harmonization of State Regulations Under Section 276(c) ............................... 116
     F. Existing Contracts .............................................................................................. 123
     G. Transition Periods .............................................................................................. 128
     H. Accessible Inmate Calling Services ................................................................... 133
     I. Advanced Inmate Communications Services ...................................................... 145
     J. Periodic Review .................................................................................................. 152

K.   Enforcement ................................................................................................................. 155
L.   Cost/Benefit Analysis of Proposals ............................................................................. 159
IV. PROCEDURAL MATTERS ................................................................................................. 160
A.   Filing Instructions ........................................................................................................ 160
B.   Ex Parte Requirements ................................................................................................. 161
C.   Paperwork Reduction Act Analysis ............................................................................. 162
D.   Initial Regulatory Flexibility Analysis ........................................................................ 163
V.   ORDERING CLAUSES ....................................................................................................... 164
APPENDIX – Initial Regulatory Flexibility Analysis

# I.      INTRODUCTION

1.      In 2013, nearly ten years after Martha Wright, a grandmother from Washington, D.C., petitioned the Federal Communications Commission (Commission or FCC) for relief from exorbitant long-distance calling rates from correctional facilities,[1] the Commission took long overdue steps to provide relief to the millions of Americans paying unjust and unreasonable interstate inmate phone rates. These exorbitantly high rates discouraged phone calls and, at times, made it nearly impossible for inmates to maintain contact with their families, friends and communities, to society's detriment.[2]

2.      Reforming inmate calling service (ICS) benefits society by making it easier for inmates to stay connected to their families and friends.  An April 2014 report from the Department of Justice found that, of the 400,000 prisoners released over a five-year period, two-thirds were rearrested within three years, and three-quarters were rearrested within five years.[3]  As a nation, we need to take all actions possible to reduce these recidivism rates.  Studies have shown that family contact during incarceration is associated with lower recidivism rates.[4]  Lower recidivism means fewer crimes, decreases the need for additional correctional facilities, and reduces the overall costs to society.[5]  Reform also helps families and the estimated 2.7 million children of incarcerated parents in our nation, an especially vulnerable part of

---

[1] *See generally* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petition for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking, CC Docket No. 96-128 at 3 (filed Nov. 3, 2003) (First Wright Petition) ("Accordingly, Petitioners request that the Commission prohibit exclusive inmate calling service agreements and collect call-only restrictions at privately-administered prisons and require such facilities to permit multiple long distance carriers to interconnect with prison telephone systems. . . .").  The Wright Petitioners filed an alternative petition for rulemaking in 2007.  *See* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petitioners' Alternative Rulemaking Proposal, CC Docket No. 96-128 (filed Mar. 1, 2007) (Alternative Wright Petition).

[2] *See, e.g.*, Wright Petitioners NPRM Comments at 37-38; Letter from Drew Kukorowski, Research Associate, Prison Policy Initiative and Taren Stinebrickner-Kauffman, Founder and Executive Director, SumOfUs, to Julius Genachowski, Chairman, FCC, CC Docket No. 96-128 (filed Nov. 15, 2012) (including 36,690 public comments "supporting imposition of price caps on correctional facility telephone rates").

[3] *See* U.S. Department of Justice, Bureau of Justice Statistics, *Recidivism of State Prisoners Released in 2005*, April 2014, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4987 (last visited Sept. 14, 2014).

[4] The Center on the Admin. of Criminal Law NPRM Comments at 10 (citing Nancy G. La Vigne, *Examining the Effect of Incarceration and In-Prison Family Contact on Prisoners' Family Relationships*, 21 J. OF CONTEMP. CRIM. JUSTICE 314, 316 (2005)); *accord* Letter from Roy "Lynn" McCallum, Jail Commander, Elmore County Sheriff's Office, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed April 22, 2013) ("We recognize the value of retaining family contact during incarceration.  The reduction in recidivism is well documented."); *see also* AMY L. SOLOMON, JENNY OSBORNE, LAURA WINTERFIELD ET AL., *Putting Public Safety First: 13 Parole Supervision Strategies to Enhance Reentry Outcomes* at 29-31 (Washington, D.C.: The Urban Institute 2008), *available at* http://www.urban.org/UploadedPDF/411791_public_safety_first.pdf (last visited Sept. 14, 2014).

[5] *See infra* note 458.

our society.[6]  In addition to coping with the anxiety associated with a parent who is not present on a daily basis, these young people are often suffering severe economic and personal hardships and are often doing poorly in school, all of which are exacerbated by the inability to maintain contact with their incarcerated parent due to unaffordable inmate calling rates.[7]

3.      While the Commission prefers to promote competition to ensure rates are just and reasonable, it remains clear that in the inmate calling service market, as currently structured, competition is failing to do so.[8]  Evidence in the record indicates that, as of 2013, interstate ICS rates with comparable security features and protections varied from as low as $0.046 per minute to as high as $0.89 per minute, plus a per call charge as high as $3.95.[9]  Even worse, rates are as high as $2.26 per minute for a call placed by a deaf or hard of hearing prisoner.[10]  Excessive rates are primarily caused by the widespread use of site commission payments – fees paid by ICS providers to correctional facilities or departments of corrections to win the exclusive right to provide inmate calling service at a facility.[11]  These site commission payments, which have recently been as high as 96% of gross revenues,[12] inflate rates and fees, as ICS providers must increase rates in order to pay the site commissions.  This forces inmates and their friends and families, who use ICS and are forced to absorb the site commissions in the rates they pay, to subsidize everything from inmate welfare programs, to salaries and benefits of correctional facilities, states' general revenue funds, and personnel training.[13]  The ICS market has been characterized

---

[6] *See* BRUCE WESTERN AND BECKY PETTIT, THE ECONOMIC MOBILITY PROJECT, Collateral Costs:  Incarceration's Effect on Economic Mobility at 18-19 (THE PEW CHARITABLE TRUSTS 2010), *available at* http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/CollateralCosts1pdf.pdf (last visited Oct. 7, 2014).  *See also* Letter from Barbara Graves-Poller, Supervising Attorney, MFY Legal Services, to FCC, Office of Regulations, WC Docket No. 12-375 at 2-3 (filed July 7, 2014) (noting that under New York Domestic Relations Law § 111(2), a parent who fails to visit or communicate with a child for six months is deemed to have forfeited parental rights; thus inmates who cannot afford high ICS rates "risk losing their parental rights if they or their children's caregivers cannot afford to pay for telephone communications.").

[7] *See, e.g.*, Letter from Edyael Casaperalta, Rural Broadband Policy Group Coordinator, Center for Rural Strategies, to  Ms. Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at Attach. (filed Sept. 24, 2014) (Statement of Morgan Tofani) (discussing how, when her stepfather was incarcerated, "phone conversations allow[ed] us to continue our relationship during this difficult time," and stating that her mother had spent "over $2,000 in phone calls" for ICS).

[8] *See infra* Section III.A.

[9] The $0.046 rate was in New Mexico with no connection charges; the $0.89 rate was in Georgia and also included an additional per-call charge of $3.95 – as much as a 23-fold difference.  *See* Letter from Alex Friedmann, Assoc. Dir., HRDC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Rev. Exh. B (filed June 8, 2013); *see also* Securus NPRM Comments, App. 2 (showing the wide range of rates in the various states).

[10] *See* HEARD FNPRM Comments at 3-4 (noting that one HEARD advocate paid $63.49 for a 33-minute TTY-to-voice call).  *See also* Transcript of Reforming ICS Rates Workshop at 77-78, WC Docket 12-375 (filed July 30, 2014) (2014 ICS Workshop Transcript) (Talila Lewis, Founder, HEARD).

[11] *See infra* Section III.A.

[12] *See* Letter from Lee G. Petro, Counsel to Petitioners to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at Attach. (filed Aug. 16, 2014) (Petitioners Aug. 16, 2014 *Ex Parte* Letter at Attach.).

[13] For example, Petitioners point out that in Orange County, California, the Inmate Welfare Fund had a budget of $5,016,429 in 2010, and of that amount, 74% of the funds were used for staff salaries, 0.8% was used for the actual services, supplies, and training for inmate educational programs, and 0.06% was used for services, supplies, and training for inmate re-entry programs.  *See* Petitioners NPRM Reply at 26-27 and Exh. H (providing a list of states and counties that, pursuant to statute, extract revenues shared with ICS providers for non-inmate educational needs, including employee salaries and equipment, building renewal funds, salaries and benefits, states' general revenue funds, and personnel training); PLS NPRM Comments at 7 (noting that commissions paid to county facilities in Massachusetts are placed in a fund available for use by the Sheriff, while commissions paid to the Department of Correction are transferred to the General Fund of the Commonwealth).

by some as subject to "reverse competition," forcing providers to compete not on price or service quality but on the size of site commission payments – a dynamic that drives rates ever higher to cover greater and greater site commission payments.[14]

4.      The 2013 *Inmate Calling Report and Order and FNPRM* tackled these issues for the first time and took important initial steps for reform.  The *Order* adopted a cost-based approach with interim interstate rate caps and a Mandatory Data Collection to allow the Commission to evaluate ICS costs, including ancillary charge costs,[15] in order to develop reforms such as permanent rate caps and to address the use of ancillary charges not reasonably related to the cost of providing service.[16]  With regard to site commission payments, the *Order* reaffirmed the Commission's previous holding that site commission payments are an apportionment of profit.[17]  The *Order* also determined that site commission payments and other provider expenditures not reasonably related to the provision of interstate ICS are not recoverable through ICS rates.[18]

5.      Although the rate caps adopted in the *Order* were interim in nature pending results of the Mandatory Data Collection,[19] the reforms have already had a significant impact on contact between inmates and their families.[20]  Evidence indicates that as interstate rates have declined, there has been a corresponding increase in call volumes.  For example, one provider indicates that, as a result of the Commissions' reforms, its interstate ICS rates declined 39 percent and interstate call volumes increased 20 to 30 percent.[21]  Praeses reports that it tracked interstate ICS call volume for its clients and that in comparing a four-month period prior to the *Inmate Calling Report and Order and FNPRM* with another

---

[14] *See* Letter from Jason Marks, Esq., to Mignon Clyburn, Acting Chair, FCC, WC Docket No. 12-375 at 1 (filed July 12, 2013) (Marks July 12, 2013 *Ex Parte* Letter).

[15] The Commission's rules define ancillary charges as "any charges to Consumers not included in the charges assessed for individual calls and that Consumers may be assessed for the use of Inmate Calling Services.  Ancillary Charges include, but are not limited to, fees to create, maintain, or close an account with a Provider; fees in connection with account balances, including fees to add money to an account; and fees for obtaining refunds of outstanding funds in an account."  47 C.F.R. § 64.6000.

[16] *See generally Rates for Interstate Inmate Calling Services*, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375, 28 FCC Rcd 14107 at 14140, 14172, paras. 60, 124 (2013) (*Inmate Calling Report and Order and FNPRM* or *Order* or *FNPRM*); *pets. for stay granted in part sub nom. Securus Techs. v. FCC*, No. 13-1280 (D.C. Cir. Jan. 13, 2014) (*Securus Techs. Partial Stay Order*); *pets. for review pending sub nom. Securus Techs. v. FCC*, No. 13-1280 (D.C. Cir. Nov. 14, 2013) (and consolidated cases).  Commenter abbreviations used in this item conform with those in Appendix B of the *Order*.  *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14198-200.

[17] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14135, para. 54.

[18] *See id*.  Although the D.C. Circuit stayed three of the adopted rules, the interstate rate caps and the Mandatory Data Collection remain in effect.

[19] *See generally Inmate Calling Report and Order and FNPRM*.

[20] *See* Letter from MiChelle Moore, to Lynne Engledow, FCC, WC Docket No. 12-375 (filed Sept. 17, 2014) ("As you know, in August of 2013 – the FCC barred the high long distance rates for phone calls from prisons and jails . . . this has made a truly positive impact on SO MANY PEOPLE! . . . myself included.") (emphasis in original) (Moore Sept. 17, 2014 *Ex Parte* Letter).

[21] *See* Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed May 15, 2014) (interstate call volume in March 2014 was "20-30% higher than in March 2013, and rates decreased 39% under the same comparison," but such increase "is only approximate and might not be fully attributable to the *Order*" but to a variety of other factors).  *See also* 2014 ICS Workshop Transcript at 225 (Aleks Kajstura, Legal Director, Prison Policy Initiative) ("And I think it's important to look to places like New York that have really cut their rates, what they've seen and which has been mentioned repeatedly through filings to the FCC and in the earlier panels today is that as the prices drop, the call volumes increase making up significant portions of the money and of the profits.").

period one year later, post-adoption, "call volume increased nearly seventy percent."[22]  But interstate rates are only part of the ICS market.[23]  Although the *Order* set a framework for states to follow, few have done so.  Many intrastate rates remain high, with some having even increased following the *Order*.[24]  There are indications that ancillary fees have also increased in number, price, or both, leading to further expense for ICS consumers in a manner that is often unrelated to the cost of providing ICS.[25]  These developments underscore the critical need for the Commission to move expeditiously to adopt comprehensive, permanent reforms.

6.       The Commission was unable to adopt comprehensive reform in the *Inmate Calling Report and Order and FNPRM* due to the limited data in the record and administrative notice limited only to interstate ICS.  Because we seek comment on a comprehensive solution – rather than just reforming interstate rates – we seek comment on moving to a market-based approach to encourage competition in order to reduce rates to just and reasonable levels and to ensure fair but not excessive ICS compensation.  This approach was not feasible when the Commission previously addressed interstate rates because new intrastate rates and fees could circumvent such efforts.  We therefore initiate this Second Further Notice of Proposed Rulemaking (Second Further Notice) to develop a record to adopt comprehensive, permanent ICS reforms as expeditiously as possible.  In this item, we seek comment on adopting a simplified, market-based approach focused on aligning the interests of ICS providers and facilities to deliver high quality ICS with advanced security features at the lowest prices for end users.  We seek comment on whether such an approach will significantly limit competitive distortions in the ICS marketplace.  We seek comment on the Commission's legal authority regarding site commissions and ask whether such payments should be prohibited.  We seek comment on whether facilities incur costs in the provision of ICS and, if so, how facilities should recover these costs, as well as appropriate transition periods to enable facilities time to adjust.  We seek comment on proposals in the record to establish permanent rate caps for all intrastate and interstate calls, limit ancillary charges, and adopt other measures to ensure that ICS rates are just, reasonable, fair, and accessible to all Americans.  We believe that this market-based approach is only possible through a comprehensive reform effort dealing with all of the major portions of the ICS market, unlike when the Commission addressed only interstate ICS in the *Inmate Calling Report and Order and FNPRM*.  We seek comment on alternative ways to promote competition in the ICS market.  We seek comment on whether eliminating site commissions and capping rates and fees, on both interstate and intrastate ICS, better aligns the interests of both ICS providers and correctional institutions with the interests of consumers, allowing market forces to drive rates to competitive levels.

## II.    BACKGROUND

7.       In 2003, Mrs. Wright and her fellow petitioners (Wright Petitioners or Petitioners), who included current and former inmates at Corrections Corporations of America-run confinement facilities, filed a petition with the Commission seeking to initiate a rulemaking to address high long-distance ICS

---

[22] *See* Letter from Phil Marchesiello, Counsel to Praeses LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed Oct. 3, 2014) (Praeses Oct. 3, 2014 *Ex Parte* Letter) (Praeses, a private company that "assists correctional facilities in evaluating and negotiating contracts with . . . ICS providers, monitoring the compliance of such ICS providers with the contracts, and/or complying with local, state, and federal regulation of ICS," compared the period of April-July 2013 to April-July 2014.  *Id.* at 2).

[23] Moore Sept. 17, 2014 *Ex Parte* Letter ("The trouble now is . . . it's cheaper for an incarcerated individual to call outside the state (long distance) than it is for that individual to call inside the state -- to a local number.").

[24] 2014 ICS Workshop Transcript at 169 (Lee G. Petro, Counsel to Petitioners) ("We've seen now with the reduction in the interstate rates an increase in the intrastate rates and an increase in the ancillary fees.").

[25] 2014 ICS Workshop Transcript at 137, 140 (Vincent Townsend, President, Pay Tel); *see also* Letter from Marcus W. Trathen, Counsel to Pay Tel, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at Attach. "FCC Workshop on Inmate Calling Services – Panel 2, Ancillary Charges" (filed July 10, 2014) (Pay Tel July 10, 2014 *Ex Parte* Letter).

rates.[26]  The petition sought to prohibit exclusive ICS contracts and collect-call-only restrictions in correctional facilities.[27]  In 2007, the same petitioners filed an alternative rulemaking petition, asking the Commission to address high ICS rates by requiring a debit-calling option in correctional facilities, prohibiting per-call charges, and establishing rate caps for interstate, interexchange ICS.[28]  The Commission sought and received comment on both petitions.[29]

8.        In December 2012, the Commission adopted a notice of proposed rulemaking seeking comment on, among other things, the proposals in the Wright petitions.[30]  The *2012 ICS NPRM* sought comment on the two petitions and proposed ways to "balance the goal of ensuring reasonable ICS rates for end users with the security concerns and expense inherent to ICS within the statutory guidelines of sections 201(b) and 276 of the Act."[31]  The *2012 ICS NPRM* sought comment on other issues affecting the ICS market, including possible rate caps for interstate ICS; ancillary charges; data in the record; collect, debit, and prepaid ICS calling options; site commissions; issues regarding disability access; and the Commission's statutory authority to regulate ICS.[32]

9.        On August 9, 2013, the Commission adopted the *Inmate Calling Report and Order and FNPRM*, finding that interstate ICS rates were not just and reasonable as required by section 201 of the Act, and did not ensure fair, and not excessive, compensation for ICS providers as required by section 276 of the Act.[33]  In response, the Commission adopted reforms to ensure interstate rates were just, reasonable, and fair as required by Sections 201 and 276 and focused on reforming interstate site commission payments, rates, and ancillary charges.  The Commission concluded that, in the absence of competitive pressures, the default of cost-based regulation should apply to the ICS market.[34]  As discussed in the *Order*, this approach is consistent with Commission practice that "typically focuses on the costs of providing the underlying service when ensuring that rates for service are just and reasonable under section 201(b)."[35]  In addition, the Commission noted that "the cost of providing payphone service generally has been a key point of reference when [it] evaluates rules implementing the fair compensation requirements of section 276(b)(1)(A)."[36]

---

[26] *See generally* First Wright Petition.

[27] *Id.*

[28] *See generally* Alternative Wright Petition.

[29] *See Petition For Rulemaking Filed Regarding Issues Related to Inmate Calling Services Pleading Cycle Established*, CC Docket No. 96-128, Public Notice, DA 03-4027, 2003 WL 23095474 (Wireline Comp. Bur. 2003); *Comment Sought on Alternative Rulemaking Proposal Regarding Issues Related to Inmate Calling Services*, CC Docket No. 96-128, Public Notice, 22 FCC Rcd 4229 (Wireline Comp. Bur. 2007) (*2007 Public Notice*).

[30] *See generally Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking, 27 FCC Rcd 16629 (2012) (*2012 ICS NPRM*).  The *2012 ICS NPRM* incorporated relevant comments, reply comments and *ex parte* filings from the prior ICS docket, CC Docket No. 96-128, into WC Docket No. 12-375.  *See 2012 ICS NPRM*, 27 FCC Rcd at 16636, para. 15.

[31] *2012 ICS NPRM*, 27 FCC Rcd at 16636, para. 16.

[32] *See generally 2012 ICS NPRM*.  While some commenters use the terms "debit" and "prepaid" interchangeably, in the *2012 ICS NPRM*, the Commission differentiated the two, noting that for debit calling, "money is deducted from an account but the minutes are not purchased in advance," *id.* at 16641, para. 33, whereas prepaid calls are always funded in advance.  *Id.*  We continue that distinction in this Second Further Notice.

[33] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14131-32, para. 46 ("fair" encompasses compensation received by ICS providers, as well as rates paid by end users).

[34] *See id.* at 14132, para. 47.

[35] *Id.* at 14133, para. 50.

[36] *Id.*

10.     The Commission reaffirmed previous findings that site commission payments were not costs but "profit."[37]  As a result, the Commission determined that site commission payments "were not part of the cost of providing ICS and therefore not compensable in interstate ICS rates"[38]  The Commission's previous request for "updated data from all interested parties and the public, but especially from ICS providers . . . to aid . . . in developing a clearer understanding of the ICS market,"[39] went largely unheeded.[40]  Therefore, the Commission analyzed the limited data submitted by ICS providers, in addition to publicly-available data, to establish interim per-minute interstate ICS safe harbor caps of $0.12 and $0.14 and hard rate caps of $0.21 for debit and prepaid calls and $0.25 for collect calls[41] to ensure that all rates were reduced, and provided guidance about the waiver process for ICS providers that could show good cause.[42]  The Commission also required that ancillary charges be cost based.[43]  Finally, the Commission chose not to address intrastate ICS, noting instead that it had "structured [its reforms] in a manner to encourage . . . states to undertake reform."[44]  It noted, however, that in the absence of state reform of intrastate ICS, unreasonably high rates would likely continue, which would require the Commission to "take action to reform unfair intrastate ICS rates."[45]

11.     The changes to interstate rates adopted by the Commission were significant but interim. To enable the Commission to adopt permanent ICS reform, the Commission adopted a Mandatory Data Collection for ICS providers to report costs and an Annual Reporting and Certification Requirement of ICS rates.[46]  In the *FNPRM* the Commission sought specific comment on multiple aspects of permanent ICS reform regardless of jurisdiction or call type.[47]

12.     Prior to the effective date of the *Order*, the D.C. Circuit stayed three rules adopted by the Commission pending resolution of the appeal, including the rule requiring rates to be based on costs, the rule adopting an interim safe harbor, and the rule requiring ICS providers to file annual reports and

---

[37] *Id*. at 14135, para. 54.

[38] *See id.*

[39] *See 2012 Inmate Calling* NPRM, 27 FCC Rcd at 16645, para. 43.

[40] *See, e.g.*, GTL NPRM Comments at 26 ("Because GTL has more than 1,900 correctional facility customers, each with unique procurement requirements and individualized contractual terms, it would be extraordinarily difficult and time-consuming to extract the summary information the Commission has requested for each of those correctional facility customers.").

[41] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14138-53, paras. 59-81.  Rates within the safe harbor levels of $0.12/minute and $0.14/minute benefit from a presumption of reasonableness and are insulated from refund liability, while rates above the interim interstate rate caps of $0.21/minute and $0.25/minute are not permitted without a waiver.  Rates between the safe harbor and hard rate caps may be subject to scrutiny to determine whether or not they are "cost-based" and "reasonable."

[42] Prior to the effective date of the *Order*, the Wireline Competition Bureau (Bureau) found good cause to grant a waiver of the interim interstate rate caps to one ICS provider.  *See generally Rates for Interstate Inmate Calling Services; Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates*, Order, WC Docket No. 12-375, 29 FCC Rcd 1302 (2014) (*Pay Tel Waiver Order*).  The Bureau found that, based on a combination of existing below-average-cost state ICS rates and the Commission's interim rate caps, "extraordinary circumstances" existed, and that the public interest was served by granting Pay Tel a limited waiver to be allowed to charge $0.46 per minute for new and existing interstate long distance ICS contracts for a period of nine months.  *Id*. at 1308-09, 1412-13, paras. 11, 20-21.

[43] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14157-58, para. 91.

[44] *Id.* at 14173, para. 130.

[45] *Id*. at 14173-74, para. 130.

[46] *See id*. at 14172-73, 14169-70; paras. 124-26, 116-17.

[47] *See generally FNPRM*.

certifications.[48]  The court allowed other aspects of the *Order* to take effect, including the interim interstate rate caps.[49]

13.     Since the adoption of the *Order*, the Commission has continued to monitor the effect of its reforms on the ICS industry and pursue additional reform, including holding a workshop entitled "Further Reform of Inmate Calling Services" on July 9, 2014.  The workshop evaluated options for additional ICS reforms, discussed the effects of the *Order*, the role ancillary charges play in the ICS market, the provision of ICS at different types of facilities, and communications technologies beyond traditional payphone calling being deployed in correctional facilities.[50]

14.     On June 11, 2014, the Commission received approval for its Mandatory Data Collection from the Office of Management and Budget, and, after publication in the Federal Register, announced in a *Public Notice* that data responses were due on July 12, 2014, a date which was subsequently extended until August 18, 2014.[51]  In response, the Commission received significant cost and operational data, including ancillary charge cost data, from the following ICS providers:  ATN, CenturyLink, Combined Public Communications, Correct Solutions, Custom Teleconnect, Encartele, GTL, Lattice, ICSolutions, NCIC, Pay Tel Communications, Protocall, Securus, and Telmate.  Collectively, these providers represent the vast majority, well over 85 percent, of the ICS market.[52]  In this Second Further Notice, we seek comment on these data, including some reporting and cost allocation inconsistencies among the providers.[53]  We seek comment on these issues and generally on the data received as we propose to move forward and adopt permanent interstate and intrastate ICS reform.[54]

15.     *Proposals for Reform in the Record*.  Since the *Order*, we have received several proposals in the record urging comprehensive ICS reform.  On September 15, 2014, GTL, Securus, and Telmate, who claim to be "the primary providers of inmate calling services . . . in the United States and representing 85% of the industry revenue in 2013," jointly filed a proposal to comprehensively reform all aspects of ICS.[55]  First, the Joint Provider Reform Proposal urges the adoption of rate caps of $0.20 per minute for debit and prepaid interstate and intrastate ICS, and $0.24 per minute for all interstate and intrastate collect ICS, effective 90 days after adoption of a final order.[56]  The Joint Provider Reform Proposal supports "reductions in site commission payments" but does not specify exactly what such reductions would entail.[57]  The Proposal suggests the prohibition of "in-kind payments, exchanges,

[48] *See* 47 C.F.R. §§ 64.6010 (Cost-Based Rates for Inmate Calling Services), 64.6020 (Interim Safe Harbor); and 64.6060 (Annual Reporting and Certification Requirement).

[49] *See Securus Techs. v. FCC*, No. 13-1280 (*supra* note 16).

[50] *See FCC Announces Workshop on Further Reform of Inmate Calling Services*, Public Notice, WC Docket No. 12-375, 29 FCC Rcd 5367 (Wireline Comp. Bur. 2014).

[51] *See Commission Announces Inmate Calling Services Data Due Date*, WC Docket No. 12-375, Public Notice, DA 14-829 (Wireline Comp. Bur. rel. June 17, 2014) (*Data Collection Approval PN*); *see also Rates for Interstate Calling Services,* WC Docket No. 12-375, Order, DA 14-993 (Wireline Comp. Bur. rel. July 11, 2014) (*Partial Extension Order*).

[52] *See* Letter from Brian D. Oliver, Chief Executive Officer, GTL, Richard A. Smith, Chief Executive Officer, Securus, and Kevin O'Neil, Telmate, to Chairman Tom Wheeler et al., WC Docket No. 12-375 at 5 (filed Sept. 15, 2014) (Joint Provider Reform Proposal or Proposal).

[53] *See infra* Section III.A.3.

[54] There is a *Protective Order* in place in this proceeding.  *See Rates for Interstate Inmate Calling Services*, Protective Order, WC Docket No. 12-375, 28 FCC Rcd 16954 (2013) (*Protective Order*).  All data results provided herein are aggregated to protect the confidential nature of the data filings.

[55] Joint Provider Reform Proposal at 1-2.

[56] *Id*. at 2.

[57] *Id*. at 3-4.

technology allowances, administrative, fees," or anything "not directly related to, or integrated with, the provision of ICS."[58]  These three ICS providers contend that the Commission does not have authority over "ancillary fees for transactions other than the provision of ICS" but propose to eliminate some ancillary fees, limit allowable ancillary fees to those specified in the document, and cap other ancillary fees.[59]  Finally, these three ICS providers "commit to continue to comply with their existing obligations" under the Americans with Disabilities Act and other statutes for inmates with disabilities, and suggest that the Commission require officers of ICS providers to certify compliance with all adopted rules under penalty of perjury.[60]  GTL, a signatory of the Proposal, later characterized the Proposal as "part of a new framework that is designed to respond to market forces" and noted that "[t]he proposed rates and fees are caps, which can vary by contract based on the correctional facility needs and the bidding process."[61]

16.        In addition to the Joint Provider Reform Proposal, several individual ICS providers also submitted proposals for reform.  CenturyLink asserts that it could "support a unified cap approximately at the current interstate cap levels," which would apply "for both interstate and intrastate calls, with an additional allowance for collect calling."[62]  CenturyLink supports a prohibition on "all or all but a very narrow class of ancillary fees."[63]  CenturyLink also asserts that the Commission should "allow reasonable commissions or administrative fees," exempt from regulation high-cost facilities such as secure mental health facilities, and grandfather existing contracts.[64]  Pay Tel also submitted a proposal for reform, which it characterizes as a "comprehensive solution to ICS reform that attempts to be fair to all affected parties, including inmates and their families, facilities, and vendors."[65]  Pay Tel's Proposal suggests "postalized" per-minute rate caps, at a rate to be determined, for both intrastate and interstate calls, separated between prisons and jails, with no per-call charges allowed.[66]  Specific ancillary fees would be allowed, with some "premium calling options" for jails, and all other ancillary fees prohibited.[67]  Pay Tel proposes that all facilities would be required to comply with existing obligations and laws regarding people with disabilities.[68]

17.        The Wright Petitioners, along with several public interest groups, urge the Commission to adopt a $0.07 per minute rate cap for all interstate debit, prepaid, and collect calls, with no per-minute rate, and no other ancillary fees or taxes allowed.[69]  Prisoners' Legal Service of MA (PLS) contends that the interim safe harbors and caps that the Commission implemented in the *Order* are conservative and

---

[58] *Id*. at 4.

