## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTHA WRIGHT; ANNETTE WADE; DOROTHY WADE; ETHEL PEOPLES; EVELYN MINOR; MATTIE LUCAS; LAURIE LAMANCUSA; WINSTON BLISS; SHEILA TAYLOR; GAFFNEY & SCHEMBER; M. ELIZABETH KENT; CLARA McCORMICK; SHONTE SARGENT; ROSEMARY CROOM; JOHN C. BROWN; BETTYE LOCKLEAR; DEDRE EMMONS; KATHARINE GORAY; JACKIE LUCAS; ULANDIS FORTE; CHARLES WADE; EARL PEOPLES; DARRELL NELSON; MELVIN TAYLOR; PETER C. BLISS, | No. Civil Action No. 00-293 (GK) |
| | Judge:  Gladys Kessler |
| Plaintiffs, | **DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO MOTION TO REOPEN AND LIFT STAY TEMPORARILY** |
| v. | |
| CORRECTIONS CORPORATION OF AMERICA; AMERICAN TELEPHONE AND TELEGRAPH COMPANY; MICROWAVE COMMUNICATIONS, INC.-WORLDCOM COMMUNICATIONS; PIONEER TELEPHONE COOPERATIVE; EVERCOM SYSTEMS, INC., | |
| Defendants. | |

Defendant Corrections Corporation of America ("CCA") opposes Plaintiffs' Motion to Reopen and Temporarily Lift the Stay.  For 13 years, Plaintiffs have allowed their damages claims to languish in the Federal Communications Commission ("FCC"), while pursuing rulemaking petitions and keeping in their back pocket this motion as a trump card to revive their stale damages claims.  Plaintiffs now argue that they are "armed" with the necessary determinations from the FCC and urge that it is "important that this Court move expeditiously to re-open the case and to lift the stay so that the Plaintiffs may amend their complaint as soon as practicable."  (Doc. 139 at 7.)  But Plaintiffs have not demonstrated any valid reason why

this Court should revive this case at all to salvage claims they abandoned years ago.

Abandonment aside, Plaintiffs have not complied with this Court's order to present the issue of damages to the FCC through appropriate pleadings.  Nor have they delivered on promises to file a formal complaint for damages with the FCC, as they repeatedly represented to the parties and this Court before the matter was closed.  Whether their delay was strategic, dilatory, or even unintended, Plaintiffs were unreasonable to remain silent regarding their alleged damages for so long.  Plaintiffs' attempt to break that 13-year silence today comes far too late.  Plaintiffs' Motion should be denied for these and the reasons that follow.

## I.       BACKGROUND

### A.       This Court's Proceedings

CCA, a private entity, incarcerates inmates pursuant to a correctional services agreement with the District of Columbia ("D.C.").  On February 16, 2000, Plaintiffs[1] filed a class-action lawsuit against CCA and five telephone providers [2] alleging a myriad of constitutional, statutory, and common law violations arising from the provision of inmate-calling services ("ICS") at its facilities.  (Doc. 1)  At the heart of Plaintiffs' claims was the allegation that Defendants illegally profited by exchanging exclusive rights to provide ICS at the facilities in exchange for site commissions, which resulted in "unjust and unreasonable" rates that burdened Plaintiffs' communications.  Plaintiffs sought prospective relief to prohibit the exclusive dealing arrangements, as well as damages arising from the allegedly unreasonable ICS rates.

---

[1]  Plaintiffs are seven D.C. inmates, 16 inmate family members, and two law offices.  The inmates brought claims on behalf of all inmates incarcerated at several CCA facilities throughout the country. The family members and law offices brought claims on behalf of those who accepted collect calls from CCA inmates at certain CCA facilities.

[2]  The telephone providers were Global Tel Link ("Global Tel"), Evercom, Inc., AT&T, MCI Worldcom Communications Inc., and Pioneer Telephone Cooperative ("Pioneer").

Defendants moved to dismiss the claims as meritless arguing, among other issues: (1) the telephone systems and ICS rates were reasonably related to legitimate penological interests, (2) any impact on speech was unintended and content-neutral, and alternative means of communication were available through letters, visitation, and shorter phone calls; (3) Plaintiffs are not similarly situated with phone customers who receive non-inmate calls; (4) Plaintiffs had no property interest in ICS rates; (5) the rates were not legislation that affected any private contract to which Plaintiffs were parties; (6) the claims were barred under the filed-tariff doctrine; (7) the FCC had primary jurisdiction to address the legality of ICS rates and was reviewing similar cases; and (8) Plaintiffs failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act.  (Doc. 22.)

On August 22, 2001, the Court granted the motion to dismiss, finding that the FCC had primary jurisdiction over the claims because the core issues related to the reasonableness of the rates and involved matters that the FCC had statutory authority to regulate and was in the best position to address.  (Doc. 95.)  The Court thus dismissed the case without prejudice, directing the parties to file the "appropriate pleadings with the FCC to ensure that the issues raised in this lawsuit are presented to the FCC."  (Id.)

On September 5, 2001, Plaintiffs moved for reconsideration, arguing that the case should be stayed instead of dismissed because the statute of limitations would likely run on their claims, and "there is no prejudice to the defendants by the issuance of a stay."  (Doc. 98 at 2.)  To support their stay request, Plaintiffs proposed filing a report in six months regarding the status of the FCC proceedings, and advising whether any issues could proceed in this Court. (Id.)  Over Defendants' objections, the Court stayed the case and ordered a six-month status report of the FCC proceedings.  (Doc. 105.)