[59] *Id*. at 4-6.

[60] *Id*. at 7.

[61] Letter from Chérie R. Kiser, Counsel for GTL, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1-2 (filed Oct. 2, 2014).

[62] Letter from Thomas M. Dethlefs, Associate General Counsel – Regulatory, CenturyLink, to Ms. Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Aug. 14, 2014) (CenturyLink Aug. 14, 2014 *Ex Parte* Letter).

[63] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2.

[64] *Id*.

[65] *See* Letter from Marcus W. Trathen, Counsel to Pay Tel, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Oct. 3, 2014) (attaching Pay Tel Proposal and ICS Regulatory Reform Proposal Comparison).

[66] *See* Pay Tel Proposal at 1-2.

[67] *Id*. at 2-3.

[68] *Id*. at 4.

[69] Petitioners NPRM Reply at 1.

"exceed cost data that any party submitted in the record."[70]  PLS opposes extending the interim safe harbor rates and caps, and instead proposes that the Commission adopt a flat all-distance rate of $0.07 per minute, regardless of the size of the facility or the call volume generated from the facility.[71]  To justify this rate, PLS points to the fact that ICS providers are charging as low as $0.04 and $0.05 per minute absent commissions in some states.[72]

18.      A few states have undertaken ICS reform since the Commission's *Order*.  The Alabama Public Service Commission (Alabama PSC) recently adopted comprehensive ICS reforms that include intrastate rate caps as well as restrictions on the number and rates of ancillary charges it authorized.[73]  The Minnesota Department of Corrections initiated a pilot program in a limited number of correctional facilities in which a flat rate of $0.07 per minute is charged for all local and long-distance debit calls, bringing the cost of a 15-minute call to $1.05, plus applicable tax.[74]  New Jersey recently lowered ICS rates to $0.15 a minute for all interstate and intrastate calls from state prison facilities.[75]  We applaud these efforts and seek comment below on what more the Commission and states can do to enact comprehensive ICS reform.

## III.    DISCUSSION

19.      In this Second Further Notice, we take the following steps to reform and modernize interstate and intrastate ICS regulations while ensuring adequate security measures for correctional facilities.  First, we seek comment on eliminating all site commission payments on both interstate and intrastate ICS to fulfill the Commission's statutory obligations to promote competition and ensure just and reasonable rates and fair compensation.   We also seek comment on whether facilities incur costs in the provision of ICS and, if so, how facilities should recover these costs, as well as appropriate transition periods for reform to allow correctional facilities time to adjust.  We seek comment on adopting intrastate and interstate rate caps.  We seek comment on reforming ancillary fees including adopting ancillary fee rate caps, and prohibiting certain ancillary charges.  We also seek comment on alternative ways to promote competition in the ICS market.  We seek comment on whether we should periodically review the ongoing impact of ICS rate reforms.  Finally, we seek further comment on issues related to enforcement, disability access, advanced communications in the correctional setting, and the cost/benefit analysis of all of the proposals herein.

### A.      Payments to Correctional Facilities

20.      The record, including data from the 2014 ICS Workshop and the Mandatory Data Collection, makes clear that the *Order*'s interim rate caps have significantly lowered the expense of interstate ICS calls to end users.  On the positive side, the interim interstate rate caps have resulted in increased call volumes, evidence that unreasonable rates were discouraging communications and that

---

[70] PLS FNPRM Comments at 6-7 (quoting *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14141, para. 62).

[71] *See id*. at 7.

[72] *See id*.

[73] Letter from Glenn S. Richards, Counsel for NCIC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Exh. B at 49-50, 70-88 (filed July 9, 2014) (attaching Final Order of Alabama Public Service Commission Adopting Revised Inmate Phone Service Rules, Docket 15957 (rel. July 7, 2014) (Alabama PSC Further Order)).

[74] *See* Central Office Memorandum Letter from John R. King, Assistant Commissioner-Facilities Division, to All Offenders (dated April 15, 2014), *available at* https://www.prisonphonejustice.org/MN/mn-doc-rate-change-for-2014/ (last visited Sept. 19, 2014) (announcing pilot program).

[75] S*ee* State of New Jersey, Dept. of the Treasury, Contract # 61618, Amendment # 12 *available at* http://www.njphonejustice.org/wp-content/uploads/2014/09/T1934ContractExtension12.pdf (last visited Sept. 12, 2014) (lowering the rate for interstate and intrastate calls from state prisons to $0.15 per minute).

reasonable rates foster communications between inmates and their families and friends.[76]  Yet failures in the ICS market continue.  Interstate reform in some cases has been met by increased intrastate ICS rates and has not discouraged other practices that also increase the costs of ICS to consumers, such as excessive ancillary charges and an increase in the use of single call services.[77]  The pressure to pay site commissions that exceed the direct and reasonable costs incurred by the correctional facility in connection with the provision of ICS[78] continues to disrupt and even invert the competitive dynamics of the industry.[79]  These and other market failures demonstrate that the interstate-only reforms adopted in the *Order*, while an important first step, did not completely address the problems in the ICS marketplace.  This highlights the need for more-comprehensive reform of the ICS industry to address both interstate and intrastate ICS.

### 1.    Restrictions on Payments to Correctional Facilities

21.    In this section, we seek comment on prohibiting site commissions as a category, including all payments, whether in-kind payments, exchanges, allowances, or other fees.  The record is clear that site commissions are the primary reason ICS rates are unjust and unreasonable and ICS compensation is unfair, and that such payments have continued to increase since our *Order*.[80]  Moreover, where states have eliminated site commissions, rates have fallen dramatically.[81]  We therefore predict that prohibiting such payments will enable the market to perform properly and encourage selection of ICS providers based on price, technology and services rather than on the highest site commission payment.  Although we seek comment on prohibiting site commissions as a category, we seek comment on whether correctional institutions incur any costs in the provision of ICS and, if so, how to enable the facilities to recover such costs.  We also seek comment on how best to proceed if a state has already prohibited site commission payments.

22.    As part of its reform of unreasonable and unjust interstate ICS rates in the *Inmate Calling Report and Order and FNPRM*, the Commission addressed site commissions and concluded that they were an apportionment of profits between service providers and correctional facilities and were not, in and of themselves, a cost of ICS.[82]  The payment of site commissions distorts the ICS marketplace by creating "reverse competition" in which the financial interests of the entity making the buying decision

---

[76] *See supra* note 21.

[77] Single call services are a way for call recipients to receive an ICS call without establishing an account with an ICS provider.  *See infra* Section III.C.3.c.

[78] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14135, para. 54.

[79] *See, e.g.*, Letter from Stephanie A. Joyce, Counsel to Securus, to Julie Veach, Chief, Wireline Competition Bureau, FCC, WC Docket No. 12-375 at 4 and Attach. B (filed July 30, 2014) (Securus July 30, 2014 *Ex Parte* Letter).

[80] *See, e.g.*, Letter from Paul Wright, Executive Director, HRDC, to The Honorable Tom Wheeler, Chairman, FCC, WC Docket No. 12-375 at Exh. 3 (filed Sept. 17, 2014) (HRDC Sept. 17, 2014 *Ex Parte* Letter) (citing Stephanie Clifford and Jessica Silver-Greenberg, *In Prisons, Sky-High Rates and Money Transfer Fees*, N.Y. Times) ("But even some industry executives see problems with the current setup, saying the commission system encourages providers to charge inmates more, not less, for services.  Companies often win contracts based on how much they will offer states via commissions, rather than the rates they charge inmates."); Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed July 23, 2014) (Securus July 23, 2014 *Ex Parte* Letter); *infra* para. 24.

[81] *See, e.g.*, Alex Friedmann, Associate Director, HRDC, to The Honorable Tom Wheeler, Chairman, FCC, WC Docket No. 12-375 at 1-2 (filed July 17, 2014).

[82] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14135, para. 54.

(the correctional institution) are aligned with the seller (the ICS provider) and not the consumer (the incarcerated person or a member of his or her family).[83]

23.    This "reverse competition" is reflected in data in the record.  Aggregated data from the Mandatory Data Collection from 14 ICS providers show that over $460 million in site commission payments were paid to facilities in 2013.[84]  This means that ICS users and their families, friends and lawyers spent over $460 million to pay for programs ranging from inmate welfare to roads to correctional facilities' staff salaries to the state or county's general budget.  These are pass-through payments from the provider to the facility, absent which, rates would be lower.  Moreover, the magnitude of payments is significantly higher than previous estimates in the record.  For example, using publicly available data in 2012, the Human Rights Defense Center (HRDC) estimated ICS providers paid over $123 million in site commissions to correctional facilities.[85]  To put the number in context, however, the record and data from the Mandatory Data Collection suggest that these payments represented just 0.3 percent of prison facilities total budgets in 2012.[86]  Similarly, one ICS provider estimated that site commission payments represented 0.4 percent of total prison/jail operating budgets in 2013.[87]  What appears to be of limited relative importance to the combined budgets of correctional facilities has potentially life-altering impacts on prisoners and their families.[88]

---

[83] *See id.* at 14125, 14129-30, paras. 34, 41.  While the Commission also concluded that as a category, site commissions "are not costs that are reasonably and directly related to the provision of ICS," *id.* at 14135, para. 54, the *Order* acknowledges the possibility that some portion of payments to correctional facilities "may, in certain circumstances, reimburse correctional facilities for . . . costs," such as security costs, that the Commission would likely consider reasonably and directly related to the provision of ICS.  *Id.* at 14134-35, nn.196, 203.  A partial stay of certain rules adopted by the *Order* issued by the United States Court of Appeals for the District of Columbia Circuit in January 2014 did not disturb the Commission's determination on these points, as the Wireline Competition Bureau recently emphasized in a public notice.  *See generally Securus Techs. Partial Stay Order*; *Wireline Competition Bureau Addresses the Payment of Site Commissions for Interstate Inmate Calling Services*, WC Docket No. 12-375, Public Notice, DA 14-1206 (Wireline Comp. Bur. rel. Aug. 20, 2014) (*Site Commission PN*).

[84] Staff calculation using aggregated data from ICS provider data submissions.  This estimate may be low.  *See* Kery Murakami, *Inmate Calling Rate Cap to Be Considered in FNPRM*, Communications Daily, Sept. 25, 2014 ("The providers, though, have told the groups the $540 million paid in commissions nationally represent only about 0.5 percent of the cost of running the correctional institutions.").

[85] *See* HRDC FNPRM Comments at 4.

[86] The 0.3 percent number is the result of aggregating the over $140,000,000 in site commission payments to prisons in 2012 made by the reporting ICS providers and submitted in response to the Mandatory Data Collection and dividing that by the $54.2 billion annual corrections spending estimate from the National Association of State Budget Officers.  *See* The National Assoc. of State Budget Officers; State Spending for Corrections:  Long-Term Trends and Recent Criminal Justice Policy Reforms at 1, *available at* http://www.nasbo.org/sites/default/files/pdf/State%20Spending%20for%20Corrections.pdf (last visited Oct. 19, 2014) ("State spending for corrections reached $54.2 billion in fiscal 2012.").

[87] Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at Attach. (filed Sept. 22, 2014) (Securus Sept. 22, 2014 *Ex Parte* Letter).

[88] Even if site commission represent a larger share of the budget for any facility, the Commission has a long-standing precedent that the use of revenues from unreasonably high rates, even if used for a worthwhile purpose, is not relevant to the Commission's analysis of its statutory obligations.  *See Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17876-77, para. 666 (2011) (*USF/ICC Transformation Order*), *pets. for review denied sub nom. In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

24.    Despite their limited overall budget impact, site commission payments are the chief criterion many correctional institutions use to select the ICS provider for their facilities[89] and are thus the main cause of the dysfunction of the ICS marketplace.[90]  The demand for site commission payments generates pressure on ICS providers to raise rates and assess additional ancillary charges, which are typically not subject to site commissions.[91]  The existing contract proposal process (RFP, or request for proposal) often focuses the competition between bidding ICS providers on who can pay higher site commissions to correctional institutions instead of creating incentives for ICS providers to provide the lowest rates to consumers.[92]

25.    The Alabama PSC articulated an alternative perspective on the cause of increased site commissions, stating that "the proliferation of excessive ancillary fees, not call rates, is the most significant contributor toward escalating site commission offerings."[93]  It further asserted that "to effectively constrain excessive site commissions, it is essential to first address the excessive revenue sources [from ancillary fees]."[94]  In this Second Further Notice we seek comment on proposals to address both site commissions and ancillary fees.  We also seek comment on the Alabama PSC's perspective on the cause of increases in site commissions.

26.    At the time the Commission adopted the *Inmate Calling Report and Order and FNPRM*, the highest commission amount in the record was 88 percent.[95]  Since the *Order*, despite the Commission's decision to not permit site commission payments to be included in interstate rates, the record indicates that site commissions have continued to increase, with recent contracts including site commission payments as high as 96 percent of gross revenues.[96]  Moreover, there is evidence that site

---

[89] *See* Petitioners FNPRM Comments at 16 ("However, it would appear that, in the context of evaluating RFP responses, the determining factor for the contracting party is not whether the ICS providers can meet the technical requirements and security measures required by the correctional institutions.  Instead, the selection of the winning bidder is based on the extra "add-ons" that an ICS provider will provide, such as free calls, pilot programs, or additional commissions paid to the correctional institution."); *see also Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd at 14129, para. 41.

[90] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14136, para. 54.

[91] *See* Letter from Thomas M. Dethlefs, Assoc. General Counsel – Regulatory, CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Aug. 28, 2014) (CenturyLink Aug. 28, 2014 *Ex Parte* Letter) ("bidders were obliged to utilize ancillary fees to cover costs that otherwise could not be recovered in per-minute rates after deducting the County's required commissions").

[92] *See, e.g.*, Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Sept. 26, 2014) (Securus Sept. 26, 2014 *Ex Parte* Letter) ("The provisional award has been announced, and the scoring methodology was provided to each bidder.  The methodology involved granting 83.33% of the points to the bidder with the highest site commission pledge.  All other criteria, which include the bidder's security offerings and customer service commitment, were collectively weighted at only 16.66%.  What is most telling is that call technology was only weighted at 8.33%, and there were *no points* for having the lowest calling rate.") (emphasis in original); *see also* CenturyLink Aug. 28, 2014 *Ex Parte* Letter at 1 ("First, Escambia County's Invitation to Bid was structured so that the bidder with the highest offered commission rate would be selected."); *see also* Petitioners Aug. 16, 2014 *Ex Parte* Letter at 1 ("recent bidding by ICS providers reflects that they are still willing to pay commissions/kickbacks, with CenturyLink agreeing to pay 96% commission in Escambia County, Florida and other ICS providers willing to pay between 83% and 95% of their gross revenues.").

[93] Letter from Darrell A. Baker, Director, Utility Services Division, Alabama Public Service Commission to Chairman Tom Wheeler, FCC, WC Docket No. 12-375 at 7 (filed Sept. 30, 2014) (Alabama PSC Sept. 30, 2014 *Ex Parte* Letter).

[94] *Id*. at 4.

[95] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14125, para. 34.

[96] *See* Petitioners Aug. 16, 2014 *Ex Parte* Letter at Attach.  The record also indicates that when a state acts to prohibit or reduce monetary site commission payments, the ICS contract may instead require other valuable

(continued…)

commission payments on intrastate ICS revenue, which were not addressed by the *Order*, have increased.[97]  Absent further action, we are concerned that the market will continue to fail to promote competition and ensure rates are just, reasonable and ensure fair compensation consistent with the dictates of the Communications Act.[98]  Indeed, several commenters urge the Commission to adopt an approach that "will lead to lower, market-based rates."[99]  Securus has suggested that if the Commission does anything short of completely banning site commission payments, it will allow gaming.[100]

27.  We seek comment on prohibiting all site commission payments for interstate and intrastate ICS to enable market-based dynamics to ensure just and reasonable ICS rates and fair ICS compensation.[101]  Eliminating the competition-distorting role site commissions play in the marketplace should enable correctional institutions to prioritize lower rates and higher service quality as decisional criteria in their RFPs, thereby giving ICS providers an incentive to offer the lowest end-user rates.[102]  Indeed, when states such as Missouri, New York and New Mexico eliminated site commission payments, ICS rates decreased significantly.[103]  We therefore seek comment on such an approach and on whether it will foster a competitive market that will ensure just and reasonable rates and fair compensation for ICS

---

(Continued from previous page)

inducements such as wireless telephone blocking systems.  The Commission defined site commissions broadly to include "payments in money or services from ICS providers to correctional facilities or associated government agencies, regardless of the terminology the parties to the agreement use to describe them."  *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14135, n.199.  The Commission also noted that it would treat "in-kind" payments similar to site commission payments.  *Id.* at 14137, para. 56.  For example, California's publicly available contract shows that required contributions include the provision of a systems to ensure "continuous blocking of all unauthorized cellular wireless communications."  State of California, California Technology Agency, IWTS/MASS Agreement No. OTP 11-126805, *available at* https://www.prisonphonejustice.org/CA/ca-contract-with-gtl-2012-2018-part-1/ (last visited Sept. 15, 2014) (California GTL Contract) (cited in *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14148-49, para. 76, n.280).

[97] *See* Petitioners Aug. 16, 2014 *Ex Parte* Letter at Attach.

[98] *See* Securus Sept. 26, 2014 *Ex Parte* Letter at 1 ("As such, the market is not operating freely and carriers are impeded from driving calling rates lower.").

[99] *See* GTL Aug. 11, 2014 *Ex Parte* Letter at 2; *see also* Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed July 17, 2014) (Securus July 17, 2014 *Ex Parte* Letter) ("If commissions are eliminated, however, competition will force rates down to levels below the rate caps").  *See also* Raher 2013 Comments at 7 ("If the Commission is to have any impact on ICS rates, it *must* address the critical issue of site commissions.") (emphasis in original); Securus July 23, 2014 *Ex Parte* Letter at Attach ("Conditions for Lower Inmate Rates:  1)  Eliminate Commissions"); Letter from Chérie R. Kiser, Counsel for GTL, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed Aug. 11, 2014) (GTL Aug. 11, 2014 *Ex Parte* Letter) (explaining that comprehensive reform that includes "mandatory decreases in commissions paid to facilities" will lead to "lower, market-based rates").

[100] *See* Securus Sept. 22, 2014 *Ex Parte* Letter at Attach.; *but see* Letter from Stephanie A. Joyce, Counsel to Securus, to Chairman Tom Wheeler, et al., WC Docket No. 12-375 at 3 (filed Oct. 6, 2014) (Securus Oct. 6, 2014 *Ex Parte* Letter) ("Securus does not oppose the payment of limited site commissions."); *see also* Please Deposit All Your Money Study at 15 ("The Federal Communications Commission should . . . [b]an commission payments in all prison and jail telephone contracts on the grounds that such payments necessarily lead to inflated calling rates and incentivize pernicious fee-collecting practices").

[101] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14128, para. 39.

[102] *But cf.,* Letter from Marcus W. Trathen, Counsel for Pay Tel, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Attach. at 2-3 (filed Oct. 2, 2014) (Pay Tel Oct. 2, 2014 *Ex Parte* Letter) ("The notion that 'the market' can be relied on to drive the retail rates down to cost-based levels in prisons is false given that the entities setting the rates (prisons) are not the same entities paying the rates.").

[103] *See Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd at 14126, para. 37 & n.139; 14127, para. 38 & nn.147, 149.

while minimizing regulatory burdens on ICS providers and the Commission.  We also seek comment below on whether the Commission should undertake periodic review to verify this.[104]

28.      We seek comment on a two-year transition away from site commissions to avoid flash cuts and permit correctional institutions time to adjust.[105]  In addition, we seek comment on whether correctional facilities incur costs for provisioning ICS.  We request data that demonstrate the costs that facilities bear that are directly related to the provision of ICS.  We seek comment on the magnitude of these costs and how to enable facilities to recover such demonstrated costs in a manner that does not disrupt a market-based approach to lowering rates for end users of ICS.

### 2.      Legal Authority

29.      We seek comment on the Commission's legal authority to restrict the payment of site commissions in the ICS context pursuant to sections 276 and 201(b) of the Act.  We begin with a review of the authority accorded the Commission under section 276.  In relevant part, section 276(b)(1) states:

> In order to promote competition among payphone service providers and
> promote the widespread deployment of payphone services to the benefit
> of the general public, within 9 months after the date of enactment of the
> Telecommunications Act of 1996, the Commission shall take all actions
> necessary (including any reconsideration) to prescribe regulations that –
> (A) establish a per call compensation plan to ensure that all payphone
> service providers are fairly compensated for each and every completed
> intrastate and interstate call using their payphone. . . .[106]

30.      As discussed herein, the Commission has previously concluded that site commission payments are a significant cause of ever increasing rates.[107]  This fact was recently underscored by the Joint Provider Reform Proposal, which stated that the rate caps they propose "are feasible for the parties only if implemented in conjunction with corresponding reductions in site commission payments."[108]  We seek comment on the assertion that absent reform, achieving the statutory mandate of just and reasonable ICS rates and fair ICS compensation would be difficult, if not impossible, to achieve.  At the same time, we are mindful that ICS providers should receive "fair" but not excessive compensation, and seek comment on implementation and transition below to ensure that this occurs.  We therefore seek comment on whether the payment of site commissions would be an appropriate object of regulation under this

---

[104] *See infra* Section III.J.

[105] *See infra* Section III.G.

[106] As a general matter, we observe that "provision" applies, without jurisdictional limit, to both "intrastate and interstate" payphone service calls, and similarly without regard to whether the payphone service is provided on a common carrier or non-common carrier basis.  Since "payphone service" is defined to include "the provision of inmate telephone service in correctional institutions," this section seeks comment regarding the regulation of site commissions as to both interstate and intrastate ICS unless otherwise indicated, and without regard to the classification of ICS as a common carrier or non-common carrier service.  We seek comment on how the explicit preemption in section 276 could be limited by section 2(b) of the Act, which states that "nothing in this Act shall be construed to apply or to give the Commission jurisdiction with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier."  In the *FNPRM*, the Commission tentatively concluded that "section 276 affords the Commission broad discretion to regulate intrastate ICS rates and practices that deny fair compensation, and to preempt inconsistent state requirements."  *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14175-76, para. 135.  Is the relationship between section 276 and section 2(b) effectively addressed by the accompanying discussion in the *FNPRM*?  *See id.* at paras. 14176-77, 136-139 (discussing the language of section 276 and related court precedent).  If not, why not?

[107] *See Inmate Calling Report and Order and FNRPM*, 28 FCC Rcd at 14127-28, para. 38.

[108] Joint Provider Reform Proposal at 3.

statutory provision.  Would a prohibition on site commission payments ensure "fair compensation" as that term is used in section 276?  While the Commission has previously found the phrase "fairly compensated" to be ambiguous, and acknowledged that a range of compensation rates could be considered fair, it has treated the concept of fairness as encompassing both the compensation received by ICS providers and the cost of the call paid by the end user.[109]  As the record continues to show that the payment of site commissions causes ICS rates to be set at excessive levels, could the Commission under section 276 find that site commissions result in unfair compensation and therefore should be prohibited or otherwise restricted?

31.    We seek comment on our prediction that a prohibition on the payment of site commissions would foster a more competitive marketplace for the provision of ICS.  If site commissions hinder and distort competition among ICS providers, hinder the widespread deployment of payphone services, or both, would that support the Commission's exercise of section 276 authority "to prescribe regulations" to ensure that ICS providers are "fairly compensated"?  If so, would the statutory duty to ensure fair compensation encompass an outright ban on the payment of site commissions by ICS providers?  We note, for example, that if a correctional institution were to self-provision ICS and seek to charge rates that include an amount that would be deemed a site commission as part of its profits, above and beyond a normal return, such conduct could be directly addressed by Commission regulation of ICS rates to limit rates to a level that ensures fair compensation, but no more.  Does this approach support the view that Commission regulation directly targeting site commissions likewise can be justified to the extent providers ensure that ICS rates provide no more than fair compensation?

32.    If, as the record currently shows, the payment of site commissions leads to ICS rates that are set at unreasonably high, even exorbitant, levels, then, as has occurred in states that have eliminated site commissions, we predict that a prohibition on making these payments would lead to significantly lower ICS rates.  We seek comment on the reasonableness of this presumption and whether there are criteria other than site commissions that might discourage correctional institutions from prioritizing lower rates and better service quality in their RFPs.  If the elimination of site commissions does lead to lower rates, we seek comment on whether lower ICS rates would lead to greater ICS usage.  How should we interpret the word "deployment" in this context?  For instance, is "deployment" limited to installation of new physical infrastructure that would enable the provision of ICS, or can "deployment" reasonably be construed to include new incentives or opportunities for end users to access existing payphone services?  Similarly, can "payphone service" – which section 276 defines to include "any ancillary services" – reasonably be construed to include new features that might be offered to accommodate greater demand?[110]  We seek comment on this analysis.

33.    We seek comment on any other relevant language in section 276 that may bear upon our authority to prohibit site commissions.  For instance, what is the relevance of section 276(b)(1)(A)'s requirement that regulations adopted by the Commission ensure that payphone service providers are compensated "per call" and for "each and every completed intrastate and interstate call"?  More generally, are there alternative interpretations or theories for implementing section 276 that counsel for or against particular approaches to addressing site commission payments?

34.    We seek comment on the proposal that site commission payments undermine the achievement of section 276's goals in the ICS context, even though the Commission previously has permitted location rents in the context of public payphones.[111]  For example, as to public payphones, the Commission found that "[p]ayphones in many locations are likely to face a sufficient level of competition

---

[109] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14115, para. 14.

[110] 47 U.S.C. § 276(d).

[111] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14107, para. 54, n.200 (stating that "the Commission has used location rents and site commissions synonymously throughout its ICS proceedings") (citations omitted).

from payphones at nearby locations to ensure that prices are at the competitive level," and thus "[a]s a result, we believe that payphones at such locations are unlikely to need additional scrutiny."[112]  The Commission recognized, by contrast, that there could be "locations where . . . no 'off premises' payphone serves as an adequate substitute for an 'on premises' payphone."  As the Commission observed:

> In such locations, the location provider can contract exclusively with one PSP [payphone service provider] to establish that PSP as the monopoly provider of payphone service.  Absent any regulation, this could allow the PSP to charge supra-competitive prices.  The location provider would share in the resulting "location rents" through commissions paid by the PSPs.  To the extent that market forces cannot ensure competitive prices at such locations, continued regulation may be necessary.[113]

35.     We seek comment on whether market conditions for ICS differ sufficiently from those the Commission previously found in the case of public payphones as to warrant different treatment under section 276.  Are ICS providers inherently "monopoly providers of payphone service" and therefore able "to charge supra-competitive prices?"  Do inmates have access to competing alternatives?  One way to mitigate this problem would be to require correctional institutions to enter into service contracts with multiple ICS providers instead of awarding a monopoly to a single provider, as the Wright Petitioners initially suggested.[114]  However, the record suggests that requiring multiple providers at correctional institutions, and thereby enabling competition, could present significant practical challenges and potentially could increase costs and therefore drive up rates.[115]  Further, it is unclear whether allowing multiple providers at correctional institutions would substantially lower ICS costs to consumers if facilities were still able to receive site commission payments.  We seek comment on these views, and whether action on site commissions thus can be reconciled with Commission precedent under section 276 for public payphones, or if action to prohibit or restrict site commissions for ICS locations would require the Commission to change course in any respect.

36.     We also seek comment on any other sources of Commission authority to regulate site commissions.  For example, section 201(b) of the Act requires all charges and practices "for and in connection with" an interstate common carrier service to be "just and reasonable."[116]  We seek comment on whether section 201(b), independent of any authority under section 276, gives us jurisdiction to prohibit the payment of site commissions for interstate ICS.  Is the payment of site commissions a "practice" under section 201(b)?  Conversely, could it be viewed as a "rate," or component of a "rate," under section 201(b)?  Under either alternative, is the payment of site commissions "for and in connection with" interstate ICS?  To what extent would a prohibition of site commissions under section 201(b) differ from a prohibition under section 276?  Are there circumstances under which section 201(b) would support the regulation of site commissions in connection with intrastate, as well as interstate, ICS?  For example,

---

[112] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996 et al.*, Report and Order, CC Docket No. 96-128 et al., 11 FCC Rcd 20541, 20549, para. 15 (1996).

[113] *Id.*

[114] *See generally* First Wright Petition.

[115] *See* GTL NPRM Comments at 23 (considerations such as facility differences, security requirements, training requirements, and labor costs deter correctional facilities from using multiple ICS providers); *see also* Verizon and Verizon Wireless NPRM Comments at 6-7 (suggesting that calling rates may not decrease if multiple ICS providers are allowed to offer service in a correctional facility).

[116] 47 U.S.C. § 201(b).  As the Commission explained in the *Order*, under this standard rates "must ordinarily be cost-based, absent a clear explanation of the Commission's reasons for a departure from cost-based ratemaking." *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14131, para. 45 (citation and internal quotation marks omitted).

would declining to prohibit or restrict site commissions in connection with intrastate ICS undermine the Commission's ability to ensure lawful interstate ICS rates?  Do other statutory provisions inform how the Commission can or should approach the issue of site commissions in the ICS context?  The possible reforms that we seek comment on would apply to site commissions on both interstate and intrastate ICS traffic.  In what ways would the Commission's legal basis for its actions differ based on the jurisdiction of the traffic under particular legal theories?  In addition to regulating ICS providers' payment of site commissions, does section 276 or other Commission authority enable us to regulate the conduct of correctional institutions or other third parties if they seek to induce ICS providers to make such payments?  If so, what is that authority?