On May 1, 2002, Plaintiffs submitted their First Status Report regarding the FCC proceedings.  (Doc. 106.)  Plaintiffs informed the Court that they had consulted with Special Counsel to the Market Disputes Resolution Division of the Enforcement Bureau, who advised them to wait and see if a pending order in a proceeding that challenged competition for inmate payphone services would be helpful to them.[3] (Id. at 2.)  That order, however, was unhelpful to Plaintiffs' claims because it concluded that "legitimate security concerns preclude reliance on competitive choices," so they will be unable to obtain relief in that proceeding.  (Id. at 3.) Thus, Plaintiffs stated they "intend to file a separate, stand-alone formal complaint before the FCC under Section 208 of the Communications Act raising the same claims that are presented in the instant case against some or all of the above-named defendants." (Id.)[4] Plaintiffs further stated that they will begin the mediation process required to file a formal complaint, but "[i]f mediation does not result in a settlement, plaintiffs, following the required pre-filing procedures, will file their complaint."  (Id. at 4.)  The Court thus ordered a second status report. (Doc. 107.)

On November 1, 2002, Plaintiffs submitted their Second Status Report to the Court, noting that progress had been delayed because the FCC was not yet ready to consider a complaint, but that Plaintiffs were "determined" to file one and were preparing it.  (Doc. 119; 120)

Meanwhile, litigation continued in this Court despite the stay.  On May 14, 2002, AT&T filed a renewed motion to sever and transfer the case to the Eastern District of Oklahoma.  (Doc. 108.)  Plaintiffs successfully opposed the motion.  (Doc. 110; Doc. 117)  On

---

[3] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Report and Order, 11 FCC Rd 20541 (1996).

[4] Significantly, § 208(b)(1) gives assurance of a speedy resolution by the FCC, namely the issuance of "an order concluding such investigation within 5 months after the date on which the complaint was filed."

August 29, 2002, Pioneer renewed its motion to dismiss for lack of personal jurisdiction.  (Doc. 121; Doc. 124.)  On November 29, 2002, the Court dismissed Pioneer and ordered Plaintiffs to file a third status report of the FCC proceedings by December 1, 2003.  (Docs. 127-128.)

Plaintiffs filed an untimely Third Status Report to the Court on February 24, 2004. (Doc. 132.)  Plaintiffs reported that after further discussion and meetings, they have decided to divide the referred issues into two separate FCC proceedings:

> [P]laintiffs reached an understanding with the [Enforcement Bureau (EB)] and Wireline Competition Bureau (WCB) staff dividing the referral claims between a formal complaint to be filed with the EB, limited to claims regarding the unreasonable inmate calling rates and unlawful rebates, and a petition to the WCB, challenging the FCC's exclusive dealing arrangements between private prison administrators and inmate telephone service providers and such providers' practice of offering only collect calling services.  The issues to be raised before the WCB thus involve broad policy matters best suited to rulemaking proceedings in which other parties also may comment, whereas the complaint case to be filed with the EB will be limited to plaintiffs' damages claims arising from defendants' unreasonable rates.

(Id. at 1.)

After the Third Status Report, Plaintiffs' counsel inexplicably stopped prosecuting the case in this Court.[5]  On May 10, 2004, Global Tel moved to dismiss for lack of personal jurisdiction.  (Doc. 134.)  On July 7, 2004, the Court then issued a minute entry order noting that Plaintiffs failed to respond to Global Tel's motion to dismiss and granted the motion to dismiss as unopposed.  The Court's July 7, 2004 dismissal of Global Tel was the last activity on the docket until Plaintiff filed this Motion on October 27, 2014, a 10-year hiatus.  The Court administratively terminated this case on January 31, 2005—six months after dismissing Global Tel and approximately a year after Plaintiffs' Third Status Report.

---

[5] On April 15, 2004, Attorney Deborah Maxine Golden filed a notice of appearance on behalf of the Plaintiffs.  (Doc. 133.)  Plaintiffs filed nothing else until the instant Motion.

**B.     The FCC Proceedings**

In November 2003, Plaintiffs filed their First Rulemaking Petition requesting that the FCC: (1) prohibit exclusive inmate long-distance service arrangements with private prisons and site commissions; and (2) allow competitive carriers to interconnect with inmate telephone service facilities to provide competitive long distance rates for inmate calling.[6]  Public comments and other FCC proceedings followed.  In the petition, Plaintiffs explained that, after protracted discussions with the parties and FCC staff regarding "the most appropriate procedural vehicle or vehicles" to bring the referred claims, they intend to file a separate formal complaint with the Enforcement Bureau "limited to claims regarding unreasonable inmate calling rates and related claims . . . charged by defendants." (*See* First Rulemaking Petition at 7-8 n.15.)

Four years later, in February 2007, Plaintiffs filed an Alternative Rulemaking Petition that significantly altered their strategy by proposing a rule that would permit the exclusive arrangements and site commissions, so long as the per-minute ICS rate did not exceed certain rate caps.[7]

On September 26, 2013, the FCC issued its proposed rulemaking Order ("FCC Order") in a split, 2-1 decision.[8]  The FCC Order granted in part the Alternative Rulemaking Petition by establishing an interim: (1) rate cap for interstate ICS calls; (2) safe harbor rate; and (3) 90-day period for compliance with the new rate scheme. (*See generally,* FCC Order, Framework,

---

[6] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Petition for Rulemaking or to Address Referral Issues in Pending Rulemaking, CC Docket No. 96-128 (November 3, 2003) (Doc. 132 at Exhibit A) ("First Rulemaking Petition").

[7] *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Alternative Petition for Rulemaking or to Address Referral Issues in Pending Rulemaking, CC Docket No. 96-128 (filed Mar. 1, 2007) (Attached Exhibit 1) ("Second Rulemaking Petition").