### 3.     Possible Reforms to Site Commissions

37.     We seek comment on prohibiting site commission payments for all ICS as part of comprehensive reform and whether transitioning away from site commission payments is essential to achieving the statutory requirements of just and reasonable ICS rates and fair ICS compensation.[117]  We seek comment on a definition of site commission payments that are subject to any prohibition or restriction to include "payments in money or services from ICS providers to correctional facilities or associated government agencies, regardless of the terminology the parties to the agreement use to describe them."[118]  We seek comment on interpreting this language to include any products or any other thing of value such as, for example, so-called "contract administration" fees.[119]  This is consistent with the approach in the *Order* where the Commission noted that it would treat in-kind payments as site commissions.[120]

38.     The Joint Provider Reform Proposal supports the elimination of site commissions and proposes a similar definition of impermissible site commission payments to include a comprehensive range of "in-kind payments, exchanges, technology allowances, administrative fees, or the like."[121]  It proposes that "the Commission define as impermissible: any payment, service, or product offered to, or solicited by an agency (or its agent) that is not directly related to, or integrated with, the provision of communications service in a correctional facility."[122]  We seek comment on these definitions and on any other ways to define ICS provider payments to correctional institutions that would be subject to any regulation discussed herein.  We also seek comment on whether we should prohibit gifts or charitable contributions from ICS providers to correctional facilities to ensure they are not used to undermine a potential site commission prohibition.  In an analogous context, the Commission included in its E-rate program rules a prohibition on gifts by service providers to schools or libraries to ensure that such gifts do not "circumvent competitive bidding and other E-rate program rules."[123]  Additionally, we seek comment on whether any certification required of ICS providers should include a certification of compliance with any prohibition on site commissions and gifts the Commission may impose.[124]

---

[117] *But cf*. NCIC July 9, 2014 *Ex Parte* Letter, Attach. at 6 ("The FCC should not focus on whether ICS providers pay commissions.").

[118] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14135, n.199.

[119] *See* California GTL Contract, *supra* n.96 (California's publicly available inmate calling services contract shows that required contributions include a "Contract Administration Fee" of $800,000).

[120] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14137, para. 56.

[121] Joint Provider Reform Proposal at 4.

[122] *Id*.

[123] 47 C.F.R. § 54.503(d)(4); *see generally* 47 C.F.R. § 54.503 (specifying gift restrictions under the Schools and Libraries universal service support program).

[124] *See infra* Section III.K.

39.     *Costs Incurred by Correctional Facilities.*  Although we seek comment on eliminating site commissions as a category, the Commission acknowledged in the *Order* that some portion of payments to correctional facilities "may, in certain circumstances, reimburse correctional facilities for . . . costs," such as security costs, that the Commission would likely consider reasonably and directly related to the provision of ICS.[125]  Consistent with the *Order*, we seek comment on whether correctional institutions incur any costs in the provision of ICS and, if so, how to quantify them and how the facilities should recover such costs.  We seek comment on the idea that any recovery by facilities for costs reasonably and directly related to making ICS available be built into any per-minute ICS rate caps set by the Commission.[126]

40.     We seek comment on any filings in the record attempting to demonstrate "legitimate costs incurred by correctional facilities . . . related to the provision of inmate calling services."[127]  The Joint Provider Reform Proposal states that "[t]he parties recognize . . . that correctional facilities may incur administrative and security costs to provide inmates with access to ICS," referencing them as "admin-support payments."[128]  Yet, the participating providers "have not reached agreement as to what amount or what percentage (if any) should be required, or how such admin-support payments can accurately be measured."[129]  Some parties suggest that costs to facilities may include monitoring calls, submitting trouble tickets on equipment, handling billing disputes that inmates may have with the provider,[130] and infrastructure and security costs.[131]  Praeses asserts that "correctional facilities incur real costs to enable inmate calling" and lists a number of functions they assert are related to such costs.[132]  However, other parties question whether the facilities incur any additional costs for the provision of ICS.[133]  Also, Securus notes that correctional facilities benefit significantly from having ICS in terms of reduced recidivism, solving and preventing crimes and inmate control and satisfaction suggesting that any costs are far outweighed by the benefits.[134]  Should the Commission be concerned that prohibiting or restricting site commission payments or prohibiting rates that include recovery of site commissions will lead correctional facilities to stop allowing inmates access to ICS altogether, or else to restrict inmates'

---

[125] *Inmate Calling Report and Order and FNPRM*, 28 FC Rcd at 14134-35, nn.196, 203.

[126] *But see* Pay Tel Proposal at 3 (suggesting that facility cost recovery "should be added to each minute of use for all calls").

[127] GTL Aug. 11, 2014 *Ex Parte* Letter at 2.

[128] *See* Joint Provider Reform Proposal at 3 ("The parties' proposal supports the recovery of legitimate costs incurred by correctional facilities that are directly related to the provision of inmate calling services.").

[129] *Id.* at 3.

[130] *See* 2014 ICS Workshop Transcript at 95 (Darrell Baker, Director, Utility Services, Alabama PSC).

[131] *Id.* at 187 (Alex Friedmann, Managing Editor, Prison Legal News); *see also* 2013 ICS Workshop Transcript at 262-63 (Timothy O. Woods, National Sheriffs' Assoc.) ("[A]gain, one must not neglect to take into consideration and calculation the substantial cost for jails associated with establishing, maintaining, and updating inmate calling service systems.  The so-called commissions are used by jails as cost recovery mechanisms to recoup the administration costs of inmate calling services.  In addition, depending on the locality, part of the so-called commissions are used for jail inmate welfare and benefit programs.").

[132] *See* Praeses Oct. 3, 2014 *Ex Parte* Letter at 3 (correctional facility costs incurred to enable ICS include "real estate/facilities expense; capital expenditures for equipment; call monitoring and recording; responding to law enforcement requests related thereto; compliance and implementation with call security protocols; responding to inquiries by inmates and inmate call recipients; registering, approving, blocking and unblocking the telephone numbers of call recipients; coordinating with ICS providers, including escorting ICS provider technicians and inmates to calling areas; and educating staff, inmates, and inmate call recipients regarding facilities' ICS policies").

[133] *See, e.g.*, Petitioners NPRM Comments at 17-18.

[134] *See* Securus Sept. 22, 2014 *Ex Parte* Letter at Attach.

access to ICS?[135]  We seek comment on whether correctional institutions in states that have prohibited site commissions bear any costs and, if so, whether such costs are recovered through ICS rates or are recovered through the general budget of the correctional institution.

41.     We note that because the Mandatory Data Collection applied to ICS providers, not correctional institutions, the costs submitted by the providers do not include any costs that may be incurred by facilities.  We seek comment on the actual costs, if any, incurred by correctional facilities in providing ICS, the amounts associated with these costs, and the appropriate vehicle for enabling facilities to recover such costs.  Is an allocation of a guard's time for walking a prisoner to an ICS facility necessary and appropriate to include in ICS costs?  Do facilities monitor calls for security purposes or is such monitoring done by ICS providers?  If facilities monitor calls, should such costs be considered a cost recoverable through ICS rates?  The Allegany County, NY Sheriff asserted that his facility "does experience real costs in administering these services," but did not quantify or otherwise provide a context for understanding the relative magnitude of these costs as compared to the county's correctional budget.[136]

42.     The record is mixed on whether, and if so, how much facilities spend on ICS.  For example, GTL provides research that suggests significant variations in how facilities apportion costs.  For example, one department of correction that GTL serves allocates 42 full time employees to the provision of security for ICS, whereas a second, similarly sized, department of correction allocates only 0.5 full time employees to the provision of security for ICS.[137]  GTL estimates prisons' ICS-related costs at $0.005 per minute of use and jails' costs at $0.016 per minute of use,[138] or 3.4 percent of total ICS revenue at prisons and 7.6 percent in jails.[139]  In contrast, CenturyLink asserts that to "monitor just ten percent of the calls placed by inmates at either a prison or a jail would cost the facility 5.28 cents per minute applied to all calls placed by inmates at the facility."[140]  We seek comment on these estimated costs, particularly on why they vary so significantly, and the underlying assumptions, i.e., staffing costs and time commitments.  For example, CenturyLink provides a list of "administrative and security functions" that correctional facilities commonly perform,[141] such as "responding to other law enforcement requests for records/recordings," validating attorney or other privileged numbers, "blocking/unblocking numbers blocked for security issues," and "administration of debit purchase."[142]  We seek comment on this list of functions and whether, in commenters' experiences, it accurately represents costs that correctional facilities incur in the provision of ICS.  Other comments contend that ICS facilities do not incur costs in the provision of ICS.[143]  For example, is it appropriate for any portion of a salary of a full-time guard to be considered a cost of ICS?

43.     To the extent the record indicates that facilities incur costs related to the provision of ICS, we seek comment on allowing cost recovery through a per-minute rate cap included in any rate cap adopted by the Commission, or some other approach.  The per-minute approach presumes that facilities'

---

[135] *See* CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2; *see also* Securus FNPRM Reply at 7.

[136] Letter from Ricky L. Whitney, Allegany County Sheriff, to Tom Wheeler, Chairman, FCC, WC Docket No. 12-375 (filed Mar. 25, 2014).

[137] *See* Letter from Chérie R. Kiser, Counsel to GTL, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Attach. 2 at 5 (filed Sept. 19, 2014) (GTL Sept. 19, 2014 *Ex Parte* Letter).

[138] *Id.*

[139] *Id.*

[140] Letter from Thomas M. Dethlefs, Associate General Counsel-Regulatory, CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed Sept. 19, 2014) (CenturyLink Sept. 19, 2014 *Ex Parte* Letter).

[141] CenturyLink Sept. 19, 2014 *Ex Parte* Letter at 1.

[142] CenturyLink Sept. 19, 2014 *Ex Parte* Letter at Attach. A.

[143] *See* Petitioners NPRM Comments at 17-18.

costs vary with usage.  We seek comment on the variable or fixed nature of correctional institutions' costs.  GTL estimates prisons' ICS-related costs at $0.005 per minute of use and jails' costs at $0.016 per minute of use.[144]  We seek comment on whether a per-minute amount between $0.005 and $0.016 or at some other per minute amount would ensure that correctional facilities recover their costs.  Would allowing cost recovery based on a per-minute amount give correctional facilities an incentive to increase ICS usage?  What would be the policy advantages or disadvantages of such an approach?  Would correctional facilities be likely to select ICS providers with lower rates and fees, so as to increase usage and, depending on the elasticity of demand, thereby increase cost recovery to the facilities?  We seek comment on whether any such cap should be reevaluated and adjusted as minutes of use (MOU) change.

44.     We seek comment on using a per-minute approach over one that would set such payments at a capped percentage of ICS revenues.  This approach would promote simplicity and deter possible improper incentives tied to a percentage of revenues approach, as occurs today.  If, however, we used a percentage-based approach, we seek comment on the appropriate level of any recovery percentage.  GTL estimates prisons' ICS-related costs at 3.4 percent of total ICS revenue and jails' costs at 7.6 percent.[145]  We seek comment on whether a percent of gross revenues between 3.4 percent and 7.6 percent or some other percent amount would ensure correctional facilities recover their costs.  Would basing cost recovery on a percentage of ICS revenues encourage gaming and provide no or less incentive to facilities to lower ICS rates?  For example, would basing cost recovery amounts on a percentage of revenues give ICS providers incentives to maintain rates at the highest allowable level in order to maximize site commission revenues?  Will correctional facilities structure their RFPs so as to require such an outcome?  We seek comment below on a transition period to achieve any cost recovery level.[146]  Praeses suggests that the Commission should consider developing "a safe harbor payment level in addition to a payment cap – in much the same way that the Commission regulated interstate ICS rates in the *ICS Report and Order* in light of the varying ICS costs borne by ICS providers with respect to the different types of correctional facilities served."[147]  We seek comment on these and any other alternative regulations that could govern the relationship between any restriction on site commissions and ICS rate regulations.

45.     To ensure our reforms produce just and reasonable rates and fair compensation, we seek comment on whether state statutes or regulations that require any site commission payment, as we sought comment on defining here, are inconsistent with the possible regulation herein and would therefore be preempted, pursuant to section 276(c) as discussed below.[148]  What criteria should the Commission use to determine which state actions are consistent?  For example, should state actions to eliminate or restrict site commissions be considered consistent with any reforms that the Commission adopts?  Should such an approach also preempt state statutes that only mandate how site commissions are to be used, but not require them in the first instance?  Or would such statutes simply be rendered moot to the extent that correctional institutions elect not to seek, or ICS providers elect not to pay, site commissions in those states?

46.     We also seek comment on possible state roles to address the issues discussed above.  Are there circumstances where states might be better positioned to engage in oversight?  Would states be limited to oversight in the context of intrastate ICS or could they also play some role in the context of interstate ICS?  If so, what might that role be?  Finally, we seek comment on setting interstate and intrastate ICS rates at levels that do not include the recovery of site commission payments instead of prohibiting site commission payments directly.  If the Commission determines that it does not have

---

[144] *See* GTL Sept. 19, 2014 *Ex Parte* Letter at Attach. 3.

[145] See *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14120-21, para. 26.

[146] *See infra* Section III.G.

[147] Praeses Oct. 3, 2014 *Ex Parte* Letter at 3.

[148] *See infra* Section III.E.

authority over site commission payments, does such an approach still allow for just and reasonable ICS rates as well as fair compensation?  Would such an approach help satisfy the goals, provided in section 276 of the Act, of promoting competition and widespread deployment of payphone services?

### B.   Interstate and Intrastate ICS Rate Reform

47.     A goal of ICS reform is to move to a market-based solution to reduce rates.  While we continue to see the benefits of a the approach adopted in the *Order* last year, now that we are seeking comment on comprehensively reforming all aspects of ICS (including intrastate rates and site commissions) this allows the Commission to ask about a more market-based approach to promoting competition and just and reasonable rates and to ensure fair compensation.  Given the high rates, excessive compensation and market failure we see today, we seek comment on adopting permanent rate caps to ensure that ICS rates are just and reasonable.  These rate caps will serve as a backstop to the market-based solution described above.[149]  We seek comment on how to set those rate caps.  Specifically, we seek comment below on the data submitted by ICS providers pursuant to the Mandatory Data Collection.  We also seek comment on the proposals for rate reform filed in the record.  In addition, we seek comment on prohibiting per-connection or per-call charges.  Should any such expenses be collected through a per-minute rate?  We seek comment on the best ways to address flat-rate charges for ICS.

48.     We seek comment on adopting permanent rate caps for interstate and intrastate debit/prepaid and collect ICS calls.  In the *Order*, the Commission adopted a requirement that rates be cost-based.  At that time, because reform was limited to interstate rates, market forces alone would not bring all rates down to just and reasonable levels because intrastate rates, ancillary charges and site commission payments on intrastate rates would still thwart market forces.  While we continue to see the benefits of a cost-based approach as adopted in the *Order* last year, the Commission prefers to allow market forces to ensure that rates are just and reasonable.  Now that we seek comment on comprehensively reforming all aspects of ICS, including intrastate rates, will the elimination of site commissions facilitate the market moving to just and reasonable rates?  We also seek comment on adopting permanent rate caps to ensure that ICS rates are just and reasonable and ICS compensation is fair, particularly while we transition away from site commissions.  We ask about the advantages and disadvantages of this approach as compared to setting safe harbors or simply requiring cost-based rates.  We seek comment above on a possible cost recovery amount for correctional facilities[150] and seek comment on including an amount for correctional facility cost recovery in any rate caps ultimately adopted by the Commission.

49.     *Data Analysis*.  We seek comment on the data filed by the 14 ICS providers in response to the Mandatory Data Collection.  The data filed by ICS providers include cost, site commission and ancillary services data, which are informative and useful, and we take this opportunity to remind all ICS providers of the filing requirement.[151]  These data include the cost of the full spectrum of safety and security features, including verification, monitoring and other advanced security capabilities that ensure that correctional facilities have the security necessary for the provision of ICS.  We generally seek comment on the data and invite parties to analyze the data and submit any analysis consistent with the terms of the *Protective Order*.  We also invite parties to submit concerns or alternative proposals for the Commission to consider as it evaluates further reforms.  Throughout this section we use 2012 and 2013 actual data filed by the responding ICS providers.

---

[149] During any transition period away from site commission payments adopted by the Commission, the adopted rate caps, once effective, will serve as the primary mechanism ensuring just and reasonable rates and fair compensation.  *See infra* Section III.G.

[150] *See supra* Section III.A.3.

[151] *See generally Data Collection Approval PN*; *Partial Extension Order*.

50.     While the data are useful to the Commission's evaluation of further ICS reforms, we seek comment on some apparent inconsistencies and anomalies.  For example, differing cost allocations by providers were particularly notable and could affect the consistency and reliability of the data as reported. The Wright Petitioners noted several anomalies based on their analysis of the data, including the fact that "[t]he average cost per minute of use is substantially less than the interim Interstate ICS hard rate caps adopted in August 2013; [t]he ICS providers inconsistently allocated their costs among the four cost categories (Telecom, Equipment, Security, Other); [t]he ICS providers used different methodologies to allocate costs to facilities and payment methods."[152]  We seek comment on these apparent inconsistencies and how the data may be analyzed to make an allowance for such variances.

51.     A large proportion of costs reported by ICS providers are common costs, which is consistent with the fact that ICS providers typically use centralized calling platforms to process calls from the different facilities they serve.  The Commission's Mandatory Data Collection did not dictate a particular methodology for allocating common costs – and, indeed, doing so could have greatly increased the administrative burden of providing the data.  As a result, the providers took varied and often inconsistent approaches to allocating common costs among types of facilities and types of services. Given the preponderance of common costs in ICS providers' data submissions, analysis of the data is particularly sensitive to such varied and inconsistent common cost allocation methodologies.

52.     We note that, as a whole, ICS providers allocated common costs among types of facilities and types of services differently as compared to the volumes of traffic those facilities and services experienced.  Specifically, ICS providers that served both jails and prisons generally allocated a higher proportion of their common costs to jails than would otherwise be warranted given the minutes of use from those jails.  Although the exact allocation varied by provider, on average about two thirds of common costs were allocated to jails, whereas only about half the reported total traffic volume originated from jails.[153]  The data evidence similar discrepancies between the allocation of common costs to types of service and the volume of traffic for those services.  For example, ICS providers as a whole allocated about 16 percent of their common costs to collect calls, whereas collect calls represented only about eight percent of total traffic.  It is not readily apparent why common costs (as opposed to direct costs) would not follow usage more closely.  And the results of the data from these allocations show costs for jails that are higher than proposals for comprehensive reform that the providers themselves submitted, which raises concerns about the accuracy of their methodology and whether alternative allocation methods would more accurately represent costs.

53.     One possible approach to addressing apparent inconsistencies in the providers' common cost allocation methodologies would be to use minutes of use for each provider as an alternative basis on which to allocate providers' common costs.  Given the high proportion of common costs reported by the industry and the centralized nature of its networks, using minutes of use to allocate common costs would seem likely to reflect the providers' operational realities.  We seek comment on whether employing a usage-based allocation of common costs would more closely reflect cost causation and provide more consistent and reliable data.  We further seek comment on how these data should inform the rate cap levels for interstate and intrastate debit/prepaid and collect calls.  The following table shows the costs per minute for jails and prisons when using three different methods to allocate common costs:  as submitted by ICS providers, as reallocated using total minutes of use, and as reallocated using the providers' cost

---

[152] Letter from Lee G. Petro, Counsel for Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Sept. 17, 2014).

[153] The proportion of common costs for 2012 and 2013 allocated to jails by all providers was 68.1 percent. Providers that serve both jails and prisons allocated virtually the same percentage of common costs to jails (67.6 percent).  While averaging jail common cost allocations over all providers raises the average allocation amount marginally, the difference has a negligible impact on our analysis.  We use 68 percent in this Second Further Notice to avoid any potential discrepancy in our analysis.

allocations between jails and prisons prior to reallocating those costs by minutes of use for each type of and facility.

**Table One**

| Facility Type | Common Costs as Allocated by Providers | | Common Costs Allocated by MOU | | Common Costs Allocated by Facility Type | |
|---|---|---|---|---|---|---|
| | Average Debit/Prepaid Cost | Average Collect Cost | Average Debit/Prepaid Cost | Average Collect Cost | Average Debit/Prepaid Cost | Average Collect Cost |
| Jails | 15.8 cents | 48.7 cents | 14.8 cents | 21.9 cents | 18.1 cents | 26.3 cents |
| Prisons | 10.0 cents | 13.7 cents | 14.0 cents | 17.2 cents | 9.9 cents | 14.3 cents |
| All | 13.3 cents | 28.3 cents | 14.5 cents | 19.2 cents | N/A | N/A |

54.     We seek comment on the two reallocation methodologies in Table One, both of which use minutes of use in different ways as a means of reallocating common costs in manner tied more closely to usage. We initially examine and seek comment on the reallocation based on total minutes of use. This method uses the ratio of total industry minutes of use for jails to total minutes of use for all facilities to reallocate all common costs among facility and service types. Minutes of use for jails represent about 53 percent of all minutes of use, resulting in an allocation of about 53 percent of common costs to jails instead of the average of approximately 68 percent allocated to jails in the data as reported by providers. The results of this reallocation methodology are more consistent with provider proposals in the record, both from 2008 and more recently.[154] For purposes of comparison, the 2008 ICS provider proposal reported costs of $0.164 per minute for debit calls and $0.236 per minute for collect calls, whereas the providers' data reported costs of $0.133 per minute for debit and prepaid and $0.283 per minute for collect.[155] Similarly, the Joint Provider Reform Proposal recommends a single per-minute rate cap of $0.20 for debit and prepaid and $0.24 for collect calling. CenturyLink's proposal advocates unified rate caps at the current interstate caps ($0.21 for debit and prepaid and $0.25 for collect).[156] We seek comment on these apparent allocational discrepancies.

55.     This alternative methodology would standardize common cost allocations among the five providers that serve a mix of jails and prisons. And the fact that providers that serve only jails have no prison minutes of use would ensure that their common costs would not be allocated to prisons. Does this method more closely approximate the operational realities of the providers? Is it more effective in replicating cost causation in the industry? Does it have any disparate impacts on providers that only serve jails?

56.     We also examine and seek comment on a potential reallocation of providers' common costs based on providers' allocation of common costs to facility types (jails or prisons). This method accepts each individual provider's allocation of common costs between jails and prisons and then

---

[154] *See generally* Don J. Wood, Inmate Calling Services Interstate Call Cost Study (WOOD & WOOD 2008) CC Docket No. 96-128 (filed Aug. 15, 2008); Letter from Stephanie A. Joyce, Counsel to Securus, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 96-128 (filed Aug. 22, 2008) (Joyce Aug. 22, 2008 *Ex Parte* Letter) (attaching supplemental cost and usage data); Record submission by "several providers of inmate telephone service," CC Docket No. 96-128 (filed Oct. 15, 2008) (amending supplemental cost and usage data) (collectively ICS Provider Data Submission); Joint ICS Provider Reform Proposal; Letter from Thomas M. Dethlefs, Counsel for CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Oct. 10, 2014) (Oct. 10, 2014 *Ex Parte* Letter).

[155] ICS Provider Data Submission at 4.

[156] CenturyLink Oct. 10, 2014 *Ex Parte* Letter at 3.

allocates those costs among facility and service types based on total minutes of use for each type of facility.  This method shifts fewer costs to prisons and results in higher costs for jails than the total minutes of use allocation due to the reliance on the 68 percent average allocation of common costs to jails by providers, as noted above.  Is this method more appropriate because providers' initial allocations of common costs are more accurate?  Alternatively, is this method's greater reliance on the accuracy of those allocations a potential vulnerability or flaw?

57.     The data provided by ICS providers also allocated costs to different subsets of facilities based on size of facility.  This allocation resulted in a wider range of per-minute costs with some apparent anomalies, such as per-minute costs for certain facility size groups being well above the range of rate cap proposals submitted by any ICS provider, including those that exclusively serve purportedly higher-cost facilities such as jails.[157]  The cost data generated by facility size groups also resulted in some anomalies that raised questions about whether smaller facilities have higher costs than larger ones, and vice versa, as some commenters have asserted in this proceeding.[158]  Given confidentiality of the data, we cannot disaggregate all data for jails and prisons by size but we note that while the data indicate that smaller jails are most costly and the largest jails are less costly to serve, the data did not show the same correlation between size and cost for prisons.  This raises questions about whether assumptions about facility size determining cost are accurate.  Even if size were the appropriate measure, would the administrative burden of using rates tiered by size and type of facility outweigh the benefits of multiple rate tiers?  Can rate caps for different types of services and facilities provide sufficient flexibility to ensure fair compensation short of resorting to size-based tiers?  Does the Commission need to adopt such a regulatory approach?

58.     To the extent that particular facilities are more costly to serve than suggested by the rate cap proposals in the record, can the Commission more effectively ensure fair compensation and reduce administrative costs to providers by addressing such outliers through the use of the waiver process?  We note that the Commission already granted a waiver of its interim rate caps to one ICS provider to address unique circumstances.[159]  Would using a waiver process be easier to manage than adopting and policing the multiple rate tiers the Commission would otherwise have to adopt?

59.     We also seek comment on other alternative methods of analyzing the ICS providers' cost data.  For example, would evaluating jail data separately from prison data be useful?  We seek comment on any other methods of evaluating the data that commenters may want to propose that may prove useful to the Commission in its analysis of this data to ensure just and reasonable rates and fair, not excessive, compensation.

60.     *Previous Data Submissions in the Record*.  ICS providers have previously filed data in the record throughout this proceeding.  In 2008, seven ICS providers filed a cost study based on proprietary cost data for certain correctional facilities with varying call cost and call volume characteristics.[160]  The study indicated that the per-call cost for debit calls was $0.16 per minute and $0.24 per minute for collect calls.[161]  In response to the *2012 ICS NPRM*, Securus filed data which showed, as discussed in the *Order*, "an average per-minute cost for interstate calls from all facilities included in the

---

[157] *See* Pay Tel Proposal (proposing rate caps of $0.22 per minute for larger jails and $0.26 per minute for smaller jails).

[158] Given the fact that some of the size groups contain too few data points to ensure confidentiality, they have not been reproduced here.  Parties are welcome to examine this data and provide comment and proposals based on it, consistent with the terms of the *Protective Order*.

[159] *See* Pay Tel Waiver Order.

[160] *See generally* ICS Provider Data Submission.

[161] These estimates are based on per-minute costs and were derived from the per-call and per-minute data developed by the study, using an assumed 15-minute call duration.

report to be $0.12 per minute with commissions and $0.04 per minute without them."[162]  Pay Tel filed financial and operational data for its ICS operations.[163]  The non-confidential cost summary included in the filing reported actual and projected 2012-2015 average total costs for collect and debit per-minute calling of approximately $0.23 and $0.21, respectively (including the cost of an advanced security feature known as continuous voice biometric identification).[164]  Although CenturyLink did not file a cost study at that time, it did file summary cost information for its ICS operations.[165]  Specifically, CenturyLink reported that its per minute costs to serve state departments of corrections facilities (excluding site commission payments) averaged $0.116[166] and that its per-minute costs to serve county correctional facilities (excluding site commission payments) averaged $0.137.[167]  We seek comment on how to reconcile these data submissions with the data filed in response to the Mandatory Data Collection and the Commission's analysis of that data described above, and how these data should inform our selection of rate caps.  We also seek comment on and updates to intrastate rate data currently in the record.[168]  And we seek updated comment on international ICS and the need for Commission reform focused on such services.[169]

### 1.     Proposals for a Unitary Rate

61.     Throughout this proceeding interested parties have filed in support of the Commission adopting unitary ICS rate caps for all intrastate and interstate debit/prepaid and collect calls in all facilities.  We seek comment on those proposals.

62.     *Joint Provider Reform Proposal.*  The Joint Provider Reform Proposal supports a rate cap of $0.20 per minute for debit and prepaid interstate and intrastate calls, and a rate cap of $0.24 per minute for all interstate and intrastate collect calls exclusive of per-call or per-connection charges,[170] exclusive of any facility cost recovery, and regardless of facility size.[171]  The providers that submitted this proposal assert that this "simplified rate structure" "will make ICS charges more transparent for inmates and their

---

[162] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14120-21, para. 26.  .

[163] Letter from Marcus W. Trathen, Counsel for Pay Tel Communications, Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Attach. (filed July 23, 2013) (Pay Tel July 23, 2013 *Ex Parte* Letter).

[164] Pay Tel July 23, 2013 *Ex Parte* Letter, Attach. at 2 (Pay Tel Cost Summary).

[165] *See* Letter from John E. Benedict, VP – Federal Regulatory Affairs & Regulatory Counsel, CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Aug. 2, 2013) (CenturyLink Aug. 2, 2013 *Ex Parte* Letter).  We also note that CenturyLink's predecessor, Embarq, participated in the 2008 ICS Provider Data Submission.  *See supra* n.160.

[166] *See* CenturyLink Aug. 2, 2013 *Ex Parte* Letter at 2.  CenturyLink states that the state departments of corrections facilities it serves had a median per-minute cost of $0.108, a low per-minute cost of $0.058 and a high per-minute cost of $0.188.  *See id.*

[167] *See* CenturyLink Aug. 2, 2013 *Ex Parte* Letter at 3.  CenturyLink states that the county correctional facilities it serves produced a median per-minute cost of $0.135, a low per-minute cost of $0.051, and a high per-minute cost of $0.220.

[168] *See* HRDC FNPRM Comments, Exh. A.