[8] *See* WC Docket No. 12-375 (2013), *Report and Order and Further Notice of Proposed Rulemaking*, FCC 13-113, 28 FCC Rcd 14107 (rel. Sept. 26, 2103) ("FCC Order").

at 26-53, ¶¶ 47-93.)    Additionally, the FCC Order established a formal and informal
enforcement process to challenge the reasonableness of ICS rates under the new scheme.  (Id.,
Enforcement, at 63-67, ¶¶ 115-126.)  Notably, the FCC Order expressly declined to resolve the
issues in the First Rulemaking Petition regarding whether the existing exclusive contracts or
site commissions were invalid.  (Id. at 29-30, ¶ 54 n.202, at 56, ¶ 100.)  The FCC Order has
been appealed and briefing is not yet complete.  *Securus Tech, Inc. v. FCC*, No. 13-1280 (D.C.
Cir., filed Nov. 14, 2013).

In the 13 years after this matter was referred to the FCC, Plaintiffs litigated two
rulemaking petitions.  During that time, they have not filed a formal complaint for damages in
the Enforcement Bureau.

## II.    LEGAL ARGUMENTS

### A.    Legal Standard

This court has discretion whether to reopen a case that has been administratively
terminated.  *See Advanced Commc'ns Corp. v. F.C.C.*, 376 F.3d 1153, 1154 (D.C. Cir. 2004);
*Aronowitz v. Home Diagnostics, Inc.*, No. 93-06999-CIV, 2010 WL 2351468, at *5 (S.D. Fla.
June 11, 2010), *aff'd*, 419 F. App'x 988 (Fed. Cir. 2011) (citing *Zenith Radio Corp. v.
Hazeltine Research, Inc.*, 401 U.S. 321, 331-32 (1971)).  In deciding a motion to reopen, the
district court may consider the length of delay, whether it can be excused, and the prejudice to
the parties under the circumstances.  *See Aronowitz*, 2010 WL 2351468, at *5.

### B.    Plaintiffs' Motion to Reopen is a Direct Violation of the Court's Order
Referring Damages to the FCC.

Plaintiffs' attempt to reopen this case without having first litigated the issues in the
FCC is a direct violation of this Court's Order directing them to file the "appropriate pleadings
with the FCC to ensure that the issues raised in this lawsuit are presented to the FCC."  (Doc.
95.)  As far as CCA is aware, Plaintiffs have not filed any formal complaint for damages in the

Enforcement Bureau. Indeed, Plaintiffs do not mention making any effort to present the issue of damages to the FCC. As they have done for the past 13 years, Plaintiffs have simply chosen to remain silent on the issue of damages. Based on this record, Plaintiffs have failed to comply with the Court's order to prosecute their damages claims in the FCC. Thus, their request to reopen this case so that they may amend their complaint to pursue damages should be denied. *See* Fed.R.Civ.P. 41(b) (involuntary dismissal of claim where "plaintiff fails to prosecute or to comply with . . . a court order").

Plaintiffs may argue in reply that the FCC Order is evidence that they complied with the Court's Referral Order because they are now "armed with the necessary determinations from the FCC regarding the reasonableness of the charged rates." (See Doc. 139 at 5) This is simply not true.

First, the FCC Order was a rulemaking decision by the Wireline Competition Bureau, not an adjudication of their damages claim by the Enforcement Bureau. Thus, the FCC Order does not make any factual findings regarding the reasonableness of the ICS rates challenged in Plaintiffs' complaint. Nor does it establish, or suggest, retroactive liability for damages based on existing rates. Indeed, the FCC Order expressly declines to address the legality of the "exclusive dealing arrangements" and site commissions that Plaintiffs alleged caused the exorbitant rates challenged in their complaint:

> The reforms we adopt today are not directed at the contracts between correctional facilities and ICS providers. Nothing in this Order directly overrides such contracts. Rather, our reforms relate only to the relationship between ICS providers and end users, who, as noted, are not parties to these agreements.

(*See* FCC Order at 56, ¶ 100.) And although the FCC Order calls into question the validity of site commissions *under the new rate scheme*, (FCC Order at 5, ¶ 7; 19, ¶ 38; 29, ¶ 54), it expressly invites public comments on the issue and reserves it for another day:

- 8 -

> Although it is clear that site commissions are a revenue stream to the correctional facility, we cannot foreclose the possibility that some portion of payments from ICS providers to some correctional facilities may, in certain circumstances, reimburse correctional facilities for their costs of providing ICS. As a result, we provide several avenues for exploring this issue further . . . we seek comment on whether we should categorically find that payments to correctional facilities are not compensable costs, or whether there are certain compensable costs that those payments can legitimately address."

(FCC Order at 29-30 n.202.)

That the FCC Order did not determine liability for damages, or even lend support for Plaintiffs to recover any retrospective relief, is also apparent from its enforcement provisions, which adopts the formal complaint process of § 208, and creates an informal complaint procedure.  (*See* FCC Order at 65, ¶¶ 120-22.)  The FCC Order also authorizes the Wireline Competition Bureau to determine damages under the new rate scheme and instructs any party who wishes to challenge the reasonableness of ICS rates to file the appropriate complaint.

Even assuming, however, that the FCC Order somehow determined Plaintiffs' damages claims and that the rulemaking petitions were the "appropriate pleadings" to present those claims to the FCC, Plaintiffs' motion fails.  As they acknowledge, the FCC Order is being challenged in a pending appeal and briefing on the petitions is not yet complete.[9]  (Doc. 139 at 5.)  If the D.C. Circuit reverses or remands any portion of the FCC Order for further proceedings, the requested reinstatement of this case will have been premature and in conflict with the primary jurisdiction basis for the original stay—at least the non-monetary relief sought by Plaintiffs.  Plaintiffs' motion to reopen so that they may amend their complaint based on the factual and legal determinations in the FCC Order is thus improper.