[169] We note that we sought initial comment in the *FNPRM* on international ICS.  *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14186-87, para. 166.

[170] We discuss per-call or per-connection charges in greater detail below.  *See infra* Section III.B.3.

[171] Joint Provider Reform Proposal at 3 ("Accordingly, if the FCC determines that such admin-support payments to correctional facilities are appropriate, the amount or percentage of such payments will have a direct effect on ICS provider's costs to provide ICS, and therefore, the proposed per-minute rate caps may have to be increased, unless such admin-support payments or percentages are nominal.").

friends and family," as well as "easy for ICS providers and correctional facilities to implement quickly, and will simplify oversight and enforcement."[172]

63.     Pay Tel and the Alabama PSC have raised concerns about the Joint Provider Reform Proposal for a unitary rate and urged the adoption of different rates for jails and prisons.[173]  For example, Pay Tel stated that the rate caps were "excessively high for prisons."[174]

64.     We generally seek comment on the rate caps proposed by the Joint Provider Reform Proposal.[175]  We seek comment on how our data analysis described above reconciles with the rate caps proposed by the providers.  As noted above, average debit and prepaid costs are lower than $0.20 per minute.  Should we adopt the Joint Provider Reform Proposal's rate caps because any adopted rate caps will serve as a backstop to ensure that rates are just and reasonable?  Would these rates enable the Commission to include a per-minute cost recovery of $0.005 for correctional facilities' cost recovery?  We also seek comment on how ICS providers' earlier data filings reconcile with the rate caps suggested in the Joint Provider Reform Proposal.

65.     *Current Interim Rate Caps*.  Some parties have supported making the interim rate caps permanent for all interstate and intrastate ICS calls.  CenturyLink asserts that it could "support a unified cap approximately at the current interstate cap levels."[176]  NCIC asserts that collect ICS rates should be capped at $0.25 per minute and debit call rates at $0.21 per minute.[177]  We seek comment on these proposals in light of the data received in response to the Mandatory Data Collection.[178]

66.     *Wright Petitioners' Proposal*.  The Wright Petitioners previously proposed a $0.07/minute rate cap for all interstate ICS.[179]  We sought comment on this proposal in the *FNPRM*, particularly as it related to distance insensitive rate proposals.[180]  ICS providers suggested that the rate may jeopardize ICS security.[181]  Other commenters suggested that the Commission should adopt a $0.07/minute rate cap for all ICS and that current rates in states like New Mexico ($0.043/minute) and New York ($0.048/minute) support this cap.[182]  We now seek comment on whether we should adopt this

---

[172] *Id*. at 2.

[173] Alabama PSC Sept. 30, 2014 *Ex Parte* Letter at 6-7 (Alabama asserted that "there are lower costs for serving prisons than jails" and urged the Commission to study "the need for separate rate structures according to facility type.").

[174] Pay Tel Oct. 2, 2014 *Ex Parte* Letter, Attach. at 2-3.

[175] Joint Provider Reform Proposal at 2-3.

[176] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 1.

[177] Letter from Glenn S. Richards, Counsel for NCIC, to Marlene H. Dortch, Esq., Secretary, FCC, WC Docket No. 12-375, Attach. at 6 (filed July 9, 2014) (NCIC July 9, 2014 *Ex Parte* Letter).

[178] We note that the Bureau granted a temporary, limited waiver of the Commission's interim rate caps to Pay Tel, approving a $0.46 per minute rate in response to the fact that certain states in which Pay Tel operates mandate intrastate rates that are below Pay Tel's cost.  *See generally Pay Tel Waiver Order*.  In its Petition for Waiver, Pay Tel reiterated its support for permanent rate caps of $0.21 per minute and $0.25 per minute for both interstate and intrastate ICS but requested the waiver because some intrastate rate caps in states where it serves correctional facilities are below cost.  *See* Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates, WC Docket 12-375 at 13-19 (filed Jan. 8, 2014).  Given PayTel's stated support for the interim caps as well as its current proposal for reform which is well below $0.46, we seek comment on the relevance, if any of the waiver to the interstate and intrastate rate caps we are considering in this Second Further Notice.

[179] *See* Petitioners NPRM Comments at 17.

[180] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14182, para. 155.

[181] *See* GTL FNPRM Comments at 3-4.

[182] *See* PLS FNPRM Comments at 7-8.

proposal.  If the Commission were to adopt this proposal, would rate caps at this level preclude ICS providers from paying site commissions and therefore negate the need for the Commission to regulate site commission payments as discussed above?[183]  What level of rate cap do commenters believe would change what providers are able to offer correctional facilities?  Do the data from the Mandatory Data Collection support this rate cap?  What are the considerations associated with such an approach?

## 2.      Tiered Rate Caps

67.      While we see certain benefits to a single set of rate caps such as administrative ease and avoidance of potential loopholes, some commenters recommend rates tied to the size or type of facility.  In the *FNPRM* the Commission sought comment on the adoption of, and benefits of, tiered rates based on a facility's volume of minutes, type (i.e., jail versus prison) or size.[184]  Responses centered on the distinction between jails and prisons, with some commenters advocating for different ICS rate tiers for jails and prisons.[185]  These same commenters also point out that the differences between jails and prisons are not absolute, and acknowledge that some prisons "are more costly to serve than jails and the range of costs of serving jails and prisons is very wide."[186]  The record indicates that jail administrators support a tiered rate instead of a flat rate because jails may face different costs than prisons as a result of their smaller size, higher turnover rate, and relative inability to take advantage of economies of scale.[187]  How do the data collected and reported herein impact our evaluation of these claims?

68.      *Pay Tel Proposal.*  In its proposal Pay Tel recommends separate rates for jails and prisons.[188]  Pay Tel proposes an $0.08 per minute rate for all prisons regardless of population.[189]  Pay Tel also estimated a $0.067 per minute average rate for the eight state prison systems that barred site commissions.[190]  Pay Tel suggests a rate of $0.26 per minute for jails with 1-349 average daily population [ADP], a $0.22 per minute rate for jails with 350 plus ADP, and a $0.08 per minute rate for all prisons regardless of size.[191]  We seek comment on these proposed rate caps.

69.      Alabama recently adopted ICS rates tied to facility type.  For example, the Alabama PSC has adopted per-minute rates of $0.30, decreasing to $0.25 over two years, for jails and $0.25, decreasing to $0.21 over two years, for prisons.[192]  We seek comment on this approach.

70.      Commenters suggest that rates tied to the type or size of facility would open loopholes in ICS reform and allow for gaming.[193]  Is this accurate?  Recently, CenturyLink said it "does not support

---

[183] *See* GTL FNPRM Comment at 5 (suggesting that the $0.07 all-distance rate proposed in the *FNPRM* "effectively will eliminate all commissions in the ICS industry").

[184] *See Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd at 14182-84, para. 156-59.

[185] *See generally* AJA FNPRM Comments; NSA FNPRM Comments.  *See also* CenturyLink FNPRM Comments at 15; Pay Tel FNPRM Comments at 17-24; Alabama PSC Sept. 30, 2014 *Ex Parte* Letter at 12.

[186] CenturyLink FNPRM Reply at 5-6.

[187] Transcript of 2014 ICS Workshop at 214-15 (Comments of Elias A. Diggins, Division Chief, Denver Sheriff's Department on behalf of the American Jail Association).

[188] *See* Pay Tel Proposal at 1.

[189] *See id.*

[190] *See id.*

[191] *See id.*

[192] *See* Alabama PSC Further Order at 49-50.

[193] *See* 2014 ICS Workshop Transcript at 211 (Comments of Richard A. Smith, CEO, Securus) ("We would go to a big facility like Florida.  If you did, for example, an ADP [average daily population] or a minute of use kind of a tiering, we'd got to the big facilities and say instead of one contract, we're going to have 34, one per facility because they're different, they have different characteristics, they're in different parts of the state so we migrate up to a

(continued…)

complex or tiered rate caps."[194]   Other commenters contend that an insufficient record exists from which to develop rate tiers, and point to evidence that many jails house long-term inmates, which may indicate that costly account set-up fees are less of an issue than suggested.[195]   Do the data received in response to the Mandatory Data Collection assuage the concern regarding the sufficiency of the record?  The data also suggest that certain ICS providers reported a large proportion of the costs of ICS as common costs, rather than direct or facility-specific costs.  Does this further call into question the cost allocation methods used by providers in their data submissions to allocate common and direct costs?  Or does it suggest that ICS providers did not use uniform standards to distinguish between direct and common costs?  We seek updated comment on interested parties' opinions on tiered rates for different types of facilities.[196]   Specifically, if the Commission adopts a market-based approach of addressing site commission payments and allowing competition to drive rates closer to cost, should we consider rate tiers, or should we instead adopt common rate caps for all correctional institutions to accommodate any differences between jails and prisons?  Would the adoption of tiered rates help promote competition among ICS providers and promote the widespread deployment of ICS—a form of payphone service—consistent with the goals of section 276?[197]   For example, would a lower rate cap for ICS in prison facilities promote additional usage, a potential means of promoting widespread deployment of payphone ICS service?

71.     The Commission seeks comment above on prohibiting site commissions to address the primary cause of the ICS market failure.  If the Commission does not prohibit site commissions should we focus more on rates tied to facility size or type?  If the Commission were to set tiered rates, we seek comment on defining a jail facility as a correctional facility operated by a political subdivision of a state or its agent and defining a prison facility as a state-run or federally-run correctional facility.[198]   How would differences in tiered rate caps be administered?  We seek comment on a simpler approach.  Would a variety of rate caps cause confusion?  We also seek comment on the administrability of cost on ICS providers on an approach that varies by size and type of facility.  CenturyLink urges the Commission to exclude from ICS rate reform certain types of facilities that it considers high-cost, such as juvenile detention centers and secure mental health facilities.[199]   Do other commenters agree that these types of facilities are particularly high cost?[200]   If so, why?  Are there other categories of facilities that the Commission should consider exempting because they are high cost?  Would doing so be in keeping with our statutory mandate?  How should the Commission regulate the provision of ICS at such facilities?

(Continued from previous page) ─────────────────

higher rate.  Within the facilities, I'd start to look at booking areas versus detention areas versus the women's area and the men's area.").

[194] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 1.

[195] *See* Petitioners FNPRM Comments at 11-12; *see also* PLS FNPRM Comments at 8.

[196] Transcript of 2014 ICS Workshop at 98-99 (Comments of Cheryl A. Leanza, Policy Advisor, United Church of Christ, OC Inc.) ("So, in fact, there may not be that same cost differential for a small jail as a large facility, because in fact the provider is centralizing those services at a single place so their volume is distributed over the whole facility.").

[197] *See* 47 U.S.C. § 276(b).

[198] *See* NSA FNPRM Comments at 3.

[199] *See* CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2 ("[H]igh-cost facilities such as juvenile detention centers and secure mental health facilities should be exempted from any rate caps that are imposed. . . . Limits on ancillary fees, however, should nonetheless be imposed on high-cost facilities such as juvenile detention centers and secure mental health facilities.").

[200] *See* Joint Provider Reform Proposal at n.5 ("For example, waivers could be sought to provide service to individual mental health facilities, youth work camps, and other facilities with unique environments (security, geographic or otherwise) that increase the cost of providing service beyond the cap.").

Should it exempt such facilities from ICS rate reform?  We seek comment on the appropriate definitions for juvenile detention facilities and secure mental health facilities.

72.     In the *FNPRM*, the Commission also sought comment on rate tiers based on facility size as measured by the average daily population of the facility.[201]  The Prison Policy Initiative suggested that the Commission could use the Census of Jail Facilities population data to capture facility size but could also use more recent data.[202]  Would following the Census numbers result in too few or too many tiers?  We seek comment on what interested parties believe to be the appropriate inflection points, in terms of ICS providers' scalability of costs, with regard to possible tiered rates.  Some states have recently adopted ICS rate tiering.  We seek comment on the jail and prison rates adopted by the Alabama PSC or any other states.[203]

### 3.     Additional Considerations Related to ICS Rates

73.     *Debit/Prepaid and Collect Calling*.  In the *Order* the Commission treated debit and prepaid ICS alike and collect ICS separately because "[t]he record indicates that prepaid calling is generally less expensive than collect calling but can be about equal in rates to debit calling."[204]  Data from the Mandatory Data Collection suggest a difference in cost between collect ICS calling and debit/prepaid ICS calling.  The data also show, however, that debit and prepaid ICS costs are very similar.  Commenters have recommended higher rates for collect calls.[205]  The Alabama PSC adopted different rate caps for different types of service from prisons.[206]  Other commenters have opposed differentiated rate caps for different types of ICS.[207]  We seek comment on retaining this distinction and adopting a rate cap for debit and prepaid calls and a rate cap for collect calls.[208]  We also seek comment on the appropriate differential, if any, between the debit/prepaid cap and the collect cap.

74.     *Per-Call or Per-Connection Charges*.  Per-call or per-connection charges are one-time fees often charged to ICS users at call initiation.[209]  We seek comment on banning the imposition of per-call or per-connection charges.[210]  In the *Inmate Calling Report and Order and FNPRM* the Commission noted several problems with per-call or per-connection charges, including the level of some of the charges, their effect on the rate for short calls, and evidence of premature, non-security related call terminations, and the assessment of multiple per-call charges for what was, in effect, a single conversation.[211]  The Commission, recognizing that many different ways to address per-call charges exist, did not prohibit all per-call charges in the *Order* but sought comment in the *FNPRM*.[212]  In the *FNPRM*

---

[201] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14183, para. 158.

[202] *See* Prison Policy Initiative FNPRM Reply at 4 ("A more robust and future-proof methodology might be just to require disclosure of the average daily population in the previous year").

[203] *See* Alabama PSC Further Order at 49-50.

[204] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14120, para. 24.

[205] GTL NPRM Comments at 20 ("collect calling is generally more expensive for the ICS provider than prepaid calling because of billing cost and uncollectibles").

[206] Alabama PSC Further Order at 50.

[207] *See, e.g.*, Petitioners NPRM Comments at 3.

[208] The data from the Mandatory Data Collection show that in 2013 collect calls accounted for less than nine percent of revenue producing minutes for the respondents and is projected to decrease.

[209] These terms are used interchangeably throughout this Second Further Notice.

[210] The Alabama PSC has proposed eliminating per-call charges as well.  *See* Alabama PSC Further Order at 1-2.

[211] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14154-55, para. 85.

[212] *See id.* at 14155, para. 87.

the Commission noted the flexibility it gave ICS providers to use a rate structure that included per call charges and sought further comment on the risks and benefits of allowing per call charges.[213] Specifically, the Commission "express[ed] serious concerns about such charges."[214]  Some commenters suggested that the Commission eliminate per-call charges and that doing so would be beneficial because it "would lead to significant reductions in customer complaints regarding charges associated with dropped calls and in the amount of time providers are required to spend analyzing and resolving such complaints."[215]  Is there continuing evidence of premature, non-security related call terminations since the Commission adopted the *Order*?  The per-minute rate caps proposed by Joint ICS Providers do not contemplate the continued charging of a per-call or per-connection fee.[216]

75.     We seek comment on our legal authority to ban the imposition of per-call or per-connection charges, for both interstate ICS calls and intrastate ICS calls.  More specifically, we seek comment on whether such fees are part of the rate for ICS and therefore subject to the section 276 mandate to ensure fair compensation.[217]  Alternatively, should the Commission consider per-call or per-connection charges an ancillary service as discussed in section 276(d)?  Are there instances in which the correctional facility or some other third party assesses a per-call or per-connection fee?  If so, we seek comment on our authority to ban such charges.  Would the elimination of per-call charges allow for just and reasonable interstate and intrastate ICS rates and fair compensation for providers?  Would pure per-minute rate caps at an appropriate level or levels ensure fair compensation for ICS providers?  Section 276 specifically requires us to "establish a per call compensation plan."  We seek comment on whether section 276 gives the Commission the legal authority to ban per-call compensation.  We seek comment on whether we should also rely on our section 201 authority to ban per-call charges for interstate calls.  The record has not shown significant per-call costs that could not reasonably be recovered using per-minute charges.  With one exception, ICS providers have successfully implemented the interim per-minute rate caps for interstate ICS mandated by the *Order*.  We seek comment below on transitions and whether rate caps should be effective 90 days after the effective date of a Commission order.  If the Commission continues to allow per-call charges, should it nonetheless disallow an additional per-call charge when a call has been reinitiated within one or two minutes of having been mistakenly disconnected?[218]  If states have conducted ICS reform, we seek comment on whether we should review the effective rates for consistency with the Commission's regulations based on the calculation of the cost of a 15-minute ICS call.  Are there other considerations relating to per-call charges in the ICS context that the Commission should consider?

76.     *Flat-Rate Charges*.  We seek comment on whether or not it is necessary to ban flat-rated charges for calls of a fixed duration to ensure rates are just and reasonable and fair.  In the *Order* the Commission stated that "a rate will be considered consistent with our rate cap for a 15-minute conversation if it does not exceed $3.75 for a 15-minute call using collect calling, or $3.15 for a 15-minute call using debit, prepaid, or prepaid collect calling."[219]  Rule 64.6030 mirrors this language and was intended to illustrate that a five-minute collect call would equal $1.25 and a five-minute debit or prepaid ICS call would equal $1.05, while a 30-minute collect call could equal no more than $7.50 and a 30-minute debit or prepaid ICS call could equal no more than $6.30. [220]  In the *FNPRM* the Commission

---

[213] *Id.* at 14185, paras. 161-62.

[214] *Id.* at 14185, para. 162.

[215] *See* Pay Tel FNPRM Reply at 17.

[216] *See* Joint Provider Reform Proposal at 2.

[217] 47 U.S.C. § 276(b)(1)(A).

[218] *See* Petitioners FNPRM Comments at 18.

[219] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14156, n.330.

[220] *See* 47 C.F.R. § 64.6030.

sought comment on whether it should adopt an overall rate cap based on call duration, how such a rate cap might ensure that ICS rates are just, reasonable, and fair, and whether a per-call cap is still necessary to ensure that shorter calls are reasonably priced.[221]  Commenters expressed concern that "consumers who make shorter calls would necessarily be penalized"[222] and that "there is no principled basis for capping the amount that can be charged for a call."[223]  The Public Service Commission of the District of Columbia discussed the benefits of its $1.75 per-call cap regardless of call length.[224]

77.  Subsequent to the *FNPRM* comment deadline, Securus sought additional guidance on whether the *Order* allows providers to use a flat-rated charge based on the interim rate caps for a 15-minute call regardless of call duration.[225]  We seek comment on this practice.  Should we allow ICS providers to charge fixed call duration pricing for all interstate ICS usage regardless of call duration?  Is this an appropriate interpretation and application of rule 64.6030 and the relevant discussion in the *Order*?[226]  We also seek comment on how we should address the use of flat-rate charges for ICS going forward and our legal authority to act on such charges.  We seek comment on whether we should revise the existing rules to prohibit flat-rate charges or develop new rules prohibiting flat-rated charges.  If not, how much flexibility should the Commission allow if flat-rate charges are permitted?  How can we ensure that flat-rate charges allow for just and reasonable ICS rates to end users as well as fair compensation to ICS providers?

78.  One commenter asserts that correctional facilities seek such flat-rated charges.[227]  Is this the case and, if so, why?  What impact would allowing this level of flexibility have on the effective per-minute rates end users pay?  If the Commission adopted a lesser degree of flexibility, how would it work?  Should such a flat rate be used only for calls 15 minutes in length?[228]  Will flat-rated charges, at the rate caps discussed above, for a 15-minute call duration allow for just and reasonable ICS rates and fair compensation?  In the *Order*, the Commission found that the record supported 15-minute average call duration.[229]  Data from the Mandatory Data Collection show that the average call length reported by respondents was below 13 minutes in 2013.  Is 15 minutes still a useful average call duration for purposes of discussing flat-rate charges?  If not, what would be an appropriate average call duration?

79.  *Waivers*.  The *Order* made clear that the Commission's standard waiver process applies to ICS,[230] specifically, that ICS providers seeking a waiver of the interim rules must demonstrate good cause.[231]  The Commission delegated to the Bureau the authority to seek additional information necessary for evaluating waivers.[232]  Since release of the *Order*, the Bureau has processed three waiver requests.[233]

---

[221] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14184-85, para. 160.

[222] PLS FNPRM Comments at 8.

[223] CenturyLink FNPRM Comments at 16.

[224] *See* DC PSC FNPRM Comments at 3.

[225] Letter from Stephanie A. Joyce, Counsel for Securus, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Feb. 10, 2014) (Securus Feb. 10, 2014 *Ex Parte* Letter); *see also Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14155-56, para. 88; Securus July 30, 2014 *Ex Parte* Letter at 1-2.

[226] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 141447-54, paras. 73-81.

[227] Securus Feb. 10, 2014 *Ex Parte* Letter at 1 ("several correctional authorities . . . would prefer this rate structure."); *see also* Securus July 30, 2014 *Ex Parte* Letter at 1-2.

[228] *See* 47 C.F.R. § 64.6030.

[229] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14142, n.232.

[230] *Id*. at 14153-54, paras. 82-84.

[231] *See* 47 C.F.R. § 1.3.

[232] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14154, para. 84.

CenturyLink suggests that the Commission "invite waivers where new rules conflict with state statutes, or where they would force ICS providers to offer service at a loss."[234]  The ICS providers that submitted the Joint Provider Reform Proposal suggest that the Commission "permit an ICS provider to seek a waiver of the rate cap for a particular correctional facility if the ICS provider can demonstrate that the proposed rate cap does not allow the ICS provider to economically serve the correctional facility.  However, such waivers should be permissible only on a facility-by-facility basis."[235]  We seek comment on these suggestions.  Specifically, is such action necessary if the Commission preempts inconsistent state regulations pursuant to section 276(c) of the Act?  We seek comment on how the Commission would determine that rates are below-cost in a waiver proceeding and how any adopted regulations should address this issue.  We further seek comment on what information would be important for providers to demonstrate when seeking a waiver in the ICS context.  We also seek comment on whether exempting a provider's highest-cost facilities from the final, adopted regulations would be a suitable remedy to a waiver request.  Conversely, would such an exemption encourage ICS providers to focus on particular facilities so as to arbitrage our rules?

C.      **Reforms to Ancillary Charges**

1.      **Background**

80.      In addition to unreasonable rates, ICS providers typically assess a wide range of separate charges for services ancillary to the provision of ICS.  These charges impose significant additional burdens on consumers and considerably inflate the effective price they pay for ICS.  The record indicates that ancillary charges represent a significant proportion of the total expense of ICS to consumers.  The Prison Policy Initiative estimated that ancillary charges represent 38 percent of all consumer payments for ICS.[236]  Others have suggested that this estimate may be low.[237]  Fees to open, fund, maintain, close, and refund an ICS account represent just a few of a variety of ancillary charges assessed by ICS providers.[238]

(Continued from previous page) ───────────────────

[233] *See generally Pay Tel Waiver Order*; *see also Rates for Interstate Inmate Calling Services; Securus Technologies Inc. Petition to Expand Pay Tel Waiver; Securus Technologies Inc. Petition for Leave to Add Fee for Voice Biometrics Technology*, Order, WC Docket No. 12-375, 29 FCC Rcd 5973 (2014).

[234] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2.

[235] Joint Provider Reform Proposal at 2-3 (citing, for example, "mental health facilities, youth work camps, and other facilities with unique environments").

[236] *See* Letter from Peter Wagner, Exec. Dir., Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Attach. at 10 (filed May 9, 2013) (Please Deposit All of Your Money Study).

[237] *See, e.g.*, 2014 ICS Workshop Transcript at 152 (Vincent Townsend, President, Pay Tel) ("I would argue that it's actually getting higher with the advent of the single-call program.").

[238] *See, e.g.*, *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14156-57, para. 90, n.335 (citing examples of charges).  Ancillary charges reported in response to the Mandatory Data Collection included an account close-out fee, account transfer fee, automated information services, automated operator recharge fee, bill processing charge for direct billed calls, bill processing fee, bill statement fee, biometric service charge, carrier cost recovery fee, collect call bill statement fee, collect call regulatory fee, collect interstate USF cost recovery fee, continuous voice verification, credit card charge-back fee, credit card processing fee, federal regulatory recovery fee, federal USF, federal USF administration fee for LEC billed calls, federal USF administration fee for non-LEC billed calls, funding fee, funding fee from cashier's check deposit, funding fee from credit/debit cards, funding fee from money order deposit, funding fee from Western Union deposit, live operator recharge fee, live prepaid account set-up fee, load fee, location validation, minimum payment fee, monthly bill statement fee, payment fee - IVR/web, payment fee - live operator, per call administrative fee for calls from county facilities in Tennessee, prepaid accounts, prepaid deposit fees, processing fee, refund fee, regulatory assessment fee, sales tax, state cost recovery fee, state regulatory cost recovery fee for LEC billed calls, state regulatory cost recovery fee for non-LEC billed calls, state USF, state USF administration fee for LEC billed calls, technology, threads, USF administrative fee, USF federal, USF federal (LEC billed), validation recovery fee, VINE, voice biometrics, web interface account set-up and recharge fee, and wireless administration fee.

The sheer number of ancillary charges, their varying nomenclature, and the variability of the amounts charged cause considerable customer confusion, let alone consternation.

81.     In the *Order*, the Commission "question[ed] whether such charges are reasonable in and of themselves" and noted that "the levels of such charges do not appear to be cost-based."[239]  The Commission required that all interstate ancillary service charges be cost-based and reasonably and directly related to provision of ICS.  The Commission concluded that it had the jurisdiction and authority to regulate ancillary service charges.[240]  The Commission also required ICS providers to file cost data about ancillary services as part of the Mandatory Data Collection, and in the *FNPRM* sought comment on additional steps the Commission could take to address ancillary service charges and ensure that they are cost-based.[241]  We now seek further comment on issues related to ICS ancillary charges.

82.     Since the release of the *Order*, evidence indicates that ancillary charges have increased,[242] suggesting that any reforms limited to ICS rates could be circumvented through increased and new ancillary charges.[243]  As the Commission stated in the *Order*, ICS reform and ensuring just and reasonable rates to end users "could not be achieved if ancillary charges were not also controlled."[244]  Given that ancillary charges are typically shielded from site commission assessments in correctional institutions' contracts with providers, ICS providers appear to have an incentive to assess additional ancillary charges as an alternative source of revenue to compensate for lowered ICS rates or for increasingly high site commission payments.[245]  We seek comment on the extent to which the proliferation of ancillary charges may be a result of the market distorting effects of site commissions.

83.     There is broad consensus in the record on the need for the Commission to reform ancillary charges.  The Wright Petitioners and prisoner advocacy groups have recommended the regulation or elimination of ancillary charges.[246]  A number of ICS providers have made similar recommendations.  For example, CenturyLink stated that "the Commission should prohibit all or all but a very narrow class of ancillary fees.  Ancillary fees are the chief source of consumer abuse and allow

---

[239] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14156-57, para. 90.

[240] *Id*. at 14157-58, para. 91.

[241] *Id*. at 14187-89, paras. 167-71.

[242] *See* Pay Tel July 10, 2014 *Ex Parte* Letter, Attach. ("FCC Workshop on Inmate Calling Services – Panel 2, Ancillary Charges"); Alabama PSC FNPRM Comments at 6 (the Alabama PSC "observed a tendency for the ICS industry to increase both the number and magnitude of fees").

[243] *See, e.g.*, 2014 ICS Workshop Transcript at 140 (Vincent Townsend, President, Pay Tel) ("They've increased – payment fees have gone up with most providers since then").

[244] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14158, n.338.  *See also* 2014 ICS Workshop Transcript at 136 (Vincent Townsend, President, Pay Tel) ("unless the FCC addresses the issue of fees, we're wasting a lot of everybody's time because without addressing the fees, you're never going to be able to bring real relief to the families that are paying these bills").

[245] *See* Letter from Lee G. Petro, Counsel to Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed July 14, 2014) (Petitioners July 14, 2014 *Ex Parte* Letter) ("ancillary fees are non-commissionable, i.e., the ICS providers do not share the revenue earned from ancillary fees with the correctional institutions"); 2014 ICS Workshop Transcript at 122-23 (Aleks Kajstura, Legal Director, Prison Policy Initiative) ("companies have developed fees as a way to shield that profit from the commission system"); Alabama PSC Further Order at 20 ("The Commission postulates that ICS providers offering abnormally high site commissions are either grossly exaggerating their reported service costs or they are compensating for calling revenue losses by substantially inflating ICS charges that are not exposed to site commissions.").

[246] *See, e.g.,* Petitioners FNPRM Reply at 14 ("Petitioners do not support rules authorizing ancillary fees, as most fees merely reflect standard overhead costs"); 2014 ICS Workshop Transcript at 123 (Aleks Kajstura, Legal Director, Prison Policy Initiative) ("regulating ancillary fees is a significant and important part of regulating the cost of the phone services in correctional facilities").

circumvention of rate caps."[247]   NCIC stated "[a]lthough telecom companies don't normally welcome a regulation, we see the need for the FCC and state regulators to set a standard rate and fee structure."[248] Pay Tel stated "you ought to get rid of all of them except the fees where the consumer makes a choice."[249] And Securus stated that it "offered, however, to cease passing through several types of fees and to cap its fees for optional, convenient payment methods for a period of five years."[250]

84.    *Mandatory Data Collection.*  ICS providers submitted a significant amount of ancillary service cost and usage data in response to the Mandatory Data Collection.  The ancillary services data provide some useful insight into the costs of ancillary services.  For example, the data show that approximately 82 percent of total ancillary costs incurred by ICS providers pertain to the provision of bill processing services, particularly for the processing of credit and debit card transactions.[251]  Conversely, only about 10 percent of providers' ancillary costs pertain to ancillary services that are typically treated as normal utility overhead.[252]  Even so, the data have some limitations given providers' inconsistent approaches in assessing and labeling such fees, different allocation methodologies, and different ways of reporting those costs.  The data, while mixed, also show that the per transaction cost of processing financial transactions point to the reasonable nature of the $3.00 caps for financial transaction processing fees set by the Alabama PSC.[253]  We seek comment on these general observations and on the ancillary charge data generally.