---

[9]  *See generally,* FCC Order at 111-131 (dissent, Commissioner Pai) (identifying infirmities with the FCC order and concluding that despite his hopes that the FCC Order will lower ICS rates without imposing an unmanageable system, disrupting ICS services, and compromising security inside and outside prisons, he does not believe that the Order can achieve those goals or that it will survive judicial scrutiny).

C.      **Equitable Principles Bar Plaintiffs' Claims.**

1.      **Abandonment and Waiver**

Plaintiffs' Motion should also be denied because they have abandoned and waived their damages claims.  Waiver is "an intentional relinquishment or abandonment of a known right or privilege."  *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (quoting *United States v. Robinson,* 459 F.2d 1164, 1168 (D.C. Cir. 1972)).  "It is an equitable principle designed to avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair."  *Id.*  Waiver "serves to prevent a party from insisting on a right upon which he could have insisted earlier but has found to have surrendered."  *Id.*  (internal quotations omitted).  "Intent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right."  *Id.*  (citations omitted).  And because "waiver is unilateral in character . . . the party asserting it as a defense need not have changed its position for the worse or taken any other action in reliance on the waiver of rights."  *In re K-Com Micrographics, Inc.*, 159 B.R. 61, 67 (Bankr. D.D.C. 1993).

a.      **Plaintiffs Expressly Waived Their Ability to Litigate Damages in This Court.**

Here, Plaintiffs expressly represented to the parties and the Court that they will seek all their remedies in the FCC.  (Doc. 106, 119, 120 & 132.)  After obtaining a stay, a FCC staff member suggested that Plaintiffs "return to this Court and request the Court to specify the issues that the FCC should address."  (Doc. 106 at 2.)  Despite the opportunity to request that the issue of damages be excluded from the referred matters, Plaintiffs declined stating that it was "unnecessary" to do so because they will pursue damages by filing a formal complaint with the FCC.  (Id. at 2-3.)  In three status reports regarding the FCC proceedings, Plaintiffs reiterated their intent to pursue damages by filing a formal complaint in the Enforcement

Bureau.  (Doc. 119 & 132.).  Plaintiffs even made this same assertion in the FCC.  (First Rulemaking Petition at 7-8 n.15.) Until the instant Motion, Plaintiffs never stated a contrary position.  Based on this conduct, Plaintiffs have expressly abandoned their ability to request this Court to reopen this case so that they can pursue damages.

### b.      Waiver is Also Inferred From Plaintiffs' Conduct.

Waiver is also inferred from Plaintiffs' failure to file a formal complaint for damages in the FCC and their long silence regarding the issue.  Despite searching FCC's online database of filings and proceedings for the past 13 years, and receiving assistance from support staff at the FCC, Counsel was unable to find any evidence that Plaintiffs filed a complaint for damages in the Enforcement Bureau.  (See Struck Dec., Attached Exhibit 2 at 1-3, ¶¶ 4-8.)  And, even if Plaintiffs had filed such a formal complaint for damages, CCA was never made aware of it, and the issue was not brought to this Court's attention.  If Plaintiffs had changed their minds and chose not to seek damages in the FCC, but in this Court instead, Plaintiffs made no effort to inform the Court or CCA.

In any event, whether Plaintiffs' delay in bringing the issues in this motion was dilatory or strategic, or even unintended, Plaintiffs should not have remained silent for 13 years on the issue of damages.  Based on this conduct, Plaintiffs have impliedly waived their damages claims in this Court.  *Nortel Networks*, 298 F. Supp. 2d at 88.

### 2.      Judicial Estoppel

Additionally, Plaintiffs should be judicially estopped from reopening this case.  Judicial estoppel is meant "to protect the integrity of the judicial process, by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001).  Judicial estoppel thus bars a party from: (1) adopting a position in a later proceeding that is inconsistent with its position in a prior proceeding; (2) the

party succeeded in persuading the court to accept its earlier position, such that adopting the position in the later proceeding would create the perception that either the first court or the second court was misled; and (3) the party will derive an unfair advantage or impose an unfair detriment on the opposing party unless estopped.  *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 793 (D.C. Cir. 2010).

Here, all three elements of judicial estoppel are satisfied.  First, Plaintiffs are taking the position that they should be allowed to reopen this case to pursue damages claims despite having failed to file the appropriate pleadings in the FCC.  This is inconsistent with the position they took in obtaining the stay,[10] when they assured the Court that "there is no prejudice to the defendants" because Plaintiffs will file a formal complaint for damages with the Enforcement Bureau, which will only take five months to resolve.  (Doc. 98 at 2; Doc. 106 at 4.)  Plaintiffs also represented in three status reports that they will seek damages by filing a formal complaint in the Enforcement Bureau.  (Doc. 106, 119, 120, 132)  Based on that information, the Court granted a stay and administratively closed the case approximately 10

---

[10]  In opposing Defendants' Motion to Dismiss, (Doc. 22), Plaintiffs argued that this case was not about rates, but about choice of telephone systems:

> [D]efendants characterize the dispute as one dealing only with the rates of the telephone calls, and seek to re-direct the dispute towards the [FCC] or local equivalents.  However, this is not a dispute about rates.  It is a dispute about *choice*.  It concerns the inability of plaintiffs to use their chosen long distance providers or alternative services such as 1-800 or dial-around services.  This case is about the defendant denying the plaintiffs access to the free market for telephone services.

(Doc. 54 at 6.)  Plaintiffs' statement is a binding admission that their case is not about damages arising from unreasonable rates.  *See Natl. Ass'n of Life Underwriters, Inc. v. C.I.R.*, 30 F.3d 1526, 1530 (D.C.Cir. 1994)*, citing American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court. Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well") (other citations omitted). This is consistent with how Plaintiffs pursued only the rulemaking petitions in the FCC.

years ago.   Because Plaintiffs have not followed through on their representation to file a complaint for damages in the FCC during that time, granting their Motion to reopen would create the perception of rewarding Plaintiffs for either misleading the Court in obtaining the stay or misleading the Court now to reopen the case.   *Moses*, 606 F.3d at 793.