## 2.    Legal Authority for Ancillary Charge Reform

85.    In the *Order,* the Commission asserted jurisdiction over interstate ICS ancillary charges, citing as sources of authority sections 201(b) and 276 of the Act.[254]  Given section 276's mandate of fair compensation "for each and every completed intrastate and interstate call," and its inclusion of "inmate telephone service" and "any ancillary services" in the definition of "payphone service," we seek comment on whether section 276 gives the Commission authority to regulate both interstate and intrastate charges for ICS ancillary services.[255]  While the Commission has previously adopted a definition of ancillary charges,[256] we have not adopted a definition for "ancillary services" and therefore seek comment on such a definition.  Additionally, given the absence of any qualifying statutory language to the contrary, we seek comment on whether section 276 gives the Commission jurisdiction over charges that are ancillary to ICS to the extent such services are considered IP-enabled services.  Further, in the *Order* the Commission asserted in regard to ICS generally that "[o]ur exercise of authority under sections 201 and 276 is further informed by the principles of Title I of the Act."[257]

86.    We seek comment on whether this assertion also encompasses the Commission's regulation of services ancillary to the provision of ICS to the extent that ICS may be considered an IP-enabled service.  Additionally, to the extent that ancillary charges are assessed in connection with ICS

---

[247] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2; CenturyLink FNPRM Comments at 18 ("Without controls on ancillary charges, the practical effect of rate caps is likely to be limited, if not wholly neutralized.").

[248] 2014 ICS Workshop Transcript at 132 (William Pope, President, NCIC).

[249] *Id*. at 140 (Vincent Townsend, President, Pay Tel Communications).

[250] Securus July 23, 2014 *Ex Parte* Letter at 2.

[251] Staff calculation based on aggregated data from the Mandatory Data Collection.

[252] *Id*.  Taxes and fees constituted the balance of providers' ancillary costs.  *See infra* Section III.C.3.b.

[253] *See* Alabama PSC Further Order at 79-82.

[254] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14157-58, para. 91.

[255] 47 U.S.C. §§ 276(b)(1)(A), 276(d).

[256] *See* 47 C.F.R. § 64.6000(1).

[257] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14115, para. 15.

provided through wireless phones, we seek comment on whether sections 276 and 332(c) confer jurisdiction on the Commission to reform such fees.[258]  We also seek comment on assertions that charges for ancillary services are primarily related to billing and collection and therefore may not be considered to be communications services subject to Commission regulation.[259]  Finally, we seek comment on whether regulation by the Commission of ICS ancillary services should be treated as a default federal framework, with states encouraged to adopt additional reforms to the extent they are consistent with the Commission's regulations.  Regarding the jurisdictional nature of ancillary charges, the Alabama PSC stated that "any schedule of ancillary fees applies to both the interstate and intrastate jurisdictions."[260]  Are ancillary charges inherently dual jurisdictional in nature?  We seek comment on this assertion and its impact on our legal authority to regulate such charges.[261]

### 3.    Discussion

#### a.    Prohibition of Certain Ancillary Charges

87.    The *FNPRM* sought comment on whether certain ancillary charges constituted unjust and unreasonable practices under section 201(b), or practices that would result in providers being unfairly compensated under section 276.[262]  We now seek comment on prohibiting separate charges for certain ancillary services that are basic requirements for consumers to gain access to ICS, and that are typically recovered through rates as part of normal utility overhead costs.  We also seek comment on capping charges for certain other ancillary services such as payment processing for credit and debit card payments that enhance convenience for ICS consumers.  We seek comment on whether this approach will promote the Commission's mandate of ensuring just and reasonable ICS rates and fair compensation for ICS providers, as well as promote competition and deployment in the ICS market.

88.    The record, including the discussion at the Commission's 2014 ICS Workshop, supports the notion that the Commission should prohibit separate ancillary charges for services that represent normal utility overhead but allow other charges for services that represent an additional option or convenience for consumers.  For example, the Alabama PSC workshop participant stated that its approach "is first, establish a basic level of ICS service and what is included in that basic service at no additional charge to the customer. . . .  Beyond that basic level, the Commission will consider fees."[263]  The Alabama PSC participant described its goal to be to "[m]ake the rates a true reflection of cost for providing the service."[264]  Other commenters support making a similar distinction.  For example, Pay Tel's President stated at the 2014 ICS Workshop "what I characterize as ancillary fees are all these extra things that really should be incorporated into the cost of the call. . . . [T]he fees that should be separated are the ones that are driven by consumer choice."[265]  Securus similarly proposed "not to have any mandatory fees and to have only fees for optional, convenience-related payment methods."[266]  The

---

[258] 47 U.S.C. § 332(c).

[259] *See, e.g.,* GTL FNPRM Comments at 10-11; Securus FNPRM Comments at 20-21.  *But cf.* Securus July 23, 2014 *Ex Parte* Letter at Attach.; Joint Provider Reform Proposal at 4-6.

[260] Alabama PSC Sept. 30, 2014 *Ex Parte* Letter at 8.

[261] *See infra* Section III.C.2.

[262] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14188, para. 171; *see also id.*, at 141888, para. 168 ("We seek comment on whether the Commission should identify certain ancillary charges that are unreasonable practices and therefore prohibited under the Act.").

[263] 2014 ICS Workshop Transcript at 117 (Darrell Baker, Director, Utility Services Division, Alabama PSC).

[264] *Id*. at 121.

[265] *Id*. at 171 (Vincent Townsend, President, Pay Tel).

[266] Securus July 23, 2014 *Ex Parte* Letter at 2.

Minnesota Department of Commerce stated that if an ancillary charge applies "to all ICS end-users at a facility, or cannot be avoided by a purchaser of ICS (e.g., in a situation in which a no-cost alternative is not offered), the ancillary charge or line-item fee should be incorporated in the per-minute rate, and should be subject to the per-minute rate cap."[267]

89.     We seek comment on prohibiting separate ancillary charges for functions that are typically a part of normal utility overhead and should be included in the rate for any basic ICS offering. These functions should include account establishment by check or bank account debit; account maintenance; payment by cash, check or money order; monthly electronic account statements; account closure; and refund of remaining balances.  Separate charges for such ancillary services can often represent unreasonable practices and result in unfair compensation.  For example, the record indicates that GTL currently requires a minimum deposit of $25 to create a prepaid collect account for an inmate's family member.[268]  If the customer does not spend the $25 in the account, GTL charges a $5 refund charge that is only triggered once the customer asks for a refund.[269]  If the account remains inactive for 180 days, the remaining funds become the property of GTL.[270]  We seek comment on prohibiting separate charges for these functions and on whether separate charges for other services should also be prohibited. Would such prohibitions help ensure just and reasonable ICS rates and fair, not excessive, ICS compensation?

90.     The Alabama PSC implemented such an approach to the regulation of ancillary charges in its Further Order.  It defined basic utility overhead services as including account set-up, account maintenance, account funding, payment by check or money order, monthly electronic billing statements, and refunds,[271] declining to authorize separate fees for these services.[272]  The Alabama PSC took other steps to address fees and practices, including barring payment limits for certain forms of customer payments, barring wireless administration fees for linking wireless numbers to an account, and requiring providers to include up to five pre-approved numbers on the call list for prepaid ICS at no charge.[273]  In contrast, it authorized, but capped, separate ancillary charges for other services, including debit/credit card payment, payment via live agent, bill processing for collect calls billed by a call recipient's local telecommunications service provider, third party payment services, inmate canteen/trust fund transfers, and paper billing statements.[274]  We seek comment on whether the Alabama PSC's approach to prohibiting certain fees and capping others is reasonable and would lead to just and reasonable rates and fair ICS compensation.  We also seek comment on the approach taken by the New Mexico Public Regulation Commission, which adopted a similar but more proscriptive approach, barring all fees except payment processing fees for credit card or check by phone payments and a refund fee.[275]

---

[267] MNDOC FNPRM Comments at 6; *but see* CenturyLink FNPRM Comments at 18 (the cost of providing ancillary services "should not be included as part of ICS rates").

[268] *See* HRDC Sept. 17, 2014 *Ex Parte* Letter at Exh. 1 (citing David Lazarus, *Gouging L.A. County Inmates with High Phone Fees*, LOS ANGELES TIMES, Sept. 8, 2014).

[269] *See id.*

[270] *See id.*

[271] 2014 ICS Workshop Transcript at 117 (Darrell Baker, Director, Utility Services Division, Alabama PSC).

[272] *See* Alabama PSC Further Order at 70-74.

[273] *See id.* at 22-37.

[274] *See id.* at 74-88.

[275] *See* Marks July 12, 2013 *Ex Parte* Letter at Attach. (New Mexico Public Regulation Commission, Petition to Commence Rulemaking Proceeding for Institutional Operator Service Providers, Case No. 10-00198-UT, Final Order and Final Rule (issued Nov. 8, 2012)).

91.     We seek comment on other proposals in the record to reform ICS ancillary charges.  The Wright Petitioners recommend prohibiting all ancillary charges but, if the Commission were to permit ancillary fees, it suggests adopting an approach similar to Alabama's and New Mexico's.[276]  The Prison Policy Initiative recommends "ban[ning] all illegitimate fees."[277]  Several ICS providers also recommend reforming ancillary charges.  Pay Tel recommends that ancillary charges be "generally prohibited, subject to a narrow list of clearly-defined exemptions," particularly "fees associated with the processing of payments."[278]  CenturyLink suggests similar treatment.[279]  Securus proposes eliminating all mandatory fees, bill statement fees, federal regulatory recovery fees, and state cost recovery fees, and capping all convenience fees, including transaction funding fees, for five years.[280]

92.     We also seek comment on the Joint Provider Reform Proposal, which includes a proposal "that ancillary fees are limited to a specified list of permissible fees,"[281] proposing to eliminate a number of types of fees, including per call fees, account set-up fees, billing statement fees, account close-out and refund fees, wireless administration fees, voice biometrics and other technology fees, and regulatory assessment fees and the capping of rates for remaining fees.[282]  The Proposal also requires providers to offer free payment processing options such as payment by check or money order when offering single call payment options.[283]  The Alabama PSC raised concerns with the Joint Proposal, including its treatment of site commissions, proposed rate caps that purportedly overcompensate providers serving prisons, and proposed ancillary fees that it asserted would result in substantial net revenue increases for providers.[284]  Pay Tel also identified concerns with the Proposal, stating that it "lacked legitimacy from a number of perspectives" and "would allow the Proposers . . . to continue to burden inmates and their friends and family with excessive fees and practices that significantly and unjustifiably increase the cost of ICS."[285]  The Alabama PSC's and Pay Tel's concerns are addressed at greater length below.  Will the suggestions in the Joint Provider Reform Proposal result in just and reasonable rates for consumers and fair, not excessive, compensation?  If the use of ancillary charges was driven by pressure from increasingly high site commissions and the Commission were to prohibit site commissions, is there continued justification for allowing providers to assess ancillary fees generally?

93.     If the Commission were to prohibit some ancillary charges, should ICS providers be required to seek prior Commission approval before assessing a new ancillary charge?  If so, what should such an approval process involve and what information should providers file?  Certain states already require prior approval of new ancillary charges.[286]  Should states continue to play such a role even if the Commission regulates ICS ancillary charges?  In lieu of seeking approval, should ICS providers file a

---

[276] *See* Petitioners FNPRM Comments at 12-16.

[277] Please Deposit All of Your Money Study at 16.

[278] Pay Tel FNPRM Comments at 31.

[279] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2.

[280] Securus July 23, 2014 *Ex Parte* Letter at Attach.

[281] Joint Provider Reform Proposal at 4.

[282] *Id.* at 4-6, Attach. (proposing the elimination of 19 types of ancillary fees).

[283] Joint Provider Reform Proposal at 6.  Securus asserts that approximately 15% of its current customers "fund their accounts with a free option, such as a check, and thus do not pay any funding fees."  *See* Letter from Stephanie A. Joyce, Counsel to Securus, to Chairman Tom Wheeler et al., WC Docket No. 12-375 (filed Oct. 8, 2014).

[284] *See generally* Alabama PSC Sept. 30, 2014 *Ex Parte* Letter.

[285] Pay Tel Oct. 2, 2014 *Ex Parte* Letter, Attach. at 1.

[286] *See, e.g.,* Alabama PSC Proposed Order at 19; Alabama PSC Further Order at 74; N.M. Admin. Code § 17.11.28.14 (G) ("An [ICS provider] may not bill or charge any transactional fee . . . that has not been previously approved for that purpose by the Commission.").

notice about a change such as 60 days before?  If we take this approach, should the new fee be allowed to go into effect absent Commission or a state action?  We seek comment on these approaches, including the administrability and relative burden associated with each approach.

### b.        Rate Caps for Ancillary Charges

94.        We seek further comment on whether the Commission should set rate caps for ancillary charges that it finds permissible to ensure those charges are just and reasonable and ensure fair compensation.  Commenters, including some ICS providers, support the use of rate caps.[287]  Some commenters note with approval the Alabama PSC's Further Order that capped rates for ancillary charges it allows.[288]  For example, the Wright Petitioners support the use of rate caps for ancillary charges if the Commission decides to authorize them, and cites with approval the two states that already proposed taking such a step.[289]  Would either the Alabama PSC's or the New Mexico PRC's approaches to capping ancillary charges be appropriate models for the Commission to consider?  If the Commission were to establish rate caps for ancillary charges it did not prohibit, what would be appropriate levels for such rate caps?  We seek comment specifically on the Alabama PSC's rate caps for debit and credit card payment fees via the web, an IVR, or a kiosk ($3.00 maximum) and for live operator assisted payments ($5.95 maximum).[290]  NCIC and Pay Tel expressly support ancillary charge rate caps at these levels,[291] as other ICS providers reportedly have.[292]  How do these rate caps compare to providers' costs?

95.        In the alternative, we seek comment on whether we should prohibit separate ancillary fees and instead permit the recovery of such costs using a per minute rate cap.  The data submitted by ICS providers on the cost of processing financial transactions yields a wide range of per-minute costs.  We seek comment on establishing a per-minute ancillary charge rate cap or safe harbors.  If so, how should these charges be set and what level is appropriate?  If so, what would permanent rate caps inclusive of such charges be?

96.        We also seek comment on the Joint Provider Reform Proposal which proposes to (1) cap deposit fees to fund prepaid and debit ICS accounts at $7.95 for three years, (2) allow providers to charge a $2.50 administrative fee to process payments made through third party payment processing companies such as Western Union and MoneyGram in addition to the fees they charge, (3) allow providers to charge a per call validation fee of eight percent to compensate providers for call-specific security functions, and (4) cap fees for "convenience or premium payment options" for single call services at current rates for three years.[293]  The Alabama PSC generally opposes these fee proposals.[294]  AmTel agrees and asserts that

---

[287] *See* NCIC FNPRM Comments at 3; Pay Tel FNPRM Reply at 19-22.

[288] NCIC FNPRM Comments at 3 ("NCIC urges the FCC to establish a nationwide safe harbor, rate cap schedule for account funding fees based on the Alabama PSC's order."); *see also* Alabama PSC Further Order at 81 (setting rates for debit and credit card payment fees by phone, web or interactive voice response (IVR) system at $3.00 and rates for payments via live operator at $5.95).

[289] Petitioners FNPRM Comments at 14-15 ("should the FCC elect to itemize the caps on ancillary fees, then the Alabama Order and the New Mexico rules provides [sic] guidance for ascertaining a cost-based rate.").

[290] Alabama PSC Further Order at 81.

[291] NCIC FNPRM Comments at 3; NCIC July 9, 2014 *Ex Parte* Letter, Attach. at 3 (filed July 9, 2014) ("The FCC should adopt the Alabama PSC schedule for account funding fees as a nationwide safe harbor rate cap."); Pay Tel FNPRM Reply at 21 ("Pay Tel acknowledges the public benefits of an approach similar to that taken in the *Alabama IPS Order* and encourages the Commission to use that Order").

[292] *See* Alabama PSC Further Order at 81 ("CenturyLink, NCIC, Pay Tel and AmTel support the recommended maximum [debit/credit card] payment fees").

[293] The Joint Provider Reform Proposal at 4-6.  The Proposal references these types of services as "convenience or premium payment options."  In response to a staff inquiry, an ICS provider clarified that "convenience or premium payment options" is intended to reference single call or single payment services.

the "Proposal is very misleading and will not lower prices to inmate families."[295]  Pay Tel comments that "the consumer benefits of the proposed ancillary fees' 'reduction' are illusory.[296]  For example, Pay Tel suggested that "[v]alidation is a legitimate expense, but one that is included in Pay Tel's normal cost of providing service.  In no event does this expense rise to the level of 8% of gross call revenue."[297]  We seek comment on whether these proposals would ensure reasonable rates and fair compensation.  How do these proposed caps compare with providers' costs?  How do they compare with previous proposals made by ICS providers?

97.    The following table is provided as a means of facilitating comparison of several of the ancillary charge reform proposals referenced herein.  The fees included in this table represent a non-exhaustive list of fees addressed in the various proposals.

**Table Two**

| Ancillary Charge Proposals | | |
|---|---|---|
| | **Alabama PSC Further Order** | **ICS Provider Reform Proposal** | **Pay Tel Proposal** |
| Check/money order payment | No charge[298] | No charge | No charge |
| Debit/credit card payment or deposit fees | $3.00 cap (web/IVR) $5.95 cap (live operator) | $7.95 cap for 3 years | $3.00 cap (web/IVR) $5.95 cap (live operator) |
| Single call/single payment services | Sum of $3.00 cap on bill processing fee plus capped per minute charge for a 12 minute call | Cap at existing fees (as high as $14.99 billed to card, $9.99 billed to cell phone) for 3 years | Jails (ADP 1-349): $6.12 Jails (ADP 350+):  $5.64 Prisons:  Prohibit service |

(Continued from previous page) ────────────

[294] *See* Alabama PSC Sept. 30, 2014 *Ex Parte* Letter at 9 (regarding payment transfer fees: "ICS providers can contract for lower payment transfer fees for their customers from Western Union and MoneyGram"); *id*. at 10 (regarding an eight percent validation fee:  "[validation] costs are already accounted for in the existing call rates"); *id*. at 11 (regarding convenience or premium payment options:  "allowing such enormously profitable calls to continue in excess of the rate caps can only incentivize these providers to drive as many inmate calls as possible away from prepaid service toward this more profitable alternative").

[295] Letter from Wyman Westberry, Chairman of the Board, AmTel, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Oct. 2, 2014) (AmTel Oct. 2, 2014 *Ex Parte* Letter).  Specifically, AmTel asserts that the "parties to the Proposal call for elimination of many fees that most small to medium-sized providers do not currently charge our customers and seek Commission approval for a $7.95 Transaction or Deposit Fee applicable to every customer transaction. . . . The recommended Transaction or Deposit Fee, the $2.50 third-party, payment transfer fee add-on, and the 8% Call Validation Fee all share one characteristic that distinguishes them from the ancillary fees submitted for elimination; they apply far more frequently and, in the case of the Call Validation Fee, to every call. As a result, these charges will increase provider revenue."  AmTel further asserts that the "Proposal permits these providers to shield from regulation a source of non-commissionable revenue they consider sacrosanct; the highly profitable Convenience or Premium Payment Options".

[296] Pay Tel Oct. 2, 2014 *Ex Parte* Letter at 5.

[297] *Id*. at 7.

[298] *See* Alabama PSC Proposed Order at 16.

| Account set-up, maintenance, closure, and refund fees | Prohibited | Prohibited | Not addressed |
|---|---|---|---|
| Bill processing fee for collect calls (by call recipient's carrier) | $3.00 cap | Not addressed | Not addressed |
| Bill statement fee | No charge for electronic bill. $2.00 cap for paper bill | Not addressed | No charge for electronic bill. $2.00 cap for paper bill |
| Money transfer fees | Fees above $5.95 require affidavit and are subject to investigation | Existing fees (as high as $11.95) plus an additional administrative fee capped at $2.50 | $5.95 cap (Western Union) $5.65 cap (MoneyGram) No additional fee |
| Regulatory cost recovery fees | State regulatory cost recovery fees prohibited | Various regulatory cost recovery fees prohibited (but "federal and state regulatory fees" allowed) | Not addressed (but pass through government mandated taxes and fees) |
| Security fees | Allow separate security biometrics fee | Validation fee of up to 8% per call. Prohibited fees include VINE, location validation fees, voice biometrics fees, and technology fees | $0.02 per minute voice biometric fee (only where deployed; lower in prisons) Vendors may apply for new technology fees |

### c.    Charges for Other Services

98.    *Single Call Services.*  ICS providers also make available so-called single payment or single call services.  These services enable the billing of ICS collect calls through third party billing entities on a call-by-call basis to parties whose carriers refuse to bill collect calls.  The Alabama PSC addressed single call services in its Further Order, asserting jurisdiction over intrastate single call services and capping the rates ICS providers may charge for them.[299]  By some accounts, the use of single call services has increased dramatically, particularly since the adoption of the *Inmate Calling Report and Order and FNPRM*.[300]  One commenter stated that such services have recently been estimated to account for as much as 40 percent of provider revenues.[301]  We seek further comment on the prevalence of the use of single call services in the ICS industry.  Have such services become more prevalent in the market since the Commission's *Order*?  If so, why?  Are such services effectively an end run around the Commission's rate caps[302] or are customers fully apprised of the higher costs and select such services for convenience or

---

[299] *See generally* Alabama PSC Further Order at 50-62.

[300] *See* 2014 ICS Workshop Transcript at 153 (Vincent Townsend, President, Pay Tel Communications) ("more companies have started engaging in that practice since the order"); *id.* at 155 (Darrell Baker, Director, Utility Services Division, Alabama PSC) ("if the FCC looks at what's happened since February when they implemented the interim rates, a lot of these providers have jumped in now and started offering single-payment services").

[301] *Id.* at 153-54 (Vincent Townsend, President, Pay Tel Communications) ("I've seen some as high as 40 percent of the [ICS provider's] revenue . . . has been in the single calls.").

[302] *See* Alabama PSC Further Order at 56 ("Single pay services allow for the de facto circumvention of the Commission's capped ICS rates.").

value?  We also seek comment on how significant a role such services play in the ICS market today and what usage trends for such services are likely to be.

99.        While ICS providers appear to offer single call services under a variety of names, they appear to be  generally two types.  The first involves a one-time credit or debit card payment to enable the completion of a single collect call to a wireline phone.[303]  Examples of this type of single call service include Securus' "Pay Now" and GTL's "Collect2Card" services, both of which are priced at a flat rate of $14.99 per call, substantially higher than the Alabama PSC's proposed interim intrastate rate caps.[304]  A second type of single call service involves a similar payment arrangement for the completion of a single collect call to a wireless phone, the charge for which is confirmed by a text message to the called party's wireless phone.  Examples of this type of single call service include Securus' "Text2Collect" and GTL's "collect2phone" services, both of which are priced at a flat rate of $9.99 per call, also well above the Alabama PSC's intrastate rate caps, as well as the Commission's interstate rate caps.[305]  Do charges for such services circumvent or violate either set of rate caps or are such services sufficiently distinct from collect ICS to warrant separate pricing?  Both types of single call services are charged on a flat rate basis, regardless of call duration, further distorting the effective per-minute charge consumers pay and raising concerns about multiple charges in the case of inadvertent call disconnection.  Consumers using these services may be unaware that they could dramatically reduce the charges for ICS simply by establishing an account with an ICS provider.  Some ICS providers have been successful in educating consumers on lower cost options.[306]  We seek comment on whether these rates are just and reasonable and whether they ensure fair and not excessive compensation for providers.  We also seek comment on whether ICS providers incur additional costs in providing single call services, and if so, what they are.

100.        Providers have challenged the Alabama PSC's jurisdiction over both types of single call services.  In the case of single call services to wireline phones, ICS providers disputed the Alabama PSC's authority to regulate such services, citing interference with their contractual relationships with third party billing and payment processing entities which typically contract with ICS providers to provide the service.[307]  The Alabama PSC characterized these entities as "third party billing aggregators"[308] which performed the "the billing and delivery functions for ICS calls."[309]  We seek comment on the nature of these services and the types of functions such entities provide.  For example, do these third parties perform functions analogous to those performed by third party billing entities used by local exchange carriers?  Do the third parties actually contribute any facilities or services used to provide these services?  The Alabama PSC also noted that ICS providers advertise and provide these services in their own name and bills refer consumers to an ICS provider website.[310]  The Alabama PSC determined that it had "jurisdiction over the charges for collect calls originating from Alabama confinement facilities regardless

---

[303] Alabama PSC Further Order at 4457.

[304] *See* Alabama PSC Further Order at 616158 ("the Commission seeks to ensure that its ICS rate caps are not circumvented using single payment call services"); *see also* Petitioners FNPRM Reply at 15-16.

[305] *See id.* at 57.

[306] *See* 2014 ICS Workshop Transcript at 174 (Vincent Townsend, President, Pay Tel) ("about 40 percent of our customer base, the families, we saw were making payments with cash").

[307] Alabama PSC Further Order at 55-56.

[308] *Id*. at 52.

[309] *Id*. at 56.

[310] *Id*. at 53-54 (citing Securus as an example, the Alabama PSC quoted Securus' website which described one of its single call service offerings, stating "'Pay Now$^{TM}$ is . . . offered exclusively by Securus Technologies, Inc.'"  The Alabama PSC added that "[t]he Pay Now call recipient's debit/credit card statement contains a URL to Securus' website for Pay Now.").

of any intermediaries the ICS provider chooses to include prior to call termination."[311]  We seek comment on whether Commission regulation of single call services would not impermissibly infringe on such contractual relationships.

101.     In the case of single call services to wireless phones, ICS providers have asserted that such services are not subject to state commissions' authority since they entail the use of a text message to confirm the source and charges for the call and involve calls to wireless phones, the rates for which are not subject to state jurisdiction.[312]  We seek comment on the concept that neither the fact that such calls are preceded by a text message nor the fact that the called party uses a wireless phone alters the nature of the ICS provided.  If, however, the Commission were to determine that either of these factors is relevant to determining the nature of the ICS, we seek comment on whether the Commission's section 276 jurisdiction over all forms of ICS give it authority to regulate such services.

102.     The Alabama PSC set a rate cap for single call services at a flat rate amount that included a billing or payment charge capped at $3.00 per call and a usage charge derived from its per-minute rate caps.  We seek comment on this approach.  Should the Commission adopt a rate cap for single call services?  Should ICS providers be required to charge a per-minute rate on the basis of actual call duration?  Should the rates for such calls reflect the per-minute charge for collect calls along with an appropriate bill or payment processing fee?  Should there be a transition period to allow providers to adapt their single call service offerings?  Are ICS providers required to publish on their websites their charges for single call services and notify consumers of the option of establishing an account to obtain a more reasonable rate?  Alternatively, should these services be considered ancillary services?

103.     *Money Transfer Services*.  The *FNPRM* sought comment on fees assessed by third parties such as Western Union and MoneyGram to process debit and prepaid account payments for ICS.[313]  The Prison Policy Initiative previously noted that third party payment processing fees for the provision of ICS are typically higher than such fees in other industries and suggested that ICS providers were receiving compensation from such third party service providers.[314]  We seek comment, data and other evidence on how prevalent the use of third party money transfer services is and what percent of account funding is accomplished through such services.  We also seek comment on the Alabama PSC Proposed Order which acknowledges that money transfer "fees are set by these financial services but [the PSC] is also aware that agents hosting such services are paid a portion of the fee."[315]  The Alabama PSC Proposed Order states that "ICS providers are prohibited from receiving any portion of fees paid by their customers to third-party financial services."[316]  It also proposed a rate cap of $5.95 per transaction, above which providers would face an investigation of their rates and potential refund liability.[317]  Similarly, CenturyLink suggests that "[c]ertain consumer-optional third party fees such as Western Union charges should be allowed, but without mark-ups, revenue sharing arrangements or volume rebates."[318]  In contrast, the Joint Provider Reform Proposal suggested adding an additional administrative fee of a maximum of $2.50 per

---

[311] *Id*. at 56.

[312] *Id*. at 51.

[313] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14187-88, para. 168.

[314] Please Deposit All of Your Money Study at 8 ("Western Union fees, for example, vary from $5.95 to $11.95. . . . The fee to send payments to most other companies ranges from $1.50-$3.00.").

[315] Alabama PSC Proposed Order at 16; *see also* Please Deposit All of Your Money Study at 8 (certain data "suggest that Western Union is sharing a portion of its fees with the prison phone companies").

[316] Alabama PSC Proposed Order at 16; *see also* Alabama PSC Further Order at 82-87.

[317] *Id*. at 86-87.

[318] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2.

transaction on top of existing money transfer fees.[319]  We seek further comment on these proposals and on whether ICS providers' receipt of payments from payment processing companies in connection with their provision of ICS represents an unreasonable practice under section 201(b) or results in unfair compensation under section 276.