Moreover, Plaintiffs will gain an unfair advantage and impose significant prejudice to Defendants if their Motion to reopen is granted.   *Id.*   With the mere passage of time, the accrual period for damages has been theoretically enlarged to more than a decade, much of the evidence has become stale, and witnesses have disappeared and/or their memories have faded. Indeed, Plaintiffs request to conduct "preservation depositions" [11] and to replace certain Plaintiffs who have died or no longer wish to participate in this action, highlight the very evidentiary problems that their delay in raising the damages issue has caused.   Plaintiffs cannot deny that this delay has compromised CCA's ability to present a fair defense as well as this Court's ability to adjudicate the matter on a complete record.   *Id.*

Compounding this prejudice is the fact that Plaintiffs do not wish to simply reopen this case, but to significantly expand its scope.   As if it were by right, Plaintiffs declare that they will seek to "modify their allegations and claims against the existing Defendants to account for new factual and legal developments," add a defendant, and to "expand the scope of the proposed class."   (Doc. 139 at 6-7.)   Plaintiffs also wish to increase the litigation beyond anything this Court or the parties envisioned when the stay was granted by proposing to drag the parties and this Court into multidistrict litigation under 28 U.S.C. § 1407. [12]   Given

---

[11]   *See infra*, Section III.

[12]   Plaintiffs argue that they should be allowed to reopen this case based on speculation that multidistrict litigation will ensue from four putative class actions that have been recently filed based on the FCC Order.   None of these cases, however, involve claims against a correctional facility.   *See Chubry v. Global Tel.*, No. 1:14-cv-00456-GBL-TRJ (E.D. Va, filed April 24, 2014); *Murilla v. Global Tel.*, No. 0:14-cv-03275-PAM-JSM (D. Minn., filed Aug. 27, 2014);

Plaintiffs' intent to increase the scope of litigation, Plaintiffs will likely seek, improperly, damages for the entire 13-year period of the stay, exponentially increasing CCA's exposure.[13]

---

*Mojica v. Securus Technologies, Inc.*, No. 5:14-cv-05258-TLB (W.D. Ark., filed Aug. 14, 2014; and *James v. Global Tel Link Corp*, No. 2:13-cv-04989-VJM-MF (D. N.J., filed Aug. 20, 2013). More importantly, none of these cases are likely to proceed until the matters pending in the appeal of the FCC Order are resolved. In these cases, the court has either extended the time to file the answer in light of the appeal of the FCC Order, *see Murilla*, or the parties have moved to dismiss and/or stay the action because of the pending appeal, *see Chubry* and *Mojica*. The only exception is *James*, where the court initially stayed the case and referred the matter to the FCC, but vacated the stay when Plaintiffs *voluntarily withdrew* their claims that the rates charged were unreasonable under the FCA. *See James*, Doc. 41.

Nevertheless, any multidistrict litigation arising from the FCC Order will likely be transferred to this Court for adjudication, as this case is the most developed among the five (so far), the rulemaking litigation that resulted in the FCC Order originated here, and this district is where the FCC and its records are located. *See, e.g., In re ConAgra Peanut Butter Prods.*, 495 F.Supp.2d 1381, 1382 (J.P.M.L. 2007) (transfer of 20 actions in 13 districts under § 1407 to district court where government agency that investigated the matter and documents were located); *In re Nat. Student Mktg. Litig.*, 368 F. Supp. 1311, 1317 (J.P.M.L. 1972) (transferring multidistrict litigation involving Securities Exchange Commission to D.C. District Court, in part because that was where the case was most developed). Moreover, 28 U.S.C. § 292(d), which permits inter-circuit transfer of a district judge by the Chief Justice, has been used to assign the judge most familiar with the litigation to the transferee district for conducting pretrial proceedings. *See* H. Newberg & A. Conte, Newberg on Class Actions, § 9.17 (3d ed. 1992). Additionally, once the transferee court has been assigned under § 1407, it will have plenary authority over all pre-trial matters in the consolidated matter, including the power to determine all pretrial motions and dispositive motions. *Id.* This includes the authority to reconsider all prior orders and rulings, including issues regarding class certification and discovery. *Id.* And although the transferee court must remand to the transferor courts for trial, the transferor courts are "then not prohibited from utilizing 28 U.S.C. § 1404 to transfer the case[s] back to the [transferee court] for resolution." Newberg on Class Actions § 10:38 (5th ed.).

[13] Although prejudice to the plaintiff is not an element of laches, *Nat'l R.R. Passenger Corp.*, 536 U.S. at 121–22, Plaintiffs will not be prejudiced in any way if their motion is denied. As they expressly represented in three status reports to this Court, and their First Rulemaking Petition, Plaintiffs' remedy is in the Enforcement Bureau, where they can be made whole by seeking damages against the telephone carriers under § 208. They have not argued or explained why that remedy is unavailable to them.

In stark contrast, Defendants will be severely prejudiced if Plaintiffs are permitted to seek damages for a decade-plus period, when the timely invocation of a damages complaint under § 208 would have resulted in action by the Commission within five months. (Doc. 106 at 4.) CCA, like the other Defendants, will undoubtedly have defenses to the lengthy accrual of damages due to Plaintiffs' delay and the FCC's tacit approval of the longstanding ICS fee arrangements, but CCA should not have to defend such an action 13 years after it first began hibernating.

On these facts, Plaintiffs have taken inconsistent positions on the issue of damages to CCA's detriment. Plaintiffs should be judicially estopped from reopening this case.