104.     We seek comment on how the Commission should ensure that money transfer service fees paid by ICS consumers are just and reasonable and represent fair compensation.  Are money transfer services ancillary services under section 276(d)?  Are they a practice that causes unjust rates or unfair compensation?  Are such charges encompassed by the definition of "ancillary charges" in the Commission's rules?  To the extent they involve charges placed by a third party on a call recipients' phone bill, are they analogous to third party fees that are the subject of our "cramming" rules? To ensure just and reasonable rates and fair compensation, should the Commission prohibit ICS providers from entering into revenue sharing arrangements with money transfer services, receiving payments from such services, or including the costs of such services in their rates?  To enforce a similar prohibition, the Alabama PSC proposes to require ICS providers operating in the state to report the payment transfer fees third parties charge their customers.  It also proposes to require providers to justify fees over $5.95, and subject such fees to investigation and potential refund liability.[320]  Should the Commission adopt a similar enforcement mechanism?  Should it allow states to enforce such a mechanism?  What impact would any such requirements have on contracts between ICS providers and third party money transfer services?  The Alabama PSC notes that, according to its research, contracts between ICS providers and Western Union may be cancelled on 30 days' notice.[321]  It also notes that Western Union contracts with providers include a provision requiring vendor compliance with all regulatory requirements and laws.[322]  Do commenters' experiences confirm the Alabama PSC's observations?  Are there other approaches to enforcement that the Commission should consider?

105.     *Regulatory Recovery Fees.*  Commenters have previously highlighted ICS providers' use of fees to recover the cost of regulatory compliance.[323]  The amount of such fees industry-wide can be quite substantial.[324]  The Alabama PSC noted that "[s]everal ICS providers presently absorb regulatory costs electing not to charge consumers a separate recovery fee"[325] and barred separate intrastate regulatory fees, stating that their rate caps were "sufficient to recover reasonable regulatory costs incurred by the provider."[326]

106.     A number of ICS providers have also opposed the use of regulatory recovery fees.  The Joint Provider Reform Proposal recommends eliminating various types of regulatory recovery fees and does not include such a fee among the fees it proposes to retain.[327]  Pay Tel, in its advocacy before the Alabama PSC, stated "these expenses are a cost of doing business reflected in the overall average cost per

---

[319] Joint Provider Reform Proposal at 5.

[320] *See* Alabama PSC Further Order at 86-87.

[321] *See* Alabama PSC Further Order at 86.

[322] *Id*.

[323] *See* Please Deposit All of Your Money Study at 10-13 (such fees are variously described as federal cost recovery fees, federal regulatory recovery fees, and regulatory assessment fees); Alabama PSC Further Order at 70-73.

[324] Please Deposit All of Your Money Study at 10 (estimating that such fees could cost consumers approximately $65 million annually).

[325] Alabama PSC Further Order at 71.

[326] *Id*. at 73.

[327] *See* Joint Provider Reform Proposal at 4-6, Attach.

minute.  Pay Tel supports the prohibition of such fees."[328]  Securus proposes to eliminate its federal and state regulatory recovery fees.[329]  We seek comment on whether the cost of regulatory compliance should be considered a normal cost of doing business and as such should be recovered through basic ICS rates, not additional ancillary fees.  In the alternative, if the Commission permits the separate recovery of regulatory fees, should it require that they be broken out as a line item on an ICS end users' billing statement?

107.    *Security Fees.*  Some ICS providers suggest that the Commission allow fees to recover new security technology expenses for correctional institutions.[330]  The Joint Provider Reform Proposal proposed the elimination of three or four types of fees likely related to security and the retention of a single technology-related fee.[331]  However, as part of its comprehensive proposal, Securus suggests that providers be allowed to charge "incremental product pricing above rate caps if necessary" for "safety and security features" and proposes such charges "be filed with [the] FCC for approval."[332]

108.    We seek comment on whether security costs represent a core function in the provision of ICS, the costs of which should be included in rates and not as ancillary fees.  The Commission's interim interstate rate caps were based on ICS providers' cost data that included the costs incurred in developing, deploying and provisioning security features.  The *Order* also expressly accounted for the cost of continuous voice biometrics in its debit and prepaid rate cap it adopted.[333]  Pay Tel's Proposal suggests that a voice biometric fee of $0.02 per minute be applied to its proposed rates.[334]  If the Commission were to allow providers to assess customers separate ancillary charges for such services, how would it evaluate providers' claims regarding the need for such functions or their cost?   How would it ensure that ICS providers were not recovering the cost of security features twice – once through their rates and again through an ancillary charge – short of a full analysis of the provider's costs?  If the Commission were to allow separate fees to recover security costs, should it require prior approval or 60 days' notice for such charges?

### d.    Consumer Disclosures

109.    We also seek comment on how to ensure that rates and fees are more transparent to consumers.  We therefore seek comment on the requirement that ICS providers notify their customers regarding the ICS options available to them and the cost of those options.  One ICS provider underscores the importance of "educating the consumer, giving them the choice, what's the most economical way if they want to get money on an account and do it quickly."[335]  The same provider states that when it advertises on its website the most economical way to fund ICS calls, a substantial percent of its customer

---

[328] Alabama PSC Further Order at 73 (also noting that "NCIC expressed support for the Commission's position with respect to regulatory recovery fees.").

[329] Securus July 23, 2014 *Ex Parte* Letter at Attach. (proposing to eliminate the state cost recovery fee, federal cost recovery fee, collect call recovery fee and regulatory assessment fee).

[330] *See* Pay Tel FNPRM Comments at 33; Pay Tel FNPRM Reply at 22-24; Letter from Thomas M. Dethlefs, Counsel for CenturyLink, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed Apr. 2, 2014).

[331] Joint Provider Reform Proposal at 5, Attach.

[332] Securus July 23, 2014 *Ex Parte* Letter, Attach; *see also* Pay Tel FNPRM Reply at 22-24 (suggesting that the Commission establish a separate mechanism by which a provider could seek express approval to charge an ancillary fee for a security new technology).

[333] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14148-49, para. 76.

[334] *See* Pay Tel Proposal at 3.

[335] Transcript of 2014 ICS Workshop Transcript at 173-74 (Vincent Townsend, President, Pay Tel Communications).

base uses that method, reducing consumer expense significantly.[336] ICS providers that offer interstate toll service are already required to post their rates on their websites and, to the extent they offer inmate operator services, their live agents are already required to make certain notifications to customers.[337] Should providers' websites, automated IVRs, and live agents be required to offer in a more prominent fashion no-cost or lower-cost options available to consumers before offering other, higher-priced optional services?  To what extent would any such regulation implicate the First Amendment?  Should the Commission take other steps to ensure consumers are aware of lower-priced service options?

110.     The Joint Provider Reform Proposal acknowledged existing requirements to publish ancillary fee rates on providers' websites[338] and offered a detailed proposal regarding notification requirements for financial transactions, including:

- The ICS provider shall fully inform customers of all payment methods available (including the no-charge option), the payment processing charges associated with each payment method, and the estimated time required to establish service applicable to each payment option.
- The ICS provider shall clearly and conspicuously identify the required information.  The information should be presented clearly and prominently so that it is actually noticed and understood by the customer.
  - The ICS provider shall provide a brief, clear, non-misleading, plain language description of the required information.  The description must be sufficiently clear in presentation and specific enough in content so that the customer can accurately assess each of the available payment methods.
  - An ICS provider shall clearly and conspicuously disclose any information the customer may need to make inquiries about the available payment methods, such as a toll-free number, e-mail address, or web site address by which customers may inquire or dispute any charges.  An ICS provider shall include any restrictions or limitation applicable to each payment method available.[339]

In its proposal Pay Tel suggests that:

- Vendors must post facility-specific rates and fees for all services, to be visible to inmates on-site and to consumers on the Vendor website prior to setting up an account.
- Vendor websites must provide a link to the FCC Enforcement Bureau Website and the applicable State Regulatory Agency website.
- Posting/Notice Must Include:
  - Call rates and transaction fees (at time of call, printed material available at facility, Automated IVR, Live Agent & Website).
  - Refund instructions (website).
  - Terms and conditions for service (website).
  - Cost information for calls, email and messaging services, video visitation and any other communication services offered (website). [340]

---

[336] Id. at 173 (Vincent Townsend, President, Pay Tel).

[337] See 47 C.F.R. §§ 42.10, 64.710.

[338] Joint Provider Reform Proposal at 5.

[339] Id. at 6.

[340] Pay Tel Proposal at 4.

We seek comment on these proposals as they relate to ICS financial transactions and more generally to ICS practices in general.  We also seek comment on alternative proposals to make rates and fees more transparent to inmates, their families, friends and other users of inmate calling services.

### e.     Other Issues

111.     Some ICS providers impose additional policies beyond their assessment of ancillary fees that further restrict consumers' access to ICS.  In regard to such policies, CenturyLink expresses the concern that "policies such as funding minimums and maximums, prepaid account refund requirements, and account expiration policies must be tightly controlled to avoid gaming."[341]  We seek comment on whether we should prohibit ICS providers from these and similar practices that effectively limit end users' ability to access and use ICS.  What other types of limiting practices should we prohibit or restrict to preclude such gaming?

112.     GTL asserts that the Commission's Truth-in-Billing rules give providers flexibility to recover their costs either through rates or other line item charges.[342]  The Minnesota Department of Commerce asserts that ancillary charges that exceed a provider's costs are inherently deceptive and violate the Commission's Truth-in-Billing rules.[343]  We seek comment on whether it would be necessary to harmonize Commission regulation of ICS ancillary charges with its Truth-in-Billing rules.[344]  To the extent that such fees are not commensurate with providers' costs, does existing precedent support the view that those fees violate the Truth-in-Billing rules, or should we clarify that the fees are considered misleading and a violation of the Commission's Truth-in-Billing rules, unreasonable under section 201(b) or unfairly compensatory under section 276?  Should the Commission clarify that pursuant to section 276, Truth-in-Billing rules apply to all ICS providers, including any that may claim they provide VoIP services?

### D.     Additional Ways to Promote Competition

113.     Over the last 30 years, real competition, as opposed to rate regulation, has been the preferred method to advance consumer protection, lower rates, increase feature and functionality of equipment and services, reduce the government involvement and costs, and improve the overall consumer experience.  To date, however, correctional facilities generally have not permitted competition for consumers within the ICS market.

114.     As an alternative to the ideas explored in this item to reduce inmate calling rates, we continue to explore whether the advent of competition within the inmate facilities may provide a different course of action.  The 2013 *Inmate Calling Report and Order and* FNPRM sought comment on how to promote competition within the correctional facilities, but the Commission received insufficient information in response to the questions posed, so we seek to provide more targeted questions in order to solicit further responses.[345]  Accordingly, we seek further comment on ways to remove barriers to entry and promote competition in the ICS market.  Aspects of the current ICS market appear to contribute to the market failure.  One is the practice of site commission payments, and we seek comment above on whether, and under what authority, the Commission should restrict such payments.[346]  Another is the fact that correctional facilities award ICS providers exclusive contracts and therefore do not permit

---

[341] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2.

[342] *See* GTL FNPRM Comments at 9-12.

[343] *See* MNDOC FNPRM Comments at 6 ("MNDOC believes that it is deceptive, and a violation of the FCC's truth-in-billing rules, for ICS providers to imply that the amount of a charge is attributable to recovery of a specific cost when in fact the aggregate charges to customers may well exceed the aggregate costs incurred by the provider.").

[344] *See* 47 C.F.R. § 64.2401.

[345] *Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd 14107 at 14190, para. 177.

[346] *See supra* Section III.A.3.

competition within the facilities.[347]  The Commission previously sought comment on the impact of exclusive contracts and whether they should be prohibited.[348]  While some commenters opposed the idea due to security and cost concerns,[349] another commenter suggested that the Commission revisit whether those concerns continue to justify exclusive contracts in light of technological advances.[350]  We seek additional comment on these views.  Moreover, some commenters have questioned whether facilities incur any additional costs for the provision of ICS and we seek comment above on quantifying these costs.[351]  If facilities do not incur costs when there is one provider, what additional costs are incurred by introducing multiple providers?  We ask commenters to specify and quantify any additional costs.

115.    We also seek comment on whether there are other barriers and, if so, what steps we should take to address them and under what authority.  For example, are there ways to allow greater competition within ICS without banning exclusive contracts?  Are providers willing to compete on price, quality of voice and/or video service, service disruption and outage rates, and other factors that would be applicable with multiple providers?  Would multiple providers be willing to serve an inmate facility if there is already an established provider?  What impact could new technologies have on competition within inmate facilities?

### E.    Harmonization of State Regulations Under Section 276(c)

116.    In this section, we seek comment on how state reform of ICS may be harmonized with any federal framework we may adopt and on the continuing roles states should play in advancing ICS reform.  In the *FNPRM*, the Commission "tentatively conclude[d]" that section 276 "affords the Commission broad discretion to . . . preempt inconsistent state requirements."[352]  In response, some commenters opposed state preemption,[353] while others supported it as crucial to the Commission's reform efforts.[354]  While we seek comment on whether it is necessary to have a comprehensive framework for interstate and intrastate ICS, we nonetheless seek comment on how consistent state regulation of ICS could be harmonized with our framework.  For example, should we establish guidelines regarding what a

---

[347] *See generally* First Wright Petition.

[348] *2012 ICS NPRM*, 27 FCC Rcd at 16642, para. 36; *Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd 14107 at 14190, para. 176.

[349] La. DOC NPRM Comments at 2-3; GTL NPRM Comments at 23; Telmate NPRM Comments at 5-6.

[350] Verizon NPRM Comments at 6.

[351] NJ ISJ NPRM Reply at 4–5; *see supra* Section III.A.3.

[352] *Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd at 14175, para. 135.

[353] *See, e.g.,* NARUC FNPRM Comments at 5 ("individual States <u>are</u> (and remain) in the best position to oversee and investigate matters relating to ICS INTRAstate rates and service quality") (emphasis in original); Securus FNPRM Comments at 9 (asserting that, "[e]ven assuming that the Commission has jurisdiction or authority to" preempt intrastate rates, "its intervention into intrastate calls is demonstrably unwarranted.").  Securus further asserts that "there is no market failure in the intrastate calling market to warrant Commission intervention," and "state commissions are demonstrably willing and able to review intrastate inmate calling rates."  *Id*. at 7-8.  *Contra* Securus July 23, 2014 *Ex Parte* Letter at Attach. (Securus urges the Commission to "[s]et interstate rate cap=intrastate rate cap").

[354] *See, e.g.,* Petitioners July 14, 2014 *Ex Parte* Letter at 1 (urging the Commission to "use its statutory authority provided in Section 201 and Section 276 of the Communications Act of 1934, as amended, to cap ICS Intrastate rates," and that a "postalized ICS rate that would apply to all ICS calls is statutorily mandated"); *see also* GTL Aug. 11, 2014 *Ex Parte* Letter at 2 (reporting that "there is general industry support for a rate cap on both interstate and intrastate ICS" and that "Section 276 of the Act provides the primary legal authority for addressing these issues, but support can be found in other provisions and precedence"); CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 1 (stating that, "[s]etting aside concerns about the limits of Commission authority," CenturyLink advocates that the "Commission should adopt a simple, uniform rate cap for both interstate and intrastate calls, with just an additional allowance for collect calling").

state would have to do on ICS reform to not be preempted?  What would those guidelines include?  Should we include reform of site commission payments, rate caps, actions addressing state prisons, as well as county or city jails?

117.    We recognize the substantial ICS reform already accomplished in a handful of states such as Alabama, New Jersey, New York, and New Mexico.[355]  Such states have provided important leadership in the effort to reform ICS.  In the *FNPRM*, the Commission commended such states and "encourage[d] more states to eliminate site commissions, adopt rate caps, disallow or reduce per-call charges, or take other steps to reform ICS rates."[356]  In her opening remarks at the 2014 ICS Workshop, Commissioner Clyburn urged states to "follow the FCC's lead, grab the baton, and enact their own reforms."[357]  Some states have taken steps to advance ICS reform since the release of the *Order*.  New Jersey, for example, has set lower rates for ICS.[358]  Alabama has recently proposed comprehensive regulation of intrastate ICS.[359]  However, the vast majority of states have not taken up our repeated calls for ICS reform.[360]  In addition, states have inconsistently addressed site commission payments.[361]  For example, while the *Order* noted seven states that had eliminated site commissions for intrastate ICS, by implication the vast majority have not.[362]  We again encourage states to act on ICS in their jurisdictions and note that state action that is consistent with the regulations that the Commission ultimately adopts would not be subject to preemption.  We also recognize, however, that most states either cannot or will not act and the Commission must adopt a nationwide framework to apply in these states to ensure that ICS rates are just, reasonable and fair.

118.    We seek more focused comment on section 276(c), which states in reference to payphone regulation[363] that "[t]o the extent that any State requirements are inconsistent with the Commission's

---

[355] *See supra* note 9; para. 17; *see also* Letter from Anthony Annucci, Acting Commissioners, NY Dept. of Corrections and Community Supervision, to Gregory Haledjian, Attorney-Advisor, FCC, WC Docket No. 12-375 at 1 (filed July 16, 2013) (noting that New York has per-minute ICS rates of $0.048).

[356] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14173, para. 130.

[357] 2014 ICS Workshop Transcript at 18 (Mignon Clyburn, Commissioner, FCC).

[358] *See* State of New Jersey, Dept. of the Treasury, Contract #A61618, Amendment #10 *available at* http://www.njphonejustice.org/wp-content/uploads/2014/02/T1934PriceDecrease10.pdf  (last visited Sept. 24, 2014) (in February 2014, New Jersey lowered interstate and intrastate rates for ICS calls from its state correctional and juvenile facilities from $0.33 per minute to $0.19 per minute.); *see also* State of New Jersey, Dept. of the Treasury, Contract #A61618, Amendment #11 *available at* http://www.njphonejustice.org/ ("State lowers rate to $0.17/minute") (last visited Sept. 24, 2014) (in March 2014, New Jersey further reduced rates for interstate and intrastate ICS calls from state prisons from $0.19 per minute to $0.17 per minute.); State of New Jersey, Dept. of the Treasury, Contract #61618, Amendment #12 *available at* http://www.njphonejustice.org/wp-content/uploads/2014/09/T1934ContractExtension12.pdf (last visited Sept. 24, 2014) (in September 2014, New Jersey further reduced rates for interstate and intrastate ICS calls from $0.17 per minute to $0.15 per minute.).

[359] *See generally* Alabama PSC Further Order.

[360] *See, e.g.*, *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14173, para. 130.

[361] For example, the Alabama PSC in its Further Order maintains site commissions in the state "to safeguard the public interests."  Alabama PSC Further Order at 18.  New York, on the other hand, eliminated its 57.5% commission years ago.  *See* Letter from Anthony J. Annucci, Acting Commissioner, NY Dept. of Corrections and Community Supervision, to Gregory V. Haledjian, Attorney-Advisor, FCC, WC Docket No. 12-375 at 1 (filed July 3, 2014).

[362] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14141, para. 62.

[363] 47 U.S.C. § 276(d) ("As used in this section, the term 'payphone service' means the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services.").

regulations, the Commission's regulations on such matters shall preempt such State requirements."[364]  We believe that the Commission has broad discretion to find that a particular state requirement, or category of state requirements, is either consistent or inconsistent with Commission ICS regulations under section 276(c).  We also seek comment on the whether preemption is self-effectuating under section 276(c) and will occur automatically as a consequence of the inconsistency.

119.     If preemption is not self-effectuating, and there is no Commission decision defining the scope of any inconsistency between federal and state requirements, how would states and other parties know that a particular state requirement had been preempted because it was inconsistent under section 276(c)?  In the absence of a prior Commission decision, should any disputes regarding the inconsistency of a state requirement be resolved by the Commission on a case-by-case basis:  e.g., through declaratory ruling or the section 208 complaint process?  Are certain types of state requirements inherently "inconsistent"?  Other preemption provisions in Title II of the Act require the Commission to make certain decisions before a state law can be preempted,[365] whereas section 276(c) does not directly address the issue.

120.     *Exemptions to Preemption*.  To encourage states to reform ICS, the *FNPRM* also sought comment on possible exemptions to preemption, asking whether "the Commission [should] only take action to reform intrastate ICS rates in states that have not reformed rates to levels that are at or below our interim safe harbor."[366]  We expand on this concept here.  What specific types of state actions to reform ICS should the Commission interpret as consistent with its regulations?  Should, for example, the Commission list scenarios in which state regulations would be presumed to be consistent with the federal framework, such as when states address site commissions and reform ancillary charges?  If so, what should the Commission consider "reform" or "partial reform" in this context?  For example, we note that the Alabama PSC proposes capping ancillary fees but maintaining site commission payments.[367]  If the state regulates ICS rates in a manner that is consistent with Commission regulations, but regulates ancillary services in a manner inconsistent with Commission regulations, would all state regulations be viewed as preempted, or would just the regulation of ancillary services be treated as preempted?  To the extent the question would depend on how the Commission crafts its regulations, should the Commission design them in a way that makes inconsistency regarding one dimension severable from consistency regarding other dimensions?  If so, how?

121.     One *FNPRM* commenter suggests a "cooperative federalism" approach that would allow "states to regulate intrastate rates provided that the regulatory framework complies with the core principles contained in the Order."[368]  We seek further comment on this and other approaches to

---

[364] 47 U.S.C. § 276(c) (emphasis added).

[365] For instance, section 252(e)(5) requires the Commission to issue an order if certain conditions are in place:  "If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission."  47 U.S.C. § 252(e)(5).  Similarly, section 253(d) requires the Commission to make a preliminary assessment and then to issue a preemption decision:  "If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency."  47 U.S.C. § 253(d).

[366] *Inmate Calling Report and Order and FNPRM,* 28 FCC Rcd at 14174-75, para. 132; *but see Securus Techs. Partial Stay Order.*

[367] *See generally* Alabama PSC Final Order.

[368] Raher FNPRM Comments at 2.

harmonizing federal and state ICS reform.  Some states have adopted laws that effectively require intrastate ICS rates to be provided at below-cost rates, with the difference presumably to be recouped by charging interstate rates that are set significantly above costs.[369]  Would any such state laws that require below-cost intrastate ICS rates be consistent with a Commission cap on intrastate ICS rates, even if the state rate was more "aggressive" than the Commission cap?  For example, if the Commission adopts a per-minute cap on ICS rates, should states be free to regulate the level of per-call and per-minute charges for intrastate ICS so long as the resulting charge for a call of a particular duration is within the Commission's cap?  Should states have other flexibility as it relates to site commission payments, ICS rates, charges for ancillary services, or other ICS regulation?  If so, how can the Commission craft its regulations so that such state ICS reforms are interpreted as being consistent with its regulations?  Should the Commission be concerned that some state reform actions could undercut the market-based approach that we seek comment on herein?  How would the Commission then balance the benefits of encouraging state reform efforts with the need to ensure just and reasonable rates and fair compensation for ICS, as required by sections 201 and 276 of the Act?

122.     If the Commission's final ICS rules are silent on certain issues (for example, *arguendo*, quality of service regulation), we seek comment on how the Commission should interpret state rules.  Does the Commission have broad authority to enforce section 276(c) on a case-by-case basis even in situations where it has not previously adopted an applicable rule or provided relevant guidance?  If a state commission has an active ICS proceeding, is it consistent with section 276(c) to permit the state commission a reasonable period of time to complete its proceeding prior to a Commission determination of whether such state reform is consistent with Commission reform?  What might constitute such a reasonable period of time?

## F.     Existing Contracts

123.     *Background*.  The Wright Petitioners previously discussed the possibility of a one-year fresh look period, essentially a one-year period during which existing ICS contracts may be revised regardless of terms within the contracts that may prohibit such action.[370]  The Commission sought comment on this proposal in the *2012 ICS NPRM*.[371]

124.     In the *Order,* the Commission did not directly override existing contracts between correctional facilities and ICS providers.[372]  Rather, the Commission noted that if "any particular agreement needs to be revisited or amended . . . such result would only occur because agreements cannot supersede the Commission's authority to ensure that the rates paid by individuals who are not parties to those agreements are fair, just, and reasonable."[373]  The Commission acknowledged that "[t]o the extent that the contracts contain 'change of law' provisions, those may well be triggered by the Commission's action today."[374]

125.     *Discussion*.  We seek comment on the implementation of the requirements adopted in the *Order* and their impact, if any, on ICS contracts.  The record indicates that the interim rates were implemented with little to no contract renegotiation.[375]  The record also indicates that several ICS providers have unilaterally made decisions about site commission payments without initiating contract

---

[369] *See, e.g.*, Pay Tel FNPRM Comments at n.32.

[370] *See* Petitioners NPRM Comments at 28-29.

[371] *See 2012 ICS NPRM*, 27 FCC Rcd at 16646, paras. 45-47.

[372] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14162, para. 100.

[373] *Id*. at 14162, para. 101.

[374] *Id*. at 14162-63, para. 102.

[375] *See Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Martha Wright, et al. Consolidated Comments, Exh. B at 1 (filed Mar. 11, 2014).

renegotiations or cancellations.[376]  Is this accurate?  We seek comment on any challenges associated with these practices.  To the extent that commenters suggest alternatives to the regulatory approaches discussed above that could modify or otherwise affect existing agreements, we seek comment on the Commission's authority to take such action, why it should exercise such authority, and how any modification or other effect on existing agreements should be implemented.

126.    We seek comment on a transition period for comprehensive ICS reform.  Given the transition that we seek comment on herein, we seek comment on whether we should retain the approach in the *Order* and allow for change-of-law provisions to govern changes or whether we should take an alternative approach with respect to existing contracts.  Should we allow for a "fresh look" to enable providers to renegotiate contracts or do most contracts include change-in-law provisions so a fresh look is not warranted?  If the Commission adopts a transition period for existing ICS contracts, should it stagger the transition period as previously suggested by Telmate?  Specifically, Telmate suggests that "[s]taggering the fresh look window among the many thousands of ICS contracts nationwide . . . [is] the only practical way to harmonize the existence of long-term contracts and the unreasonable burden on smaller ICS providers in competing for correctional facility business at thousands of locations at the same time nationwide."[377]  If so, should the Commission stagger any transition period based on contract expiration dates or some other metric?

127.    Alternatively, we seek comment on whether we should abrogate ICS contracts or modify particular terms of such contracts.  Will abrogation of contracts that are focused on site commission payments better enable the market-based approach described herein to be implemented?[378]  In the *Order* the Commission concluded that it has the authority to abrogate or modify contracts.[379]  We seek comment on our legal authority to do so.  In the alternative, should the Commission grandfather existing ICS contracts for some period of time and then allow them to expire?  Given that ICS contracts are often multiple years in duration, is it consistent with the statute's requirement that ICS rates be just, reasonable and fair if we allow such rates to continue for an extended period of time?  Are there ways the Commission could mitigate the possible disadvantages of a grandfathering approach?  We seek comment on these issues, including our legal authority for each approach.

**G.    Transition Periods**

128.    In the *Order*, the Commission delayed the effective date of the new rules until 90 days following publication in the Federal Register to give parties "time to renegotiate contracts or take other appropriate steps."[380]  The *FNPRM* sought further comment on "how the Commission should proceed in establishing ICS rates for interstate and intrastate ICS."[381]  Comments were mixed.  Several commenters requested that, if the Commission takes further steps toward ICS reform, it implement a transition period "that is sufficiently long to enable correctional facilities to revise budgets and find replacement sources of

---

[376] *See id.*

[377] *See* Letter from Glenn Manishin, Counsel to Telmate, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed July 30, 2013).

[378] CenturyLink Aug. 14, 2014 *Ex Parte* Letter at 2 ("A chief concern for both correctional facilities and ICS providers is the impact of new rules on existing contracts.  ICS reform will be more durable and effective if it is not disrupting existing contracts and state procurement laws and allows ICS providers and correctional facilities time to adjust.").

[379] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14162, n.365 (finding that if the Commission's action in the *Order* "were somehow construed as modifying particular contractual provisions or abrogating particular contracts, we still would be acting within our lawful authority.").

[380] *Id.* at 14162-63, para. 102.

[381] *Id.* at 14185, para. 163.

funding."[382]  Conversely, one commenter opined that rate changes pursuant to the interim *Order* may have been accomplished through a simple notification letter from ICS providers to correctional facilities.[383]

129.    *Discussion*.  The ICS providers that submitted the Joint Provider Reform Proposal suggest that "[t]he new rate caps should become effective 90 days after adoption, along with any site commission reductions and ancillary fee changes outlined below."[384]  The providers that submitted the Proposal assert that "[t]his period for implementation should ensure ICS providers and correctional facilities have adequate time to implement the new rate caps and any corresponding reductions in site commissions, including any contract amendments or adjustments that may be necessary."[385]  Pay Tel suggests a 90-day, after final order publication transition period for transaction fees, third party money transfer service fees, and ancillary fees and an 18-month transition period for jail and prison rate caps.[386]  Commenters advocating for a transition to the new rate caps should identify the appropriate transition and the justification for doing so.

130.    We seek comment on whether 90 days after the effective date of the order is the appropriate transition to comply with all new requirements, including any rate caps, elimination of per-call charges, and ancillary fee changes for existing contracts.  We also seek comment on whether any new ICS contracts entered into after adoption of an ICS reform order must comply with the terms of the order immediately after the effective date of the order.