### 3. Doctrine of Laches

Plaintiffs' dilatory conduct in prosecuting their damages claims and in raising the issues in this Motion should also preclude them from reopening this case under the doctrine of laches. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 121–22, (2002) (holding the doctrine of laches bars a party's dilatory claim). Laches stems from the principle that "equity aids the vigilant and not those who slumber on their rights." *Kansas v. Colorado,* 514 U.S. 673, 687(1995) (quotations omitted). Laches thus bars a claim when there is: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 121–22 (internal quotation omitted). Like "statutes of repose designed to bring litigation to a seasonable end," a similar "purpose inheres in the doctrine of equitable laches." *Mitchell v. Big Six Dev. Co.*, 186 F. 552, 564 (C.C.W.D. Mo. 1911).

Here, the record shows that Plaintiffs' damages claim and this Motion are dilatory. Even before this case was administratively closed, Plaintiffs stopped prosecuting it. Plaintiffs' last substantive filing was the Third Status Report filed in February 2004, which was two months late. (Doc. 127; Doc. 132.) Six months before the case was closed in January 2005, the Court noted that Plaintiffs failed to respond to Global Tel's renewed motion to dismiss and granted that motion. Global Tel is the same defendant, however, that Plaintiffs now seek to add, allegedly because it has relocated its headquarters to Virginia. But Plaintiffs do not explain how long ago that occurred and whether their request is timely.

Nor have Plaintiffs demonstrated diligence in bringing this Motion. For instance, Plaintiffs seek to replace Evercom with Securus due to a name change that occurred 10 years

ago, in 2004—even before this case was closed.  Further, Plaintiffs rely on "factual and legal determinations," presumably from the FCC Order, but that order was issued in September 2013.  Plaintiffs do not explain why they waited **another year** to seek to reopen and amend their complaint based on the FCC Order.  *See Milo Manor, Inc., v. Woodard*, 92 F.2d 220, 223 (D.C. Cir. 1937) (noting that plaintiff must properly supplement a claim to bring significant facts to the attention of the court).

Moreover, Plaintiffs cannot absolve themselves of responsibility for their "long stayed claim for damages."  (Doc. 139 at 7.)  This Court granted Plaintiffs an equitable stay based on Plaintiffs' representations that they will pursue damages in the FCC without causing Defendants any prejudice.  (Doc. 98 at 2; Doc. 105.)  Plaintiffs cannot fault this Court for holding them to that promise.

Nor can Plaintiffs place all the blame on the FCC.  Four years into the rulemaking process, Plaintiffs filed an Alternative Rulemaking Petition, which changed their strategy by seeking rate caps instead of prohibiting exclusive contracts with private facilities.  That this added significant delay to the FCC proceedings is demonstrated by the FCC Order, which grants a portion of the relief requested in the Alternative Rulemaking Petition, but declines to decide the issues in the First Rulemaking Petition.

As a result of the above dilatory conduct, Defendants believed that Plaintiffs had abandoned their claim for damages.  *See, e.g., Aronowitz*, No. 93-06999-CIV, 2010 WL 2351468, at *5 (denying motion to reopen based on laches for "extraordinary delay," where plaintiffs' failed to diligently prosecute claims for twelve years, resulting in difficulty to the defendants in locating witnesses or materials necessary to defend their claim, and defendants "believed Plaintiff to have abandoned his claim after such a long period of inactivity").  Moreover, as noted above in Section II.C.2, CCA has been significantly prejudiced in its

ability to locate witnesses and materials necessary to present a fair defense.  Plaintiffs are thus barred by laches from reopening this case.  *See*, *e.g., Mitchell*, 186 F. at 564 (finding laches barred reopening case where plaintiff "waited nearly five years to reopen litigation "for the purpose of obtaining other, further, and different relief—not prayed in the original bill, not seasonably suggested to the court by amendment or otherwise, while the action was pending in which it might have been urged.").

### 4.   Equitable Estoppel

Plaintiffs' conduct also offends the traditional doctrine of equitable estoppel, which requires a showing that: (1) there was a definite representation to the party claiming estoppel; (2) the party relied on its adversary's conduct to his detriment; and (3) the reliance on the representation was reasonable.  *Graham v. SEC,* 222 F.3d 994, 1007 (D.C. Cir. 2000) (citation omitted).  Here, Plaintiffs made a definite representation that they "intend to file a separate, stand-alone formal complaint before the FCC under Section 208 of the Communications Act raising the same claims that are presented in the instant case against some or all of the above-named defendants." (Doc. 106 at 3.)  Plaintiffs further represented that they will seek that remedy without causing any prejudice to Defendants during the period of the stay.  (Doc. 98 at 2; Doc. 105.)  CCA was reasonable to rely on the representation, as it was consistent with the Court's order to file the "appropriate pleadings with the FCC to ensure that the issues raised in this lawsuit are presented to the FCC."  (Doc. 95.)  CCA's reliance was also detrimental because, Plaintiffs are now seeking to litigate damages in this Court instead of proceeding with those claims in the FCC, at significant prejudice to CCA. (*See supra* Section II.C.2.)  Equitable estoppel thus bars Plaintiffs' attempt to reopen this case.

### 5.   Unclean Hands

Plaintiffs' Motion is also barred by the doctrine of unclean hands because Plaintiffs acted inequitably during the stay period.  *See Precision Instrument Mfg. Co. v. Auto. Maint.*

*Mach. Co.,* 324 U.S. 806, 814 (1945) (stating the doctrine of unclean hands derives from the equitable maxim that "he who comes into equity must come with clean hands" and "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"). Plaintiffs demonstrated bad-faith by taking advantage of the stay that was granted to them in equity. Instead of prosecuting damages separately, as they represented to the parties and this Court, Plaintiffs waited for the results of the rulemaking process while keeping this Motion in their back pocket to reopen the case when they believed the moment was most convenient for them. *See, e.g., In re Delfino*, 351 B.R. 786, 790 (Bankr. S.D. Fla. 2006) ("The Debtor's protracted conduct of the state court litigation, while keeping the trump card of a motion to reopen the case under § 350 tucked away in the Debtor's back pocket for later use in the event the state court litigation failed, was marked by a want of good faith. A court of equity requires one in the Debtor's position to come to court having acted in good faith and fairness. He did not so act, but instead acted in a manner deliberately to the contrary."). The doctrine of unclean hands thus bars Plaintiffs' request for relief.