131.    In addition, we seek comment on a two-year transition period or at least one state or state subdivision budget cycle to transition away from site commission payments to allow facilities and states time to adjust.  If we adopt a cost recovery amount for facilities, how should the transition be implemented in a manner that does not delay comprehensive reform?  How would the transition work if the Commission gave a 90-day transition for rates to be at or below the cap, while allowing two years for site commissions to be eliminated?  Would a period of two years allow sufficient time for correctional facilities to prepare for forthcoming ICS reform and its effect on their budgets?  Or should we consider a longer transition such as a three year transition?[387]  Should the transition be shorter to minimize the potential for abuse?[388]  If so, should the transition be one year, the same as the 90-day transition to rate caps, or something else?  The record suggests that site commission payments make up less than five-tenths of a percent of facilities' operating budgets.[389]  Securus suggests that site commissions should be

---

[382] Securus July 23, 2014 *Ex Parte* Letter at 2; *see also* Securus July 17, 2014 *Ex Parte* Letter at 2  ("If Commissions are eliminated there must be a transition period that will allow facilities to replace these funds with other revenue streams," as "an orderly transition is in the best interest of all constituents.") (emphasis omitted).  *See also* Letter from Chérie R. Kiser, Counsel for GTL, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 2 (filed June 3, 2014) (discussing "the need for a transition period to address existing contracts").

[383] *See* Martha Wright, et al. Consolidated Comments, WC Docket No. 12-375 at Exh. B (filed Mar. 11, 2014).

[384] *See* Joint Provider Reform Proposal at 2.

[385] *Id*.

[386] *See generally* Pay Tel Proposal.

[387] GTL previously suggested that site commission "payment decreases could be phased in over a three-year period." GTL Aug. 11, 2014 *Ex Parte* Letter at 2.

[388] *See* Letter from Lee G. Petro, Counsel to Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 4 (filed July 18, 2013) (predicting that any disparity in the application of new rules "would be ripe for abuse, as every current party to a contract [might take] steps to extend, renew, restate, or use some other mechanism to perpetuate high ICS rates and ancillary fees").

[389] *See* Securus Sept. 22, 2014 *Ex Parte* Letter at Attach.

completely eliminated by January 1, 2016 and rate reform should also be accomplished by that date.[390]
We seek comment on these proposals.

132.     If the Commission adopts a two-year transition to the elimination of site commission
payments, how should the payments be reduced?  Should they be reduced in equal increments over two
years, or should we align the reductions to state or state subdivision budget cycles?  How have other
states that reduced or eliminated site commissions implemented this change?  Did they adopt a transition
plan or implement the change immediately?  We seek comment on whether any new contracts that
include any potential cost recovery payments to facilities and a ban on site commissions that are entered
into after the adoption of the final order be required to comply with the order.  Should there be exceptions
to a transition period based on whether interstate or intrastate rates are already below the prescribed rate
level?

### H.     Accessible Inmate Calling Services

133.     Our goal with ICS reform is to ensure that ICS is accessible to all inmates and their
families at just and reasonable rates that represent fair compensation to ICS providers.  Below, we seek
focused comment on several disability access issues raised in the *Inmate Calling Report and Order and
FNPRM* that merit further inquiry.

134.     *Background*.  In the *Order*, the Commission highlighted the telecommunications
challenges faced by inmates who are deaf and hard of hearing, as well as by inmates communicating with
family members or friends who are deaf and hard of hearing, such as extremely high rates for calls placed
via the Telecommunications Relay Service (TRS).[391]  In the *Order*, the Commission "clarif[ied] that ICS
providers may not levy or collect an additional charge for any form of" telecommunications relay services
(TRS) call because "such charges would be inconsistent with section 225 of the Act."[392]  However, the
record indicates continuing problems, such as, for example, "nearly half of deaf inmates surveyed did not
have access to TTY at their facilities."[393]

135.     In the *FNPRM*, the Commission sought comment on a number of questions to ensure that
ICS is accessible.[394]  The Commission also tentatively concluded that inmate calling service rates per-
minute for TTY calls should be set at 25 percent of the safe harbor rate for inmate calls, and sought
comment on this proposal.[395]  The Commission sought comment on how ICS providers should recover the
costs of providing such discounted TTY calls, and on the possibility of allowing ICS providers to recover
the cost of a TTY call from the Telecommunications Relay Service Fund.[396]  In the Joint Provider Reform
Proposal, the providers "commit to continue to comply with their existing obligations" under applicable
laws, and "also will work closely with correction facilities 'to ensure that deaf and hard of hearing
inmates are afforded access to telecommunications that is equivalent to the access available to hearing

---

[390] *See* Securus July 23, 2014 *Ex Parte* Letter at Attach.

[391] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14110, para. 3.

[392] *Id.* at 14159-60, para. 95.  Title IV of the Americans with Disabilities Act requires "that users of
telecommunications relay services pay rates no greater than the rates paid for functionally equivalent voice
communications services."  47 U.S.C. § 225(d)(1)(D).

[393] HEARD FNPRM Comments at 5.

[394] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14178-81, paras. 142-151.  We make clear
that when we refer to the disability communications issues related to ICS, we are referring to both the needs of
inmates that must use accessibility services because they are disabled themselves and the needs of inmates that must
use accessibility services to contact non-incarcerated people that are disabled.

[395] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14179, para. 144.

[396] *Id.* at 14179-80, paras. 146-47.

inmates.'"[397]  Pay Tel's Proposal states that "ICS Vendors will work with confinement facilities where requested to enable video relay services," "[c]omply with all existing obligations and laws regarding service people with disabilities," and "[r]equire that deaf and hard of hearing inmates will have full access to TDD/TTY services at no additional charge."[398]  We seek comment on these proposals.

136.    *Discussion.*  In the *Order*, the Commission noted commenters' general agreement with the Commission's statement in the *2012 ICS NPRM* that TTY-to-voice calls take at least three to four times longer than voice-to-voice conversations to deliver the same conversational content, not including the time it takes to connect to the operator.[399]  In the *FNPRM*, the Commission tentatively concluded that ICS per-minute rates for TTY calls should be set at 25 percent of the interim safe harbor rate for standard ICS calls, and sought comment on this proposal.[400]  CenturyLink asserts that "a discounted rate of 25% of the interstate safe harbor rate for TTY calls . . . is far too low.  In CenturyLink's experience, TTY calls can take up to two times as long as regular calls, not the three or four times suggested by some commenters."[401]  HEARD, however, asserts that the proposed discounted rate is insufficient, as it "does not account for varying literacy rates of deaf prisoners--many of whom use sign language as their primary or only method of communication."[402]  HEARD urges a greater discount, based on the assertion that "prison TTY telephone calls are typically at least six to eight times longer than a hearing phone call."[403]  We seek specific comment on the actual relative length of TTY-to-TTY and TTY-to-voice calls as compared to voice-to-voice calls.  Given the wide range of assertions in the record, we request that comments be backed by data on the actual lengths of TTY-to-TTY, TTY-to-voice, and voice-to-voice conversations.  Commenters should describe the methodology they used to collect the information with specificity.

137.    The Commission has observed that, in implementing section 276 of the Act, section 276(b)(1)(A) exempts TRS calls from the per-call compensation requirement, and it requires payphone service providers to provide free access to connect to TRS.[404]  However, if the outgoing portion of a TRS call is a long distance call, a caller is required to pay for that portion.[405]  Is it the case that no ICS provider charges inmates for voice-to-TTY or TTY-to-voice calls because the "interexchange company holding the [state] TRS contract carries the call to the called party?"[406]  If so, should final reduced ICS per-minute rates for TTY calls be applicable only to TTY-to-TTY calls, as those calls are indistinguishable from standard voice calls because the inmate is dialing the called party directly, using the called party's

---

[397] Joint Provider Reform Proposal at 7 (citing *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14160, para. 54).

[398] *See* Pay Tel Proposal at 4.

[399] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14178, para. 143.

[400] *See id.* at 14179, para. 144.  *But see Securus Techs. Partial Stay Order.*

[401] CenturyLink FNPRM Comments at 11-12.

[402] HEARD FNPRM Comments at 4.

[403] *Id.*

[404] *See, e.g., Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996 et al.*, Report and Order, CC Docket Nos. 96-128, 91-35, 11 FCC Rcd 20541 at 20545, para. 6 (1996).  *See also Telecommunications Relay Services and the Americans with Disabilities Act of 1990*, Fifth Report and Order, CC Docket No. 90-571, 17 FCC Rcd 21233 at 21244-45, para. 24 (2002) ("A call made from a payphone connects to a TRS facility via free local calling.").

[405] *See Telecommunications Relay Services and the Americans with Disabilities Act of 1990*, 17 FCC Rcd at 21244-45, para. 24.

[406] *See* Securus FNPRM Comments at 17-18; *see also id.* at Hopfinger Decl. at 1-2.

terminating phone number, and thus the call data looks identical to the call data from a typical voice call?[407]

138.    With respect to TTY-to-voice and voice-to-TTY calls, we seek comment on AT&T's request for clarification that the "manner in which it handles operator-assisted collect calls from inmates via TRS" is "subject to the rate requirements set out in the order in WC Docket No. 12-375."[408]  AT&T describes the issue as follows:

> Pursuant to contract with state authorities, AT&T provides TRS service in eight states plus the District of Columbia.  Often times, but not always, the TRS Communications Assistant (CA) can see that the call has originated from a detention facility.  For security, operator services practices limit inmate calling to collect calls.  Upon receiving the call, the inmate can direct the CA to forward the call to any interexchange carrier on the carrier of choice list.  The CA in the states where AT&T provides the service is an AT&T employee.  If the inmate selects AT&T as the IXC for the call, the CA then functions as the operator service provider and the called party will be charged at the tariffed rate for the call, which is higher than the rate cap for a collect call specified in the ICS order.  AT&T interexchange collect calling toll services are not limited to inmates only; anyone making the same type of TRS collect call will be treated and charged in the same manner.[409]

139.    Section 64.6000 of our rules defines ICS as "the offering of interstate calling capabilities from an Inmate Telephone;" and Inmate Telephone as "a telephone instrument or other device capable of initiating telephone calls set aside by authorities of a correctional institution for use by Inmates."[410]  We seek comment on whether AT&T and other entities that provide TRS are providing ICS for TRS calls placed by inmates.  Is it relevant that "TRS [communications] assistants may place only [operator assisted] collect calls on behalf of inmates using TRS?"[411]  Would it be relevant if inmates are not charged for calling TRS, but only for the long distance component of a TRS call?[412]

140.    We seek further comment as to whether the rates and charges levied for operator-assisted collect calls from inmates via TRS are subject to the rate requirements set out in the *Order*.  Does the fact that an inmate "can direct the CA to forward the call to any interexchange carrier on the carrier of choice list" indicate that the interexchange portion of the call is no longer ICS, and therefore not subject to our rate requirements?

141.    TTYs are only one form of accessible equipment, and TTY relay is only one form of TRS, and commenters to the *FNPRM*, as well as some 2014 ICS Workshop participants, decry correctional facilities' continued reliance on TTY equipment, as well as their failure to make newer equipment technology such as videophones for Video Relay Service (VRS)[413] and point-to-point video

---

[407] *Id*. at 17 (citing Hopfinger Decl. at para 4-8).

[408] Letter from William L. Roughton, Jr., General Attorney, AT&T Services, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1 (filed Jan. 10, 2014) (AT&T Jan. 10, 2014 *Ex Parte* Letter).

[409] Letter from William L. Roughton, Jr., General Attorney, AT&T Services, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 1-2 (filed Dec. 5, 2013).

[410] 47 C.F.R. § 64.6000.

[411] AT&T Jan. 10, 2014 *Ex Parte* Letter at 1.

[412] *See supra* para. 137.

[413] VRS is "[a] telecommunications relay service that allows people with hearing or speech disabilities who use sign language to communicate with voice telephone users through video equipment.  The video link allows the

(continued…)

communications, devices for Internet Protocol Relay Service (IP Relay)[414] and Internet Protocol
Captioned Telephone Services (IP CTS),[415] available to inmates.[416]  We seek comment on the availability
of these technologies as well as any other advanced technologies that meet persons with disabilities
communication needs in correctional facilities.  Should all correctional facilities be required to install a
certain type or types of equipment for inmates with disabilities, such as videophone equipment, IP CTS
devices or other assistive technologies?  Should they do so upon the request of an inmate with a
disability?  We seek comment on our authority to regulate correctional facilities in this manner.  If
correctional facilities are required to provide such equipment, how should the facilities recover the costs
of purchasing and installing the necessary equipment, and how should ICS providers recover the costs of
the calls?  In the alternative, are ICS providers responsible for providing any communications equipment
needed to meet the communications demands of all inmates regardless of ability?  How would such a
requirement fit into the Commission's section 225 authority?  Do ICS providers meet criteria as a
common carrier for offering telecommunications relay service eligible for cost recovery from the TRS
Fund?  Why or why not?  And, if not, is there a justification for different treatment in this industry?  Will
ICS providers or facilities incur costs to install equipment for use by any inmate with a disability?  What
is the impact of such approaches on ICS providers?  Should providers be able to recover any additional
costs if they are unable to do so through the TRS Fund?

142.     The Commission has imposed differing registration requirements for users of the various
types of TRS.  We seek comment on how the Commission's evolving relay service registration
requirements can be met in an institutional setting where more than one user will be utilizing equipment.
We also seek comment about security issues related to IP telephone technologies, such as VRS, IP-
captioned telephone service, and IP Relay.  Do these types of advanced technologies pose a security risk
in a correctional setting?  If so, what is the nature of such risk?  Is the risk greater or lesser than that
associated with traditional telecommunications and interconnected VoIP services utilized by ICS
providers?

143.     What are just, reasonable and fair per-minute rates for end users and ICS providers for
forms of TRS other than traditional TTY TRS that will allow service to be accessible to all inmates
regardless of ability?[417]  HRDC suggests that, consistent with section 225 of the Act, the rates for
accessible communications technology from correctional facilities should be no more than calls made
from traditional telephones.[418]  Would it be appropriate to discount the per-minute rate for ICS calls made

---

(Continued from previous page) ————————————————
[communications assistant] to view and interpret the party's signed conversation and relay the conversation back and
forth with a voice caller."  47 C.F.R. § 64.601(a)(40).

[414] Internet Protocol Relay Service (IP Relay) is "[a] telecommunications relay service that permits an individual
with a hearing or a speech disability to communicate in text using an Internet Protocol-enabled device via the
Internet, rather than using a text telephone (TTY) and the public switched telephone network."  47 C.F.R. §
64.601(a)(17).

[415] Internet Protocol Captioned Telephone Service (IP CTS) is "[a] telecommunications relay service that permits an
individual who can speak but who has difficulty hearing over the telephone to use a telephone and an Internet
Protocol-enabled device via the Internet to simultaneously listen to the other party and read captions of what the
other party is saying."  47 C.F.R. § 64.601(a)(16).

[416] *See, e.g.*, HEARD FNPRM Comments at 4 ("That ICS providers and prisons have resisted installing modern
technology should not justify the continued exclusive use of obsolete technology that does not connect to the vast
majority of the Deaf Community and that does not allow for equal communication access between deaf prisoners
and hearing individuals outside of the prison walls.");  HEARD FNPRM Reply at 2-3;  HRDC FNPRM Comments at
13.  *See also* 2014 ICS Workshop Transcript at 36-43 (Talila Lewis, Founder, HEARD).

[417] *See supra* para.141.

[418] *See* HRDC FNPRM Comments at 13; *see also* 47 U.S.C. § 225(d)(1)(D).

using other accessible equipment or other forms of TRS, such as Speech to Speech relay services[419] or Captioned Telephone Service, as previously proposed for TTY calls?  Would different rate setting methodologies be appropriate given the differing nature of TTY and other forms of TRS?

144.    *TRS Reporting Requirements.*  In the *FNPRM* the Commission asked whether ICS providers should be required to submit TRS usage data and report on user complaints.[420]  Commenter HEARD asserts that "nearly half of deaf inmates surveyed did not have access to TTY at their facilities"[421] and suggests that correctional facilities begin to track and report to the Commission the number of relay calls being made.[422]  We seek further comment on this proposal.  Should ICS providers be required to report to the Commission the number of disability-related calls they provide, the number of problems they experience with such calls, or related complaints they receive?[423]  Or should any such data collection be more narrowly tailored as suggested by the Federal Bureau of Prisons?[424]  Should such data be part of the periodic review we seek comment on below?[425]

## I.    Advanced Inmate Communications Services

145.    We seek comment on newer technologies and services available for inmate communications.  We believe that our core goals for inmates and their families remain the same regardless of the technologies used—ensure competition and continued widespread deployment of ICS and the societal benefits that they bring.  We expect that new technologies available in correctional settings—like new technologies available to consumers in the general public—should offer improvements and innovations that benefit users and thus serve our goals for ICS reform.  In this section we seek comment on these newer technologies, on whether there are any pertinent differences that justify any differences in rules, and on the legal considerations that may need to be addressed.

146.    *Background.*  In the *FNPRM*, the Commission sought comment on "the impact of technological advancements on the ICS industry."[426]  The Commission also invited comment on the Commission's legal authority to regulate the rates for services provided over newer technologies.[427]  In response, Pay Tel states that "[t]here is no question that new technologies will continue to emerge that will affect and improve provision and quality of, and security related to, ICS."[428]  The Prison Policy Initiative suggests that there are benefits to advanced technologies in correctional settings such as video visitation systems (VVS), but cautions that there is "clear evidence that the video communications market is currently driven by the same perverse incentives that caused market failure in the correctional telephone industry."[429]

---

[419] Speech-to-speech relay service (STS) is a "telecommunications relay service that allows individuals with speech disabilities to communicate with voice telephone users through the use of specially trained [communications assistants] who understand the speech patterns of persons with speech disabilities and can repeat the words spoken by that person."  47 C.F.R. § 64.601(a)(30).

[420] HEARD FNPRM Comments at 5.

[421] *Id.*

[422] *Id.*

[423] *Id.*

[424] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14185-86, para. 164.

[425] *See infra* Section III.J.

[426] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14185-86, para. 164.

[427] *See id.* at 14185-86, paras. 164-65.

[428] Pay Tel FNPRM Reply at 23.

[429] Prison Policy Initiative FNPRM Comments at 1.

147.    At the Commission's 2014 ICS Workshop, MeshIP discussed its "secure prison cell phone solution that gives detainees highly customized cell phones with all the security and control features of prison payphones."[430] JLG Technologies described for the audience voice biometrics technology, the second generation of voice biometrics, known as continuous voice identification, and next generation voice biometrics technology currently under development.[431] GTL believes the biggest technological trends in inmate communications will be access to wall-mounted, multiservice kiosks, which offer more frequent and better contacts with the inmates' families and friends and then a shift to hand-held devices.[432]

148.    *Discussion*.  We seek a greater factual understanding of the availability of these and other services.  What kinds of services are available?  Are they available commonly in most facilities, or only in certain ones?  What is the demand for these services and what rates and fees are charged?  What additional functionalities do they offer?  Do they provide any greater benefits to inmates, their families, or others, than traditional services?  What are ICS providers' rates for other services such as email, voicemail or text messaging?  The record indicates that some ICS providers offer tablet computers and kiosks that allow inmates to access games, music, educational tools, law library tools and commissary ordering.[433]  What is the compensation mechanism for access to these offerings?

149.    Are there additional costs to ICS providers in developing, provisioning, or offering these services?  Participants at the 2014 ICS Workshop suggest that there are "huge challenges in anticipating and funding costs associated with developing, implementing, and maintaining these new systems and services."[434]  GTL noted that ICS providers bear the costs of the "development for the kiosk, to put that device on the wall . . . to provide the additional bandwidth, to develop and do the software development research for the applications that go in that device, for the additional maintenance and support to support the device once it's on the wall."[435]  We seek comment on the costs of these services in general.  We also seek comment on the rates and fees charged for their use.

150.    We seek comment on whether there is a similar market failure for service provided by new technology as described above for existing ICS.  For instance, in response to evidence of unreasonable rates, the Alabama PSC capped VVS rates at $0.50 per minute and VVS recorded message download at "$1.00 for the first minute and $0.50 for each additional recorded minute."[436]  Do commenters consider these just and reasonable rates and fair compensation for VVS?  We seek comment on Pay Tel's proposal that the Commission establish a discrete mechanism by which providers may seek approval for a separate ancillary charge related to some type of advanced technology.[437]  How would such a charge function in the context of the proposed reform of ancillary charges discussed above?[438]  Securus also suggests that the Commission allow for "incremental product pricing above rate caps if necessary"

---

[430] 2014 ICS Workshop Transcript at 246 (Brian F. Byrne, Founder and Managing Partner, MeshIP).

[431] *Id*. at 249-51 (Jay L. Gainsboro, Founder, JLG Technologies).

[432] *Id*. at 260-61 (Chris Moore, VP - Product Management, GTL).

[433] *Id*. at 254 (Grant Gongaware, Chief Architect, Telmate); *Id*. at 260 (Chris Moore, VP - Product Management, GTL).

[434] *Id*. at 255-58 (Grant Gongaware, Chief Architect, Telmate) (discussing the difficulty in engineering countermeasures to inmate abuses of communications services and tools; significant new storage and maintenance costs for self-contained and supervised services; and the need to anticipate the changing costs of regulatory compliance).

[435] *Id*. at 260-61 (Chris Moore, VP - Product Management, GTL).

[436] *See* Alabama Further Order at 66-67.

[437] *See* Pay Tel FNPRM Reply at 23-24; *see also* Pay Tel Proposal at 3.

[438] *See supra* Section III.C.

for "[p]roduct [e]xceptions."[439]  Is such a separate mechanism necessary?  If so, how do proponents of such a mechanism suggest that it function?  Will advanced ICS technologies continue to be developed and deployed without a separate and discrete recovery mechanism?  Finally, if the Commission were to adopt regulations for advanced technologies like video visitation and video calling, what is the best way to harmonize our approach with that of the states?

151.      In the *Order*, the Commission found that the application of section 276 is not restricted to any one form of communications technology and made clear that reforms apply to ICS regardless of technology used to provision the service, such as IP-based and TDM-based provisioning.[440]  Some ICS providers are developing wireless options.[441]  We therefore seek comment on whether ICS provisioned through wireless technology will also be subject to any final reforms adopted by the Commission under section 276.[442]  We also seek comment on whether advanced services like video visitation service and video calling services constitute "inmate telephone service" within the meaning of the term in section 276.[443]  Given the technologically neutral nature of section 276 and the fact that video calling shares many of the attributes of traditional ICS, including the fact that it is a pay per use service involving real time, two-way voice communications, are these services "inmate telephone service"?  Does the Commission's recognition of video relay service as a reimbursable relay service under section 225 of the Act (defining the video service as "functionally equivalent" to traditional TRS) provide analogous support for including video calling as an inmate telephone service?[444]  To the extent any communications services available to inmates fall outside the statutory definition of "inmate telephone service," what other sources of authority provide the Commission with the ability to ensure that rates are just and reasonable?  Could such services be regulated pursuant to sections 201 and 202 to ensure the rates, charges, and practices associated with those services are just, reasonable, and not unreasonably discriminatory?  Could regulation of these services be supported through the use of the Commission's ancillary authority?  For example, the record shows that some correctional institutions have eliminated all in-person visitation and replaced it with video visitation.[445]  What if providers were to eliminate all payphone calling in favor of video calling and charged rates for those services far in excess of the Commission's rate caps?  Would such a shift effectively void the section 276 requirement of fair compensation and preclude the Commission from discharging its statutory mandate?

---

[439] Securus July 23, 2014 *Ex Parte* Letter at Attach.

[440] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14115, para. 14 ("Section 276 makes no mention of the technology used to provide payphone service and makes no reference to 'common carrier' or 'telecommunications service' definitions.  Thus, the use of VoIP or any other technology for any or all of an ICS provider's service does not affect our authority under section 276.").

[441] *See, e.g.*, GTL, "Personal hand-held devices to provide enhanced services for offenders," *available at* http://www.gtl.net/correctional-facility-services/inmate-communication-solutions/handheld-devices/ (last visited Sept. 12, 2014).

[442] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14115, para. 14.

[443] *See* 47 U.S.C. § 276(d).

[444] *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 5140 at 5152-54, paras. 21-27 (2000).

[445] *See, e.g.*, Alabama PSC Further Order at 69-70 (addressing VVS End User Agreements that eliminate all face to face visitation in favor of video visitation); 2014 ICS Workshop Transcript at 28 (Darrell Baker, Director, Utilities Division, Alabama PSC) ("Some inmate providers are pressuring confinement facilities to eliminate face-to-face visitation with the lure of 20 percent site commissions."); Prison Policy Initiative FNPRM Comments at 1-2 (discussing similar action in five jurisdictions).

### J.        Periodic Review

152.     We seek comment on whether a periodic review of how the reforms we seek comment on above are impacting ICS rates, demand, ancillary charges and site commission levels is essential to ensure that our adopted reforms are creating and maintaining the proper incentives to drive end user rates to competitive levels.  We seek comment on the benefits of establishing a periodic review process.

153.     In the *Order* the Commission adopted an Annual Reporting and Certification Requirement that included the submission of interstate and intrastate ICS rate and demand data as well as the average duration of calls.[446]  In the *FNPRM* the Commission sought further comment on adjusting ICS rates over time.[447]  In response, the Wright Petitioners suggested that the Commission "adopt rules to review the interim rates no later than 180 days after the ICS providers have submitted their second round of data collected under Section 64.6060 of the Commission's rules."[448]

154.     The ICS providers that signed on to the Joint Provider Reform Proposal suggest that "ICS providers should be required to provide certain information to the Commission annually for three (3) years to ensure the caps on per-minute rates and any admin-support payments adopted are implemented as required."[449]  Specifically, they suggest that "[s]uch information should include a list of the ICS provider's current interstate and intrastate per-minute ICS rates, the ICS provider's current fee amounts, the locations where the ICS provider makes admin-support payments, and the amount of those admin-support payments."[450]  We seek comment on this portion of the Proposal.  In addition to the information suggested by the ICS providers, we suggest that providers also be required to file demand and call duration data.  Finally, we seek comment on whether any information gathered for an annual review must be certified as accurate by an officer of the reporting company.[451]

### K.        Enforcement

155.     In the *Order*, the Commission described its standard enforcement authority as it relates to ICS.[452]  The Commission also made clear, and we remind interested parties, that the Commission's general section 208 complaint procedures apply.[453]

156.     The Commission also made clear that penalties or failure to comply with the Commission's rules may result in monetary forfeitures of up to "$160,000 for each violation or each day of a continuing violation, up to a maximum of $1,575,000 per continuing violation."[454]  We seek comment on how to interpret "violation" for use in the ICS context in light of the reforms discussed herein.  For example, would each non-compliant ICS rate charged by a provider be a single violation?  Would the

---

[446] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14169-70, paras. 116-17; 47 C.F.R. § 64.6060; *but see Securus Techs. Partial Stay Order*.

[447] *See id.* at 14185, para. 154 ("Should we maintain the current safe harbors and make them permanent or should they be reduced over time[?]").

[448] Petitioners FNPRM Comments at 2, 10 (the Commission should "take into account the information provided by the ICS providers in connection with the annual data collection required under the new FCC rules, and reduce rates when necessary.").

[449] Joint Provider Reform Proposal at 7.

[450] *Id*.

[451] *See id.* at 7 ("In addition, all ICS providers should be required to submit an annual certification by the company Chief Executive Officer, Chief Financial Officer and General Counsel, under penalty of perjury, certifying that the company is in compliance with the FCC ICS rate rules and any admin-support payment rules adopted.").

[452] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14169-73, paras. 115-26.

[453] *See id.* at 14171-72, paras. 120-23.

[454] *Id*. at 14170, para. 118.

continued payment of site commissions to a correctional facility constitute a single violation?  Would the imposition of one ancillary charge over any cap or caps ultimately adopted by the Commission to one consumer constitute a single violation?

157.    Securus has urged the Commission to require that the CEO, CFO, and General Counsel of each ICS provider all certify to the companies' compliance with the Commission's ICS rules and regulations.[455]  In the *Order*, the Commission also adopted an Annual Reporting and Certification Requirement that required "an officer or director of each ICS provider annually to certify the accuracy of the data and information in the certification, and the provider's compliance with all portions of this Order."[456]  We note that this rule was stayed by the D.C. Circuit so we have not evaluated the effectiveness or impact of such a certification.[457]  Should the Commission adopt such a requirement?  How does such a certification requirement function with the proposed periodic review requirement we seek comment on above?

158.    We seek comment on whether states should continue to exercise enforcement functions with respect to any state requirements that are consistent with the Commission's regulations.  We seek comment on whether states should continue to exercise their enforcement functions with respect to any final rules that the Commission may adopt as part of comprehensive ICS reform.  Should the Commission expressly allow states to exercise such enforcement authority, e.g., to be carried out through their complaint resolution process, or some other role in the oversight process of state commissions?  If the Commission did so, what if any oversight role should the Commission adopt with respect to state proceedings involving the enforcement of Commission rules?  Would our authority to provide for such a state role apply regardless of whether certain state laws have been found to be inconsistent with any ICS rules governing intrastate ICS?

### L.    Cost/Benefit Analysis of Proposals

159.    Acknowledging the potential difficulty of quantifying costs and benefits, we seek to determine whether each of the proposals above will provide public benefits that outweigh their costs.  We also seek to maximize the net benefits to the public from any proposals we adopt.  For example, commenters have argued that inmate recidivism decreases with regular family contact.[458]  This not only benefits the public broadly by reducing crimes, lessening the need for additional correctional facilities and cutting overall costs to society,[459] but also likely has a positive effect on the welfare of inmates' children.[460]  On the other hand, commenters have argued that eliminating site commissions would directly affect jail revenues and lead to a reduction in recreational and rehabilitation services provided to inmates by facilities.[461]  Such a reduction could produce its own wave of negative aftereffects that offset some of

---

[455] *See* Securus Sept. 22, 2014 *Ex Parte* Letter at Attach.

[456] *Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14169-70, para. 117; *see also* 47 C.F.R. § 64.6060 (Annual Reporting and Certification Requirement).