> **D.      Reopening the Case Would Be a Futile Act Because Plaintiffs' Claims Lack Merit.**

This Court should also deny the motion because reopening the case in order to lift the stay will be futile. *See Am. Family Mut. Ins. Co. v. Teamcorp, Inc.*, 835 F. Supp. 2d 1083, 1086 (D. Colo. 2011) (refusing to reopen where amendment of claims would be futile), *citing A123 Systems v. Hydro–Quebec,* 626 F.3d 1213, 1216 (Fed. Cir. 2010) (affirming denial of motion to reopen case on grounds of futility), *Redmond v. Fifth Third Bank,* 624 F.3d 793, 803 (7th Cir. 2010) (holding that a closed bankruptcy proceeding should not be reopened "where it appears that to do so would be futile and a waste of judicial resources.") (citation omitted), and *Nesmith v. Gen. Motors Corp.,* 2006 WL 2786840 at *3, (W.D.N.Y. 2006) (finding "it would be futile to grant plaintiffs' motion to reopen the case, only to have summary judgment entered

against plaintiffs")).

In *Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001), the court rejected claims that were nearly identical to those raised in Plaintiffs' complaint.  In *Arsberry*, two putative classes consisting of (1) Illinois jail and prison inmates; and (2) their family and a public interest law firm, sued the Illinois Department of Corrections and the telephone companies it had contracted with to provide ICS services, arguing that the defendants' exclusive dealing agreements and site commissions ("kickback scheme") burdened plaintiffs' rights under the First Amendment, Due Process Clause, Takings Clause, Contracts Clause, as well as anti-trust statutes.  *Id.*  The district court dismissed for lack of jurisdiction, finding that the filed-tariff and the primary jurisdiction doctrines deprived it of jurisdiction to adjudicate the claims.  *Id.* at 562.  Writing for the Seventh Circuit, Judge Posner held that, although a number of jurisdictional bars applied (including the fact that the law firm had no standing), the district court erred in concluding that the FCC had "exclusive jurisdiction" over the subject matter.  *Id.* at 562-63.

Turning to the merits of the case, the court then held that Plaintiffs' constitutional claims lacked merit.  *Id.* at 564.  Specifically, it found that: (1) the allegation ICS rates were exorbitant because of the "kickback scheme" did not bring the claim within the purview of the First Amendment any more than an excise tax or regulation of a paper manufacturer burdens free speech by increasing the costs of communicating on paper; (2) there was no evidence that the defendants were motivated by a desire to limit free speech; (3) unlike newspapers, telephones are not primarily used by inmates as a means of expressing free speech; (4) the alleged "kickback scheme" does not impair any specific contract to which plaintiffs were party or within the meaning of the Constitution; (4) "the contention that by charging a high price for phone calls the defendants have taken the plaintiffs' property and must pay just compensation

is downright absurd"; (5) the claim that the ICS rate burdened plaintiffs' communications has "no procedural dimension"; and (6) the allegation that unreasonable ICS rates curtailed the ability of inmates to communicate has no more substantive merit than a claim that raising a gasoline tax would increase the cost of visitation.  *Id.* at 564-66.

The court further held that the anti-trust claims lacked merit, reasoning that they were barred by the filed-tariff doctrine, and: (1) no horizontal monopoly existed because there was no evidence of collusion between the state and the phone companies, or between the phone companies themselves; and (2) no vertical monopoly existed because Plaintiffs were not trying "to clear away an obstacle to a voluntarily negotiated lower tariff; they simply wanted the lower tariff."  *Id.* at 566-67.  The court thus affirmed dismissal of the claims for lack of merit and remanded with instructions to decline supplemental jurisdiction over the state-law claims. *Id.* at 567 (citing 28 U.S.C. § 1367).

*Arsberry* is well-reasoned and directly on point because the factual and legal issues are practically identical to this case.  The similarities are not surprising, however, as the plaintiffs were represented by Stephen Seliger, who is also counsel of record for Plaintiffs in this case. Like *Arsberry*, Plaintiffs' constitutional and anti-trust claims therefore lack merit.[14]  Because Plaintiffs' claims are meritless, granting their Motion is a futile act that will only waste judicial resources.  Plaintiffs' motion should therefore be denied in its entirety.

## III.    REOPENING THIS CASE IS PREMATURE

Alternatively, CCA respectfully requests that Plaintiffs' Motion should be denied as premature.  That Plaintiffs seek to reopen only to "temporarily" lift the stay demonstrates that the issues are not yet ripe for adjudication in this Court, and the stay should continue. Plaintiffs, however, argue that they should be allowed to perform three tasks: (1) amend their

---

[14] If Plaintiffs' Motion is granted, CCA will move to dismiss the meritless claims.

complaint based on factual and legal developments; (2) take preservation depositions; and (3) substitute counsel.  But none of these issues demonstrate any urgency that would warrant lifting the stay, even temporarily, at this time.

First, Plaintiffs' reliance on the FCC Order to amend the Complaint is improper as they acknowledge it is an incomplete ruling that does not address intrastate ICS, (Doc. 139 at 4), and for the reasons discussed above in Section II.B.  Plaintiffs also refer to Global Tel's move to Virginia and Evercom's name change as reasons to amend their complaint, but any amendment based on those events can wait.  Plaintiffs do not explain when Global Tel allegedly moved its headquarters to Virginia, and they allege Securus changed its name in 2004, demonstrating that amending the complaint to add or replace these defendants is not an urgent matter.