[457] *See generally Securus Techs. Partial Stay Order*.

[458] *See Inmate Calling Report and Order and FNPRM*, 28 FCC Rcd at 14109-10, paras. 2-3.

[459] *See* Petitioners 2013 Comments Exh. C, Bazelon Decl. at para. 48; Petitioners 2013 Reply, Exh. A, Bazelon Decl. at para. 10.

[460] *See* 2013 ICS Workshop Transcript at 11 (Mignon Clyburn, Acting Chairman, FCC) ("Regardless of why that inmate is in jail, the exorbitant inmate calling regime deeply and chronically affects the most vulnerable among us. If you were to ask their teachers, it is affecting their [children's] academic performance.  If you ask the school counselors, it affects their behavior and attitudes.  And if you were to speak with the guardians, families and friends, it impacts their ability to adequately and affordably care for these children.").

[461] *See* Letter from Harrison A. Moody, President, Virginia Association of Counties, to the Honorable Tom Wheeler, Chairman, FCC, WC Docket No. 12-375 (filed September 3, 2014) ("Local and regional jails in Virginia stand to lose a total of around $13.5 million in annual revenue if the FCC decides to eliminate commissions from their phone

the purported benefits.[462]  Accordingly, we seek specific comment on the costs and benefits of the proposals above and any additional proposals received in response to this Second Further Notice.  We also seek any information or analysis that would help us to quantify these costs or benefits.  We request that interested parties discuss whether, how, and by how much they will be impacted in terms of costs and benefits of the proposals included herein.  Additionally, we ask that parties consider whether the above proposals have multiplier effects beyond their immediate impact that could affect their interest or, more broadly, the public interest.  Further, we seek comment on any considerations regarding the manner in which the proposals could be implemented that would increase the number of people who benefit from them, or otherwise increase their net public benefit.  We recognize that the costs and benefits may vary based on such factors as the correctional facility served and the ICS provider.  We request that parties file specific analyses and facts to support any claims of significant costs or benefits associated with the proposals herein.

## IV.    PROCEDURAL MATTERS

### A.    Filing Instructions

160.    Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 C.F.R. §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).  Comments and reply comments on this Second FNPRM must be filed in WC Docket No. 12-375.

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

  - All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.

  - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

---

(Continued from previous page) ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

contracts.  This revenue currently offsets the costs to jails of providing this service and in many local and regional jails the revenue is also used to provide additional direct services for inmates.").

[462] *See, e.g.,* Arizona Detention Association FNPRM Comments at 1 (asserting that Arizona law requires any revenue received from ICS contracts to be deposited in an Inmate Welfare Fund, which in turn funds programs and services that directly benefit the inmates, and that if such funds were to diminish, the burden to provide the same level of program services would be placed on the back of the tax payers and general fund); Correctional Institutions FNPRM Comments at 7 (stating that, by curtailing the availability of site commissions, the FCC has placed it in the unenviable position of terminating inmate programs and services or attempting to find other ways to cover the costs for the programs).

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

### B.    Ex Parte Requirements

161.    This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[463]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  Memoranda must contain a summary of the substance of the *ex parte* presentation ad not merely a list of the subjects discussed.  More than a one or two sentence description of the views arguments presented is generally required.  If the oral presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

### C.    Paperwork Reduction Act Analysis

162.    This document does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4).

### D.    Initial Regulatory Flexibility Analysis

163.    As required by the Regulatory Flexibility Act of 1980 (RFA),[464] the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) for this Second Further Notice, of the possible significant economic impact on small entities of the policies and rules addressed in this document.  The IRFA is set forth as the Appendix.  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed on or before the dates on the first page of this Second Further Notice.  The Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, will send a copy of this Second Further Notice, including the IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[465]

---

[463] 47 C.F.R. §§ 1.1200 *et seq*.

[464] *See* 5 U.S.C. § 603.

[465] *See* 5 U.S.C. § 603(a).

## V.        ORDERING CLAUSES

164.        ACCORDINGLY, IT IS ORDERED that, pursuant to sections 1, 2, 4(i)–(j), 201(b), 276, and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)–(j), 201(b), 276, and 332, this Second Further Notice of Proposed Rulemaking IS ADOPTED.

165.        IT IS FURTHER ORDERED, that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Second Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

166.        IT IS FURTHER ORDERED, that pursuant to sections 1.4(b)(1) and 1.103(a) of the Commission's rules, 47 C.F.R. §§ 1.4(b)(1) and 1.103(a), that this Second Further Notice of Proposed Rulemaking SHALL BE EFFECTIVE 30 days after publication of a summary thereof in the Federal Register.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

# APPENDIX

## Initial Regulatory Flexibility Analysis

1.      As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies and rules proposed in this Second Further Notice of Proposed Rulemaking (Second Further Notice).  Written comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the Second Further Notice.  The Commission will send a copy of the Second Further Notice, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the Second Further Notice and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.      Need for, and Objectives of, the Notice

2.      In today's Second Further Notice the Commission seeks comment on additional measures it could take to ensure that interstate and intrastate inmate calling service (ICS) are provided consistent with the statute and public interest and the Commission's authority to implement these measures.  The Commission believes that additional action on ICS will help maintain familial contacts stressed by confinement and will better serve inmates with special needs while still ensuring the critical security needs of correctional facilities of various sizes.  Specifically, the Second Further Notice seeks comment on:

- Limiting site commission payments;

- Final interstate and intrastate ICS rate cap reform;

- Limiting ancillary charges;

- Harmonizing inconsistent state regulations pursuant to Section 276(c) of the Communications Act of 1934, as amended;

- Treatment of existing ICS contracts;

- Appropriate transition period;

- Accessible inmate calling services;

- Advanced inmate communications services;

- Periodic review of the industry;

- Enforcement; and

- Cost/Benefit analysis of proposals.

### B.      Legal Basis

3.      The legal basis for any action that may be taken pursuant to the Second Further Notice is contained in sections 1, 2, 4(i)-(j), 201(b) and 276 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b) and 276.

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601–612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See id.*

### C.   Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[6]  A "small-business concern" is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

5.      **Small Businesses**.  Nationwide, there are a total of approximately 28.2 million small businesses, according to the SBA.[8]

6.      **Wired Telecommunications Carriers**.  The SBA has developed a small business size standard for Wired Telecommunications Carriers, which consists of all such companies having 1,500 or fewer employees.[9]  According to Census Bureau data for 2007, there were 3,188 firms in this category, total, that operated for the entire year.[10]  Of this total, 3,144 firms had employment of 999 or fewer employees, and 44 firms had employment of 1,000 employees or more.[11]  Thus, under this size standard, the majority of firms can be considered small.

7.      **Local Exchange Carriers (LECs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[12]  According to Commission data, 1,307 carriers reported that they were incumbent local exchange service providers.[13]  Of these 1,307 carriers, an estimated 1,006 have 1,500 or fewer employees and 301 have more than 1,500 employees.[14]  Consequently, the Commission estimates that most providers of local exchange service are small entities that may be affected by our action.

---

[4] *See* 5 U.S.C. § 603(b)(3).

[5] *See* 5 U.S.C. § 601(6).

[6] *See* 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] *See* 15 U.S.C. § 632.

[8] *See* SBA, Office of Advocacy, "Frequently Asked Questions," http://www.sba.gov/sites/default/files/advocacy/FAQ_March_2014_0.pdf  (last visited July 21, 2014).

[9] 13 C.F.R. § 121.201, NAICS code 517110.

[10] U.S. Census Bureau, 2007 Economic Census, Subject Series:  Information, Table 5, "Establishment and Firm Size: Employment Size of Firms for the United States: 2007 NAICS Code 517110" (issued Nov. 2010).

[11] *See id*.

[12] 13 C.F.R. § 121.201, NAICS code 517110.

[13] *See Trends in Telephone Service*, Federal Communications Commission, Wireline Competition Bureau, Industry Analysis and Technology Division at Table 5.3 (Sept. 2010) (*Trends in Telephone Service*).

[14] *See id*.

8.     **Incumbent Local Exchange Carriers (incumbent LECs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to incumbent local exchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[15]  According to Commission data, 1,307 carriers reported that they were incumbent local exchange service providers.[16]  Of these 1,307 carriers, an estimated 1,006 have 1,500 or fewer employees and 301 have more than 1,500 employees.[17]  Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action.

9.     We have included small incumbent LECs in this present RFA analysis.  As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (e.g., a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field" of operation.[18]  The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[19]  We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

10.     **Competitive Local Exchange Carriers (competitive LECs), Competitive Access Providers (CAPs), Shared-Tenant Service Providers, and Other Local Service Providers.**  Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers.  The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[20]  According to Commission data, 1,442 carriers reported that they were engaged in the provision of either competitive local exchange services or competitive access provider services.[21]  Of these 1,442 carriers, an estimated 1,256 have 1,500 or fewer employees and 186 have more than 1,500 employees.[22]  In addition, 17 carriers have reported that they are Shared-Tenant Service Providers, and all 17 are estimated to have 1,500 or fewer employees.[23]  In addition, 72 carriers have reported that they are Other Local Service Providers.[24]  Of the 72, 70 have 1,500 or fewer employees and two have more than 1,500 employees.[25]  Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, Shared-Tenant Service Providers, and Other Local Service Providers are small entities that may be affected by our action.

---

[15] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[16] *See Trends in Telephone Service* at Table 5.3.

[17] *See id.*

[18] 5 U.S.C. § 601(4).

[19] *See* Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999).  The Small Business Act contains a definition of "small business concern," which the RFA incorporates into its own definition of "small business."  *See* 15 U.S.C. § 632(a); *see also* 5 U.S.C. § 601(4).  SBA regulations interpret "small business concern" to include the concept of dominance on a national basis.  *See* 13 C.F.R. § 121.102(b).

[20] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[21] *See Trends in Telephone Service* at Table 5.3.

[22] *See id.*

[23] *See id.*

[24] *See id.*

[25] *See id.*

11.     **Interexchange Carriers (IXCs)**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to interexchange services.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[26]  According to Commission data, 359 companies reported that their primary telecommunications service activity was the provision of interexchange services.[27]  Of these 359 companies, an estimated 317 have 1,500 or fewer employees and 42 have more than 1,500 employees.[28]  Consequently, the Commission estimates that the majority of interexchange service providers are small entities that may be affected by our action.

12.     **Local Resellers**.  The SBA has developed a small business size standard for the category of Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[29]  According to Commission data, 213 carriers have reported that they are engaged in the provision of local resale services.[30]  Of these, an estimated 211 have 1,500 or fewer employees and two have more than 1,500 employees.[31]  Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by our action.

13.     **Toll Resellers**.  The SBA has developed a small business size standard for the category of Telecommunications Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[32]  According to Commission data, 881 carriers have reported that they are engaged in the provision of toll resale services.[33]  Of these, an estimated 857 have 1,500 or fewer employees and 24 have more than 1,500 employees.[34]  Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by our action.

14.     **Other Toll Carriers**.  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to Other Toll Carriers.  This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers.  The closest applicable size standard under SBA rules is for Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[35]  According to Commission data, 284 companies reported that their primary telecommunications service activity was the provision of other toll carriage.[36]  Of these, an estimated 279 have 1,500 or fewer employees and five have more than 1,500 employees.[37]  Consequently, the Commission estimates that most Other Toll Carriers are small entities that may be affected by our action.

---

[26] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[27] *See Trends in Telephone Service* at Table 5.3.

[28] *See id.*

[29] *See* 13 C.F.R. § 121.201, NAICS code 517911.

[30] *See Trends in Telephone Service* at Table 5.3.

[31] *See id.*

[32] *See* 13 C.F.R. § 121.201, NAICS code 517911.

[33] *See Trends in Telephone Service* at Table 5.3.

[34] *See id.*

[35] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[36] *See Trends in Telephone Service* at Table 5.3.

[37] *See id.*

15.     **Payphone Service Providers (PSPs)**.  Neither the Commission nor the SBA has developed a small business size standard specifically for payphone services providers.  The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[38]  According to Commission data,[39] 535 carriers have reported that they are engaged in the provision of payphone services.  Of these, an estimated 531 have 1,500 or fewer employees and four have more than 1,500 employees.[40]  Consequently, the Commission estimates that the majority of payphone service providers are small entities that may be affected by our action.

### D.     Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

16.     In this Second Further Notice, the Commission seeks public comment on options to reform the inmate calling service market.  Possible new rules could affect all ICS providers, including small entities.  In proposing these reforms, the Commission seeks comment on various options discussed and additional options for reforming the ICS market.

### E.     Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

17.     The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[41]

18.     The Second Further Notice seeks comment from all interested parties.  The Commission is aware that some of the proposals under consideration may impact small entities.  Small entities are encouraged to bring to the Commission's attention any specific concerns they may have with the proposals outlined in the Second Further Notice.

19.     The Commission expects to consider the economic impact on small entities, as identified in comments filed in response to the Second Further Notice, in reaching its final conclusions and taking action in this proceeding.  Specifically, the Commission will conduct a cost/benefit analysis as part of this Second Further Notice and consider the public benefits of any such requirements it might adopt, to ensure that they outweigh their impacts on small businesses.

### F.     Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules

20.     None.

---

[38] *See* 13 C.F.R. § 121.201, NAICS code 517110.

[39] *See Trends in Telephone Service* at Table 5.3.

[40] *See id.*

[41] 5 U.S.C. § 603(c)(1)–(c)(4).

## STATEMENT OF
## CHAIRMAN TOM WHEELER

Re:      *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375.

Last summer, thanks to the leadership of Chairwoman Clyburn, the Commission took an important step forward to reform exorbitant inmate calling service (ICS) rates. The action, which was a decade overdue, was the right thing to do, not just for the families who directly benefit from lower rates, but for all of us. No one can deny the societal benefits of reducing recidivism rates by enabling inmates to stay connected with their families and loved ones. I won't restate the many, many clear reasons that tackling this issue is so important. I will simply fully associate myself with the comments and leadership of Commissioner Clyburn on this topic.

When I became Chairman, one of the easiest decisions I made was to communicate my commitment to Commissioner Clyburn to continue the ICS reform process and to do so with Commissioner Clyburn as the undisputed leader on the issue. Today's item reflects that commitment and I am pleased to support it for several reasons.

First, despite positive steps forward on interstate rates, it is clear that a more comprehensive approach to reform is necessary to address problems that continue to drive up rates. Namely, charges for "ancillary services" for an increasing array of services are on the rise; intrastate rates, which encompass the vast majority of calls from correctional facilities, remain very high in many states; and, most importantly, site commissions – payments required by correctional institutions from ICS providers for the privilege of serving those facilities – continue to be demanded and appear to be the driving force behind increased rates and ancillary fees. There are some positive signs that reform of interstate rates has resulted in reduced rates and increased calling, but absent a comprehensive solution to the problem we will continue to find ourselves in a never ending game of ICS rate whack-a-mole.

Second, the item is consistent with my belief that the best way to bring high-quality, affordable service to consumers is through competition. No one could mistake ICS as a competitive market today when exorbitant rates are driven by site commissions demanded by correctional facilities, not by who can provide the best service at the lowest price. As I have said in the context of broadband competition, where competition can exist, we will encourage it and where meaningful competition is not available, the Commission will work to create it. The same principles hold true here. Today's item seeks comment on a variety of issues which are fundamentally seeking a comprehensive path forward that ensures ICS rates are driven by competition wherever possible. To that end, I am pleased that Commissioner O'Rielly offered a section in the item specifically seeking comment on additional ways in which we can facilitate increased competition in the ICS market.

Third, the item recognizes that correctional facilities may incur some costs in the provision of ICS and, if so, seeks comment on how facilities should recover these costs. The record is sparse with information on this topic, so we invite parties to submit additional data in to the record and ideas on how to ensure that facilities can recover costs incurred to operate calling systems, but not for unrelated activities. The item also seeks comment on appropriate transition periods for reform so providers and facilities can adapt. In short, the item strikes the right balance between reforming a system to ensure just and reasonable rates while also ensuring that providers are fairly compensated and facilities are able to adjust to reform.

As always, I want to thank Julie Veach and the talented team in the Wireline Bureau for their hard work on this item. Finally, in praising Commissioner Clyburn for her leadership on this issue, I would be remiss if I did not acknowledge Rebekah Goodheart, Commissioner Clyburn's wireline legal advisor, who has so effectively and diligently coordinated this item with the Bureau and the other Commissioner offices. Hats off to you, Rebekah, for your great work.

## STATEMENT OF
## COMMISSIONER MIGNON CLYBURN

Re:     *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375.

If ever there were a time to stand up for fundamental fairness, this is it.  As one of America's most beloved heroes famously observed:  "The moral test of government, is how it treats those who are in the dawn of life, the children; those who are in the twilight of life, the elderly; and those who are in the shadows of life, the sick, the needy and the handicapped."  That great man was Vice President Hubert H. Humphrey, a leader who put humanity before politics.  And as I think about the action we took last year, I believe he would have been proud.

For nearly a decade, the earnest efforts of beleaguered lawyers and loved ones of American inmates fell short in the pursuit of equity and due process.  Their quest for something as basic as making a phone call to family and friends-- at a reasonable and affordable price-- was set aside as the FCC pursued some more lofty goals.  But for the persistent pleas of an unlikely heroine—Mrs. Martha Wright, a grandmother from Washington, D.C., who wanted nothing more than to stay in touch with her grandson -- thousands of mothers, fathers, and families of inmates would not have more of an opportunity to do what the rest of us take for granted--to stay in touch with the people we care about the most.

When the FCC took its first steps to provide relief to the families of inmates, we struck a chord for the public interest.  We brought scores of families closer to parity with other Americans, who are able to call anywhere in our country without making critical economic trade-offs.

With the support of my colleague Commissioner Rosenworcel, the impact of the first phase of reform of our nation's inmate calling regime has been tremendous.  Our decision shows that doing the right thing can have reverberating benefits.  Since February, when the interstate rate caps of $0.21 for debit/prepaid calls and $0.25 for collect calls went into effect, call volumes across state lines have increased nearly 70% in some facilities, and over 300% at one state department of corrections.

These are not just empty statistics. More affordable rates can help bring about increased and regular contact between inmates and their families.  Studies show that having meaningful  communication beyond prison walls can make a real difference when it comes to maintaining community ties, promoting rehabilitation, and reducing recidivism.

And recent data underscore the critical need, to reduce recidivism rates in our nation.  In April 2014, the Department of Justice released a report analyzing the five-year recidivism rates for over 400,000 prisoners in 30 states and the results are troubling. Two-thirds were rearrested within three years, and three-quarters were rearrested within five years.  These trends come with enormous societal costs.  In addition to more crime, crowded correctional facilities, more expensive prisons, and the judicial time required to prosecute these offenses, it costs an average of $31,000 per year to house each inmate.

But what the statistics do not show, is the personal impact:  2.7 million children, who have committed no crime, are being punished by an unjust and unreasonable inmate calling structure.  In addition to the anxiety associated with a parent who is absent on a daily basis, these young people suffer severe economic and personal hardships and more likely to do poorly in school all exacerbated by an unreasonable rate regime.

While an affordable calling structure will not solve every problem, by reforming the inmate calling regime, we can make a difference for struggling families wishing to maintain contact.  And as a public servant, I strongly believe that those who have the power and the ability to promote the public interest should not make excuses or hesitate to do so.

While the results from last year's Order are significant, we have a lot more work left to do.  The majority of calls from facilities are to friends, family and legal representatives within the same state, and our Order did not address these intrastate calls.  While I sincerely hoped that the states which have yet to

reform their intrastate inmate calling rate structures would have followed the FCC's lead, only a few have elected to do so.

And what has been the result of that inaction?  Since our Order was released, we have witnessed disturbing trends.  New and increased ancillary charges have appeared, intrastate rates have inched higher than the already outrageous costs, and payments from the providers to those facilities – known as site commissions – have skyrocketed to as high as 96% of gross revenues.  While I made it clear early on that I prefer to refrain from regulation, in this instance the record shows, that a comprehensive approach which addresses all rates and fees to enable this market to function properly is warranted.

In my 16 years as a regulator, this is the clearest, most egregious case of market failure I have seen.  Instead of getting better, rates and fees for consumers are more onerous.  Thus, it is imperative for us to move quickly to adopt an Order for total reform.

While we sought comment on permanent interstate and intrastate reforms last year, intervening developments necessitate launching a Second Further Notice of Proposed Rulemaking, to ensure we are on solid ground, to reform to address all aspects of inmate calling services.  The Commission has concluded tentatively, that Congress gave it express authority in Section 276, to establish a per-call compensation plan "for each and every intrastate and interstate call" and it also directs that the Commission "shall preempt" any inconsistent state regulations.  Congress's directive could not be more clear here, and it is past time for the FCC to act consistent with the statute and bring certainty to the industry and consumers.

Launching this Second Further Notice also gives us the unique opportunity to evaluate the impact our reforms have had on inmates, consumers, providers and correctional facilities, and ask how best to structure comprehensive reforms, for interstate and intrastate rates.  There have also been intervening developments that would benefit from comments from the public, including the submission of data from inmate calling providers in August of 2014, as required by last year's Order proposals, for comprehensive reform filed by several ICS providers, and action by the Alabama Public Service Commission, which included the adoption of caps on ancillary charges.

While I continue to support the cost-based approach in the Order, moving forward with comprehensive reform allows us to seek comment on a simpler framework with the goal of allowing market forces to put pressure on rates, rather than the Commission setting up a more regulatory, separate rate tied per facility.  Such framework was not possible with the incremental interstate only approach.  To the contrary, as we have seen, intrastate rates and fees can circumvent some of the benefits of interstate-only reforms. The disturbing trends of higher site commissions, coupled with new and increasing ancillary charges, underscore the fact that we need a comprehensive approach that addresses all rates and fees for the market to function properly.

This Second Further Notice represents a balanced approach that includes rates that are higher than I would have proposed, and transitions that are longer than I would have preferred, but it addresses concerns raised in the record and strikes a reasonable path forward that is administratively simple and less burdensome for consumers, providers, facilities and the Commission.

I want to thank my colleagues for their collaboration on this item.  I am extremely thankful to the Chairman for continuing to make this issue a priority for the agency.  And I will be forever grateful for the continued assistance of my friend Commissioner Jessica Rosenworcel, whose support today, and vote last year, has enabled this nation to realize the tremendous results we see today.  And I appreciate the constructive input of Commissioner O'Rielly, including his suggestion to seek comment on others ways to promote competition in this industry without regulation.

For as long as I can remember, the benefits and trade-offs from compromises have netted some impressive policy results. We should not, however, compromise the means we possess to grant relief to the most vulnerable in our society.  All told, we offered edits to nearly 45% of the paragraphs in the item in the spirit of compromise.

But I could not agree to seek comment on a reading of the statute that suggested Congress intended section 276 to require the payment of site commissions, nor could I agree to questions that undercut last year's Order or previous decisions made by this agency.  Today, I can say with comfort and good conscience that I cast my vote knowing that I did everything possible to reach a good faith consensus, and I am pleased to offer my full support of this Second Further Notice.  As Hubert Humphrey said:  "You can always debate about what you should have done.  The question is what are you going to do?"

While today's vote cannot make up for the inactions of the past, it is my hope that an expeditious move to a final order will finally bring relief to the 2.7 million children who just want to hear their parents' voice and show that the process can work for them too.

Mr. Chairman, as I yield, allow me to thank the small but dedicated team of the Wireline Competition Bureau led by Julie Veach, including Kalpak Gude, Lynne Engledow, David Zesiger, Rhonda Lien, Don Sussman, Doug Galbi as well as the support of Patrick Halley on behalf of the Chairman's office, Valery Galasso from Commissioner Rosenworcel's office, my law clerk Christine Sanquist and my legal advisor Rebekah Goodheart.

# STATEMENT OF
# COMMISSIONER JESSICA ROSENWORCEL

Re:     *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375.

With this rulemaking, we take a critical step toward addressing the high cost that prison inmates and their families pay for phone service.  This is not just an issue of markets and rates—this is a broader issue of social justice.

In many cases, inmates are separated from their families by hundreds of miles, and families may lack the time and means to make regular visits.  Phone calls are the only way these families can stay connected.  But when a single call may cost as much as what you and I pay for unlimited phone service, the financial burden of staying in touch may be too much for inmates' families to bear.  This harms the families and children of the incarcerated.  But it goes beyond that.  It harms all of us because we know that regular contact between prisoners and family members reduces recidivism.  And in a country with the highest per capita incarceration rate in the world, where we spend nearly $58 billion annually to manage its prison population—all of us should care about reducing recidivism.

Last year, the Commission took its first big step to address this problem.  As a result, we reduced interstate long-distance inmate calling rates by nearly 40 percent.  But we vowed to do more—and that is why we are here today.  This new rulemaking seeks to address the exorbitant rates that prisoners and families of prisoners still face for in-state calls and slew of suspect fees for ancillary services and commission charges.

I am pleased to support today's rulemaking.  I believe that when history is written, we will be able to say we did good and cleaned up questionable charges and usurious rates.  Moreover, I believe that when history is written, it will show that there are two women who deserve credit for righting this wrong.  The first is Martha Wright, who more than a decade ago, petitioned this agency because she thought it was unacceptable that she had to pay outlandish fees just to stay in touch with her grandson.  The second is my colleague Commissioner Mignon Clyburn, who has been a tireless advocate for fixing this problem.  Our arc for action may be far too long, but it will bend toward justice.  These two women are chiefly responsible—and I am proud to support them.

## STATEMENT OF
## COMMISSIONER AJIT PAI
## CONCURRING IN PART AND DISSENTING IN PART

Re:     *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375.

Two years ago when we opened this docket with a unanimous Notice of Proposed Rulemaking, I welcomed the opportunity to address the petition filed by Martha Wright almost a decade before, when she came to the FCC seeking redress for the high rates she paid to speak with her then-incarcerated grandson.  As I said then, "I am open to exploring whether there is action we can and should take, consistent with our legal authority, to address the issues identified in Martha Wright's petition for rulemaking."[1]  That remains true today.

But I cannot support rules that lack a solid legal foundation.  While I did not doubt that last year's order was motivated by the best of intentions, I could not countenance its legal flaws—flaws that ultimately led the D.C. Circuit to stay most of the adopted rules, a stay that remains in effect today.[2]

When this Second Further Notice first circulated, I feared the Commission was headed down that path again.  The proposals seemed to assume that the Communications Act set no limits on our authority, the data analysis was one-sided, and alternatives to highly intrusive regulation were few.

That's why I was pleased when I reached an agreement with my colleagues that we would work together to modify the Second Further Notice so that it would be like the initiating Notice:  All Commissioners would be able to ask questions, assess the data, and seek comment on alternatives.  As a firm believer in the marketplace of ideas, I welcomed this inclusive process because it offered the hope that the Commission would explore all issues fully and fairly, ensuring that we would have a solid record on both the law and the facts before making a decision.

But when I offered my suggestions, some topics suddenly became off limits and the deal was taken off the table.  I was told that additional questions concerning our legal authority would not be asked and that data showing that the costs of providing service at the smallest jails exceed the costs at prisons on average by 14.5 cents would not be included.[3]  I was shocked and disappointed at this decision—a decision which unnecessarily and unwisely rejects an open-minded, consensus-based approach to examining this issue, and one which I cannot support.  I fear this decision bodes poorly for this proceeding.  For if we cannot agree to gather all the evidence, and if we refuse to consider the limits of our authority, how can we possibly agree on a solution that comports with the law?

Nevertheless, I appreciate that my colleagues amended the Second Further Notice to include alternatives to their preferred course of action, and I will accordingly be voting to concur in part.

---

[1] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking, 27 FCC Rcd 16629, 16662 (2012) (Statement of Commissioner Ajit Pai).

[2] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14218 (2013) (Dissenting Statement of Commissioner Ajit Pai); *Securus Techs. v. FCC*, No. 13-1280, Order (D.C. Cir. Jan. 13, 2014).

[3] Table One reports the average per-minute debit/prepaid costs of prisons as 10.0 cents, 14.0 cents, and 9.9 cents using three separate methodologies.  Applying those same methodologies to the smallest jails (i.e., those with average daily populations of 0–99) yields average costs of 26.3 cents, 18.8 cents, and 32.2 cents.  Thus the difference in average costs ranges from 4.8–22.3 cents with an average difference of 14.5 cents.

**STATEMENT OF**
**COMMISSIONER MICHAEL O'RIELLY**
**CONCURRING IN PART AND DISSENTING IN PART**

*Re:*      *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375.

There is no dispute that the prison payphone market as a whole does not seem to be functioning properly.  I concur with the initiation of this Second Further Notice to review and consider comments to address the problem.  Where I may differ from some of my colleagues is on how best to tackle it.  I would prefer to permit real competition within the facilities because, over time, competition has proven to be the best way to protect and benefit consumers, lower costs, and encourage innovation.  Therefore, I am glad that the Second Further Notice now includes a section on ways to reduce barriers to entry and competition.

Working with Commissioner Clyburn and her staff, as well as with the Chairman's office and Bureau staff, questions about ways to remove barriers to competition were added and the item was edited to strike a more neutral balance throughout.  This process worked for me, and it is what enables me to concur in part.

The reason I dissent in part, however, is that absent a compelling and actionable record on competition, the Second Further Notice leads us down a highly regulatory path that I would not have imagined possible based on the statute alone.  Section 276 was intended to protect payphone providers that had been unable to receive fair compensation for their service, not to dictate, for example, whether they charge per minute or per call, or how they recover legitimate fees.  Moreover, while we all must review the record in response to the Second Further Notice, I am concerned that this extensive item and the Commission's previous work in this area have set the stage for extreme rate regulation once more that I am unlikely to favor.