Second, Plaintiffs vaguely refer to the "advanced ages" of class representatives as a reason to reopen this case so that they can take "preservation depositions."  (Doc. 139 at 7.)  The only Plaintiff they identify, however, is Martha Wright, who is 89 years old.  But Plaintiffs do not explain what infirmity she has that requires taking her deposition now instead of during any of the 13 years since this case was stayed.  Moreover, Plaintiffs' argument is misguided, as nothing prevents Plaintiffs' counsel from taking the sworn statements of their own clients.  In any event, it would be Defendants who would likely suffer prejudice if any of the proposed class representatives cannot be deposed.

Third, Plaintiffs seek to file an appearance on behalf of "new counsel," but again they fail to explain why that is an issue cannot wait.  In sum, Plaintiffs reasons for urging the Court to "move expeditiously" to reopen this case for amendment are unfounded.  Plaintiffs' request to reopen and temporarily lift the stay should therefore be denied as premature.

**IV.      CONCLUSION**

Plaintiffs' failure to file a formal complaint for damages is a direct violation of this Court's referral order and is contrary to the representations they made to the parties and Court when this matter was equitably stayed.  Plaintiffs' litigation slumber and silence for 13 years on the issue of damages constitutes abandonment and waiver of their claims, and they should be estopped from obtaining equitable relief now.  For these reasons, and those stated above, Plaintiffs' motion should be denied.  Alternatively, CCA requests a continued stay pending the outcome of the FCC Order appeal to the D.C. Circuit.

DATED:  November 24, 2014

STRUCK WIENEKE & LOVE, P.L.C.


 /s/ Daniel P. Struck
Daniel P. Struck, Bar No. CO0037
Anne M. Orcutt, Bar No. OK0011
3100 W. Ray Road, Suite 300
Chandler, Arizona 85226
Tel:  (480) 420-1600
Fax:  (480) 420-1699
dstruck@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendant  Corrections*
*Corporation of America*

- 22 -

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Deborah Maxine Golden, Esq.
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
D.C. Prisoners' Project
11 Dupont Circle NW
Suite 400
Washington, DC   20036
Tel:  (202) 319-1000 x 108
Fax:  (202) 319-1010

Deborah_Golden@washlaw.org;
Dennis_Corkery@washlaw.org;
Stacey_Litner@washlaw.org

*Attorneys for Plaintiffs*

Adam Howard Charnes, Esq.
KILPATRICK TOWNSEND & STOCKTON, LLP
1001 West Fourth Street
Winston-Salem, North Carolina  27101-2410
Tel:  (336) 607-7382
Fax:  (336) 734-2602

achares@kilpatricktownsend.com;cmarshall@kilpatricktownsend.com
rdietz@kilpatricktownsend.com

Anthony Charles Epstein, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC   20036
Tel:  (202) 429-8065
Fax:  (202) 261-7507

aepstein@steptoe.com

*Attorneys for Defendant Microwave*
*Communications, Inc.-Worldcom*
*Communications*

David Cosson, Esq.
LAW OFFICE OF DAVID COSSON
2154 Wisconsin Avenue, NW
Washington, DC   20007
Tel:  (202) 333-5275

dcosson@kletele.com

Vaughn W. Royal, Esq.
VAUGHN W. ROYAL, ATTORNEY AT LAW
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC   20015
Tel:  (202) 895-1530
Fax:  (202) 686-6405

vroyal@royal-law.com;
Vaughn.royal@gmailcom

*Attorneys for Defendant Pioneer Telephone*
*Cooperative*

- 23 -

Debra Ann Palmer, Esq.
SCHIFF HARDIN LLP
1101 Connecticut Avenue, N.W.
Suite 600
Washington, DC   20036
Tel:  (202) 778-6400
Fax:  (202) 778-6460

dpalmer@schiffhardin.com

Steven John Roman, Esq.
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC   20006
Tel:  (202) 420-4759
Fax:  (202) 420-2201

romans@dicksteinshapiro.com

Susan A. Littell, Esq.
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC   20006
Tel:  (202) 420-2200
Fax:  (202) 887-0689

littells@dsmo.com

Catherine A. Bernard
Kyle J. Steinmetz
John Muench
MAYER BROWN, LLP
1999 K. Street, N.W.
Washington, D.C. 20006-1101

cbernard@mayerbrown.com
ksteinmetz@mayerbrown.com
jmuench@mayerbrown.com

*Attorneys for Defendant American Telephone
and Telegraph Company*

Frank R. Volpe, Esq.
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC   20005
Tel:  (202) 736-8366
Fax:  (202) 736-8711

fvolpe@sidley.com;
dcefilingnotice@sidley.com;
mkulkarn@sidley.com

Mark D. Hopson, Esq.
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC   20005
Tel:  (202) 736-8188
Fax:  (202) 736-8711

mhopson@sidley.com

*Attorneys for Defendant Corrections
Corporation of America*

Stephanie A. Joyce
ARENT FOX, LLP
1717 K Street, N.W.
Washington, D.C. 20006

Stephanie.joyce@arentfox.com

*Attorneys for Securus Technologies, Inc.*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following:

Stephen G. Seliger, Esq.
SELIGER, ELKEN & DOLAN
155 N. Michigan Avenue
Suite 500
Chicago, Illinois   60601
*Attorneys for Plaintiffs*


I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

Jay M. Jay M. Vogelson, Esq.
STUTZMAN & BROMBERG, P.C.
2323 Bryan Street, Suite 2200
Dallas, Texas  75201
*Attorneys for Evercom Systems, Inc.*

_/s/ Daniel P. Struck_____