**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARTHA WRIGHT, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 00-293 (GK) |
| | ) | |
| v. | ) | |
| | ) | Judge:  Gladys Kessler |
| CORRECTIONS CORPORATION OF | ) | |
| AMERICA, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THE
MOTION TO REOPEN AND LIFT THE STAY TEMPORARILY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

    I.    Because Administrative Closure Is a Case Management Mechanism with No Legal Significance, This Court Has Complete Discretion To Temporarily Reopen this Case ............................................................................ 4

    II.    Plaintiffs Have Provided Compelling Reasons for Temporarily Reopening This Case and Temporarily Lifting the Stay of Proceedings ................................ 6

        A.    Denying or Delaying the Motion to Temporarily Reopen Would Severely Prejudice Plaintiffs ............................................................ 6

        B.    Securus is Judicially Estopped From Arguing that this Case is Not a "Rate Case" ............................................................................. 10

        C.    Plaintiffs' Motion Is Not a Motion to Amend and Should Not Be Evaluated Under Federal Rule of Civil Procedure 15 ............................. 13

        D.    Defendants' Remaining Arguments Opposing Plaintiffs' Motion to Reopen Similarly Fail ........................................................................... 14

    III.    Plaintiffs' Claims Should Not Be Dismissed for Failure to Prosecute ................. 16

        A.    Dismissals for Failure to Prosecute Are Disfavored ................................ 16

        B.    Plaintiffs Have Not Failed to Prosecute Their Claims .............................. 17

        C.    Defendants Have Failed to Demonstrate Any Prejudice ........................... 21

        D.    A Dismissal Would Be Improper Because Plaintiffs Have Been Given No Warnings and No Alternatives Have Been Explored .............. 23

        E.    There Is No Need to Deter Future Misconduct ........................................ 24

    IV.    Defendants' Affirmative Defenses and Other Equitable Arguments Do Not Justify Dismissing Plaintiffs' Claims ...................................................................... 24

        A.    Defendants' Affirmative Defenses and Equitable Arguments Are Untimely ............................................................................................ 24

        B.    Plaintiffs Have Not Intentionally Abandoned Their Claims ..................... 26

        C.    Plaintiffs' Claims Are Not Barred by Laches ......................................... 27

        D.    Plaintiffs Are Not Judicially Estopped From Pursuing Their Claims ....... 28

        E.    Equitable Estoppel Does Not Apply ....................................................... 30

        F.    There Is No Basis for Applying the "Unclean Hands" Doctrine .............. 31

    V.    Plaintiffs' Claims Are Not Futile ....................................................................... 32

CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A123 Systems, Inc. v. Hydro–Quebec,*
626 F.3d 1213 (Fed. Cir. 2010)..................................................................................32

*Adams v. Trustees of New Jersey Brewery Employees Pension Trust Fund,*
29 F.3d 863 (3d Cir. 1994)........................................................................................16

*Advanced Communications Corp. v. FCC,*
376 F.3d 1153 (D.C. Cir. 2004)..................................................................................5

*Aetna Life Insurance Co. v. Kollmeyer,*
448 B.R. 749 (N.D. Tex. 2011)..................................................................................27

*American Family Mutual Insurance Co. v. Teamcorp, Inc.,*
835 F. Supp. 2d 1083 (D. Colo. 2011).......................................................................33

*American Heritage Life Insurance Co. v. Orr,*
294 F.3d 702 (5th Cir. 2002) .....................................................................................4

*Amin v. 5757 N. Sheridan Rd. Condo Association,*
No. 12 C 446, 2012 WL 2049820 (N.D. Ill. June 6, 2012) ....................................14

*In re Apple iPhone 3G & 3GS MMS Marketing. & Sales Practices Litigation,*
864 F. Supp. 2d 451 (E.D. La. 2012).........................................................................18

*ARE Sikeston Ltd. Partnership v. Weslock National, Inc.,*
120 F.3d 820 (8th Cir. 1997) ...................................................................................15

*Aronowitz v. Home Diagnostics, Inc.,*
No. 93-069990-CIV, 2010 WL 2351468 (S.D. Fla. June 11, 2010)...........................5

*Arsberry v. Illinois,*
244 F.3d 558 (7th Cir. 2001) ...................................................................................33

*Association of American Medical Colleges v. Princeton Review, Inc.,*
332 F. Supp. 2d 11 (D.D.C. 2004)............................................................................32

*\*B.R. ex rel. Rempson v. District of Columbia,*
262 F.R.D. 11 (D.D.C. 2009)........................................................................21, 23, 24

*Berry v. District of Columbia,*
833 F.2d 1031 (D.C. Cir. 1987)................................................................................17

*Britamco Underwriters, Inc. v. Nishi, Papagjika & Associates, Inc.,*
20 F. Supp. 2d 73 (D.D.C. 1998).............................................................................25

*Cherry v. Brown-Frazier-Whitney*,
548 F.2d 965 (D.C. Cir. 1976) ...................................................................22

*Chung v. United States Department of Justice*,
333 F.3d 273 (D.C. Cir. 2003) ...................................................................30

*Comcast Corp. v. Federal Communications Commission*,
600 F.3d 642 (D.C. Cir. 2010) ...................................................................28

*Florida Ass'n for Retarded Citizens, Inc. v. Bush*,
246 F.3d 1296 (11th Cir. 2001) ...................................................................4

*Gardner v. United States*,
211 F.3d 1305 (D.C. Cir. 2000) ...................................................16, 21, 23, 24

*Gilbert v. Napolitano*,
670 F.3d 258 (D.C. Cir. 2012) ...................................................................25

*Graham v. Securities and Exchange Commission*,
222 F.3d 994 (D.C. Cir. 2000) ...............................................................30, 31

*Harney v. City of Chicago*,
702 F.3d 916 (7th Cir. 2012) ...................................................................10

*In re Heritage Southwest Medical Group. PA*,
464 F. App'x 285 (5th Cir. 2012) ...........................................................16, 22, 27

*Hughes v. Abell*,
794 F. Supp. 2d 1 (D.D.C. 2010) ...............................................................31

*James v. Global Tel*Link Corp.*,
2:13-cv-4989 (D.N.J. filed Aug. 20, 2013) ...................................................8

*James v. Global Tel*Link Corp.*,
2:13-cv-4989 (D.N.J. Sept. 8, 2014) ...........................................................20

*Leftridge v. Connecticut State Trooper Officer No. 1283*,
640 F.3d 62 (2d Cir. 2011) .......................................................................16

*Lehman v. Revolution Portfolio, LLC*,
166 F.3d 389 (1st Cir. 1999) ...............................................................4, 5, 17

*Lockhart v. Coastal International Security, Inc.*,
905 F. Supp. 2d 105 (D.D.C. 2012) ...........................................................20, 22, 24

*Menominee Indian Tribe of Wisconsin v. United States*,
614 F.3d 519 (D.C. Cir. 2010) ...............................................................27, 28

*Mire v. Full Spectrum Lending Inc.,
   389 F.3d 163 (5th Cir. 2004) ......................................................................4

Mojica v. Securus Technology, Inc.,
   5:14-cv-5258 (W.D. Ark. filed Aug. 14, 2014) ...........................................8

Monument Realty LLC v. Washington Metropolitan Area Transit Authority,
   540 F. Supp. 2d 66 (D.D.C. 2008)..............................................................31

*Moses v. Howard University Hospital,
   606 F.3d 789 (D.C. Cir. 2010) ...................................................28, 29, 30

Murilla v. Global Tel*Link, Corp.,
   14-cv-3275 (D. Minn. filed Aug. 27, 2014)..................................................8

Nesmith v. General Motors Corp.,
   No. 03-CV-6494, 2006 WL 2786840 (W.D.N.Y. Aug. 9, 2006) ...........................32

*New Hampshire v. Maine,
   532 U.S. 742 (2001).............................................................................12, 28

Nita v. Connecticut Department of Environmental Protection,
   16 F.3d 482 (2d Cir. 1994).......................................................................24

Noble v. United States Postal Service,
   71 F. App'x 69 (D.C. Cir. 2003) ...............................................................24

Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.,
   298 F. Supp. 2d 81 (D.D.C. 2004)..............................................................26

Peart v. Latham & Watkins LLP,
   985 F. Supp. 2d 72 (D.D.C. 2013)..............................................................25

Peterson v. Archstone Communities LLC,
   637 F.3d 416 (D.C. Cir. 2011) ............................................................17, 24

Philadelphia Electric Co. v. Nuclear Electric Insurance Ltd.,
   845 F. Supp. 1026 (S.D.N.Y. 1994)..............................................................4

Rare Coin Alliance, Ltd. v. Island Rarities, Inc.,
   No. 2:05-cv-891, 2010 WL 4384221 (S.D. Ohio Oct. 27, 2010) ...................25, 33

Redmond v. Fifth Third Bank,
   624 F.3d 793 (7th Cir. 2010) ....................................................................32

Saint-Jean v. District of Columbia,
   846 F. Supp. 2d 247 (D.D.C. 2012)...........................................................32

*St. Marks Place Housing Co. v. United States Department of Housing & Urban*
  *Development,*
  610 F.3d 75 (D.C. Cir. 2010) ...................................................................................4

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC,*
  594 F. Supp. 2d 76 (D.D.C. 2009) .....................................................................25, 26

*Trakas v. Quality Brands, Inc.,*
  759 F.2d 185 (D.C. Cir. 1985) ............................................................................16

*In Interest of W.P.,*
  449 N.W.2d 615 (Wisc. 1990) ............................................................................18

*Walsh Security, Inc. v. Cristo Prop. Management., Ltd.,*
  No. CIV.A. 97-3496 (WGB), 2006 WL 166491 (D.N.J. Jan. 23, 2006) ...................7

*Wood v. Idaho Department of Corrections,*
  No. CV-04-99-C-BLW, 2007 WL 1381786 (D. Idaho Mar. 28, 2007)....................18

*Workman v. Bell,*
  No. 94-2577-D, 2006 WL 3827482 (W.D. Tenn. Dec. 27, 2006) ...........................4

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  401 U.S. 321 (1971)................................................................................................5

**STATUTES**

28 U.S.C. § 1407......................................................................................................9

47 U.S.C. § 151 .......................................................................................................2

47 U.S.C. § 201 ...........................................................................................2, 13, 33

47 U.S.C. § 202 ...........................................................................................2, 13, 33

47 U.S.C. § 276 .......................................................................................................2

Fed. R. Civ. P. 8......................................................................................................25

Fed. R. Civ. P. 15.............................................................................................13, 14

Fed. R. Civ. P. 27....................................................................................................10

Fed. R. Civ. P. 41........................................................................................... *passim*

Fed. R. Civ. P. 60....................................................................................................32

**OTHER AUTHORITIES**

Implementation of the Pay Telephone Reclassification and Compensation Provisions of
    the Telecommunications Act of 1996, Petitioners' Alternative Rulemaking Proposal,
    CC Docket No. 96-128 (filed Mar. 1, 2007)............................................................18

Implementation of the Pay Telephone Reclassification and Compensation Provisions of
    the Telecommunications Act of 1996, Petition of Martha Wright *et al.* for
    Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending
    Rulemaking, CC Docket No. 96-128 (filed Nov. 3, 2003) .......................................18

Joe Palazzolo, *Agency Caps Inmates' Phone Rates*, Wall. St. J., Aug. 9, 2013, available at
    http://www.wsj.com/articles/SB10001424127887323838204579003040964899508 ..............1

Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Rates for
    Interstate Inmate Calling Service*, WC Docket No. 12-375, Sept. 26, 1996,
    https://apps.fcc.gov/edocs_public/attachmatch/FCC-13-113A1.pdf...................................2, 19

Second Further Notice of Proposed Rulemaking, *In the Matter of Rates for Interstate
    Inmate Calling Service*, WC Docket No. 12-375, Oct. 22, 2014,
    https://apps.fcc.gov/edocs_public/attachmatch/FCC-14-158A1.pdf...................................1, 13

Plaintiffs respectfully submit this reply in support of their motion to reopen and lift the stay temporarily.

## INTRODUCTION

Plaintiffs are inmates, their loved ones, and their legal counsel who filed this class action lawsuit challenging Defendants'[1] imposition of excessive and unreasonable charges for inmate calling services ("ICS"). These excessive charges, which are most often borne by family members of inmates who have not themselves been convicted of any crime, are disconnected from the legitimate costs of providing inmate calling services. Rather, excessive ICS rates are the product of the high profits that ICS providers extract from Plaintiffs who have no alternatives, and of the commissions or kickbacks paid to private correctional companies and state and local governments in exchange for the exclusive contracts that ensure an absence of competition. The ICS industry's use of exclusivity arrangements has facilitated the funneling of kickbacks from inmates and their families at up to 96% of ICS revenues.[2] Meanwhile, the ICS market has grown to more than $1.2 billion annually.[3]

In response to over a decade of pressure, including two petitions for rulemaking and dozens of other submissions before the Federal Communications Commission ("FCC"), Plaintiffs are finally starting to see some light at the end of this long and dark tunnel. In its

---

[1] Plaintiffs sued Global Tel*Link Corporation ("GTL"), Evercom, Inc. ("Evercom"), AT&T Corporation ("AT&T"), Corrections Corporation of America ("CCA"), MCI-Worldcom, and Pioneer Telephone Cooperative ("Pioneer"). Defendants GTL and Pioneer have been dismissed. Evercom's successor is Securus Technologies, Inc. and is referred to herein as "Securus."

[2] Second Further Notice of Proposed Rulemaking ("SFNPR") ¶ 3, *In the Matter of Rates for Interstate Inmate Calling Service*, WC Docket No. 12-375 (FCC 14-158), Oct. 22, 2014, https://apps.fcc.gov/edocs_public/attachmatch/FCC-14-158A1.pdf.

[3] Joe Palazzolo, *Agency Caps Inmates' Phone Rates*, Wall. St. J., Aug. 9, 2013, available at http://www.wsj.com/articles/SB10001424127887323838204579003040964899508.

September 26, 2013, Report and Order and Further Notice of Proposed Rulemaking ("Inmate Rate Order"), the FCC concluded that the rates charged by ICS providers often "greatly exceed the reasonable costs of providing the service."[4]  Employing its authority under §§ 201 and 202 of the Federal Communications Act ("FCA"),[5] 47 U.S.C. §§ 201, 202, the FCC set interim caps and "safe harbors" for ICS rates.  The FCC recognized Plaintiffs' role in spurring it to action, explaining that "[t]his all began with one Washington, D.C. grandmother, Mrs. Martha Wright, who spoke truth to power in 2003, and reminded us that one voice can still spur a movement and drive meaningful change."[6]  Nevertheless, as Defendants acknowledge, the FCC's ability to finalize its regulations has been subject to further delay, as Defendants and other recalcitrant ICS providers continue to fight the FCC's efforts, including by filing a legal challenge in the D.C. Circuit.[7]  On October 22, 2014, the FCC issued a Second Further Notice of Proposed Rulemaking seeking comment on permanent ICS rate reform.[8]

In order to facilitate this court's ability to speedily resolve the merits of Plaintiffs' underlying claims once the FCC finishes its work, Plaintiffs have sought to *temporarily* reopen this case and to *temporarily* lift the stay of proceedings.  As Plaintiffs pointed out in their original motion, the temporary lifting of the stay will serve several limited purposes: (1)

---

[4] Report and Order and Further Notice of Proposed Rulemaking ("Inmate Rate Order") ¶ 3, *In the Matter of Rates for Interstate Inmate Calling Service*, WC Docket No. 12-375 (FCC 14-158), Sept. 26, 1996, https://apps.fcc.gov/edocs_public/attachmatch/FCC-13-113A1.pdf.

[5] Inmate Rate Order at 6 (quoting 47 U.S.C. §§ 151, 201(b)); *see also id*. (quoting 47 U.S.C. § 276(b)(1)).

[6] Inmate Rate Order at 107 (statement of Acting Chairwoman Mignon Clyburn).

[7] Yesterday, the D.C. Circuit granted the FCC's unopposed motion to hold the petition to review the Inmate Rate Order in abeyance until the FCC issues its permanent rules.  Order, *Securus Tech., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Dec. 16, 2013).  The ICS providers supported the FCC's motion.  Unopposed Mot. at 1, *Securus Tech., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Dec. 10, 2013).

[8] SFNPOR, WC Docket No. 12-375 (FCC 14-158).

Plaintiffs will seek leave to file an amended complaint to narrow their causes of action and to assert remaining claims against GTL, and on behalf of inmates located in non-CCA facilities; (2) Plaintiffs will seek leave to take preservation depositions, including of a nearly 90-year-old Martha Wright; and (3) Plaintiffs will add class counsel.

It is important that the Court act expeditiously on Plaintiffs' motion.  Plaintiffs' proposed claims against GTL and on behalf of the payers of ICS in non-CCA facilities may be subject to limitations.  Additionally, in light of other recent lawsuits filed around the country against ICS providers for charging unreasonable and excessive rates, permitting Plaintiffs to amend now is important to facilitate Plaintiffs' ability to coordinate with the counsel who have brought these newer suits.

In their opposition briefs, Defendants raise a laundry list of objections, many contradictory and others of little relevance to deciding Plaintiffs' motions.  The purposes of these objections appear to be two-fold: (1) to prevent Plaintiffs from asserting additional claims that may otherwise be barred by limitations and (2) to make it difficult for Plaintiffs to develop a coordinated legal strategy with attorneys who have filed other, similar cases.  Neither is a legitimate basis for denying Plaintiffs' motion.  Defendants also attempt to blame Plaintiffs for the FCC's bureaucratic delays, when Defendants—over Plaintiffs' vocal objections—sought to have this Court refer the "reasonableness" of Defendants' rates to the FCC in the first instance. Finally, Defendants use Plaintiffs' procedural motion as an opportunity to rehash old arguments against the merits of some, but not all, of Plaintiffs' claims.  This is not the appropriate vehicle for such argument and this Court should, once again, decline Defendants' invitation to address the merits.

## ARGUMENT

I.     **BECAUSE ADMINISTRATIVE CLOSURE IS A CASE MANAGEMENT MECHANISM WITH NO LEGAL SIGNIFICANCE, THIS COURT HAS COMPLETE DISCRETION TO TEMPORARILY REOPEN THIS CASE**

Defendants' attempts to imbue the Court's administrative closure order with procedural and substantive significance are contrary to well established law.  Multiple federal appeals courts have held that "an administrative closing has no effect other than to remove a case from the court's active docket and permit the transfer of records associated with the case to an appropriate storage repository." *Lehman v. Revolution Portfolio, LLC*, 166 F.3d 389, 392 (1st Cir. 1999).[9] Indeed, "[t]he effect of an administrative closure is no different from a simple stay, except that it affects the count of active cases pending on the court's docket." *Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163, 167 (5th Cir. 2004); *see also St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 81 (D.C. Cir. 2010) (citing *Mire* approvingly).

"Designating a case 'closed' does not prevent the court from reactivating a case either of its own accord or at the request of the parties." *Florida Ass'n for Retarded Citizens, Inc. v. Bush*, 246 F.3d 1296, 1298 (11th Cir. 2001); *see also Workman v. Bell*, No. 94-2577-D, 2006 WL 3827482, at *2 (W.D. Tenn. Dec. 27, 2006) ("An administratively closed case can be easily reopened through a simple order of the Court . . . .  Upon a reopening, the case becomes, ipso facto, a statistically active case and resumes under the same status it had prior to the administrative closing without prejudice to the rights of any party in interest.").  Accordingly, a

---

[9] *See also American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 715 (5th Cir. 2002) (Dennis, J., concurring) ("[T]he administrative closure reflects nothing more than the federal courts' overarching concern with tidy dockets; it has no jurisdictional significance."); *Phila. Elec. Co. v. Nuclear Elec. Ins. Ltd.*, 845 F. Supp. 1026, 1028 (S.D.N.Y. 1994) ("[A]n administrative closing has no effect other than the removal of all case records to the Closed Records office and, in some instances, to warehouse storage outside of the courthouse.  In no event does such an order bar a party from restoring the action to the Court's active calendar upon an appropriate application.").

judge, in her discretion or at the request of a party, may choose to reactivate an administratively closed case without requiring any special showing.  *Lehman*, 166 F.3d at 392.

Despite an abundance of decisions holding that administrative closure is devoid of legal significance, CCA asserts that this Court must apply a more searching standard to determine whether a request to reopen an administratively closed case is warranted.  The only two decisions that the CCA cites in support of its proposed legal standard, however, are inapposite.  The first decision, *Advanced Communications Corp. v. FCC*, 376 F.3d 1153, 1154 (D.C. Cir. 2004), involved a petition to review an FCC order declining to reopen an administrative proceeding in which the FCC had already reached a final decision.  *Advanced Communications* did not address the standards that a court applies when considering whether to reopen a case that it administratively closed prior to making a merits determination.   Likewise, the only other decision cited by CCA, *Aronowitz v. Home Diagnostics, Inc*., No. 93-069990-CIV, 2010 WL 2351468, at *5 (S.D. Fla. June 11, 2010), is an unpublished district court decision from another circuit involving a motion to reopen the record to present evidence after a case had been *tried*.  Accordingly, in denying the motion to reopen, the court in that case drew its authority from *Zenith Radio Corp. v. Hazeltine Research, Inc*., 401 U.S. 321, 331 (1971), which concerned the standards for resolving a motion to reopen a *trial record* to submit additional proof—not for reopening a case that was administratively closed prior to any adjudication of the merits.[10]  CCA

---

[10] *Aronowitz* is also distinguishable on the facts.  In that case, the court had twice ordered the plaintiff to show cause as to why the case should not be dismissed for lack of prosecution, 2010 WL 2351468, at *2 n.3, the plaintiff had "failed to provide evidence that he made *any* reasonable effort to prosecute his claim after the case was administratively closed," *id*. at *6 (emphasis added), and the defendant was prejudiced because it was "no longer able to locate *any* of the witnesses or materials necessary to defend this claim," *id*. at *6 (emphasis added).  Defendants have not shown that any of these elements is present here.

has failed to show that there are any legal rules cabining this Court's discretion to reopen this case.

## II.   PLAINTIFFS HAVE PROVIDED COMPELLING REASONS FOR TEMPORARILY REOPENING THIS CASE AND TEMPORARILY LIFTING THE STAY OF PROCEEDINGS

### A.   Denying or Delaying the Motion to Temporarily Reopen Would Severely Prejudice Plaintiffs

Plaintiffs seek to have to have this case temporarily reopened and the stay temporarily lifted for three limited purposes: (1) to move to file an amended complaint; (2) to ask for leave to take preservation depositions; and (3) to add counsel.

As set forth in Plaintiffs' motion, if this case is reopened and the stay lifted, Plaintiffs will move to amend their complaint in several respects. First, Plaintiffs will seek to reassert claims against GTL for imposing excessive and unreasonable ICS charges. GTL has contracted with the District of Columbia Department of Corrections to provide inmate telephone services at the Correctional Treatment Facility located in Washington, D.C.,[11] and has relocated its corporate headquarters to Reston, Virginia,[12] which is located in the D.C. metropolitan area. This Court's jurisdiction over GTL is no longer in doubt.

---

[11] *See* District of Columbia Department of Corrections, *DOC Frequently Asked Questions*, http://doc.dc.gov/page/doc-frequently-asked-questions (last visited Dec. 16, 2014) ("[Y]ou may also make deposits to the inmate's commissary fund or prepaid telephone account using the Offender Connect kiosk in the waiting area."). The "Offender Connect" link on D.C. DOC's website directs the user to GTL's "ConnectNetwork" website. *See* District of Columbia Department of Corrections, *Inmate Telephone Services,* http://doc.dc.gov/service/inmate-telephone-services (last visited Dec. 16, 2014). "D.C." is also listed on the ConnectNetwork website as one of GTL's service locations. GTL ConnectNetwork, *Service Locations*, https://www.connectnetwork.com/portal (select "Locations" and see "DC" under the "State" dropdown list under "Facility Search") (last visited Dec. 16, 2014).

[12] GTL acknowledges that it is "headquartered in Reston, VA" on its website. *See* GTL, *Company Profile*, http://www.gtl.net/about-us/company-profile (last visited Dec. 16, 2014).

Second, Plaintiffs will seek to name as a defendant Securus Technologies, Inc., the second largest provider of ICS services.  Securus is a successor of Evercom, a current defendant in this case.  It was created after a private equity firm purchased Evercom and combined it with another ICS provider.[13]

Third, Plaintiffs will seek to narrow their claims to those most likely to succeed on the merits and to expand the scope of their proposed class to include individuals who have paid for ICS in order to communicate with inmates located in correctional facilities beyond those operated by Defendant CCA.

The time-sensitive nature of these amendments weighs strongly in favor of temporarily reopening the case.  The amendments Plaintiffs seek, which involve adding claims against GTL and modifying the class definition to encompass individuals paying for inmate calling services for inmates who are located in non-CCA facilities, may be subject to limitations.[14]  If the case is not reopened in order to permit Plaintiffs to move to amend their complaint, the claims of millions of inmates and other class members may be time-barred when the FCC issues its final regulations on ICS rates.   Other courts have recognized the necessity of reopening administratively closed cases in similar circumstances.  *See, e.g*, *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd*., No. CIV.A. 97-3496 (WGB), 2006 WL 166491, at *9 (D.N.J. Jan. 23, 2006) (holding that newly asserted claims in an amended complaint were time-barred because the "administrative dismissal did not prevent [the plaintiff] from asking the Court to reinstate the

---

[13] Securus Technologies, *History of Securus*, https://securustech.net/securus-history (visited Dec. 16, 2014).

[14] Plaintiffs anticipate that Securus will attempt to argue that it is not liable for post-merger damages.  Amending the complaint to add Securus as a defendant protects Plaintiffs against this possibility by preventing the limitations period from running on Plaintiffs' claims against Securus.

case, so that the complaint could be amended to include [a new defendant] in order to stop the running of the statute of limitations").

Tellingly, Defendants largely do not dispute that Plaintiffs would be severely prejudiced if not permitted to seek amendments to their complaint.[15]   Rather, Defendants' briefs focus on the fact that "the FCC's rulemaking continues."   (AT&T Br. at 4).   Had Plaintiffs moved to permanently reopen the case and lift the stay, Defendants' arguments might have some force. But Plaintiffs seek only to reopen the case temporarily and for limited purposes.   AT&T suggests that, once the FCC has issued final regulations governing ICS rates, Plaintiffs "will have the opportunity to add any new allegations that relate back to the original complaint."   (AT&T Br. at 5).   AT&T does not state, however, whether the particular amendments that Plaintiffs seek would relate back to the original complaint; nor has AT&T offered to waive its limitations defense to those amendments.

Indeed, the fact that the FCC's efforts to regulate the ICS industry are ongoing is further reason to grant Plaintiffs' motion to reopen.   As the original motion notes, since the FCC issued its Inmate Rate Order, inmates and their families have filed several additional class action suits in various federal courts challenging excessive and unreasonable ICS rates.[16]   Plaintiffs' proposed amendments would harmonize the complaint in this case with the complaints filed in these other cases—as CCA acknowledges in its brief, (CCA Br. at 13 n.12), the class definitions

---

[15] CCA does erroneously assert that Plaintiffs will not be prejudiced if the motion to reopen is denied because Plaintiffs can pursue remedies in the FCC's Enforcement Bureau. (CCA Br. 14 n.13).   As CCA well knows, however, there is no mechanism for obtaining classwide relief through an enforcement complaint.   Thus, denying the motion to reopen would be tantamount to preventing millions of inmates and others from obtaining relief.

[16] Those cases include: *James v. Global Tel\*Link Corp.*, 2:13-cv-4989 (D.N.J. filed Aug. 20, 2013); *Chruby v. Global Tel\*Link Corp.*, 1:14-cv-456 (E.D. Va. filed Apr. 24, 2014); *Mojica v. Securus Tech., Inc.*, 5:14-cv-5258 (W.D. Ark. filed Aug. 14, 2014); *Murilla v. Global Tel\*Link, Corp.*, 14-cv-3275 (D. Minn. filed Aug. 27, 2014).

in other ICS cases are not limited to inmates confined to CCA facilities and their families. Accordingly, granting the motion to reopen would facilitate Plaintiffs counsel's ability to coordinate, both for purposes of litigation and before the FCC, with counsel for the plaintiffs in the subsequently filed ICS cases.  One means of coordination would be for counsel in one or more of the pending cases to seek to have those cases referred, under 28 U.S.C. § 1407, to the Judicial Panel on Multidistrict Litigation ("MDL").  Permitting Plaintiffs to amend their complaint prior to this process would also enhance Plaintiffs' ability to fully represent their interests in a hearing before the MDL panel and subsequently.[17]  The strategic benefits to Defendants of preventing coordination by the plaintiffs in these various cases is not a legitimate basis for denying Plaintiffs' motion to reopen.

Plaintiffs also seek to have this case temporarily reopened and the stay temporarily lifted, so that Plaintiffs may move under the Federal Rules of Civil Procedure to take one or more preservation depositions.  In particular, Plaintiffs seek to depose Martha Wright, who is now nearly 90 years old.   CCA, surprisingly, disputes the necessity of deposing Mrs. Wright.  But the parties and the Court need not consult actuarial tables to recognize the strong possibility that Mrs. Wright may be unable to testify by the time that the FCC finalizes its ICS regulations. Moreover, lifting the stay in order to permit Plaintiffs to seek leave to amend and to request preservation depositions promotes judicial efficiency by obviating the need for future requests to

_____

[17] Contrary to CCA's implication, the entering of stays pending further action by the FCC in several of the other similar suits filed by inmates and their families does not preclude either the MDL process or further coordination before the FCC.  Nor is the prospect of an MDL "speculation," as CCA suggests.  (CCA Br. at 13 n.12).  Plaintiffs' counsel are authorized by statute to initiate the MDL process.  *See* 28 U.S.C. § 1407(c), (c)(ii) ("Proceedings for the transfer of an action under this section may be initiated by— . . . motion filed with the panel by a party in any action in which transfer for coordinated or consolidated pretrial proceedings under this section may be appropriate.").  Finally, CCA's conjecture that a prospective MDL would be transferred to this Court for adjudication is both irrelevant and baseless.  In Plaintiffs counsel's experience, attempting to predict where an MDL will be referred is generally a futile exercise.

reopen the case and lift the stay in order to take preservation depositions.  Defendants' assertion that any prejudice from not permitting a preservation deposition accrues to the Defendants, (CCA Br. at 21), ignores the simple fact that Plaintiffs bear the burden of proving their claims and is belied by Defendants' opposition to the request.

CCA and Securus further oppose the motion to reopen on the ground that "nothing prevents Plaintiffs' counsel from taking the sworn statements of their own clients."  (CCA Br. at 21; *see also* Securus Br. at 18–19).  Unlike preservation depositions, however, sworn statements of one's own client are not admissible at trial in the same manner as live testimony.  *See Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012) ("[A]ffidavits are not normally admissible at trial.").  AT&T also questions why Plaintiffs have not made use of Federal Rule of Civil Procedure 27 to request preservation depositions.  (AT&T Br. at 4).  It is not apparent that Rule 27, which on its face, applies when a party seeks to take depositions to perpetuate testimony "before an action is filed" and "pending appeal," Fed. R. Civ. P. 27(a), (b), would likewise apply when an already filed case, that is not on appeal, has been stayed.  AT&T's citation to a single decision from the Federal Circuit construing Rule 27 in this manner is thin evidence that courts in this circuit would so construe Rule 27, given that Rule 27 language does not reference stayed cases.  Moreover and most significantly, regardless of which procedural rule applies, Plaintiffs must obtain approval by the Court and a lift of the stay before taking preservation depositions.

**B.      Securus is Judicially Estopped From Arguing that this Case is Not a "Rate Case"**

Securus maintains at great length that Plaintiffs' motion to reopen shows that Plaintiffs improperly seek "to convert this lawsuit from an antitrust suit to a rate case."  (Securus Br. at

13).  But, as Securus and the other Defendants successfully argued in the motions to dismiss that they submitted in 2001,[18] this lawsuit was always a "rate case."

There is little room for confusion on this point.  Indeed, Defendants convinced the Court to refer this case to the FCC in the first place precisely by arguing that Plaintiffs suit was a challenge to Defendants' ICS rates.  As Securus's counsel represented to the court during a hearing on Defendants' motions to dismiss in 2001, "What we're dealing with here are essentially questions of inmate choice, access, rates, the reasonableness of rates, [and] whether rates are discriminatory.  These are all questions that are at the heart of FCC jurisdiction."[19]  The District Court accepted these arguments by Securus and the other Defendants, and made the following findings in its August 22, 2001 order:

- "This case involves a putative class action **challenge to the rates** and terms arising from the long distance telephone service arrangements between telephone companies and prison facilities . . . ."  (DE 94 at 1);

- "Defendants argue that Plaintiffs' suit is primarily a **challenge to the reasonableness of the collect call-only phone rates charged**.  Defendants maintain that because the FCC is statutorily charged with evaluating and regulating the reasonableness of phone rates, it is the forum best-suited to resolv[ing] Plaintiffs' claims."  (DE 94 at 4);

- "Although Plaintiffs have advanced numerous constitutional and statutory claims in this action, **what is common to all is the complaint that the rates** contained in the exclusive dealing contracts between CCA and Defendant phone companies **are unreasonable**."  (DE 94 at 5–6 (emphasis added));

---

[18]  *See* MCI WorldCom Mem. of Point & Authorities in Supp. of MCI WorldCom Communications, Inc. [Mot.] to Dismiss, DE 28-1 at 1–20 ("[T]he Court should . . . refer the dispute to the FCC under the doctrine of primary jurisdiction, so that the FCC can determine whether MCI WorldCom's **rates** comply with the requirements of the Communications Act." (emphasis added)); Evercom's Mem. in Support of Its Mot. to Dismiss and, Alternatively, to Sever and Transfer Claims, DE 19-1 at 6 (joining MCI-Worldcom's motions to dismiss).

[19]  Aug. 9, 2001 Mot. Hearing Trans., DE 93 at 38; *see also id.* at 45 ("Essentially, this is a case about lower rates.  They want lower rates" (Securus's attorney)); *id*. at 46 ("What they're concerned about is the rates that their clients are paying for these calls, and if the FCC comes in and says these rates are too high and the rates are lowered, then the Plaintiffs should be satisfied." (Securus's attorney)); *id*. at 48 ("I concur with everything [Securus's attorney] said in this case.  I do believe this is a case about lower rates." (CCA's attorney)).

- "**Whether telephone rates can be lowered** . . . **[is an] issue[]** . . . **best addressed by the FCC**." (DE 94 at 6 (emphasis added));

- "Plaintiffs allege that those rates are inflated in part because of the 25-50% commissions received by Defendant CCA. Any remedy would require the Court to order one of two arrangements: (1) **that the exclusive dealing contracts contain lower phone rates**; or (2) that CCA offer inmates a choice of phone carriers or calling options." (DE 94 at 6 (emphasis added)).

- "[C]ourts routinely refer **rate challenges** to the FCC." (DE 94 at 6 (emphasis added));

- "[T]he FCC, in exercising its mandate to **regulate the reasonableness of rates**, is authorized to reject inclusion in Defendants' cost-basis of the 25-50% commissions received by CCA." (DE 94 at 7 (emphasis added));

- "[C]ourts faced with similar **challenges to inmates phone rates** have already referred such challenges to the FCC . . . ." (DE 94 at 10 (emphasis added));

- "[T]he Court concludes that the FCC is clearly in the best position to resolve **the core issues** in this case, namely **the reasonableness of the rates charged** and the feasibility of alternative telephone arrangements in CCA facilities." (DE 94 at 10–11 (emphasis added)).

After arguing that this suit was a "rate case," and convincing the Court of that fact, Securus cannot now claim otherwise. Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). Because Securus previously succeeded in persuading the court that this case was a "rate case" that should be referred to the FCC, Securus is now judicially estopped from advancing contrary arguments.

Additionally, Securus incorrectly assumes that this case must be classified as either "an antitrust suit" or a "rate case." Although Plaintiffs' complaint includes an antitrust claim, it also includes a claim that the ICS "charges . . . which are imposed on plaintiffs as authorized by the illegal arrangement between the defendants herein are 'unjust' and 'unreasonable,' in violation

12

of § 201(b) of the [Federal] Communications Act."  (DE 1 ¶ 129).  That Plaintiffs allege that these "unjust" and "unreasonable" rates are caused in part by exclusive dealing arrangements does not alter the fact that Plaintiffs' FCA claims concern the reasonableness of Defendants' ICS rates.  In its Second Further Notice of Proposed Rulemaking, for instance, the FCC itself recognized that the ICS industry is characterized by "reverse competition"[20] and that "[e]xcessive rates are primarily caused by the widespread use of site commission payments— fees paid by ICS providers to correctional facilities or departments of corrections to win the exclusive right to provide inmate call service at a facility."[21]  Defendants have not shown that Plaintiffs are improperly attempting to convert this suit into something new.

### C. Plaintiffs' Motion Is Not a Motion to Amend and Should Not Be Evaluated Under Federal Rule of Civil Procedure 15

Defendant Securus uses much of its opposition brief to characterize Plaintiffs' motion as a procedurally deficient motion to amend their complaint and, alternatively, to argue that Plaintiffs' motion to reopen should be denied because Plaintiffs have not sought leave to amend. (Securus Br. at 11).

As to the first issue, Plaintiffs have not yet moved to amend their complaint, and Securus fails to point to any language from Plaintiffs' motion to the contrary.  Because Plaintiffs have not moved to amend their complaint, there is no basis for evaluating Plaintiffs' motion to reopen under Federal Rule of Civil Procedure 15, which sets out the procedures for filing amended and supplemental pleadings.

As to the second point, Securus has not cited any procedural rule, judicial precedent, or other authority mandating that plaintiffs who seek to reopen a case or lift a stay must

---

[20] SFNPR, ¶¶ 3, 22, 23.

[21] SFNPR, ¶ 3.

simultaneously file a motion to amend their complaint.  To the contrary, courts have recognized that plaintiffs should move to reopen an administratively closed case or lift a stay *before* filing a motion to amend a complaint, as Plaintiffs have done here.  *See Amin v. 5757 N. Sheridan Rd. Condo Ass'n*, No. 12 C 446, 2012 WL 2049820, at *1 (N.D. Ill. June 6, 2012) (noting that "the court denied plaintiffs' motion to file a second amended complaint on the grounds that the case had been stayed at the time their motion was filed").  Accordingly, had Plaintiffs moved to amend their complaint while the case was administratively closed and while the proceedings were stayed, Defendants could have argued, perhaps successfully, that Plaintiffs' motion to amend was procedurally improper and in violation of the stay.

Granting Plaintiffs' motion to reopen so that the Court may *subsequently* consider Plaintiffs' proposed amendments in response to a separate motion to amend would not prejudice Defendants.  Once this Court reopens this case and lifts the stay, Plaintiffs will file a motion to amend their complaint under Rule 15 and will submit, along with that motion, a proposed amended complaint.  Defendants will then have an opportunity to brief the Court on any opposition they might have to the proposed amendments.

### D.   Defendants' Remaining Arguments Opposing Plaintiffs' Motion to Reopen Similarly Fail

Securus argues that this Court should deny the motion to reopen on the grounds that "Plaintiffs seek to amend their Complaint to allege violations of the rate caps by retroactively applying the 2013 Inmate Rate Order."  (Securus Br. at 13).  This is premature supposition.  Securus fails to point to any language from Plaintiffs' motion suggesting that Plaintiffs intend to seek such an amendment.  Because Plaintiffs have not sought to amend their complaint to "retroactively apply[]" the Inmate Rate Order, Securus's related argument that the administrative regulations cannot be applied retroactively, (Securus Br. at 16), is similarly inapposite.

Furthermore, even if Plaintiffs did choose to seek such an amendment at some future date, the merits of that amendment would best be resolved after a formal motion to amend and full briefing of the issues.

Securus also asserts that permitting any amendment would be "extremely prejudicial" because it "was not even a party to the lawsuit and is here only to defend 14-year old claims against Evercom." (Securus Br. at 7). There is nothing unfair or prejudicial about Securus's liability for its predecessor's excessive ICS rates. Under the rules of successor liability, where there is a merger or a sale and purchase of a corporation's outstanding stock, "preexisting corporate liabilities also pass to the surviving corporation or to the purchaser." *ARE Sikeston Ltd. P'ship v. Weslock Nat'l, Inc.*, 120 F.3d 820, 828 (8th Cir. 1997) (citation omitted). Securus's liability for its predecessor's actions is particularly reasonable here. Evercom was not a bit player that Securus acquired without due diligence about this issue. According to Securus, prior to its acquisition, Evercom was the "the leading correctional industry telecom provider to facilities nationwide."[22] Indeed, Securus owes its creation to the merger of Evercom and T-Netix, Inc., which Securus describes as "two correctional industry giants."[23] Moreover, after acquiring Evercom, Securus continued to charge unreasonable ICS rates in violation of the FCA.

Lastly, AT&T asserts that Plaintiffs' motion should be denied because "the Federal Rules do not require citations of legal authority to support a claim." (AT&T Br. at 4). This argument is a nonsequitor. Plaintiffs have not sought to amend their complaint for the purpose of adding citations to caselaw.

---

[22] Securus Technologies, *History of Securus*, , https://securustech.net/securus-history (last visited Dec. 16, 2014).

[23] Securus Technologies, *History of Securus*, , https://securustech.net/securus-history (last visited Dec. 16, 2014).

## III.   PLAINTIFFS' CLAIMS SHOULD NOT BE DISMISSED FOR FAILURE TO PROSECUTE

### A.   Dismissals for Failure to Prosecute Are Disfavored

Defendants assert that this suit should be dismissed for want of prosecution.  (CCA Br. at 8).   Defendants, however, fail to describe the applicable legal standards or to show how those standards are satisfied in this case.

Courts evaluate arguments that a case should not be reopened due to a party's failure to prosecute or to otherwise comply with court orders under Federal Rule of Civil Procedure 41(b). *See Leftridge v. Conn. State Trooper Officer No. 1283*, 640 F.3d 62, 67–68 (2d Cir. 2011) (reversing a district court that declined to reopen an administratively closed case for failing to conduct a Rule 41(b) analysis).[24]   This circuit has recognized that, ordinarily, Rule 41(b) are warranted only when three conditions have been satisfied: (1) "prejudice to the other party"; (2) "failure of alternative sanctions to mitigate the severe burden that the misconduct has placed on the judicial system"; and (3) "deterrence of future misconduct."  *Gardner v. United States*, 211 F.3d 1305, 1309 (D.C. Cir. 2000).

"These justifications are not easily met," *id.*,[25] and dismissals and refusals to reopen under Rule 41(b) are disfavored in this Circuit, *see, e.g.*, *Trakas v. Quality Brands, Inc.*, 759 F.2d 185, 186 (D.C. Cir. 1985) ("The law of this circuit partakes of the general view that dismissal is an extremely harsh sanction and may be reversed when discretion is abused."); *Berry v. District*

---

[24] *See also In re Heritage Sw. Medical Grp. PA*, 464 F. App'x. 285, 287 (5th Cir. 2012) (evaluating an opposition to a motion to reopen an administratively closed case under Rule 41(b)); *Adams v. Trustees of N.J. Brewery Emps. Pension Trust Fund*, 29 F.3d 863, 869 (3d Cir. 1994) (evaluating arguments that an administratively closed case should not be reopened and should be permanently dismissed due to failure to prosecute under Rule 41(b) and reversing the district court's dismissal despite the plaintiffs' unexcused four and one-half year break in pursuing their claims because there was no prejudice or bad faith).

[25] *See also In re Heritage Sw. Med. Grp. PA*, 464 F. App'x 285, 287 (5th Cir. 2012) ("This court sets a high bar for a dismissal with prejudice under Rule 41(b).").

*of Columbia*, 833 F.2d 1031, 1037 (D.C. Cir. 1987) (reversing a dismissal under Rule 41(b) even though the attorney did not file a pretrial brief by the required date, skipped a status conference, and failed to file a pleading specifically requested by the court).  "Because disposition of claims on the merits is favored, the harsh sanction of dismissal for failure to prosecute is ordinarily limited to cases involving egregious conduct by particularly dilatory plaintiffs, after less dire alternatives have been tried without success."  *Peterson v. Archstone Communities LLC*, 637 F.3d 416, 418 (D.C. Cir. 2011) (internal quotation marks, citation, brackets, and ellipses omitted).

### B.    Plaintiffs Have Not Failed to Prosecute Their Claims

Defendants have failed to show that Plaintiffs stopped prosecuting their claims or otherwise violated this Court's orders.

CCA asserts that "Plaintiffs counsel inexplicably stopped prosecuting the case in this Court." (CCA Br. at 5).  But there is nothing "inexplicable" about the absence of court filings by Plaintiffs.  The Court stayed and administratively closed the case *precisely so that Plaintiffs could seek critical determinations from the FCC before proceeding in federal court*.  Administrative closures are primarily used when a case "though not dead, is likely to remain moribund for an appreciable period of time."  *Lehman*, 166 F.3d at 391–92.  For similar reasons, "[a]n action will not be dismissed for failure to proceed where the action has been stayed."  27 C.J.S. Dismissal & Nonsuit § 83.  Requiring a party to continue to move a case forward when that case has been administratively closed or stayed defeats the very purpose behind those procedures.

CCA, nonetheless, faults Plaintiffs for not filing a response to GTL's renewed motion to dismiss for lack of personal jurisdiction.   Yet the Court's stay order—which, using broad

language, "stay[ed] this action"—permitted no exception for the filing of post-stay dispositive motions.  Nor did GTL seek relief from the stay in order to file its motions to dismiss.  Given these facts, GTL's filing of a dispositive motion on May 10, 2004, (DE 134), while this case was stayed, violated this Court's November 5, 2001 order staying the proceeding.  *See In re Apple iPhone 3G & 3GS MMS Mktg. & Sales Practices Litig.*, 864 F. Supp. 2d 451, 458 (E.D. La. 2012) (explaining that a motion filed during a stay would be stayed).[26]

CCA also points out that, after filing three status reports with the Court, Plaintiffs did not file any additional reports.  The Court ordered the Plaintiffs to file three status reports, and all three reports were, in fact, filed.  The Court did not order the parties to file any reports after the initial three.  Accordingly, the absence of additional reports does not demonstrate a failure to prosecute nor to comply with a court order.

Plaintiffs have also vigorously pursued their claims before the FCC and will continue to do so.  Consistent with the Court's order referring the case, Plaintiffs filed two separate petitions for rulemaking.[27]  Since then, Plaintiffs have consulted with FCC staff on numerous occasions and have submitted dozens of filings in several administrative dockets, the most recent of which

---

[26] *See also Wood v. Idaho Dep't. of Corr.*, No. CV-04-99-C-BLW, 2007 WL 1381786, at *20 (D. Idaho Mar. 28, 2007) ("No party shall file motions in this case while it is stayed.  This case shall be administratively terminated for internal court purposes only while this case is stayed."); *In Interest of W.P.*, 449 N.W.2d 615, 618 (Wisc. 1990) ("A stay operates to put an end to all progress in the action, and no additional step may be lawfully taken" (internal quotation marks, citation, and brackets omitted)).

[27] Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petition of Martha Wright *et al.* for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking, CC Docket No. 96-128 at 3 (filed Nov. 3, 2003); Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petitioners' Alternative Rulemaking Proposal, CC Docket No. 96-128 (filed Mar. 1, 2007).

was submitted last month.[28]   In its Inmate Rate Order, the FCC gave special recognition to Plaintiffs' dogged efforts to reform the ICS industry.[29]   In that same order, the FCC's commissioners *unanimously* concluded—based, in part, on Plaintiffs' petitions—that the Defendants and other ICS providers charged inmates and their families excessive and unreasonable rates under the FCA.  A majority of commissioners also approved the imposition of an interim rate cap scheme on ICS providers.[30]

The delays in the FCC, while frustrating, are not attributable to Plaintiffs.  They are, instead, the result of political and bureaucratic forces internal to the FCC and beyond Plaintiffs' control.  Indeed, in the Inmate Rate Order, Commissioner Pai lamented that "the FCC should have acted years ago" and offered an apology to Plaintiffs, explaining that "Ms. Wright expected and deserved better."[31]   Moreover, it is the protracted and continuing opposition by Defendants and other members of the ICS industry, who brought a judicial challenge even to the FCC's attempt to set *interim* rate caps, that has delayed the implementation of a permanent scheme for regulating ICS rates.

Nor did Plaintiffs' decision to begin by filing rulemaking petitions and then, upon the FCC's promulgation of ICS industry regulations, to file complaints with the FCC's Enforcement

---

[28] FCC, Electronic Comment Filing System, available at http://tinyurl.com/lxjs5fe (last visited Dec. 16, 2014) (listing 93 separate filings by the Wright Petitioners in the FCC).

[29] *See, e.g.*, Inmate Rate Order at 107 (statement of Acting Chairwoman Mignon Clyburn).

[30] Although Commissioner Pai dissented over procedural concerns and criticisms of specific aspects of the regulatory scheme endorsed by the other four commissioners, he also indicated his belief that "we cannot necessarily count on market competition to keep prices for inmate calling services just and reasonable" and proposed an alternative system of rate caps on ICS providers.  Inmate Rate Order at 111 (Dissenting statement of Commissioner Ajit Pai). Commissioner Pai urged on these reform efforts, pleading that "we must take action to meet our duties under the law, not to mention our obligations of conscience."  *Id.*

[31] *See also* Inmate Rate Order at 112 (Dissenting statement of Commissioner Ajit Pai) ("As Ms. Wright and the other petitioners know all too well, justice delayed is justice denied.").

Bureau violate any court orders or unnecessarily delay the resolution of this case. This suit involves a number of fundamental policy questions—such as how to treat commission payments in determining the reasonable cost of ICS rates—that are more appropriately resolved, in the first instance, by the FCC's commissioners in a rulemaking proceeding, which invites public comment. Once the FCC completes its rulemaking, the Enforcement Bureau will be able to rely on the commissioners' resolution of these issues in deciding complaints. Indeed, it appears that another court deciding a similar challenge to ICS rates recently recognized this fact when it predicated its order requiring the plaintiffs in that case to file an enforcement complaint on the outcome of the judicial challenge to the FCC's interim rulemaking.[32]

Plaintiffs complied with the Court's referral order, which directed Plaintiffs to file "appropriate pleadings," (DE 95), by timely filing and vigorously prosecuting two rulemaking petitions. Defendants do not point to any court order purporting to direct the sequencing of Plaintiffs' filings. *See Lockhart v. Coastal Int'l Sec., Inc*., 905 F. Supp. 2d 105, 113 (D.D.C. 2012) (stating that misconduct warranting dismissal arises only when a plaintiff either "repeatedly fails to heed" court orders or "conspicuously disregards clear instructions to take certain steps" by a court).[33]

The timing of Defendants' objections is telling. Defendants, who have actively participated in the FCC's efforts to regulate the ICS industry, have long been aware that Plaintiffs filed their rulemaking petitions prior to submitting enforcement complaints. Had

---

[32] Order, *James v. Global Tel*Link Corp.*, 2:13-cv-4989 (D.N.J. Sept. 8, 2014) (ordering the plaintiffs to "file an administrative complaint with the [FCC] within 90 days of the D.C. Circuit's filing of the opinion in the pending appeal, Global Tel*Link, v. FCC, No. 13-1281").

[33] Additionally, because Plaintiffs seek both retroactive and prospective relief (the latter depending solely on the FCC's rulemaking), *even if* Plaintiffs' enforcement complaints were filed and resolved earlier, this suit would likely be pending until the FCC completed its rulemaking.

Defendants genuinely believed that the sequencing of Plaintiffs' filings before the FCC violated this Court's orders, constituted a failure to prosecute, or otherwise prejudiced them, they could have sought direction from the Court at any time.  Instead, Defendants now object only after it has become clear that the FCC is prepared to promulgate rulemaking enforcing the FCA's "just and reasonable" rate requirements against ICS providers, which will in turn provide the FCC's Enforcement Bureau with a basis for affording inmates and their families relief for years of excessing ICS charges.

### C.      Defendants Have Failed to Demonstrate Any Prejudice

Even if this Court were to find that Plaintiffs failed to prosecute their claims—which it should not—dismissal under Rule 41(b) is not warranted because Defendants have failed to demonstrate that they have been severely prejudiced.  To warrant dismissal, the prejudice to the opposing party must be "so severe as to make it unfair to require the other party to proceed with the case." *Gardner*, 211 F.3d at 1309 (internal quotation marks, citation, and brackets omitted).

Although "[s]uch severity may be demonstrated when the plaintiff's conduct fails to put the defendants on notice of the claim or interferes with the defendants' ability to obtain evidence relevant to the plaintiff's claims," *B.R. ex rel. Rempson v. District of Columbia*, 262 F.R.D. 11, 16 (D.D.C. 2009), Defendants have presented no basis for inferring that any delay has harmed their ability to mount a defense.  The sole reference to this issue in Defendants' briefing is the boilerplate assertion that "much of the evidence has become stale, and witnesses have disappeared and/or their memories have faded."  (CCA Br. at 13).  But Defendants fail to explain, with even a modicum of specificity, *what* evidence has become stale and *which* witnesses have disappeared.

There are particularly strong reasons in this case to doubt Defendants' generic assertions of prejudice, given the nature of the claims at issue.  This is not a tort case involving conflicting witness recollections.   Rather, as Defendants' have acknowledged, Plaintiffs' claims turn primarily on financial data concerning ICS rates and provider costs and profits, as well as on provider contracts to pay kickbacks to private correctional facilities.   To the extent that Defendants have failed to preserve this data, despite their knowledge of the pendency of this and other suits challenging the reasonableness of ICS rates and of ongoing rulemaking proceedings in the FCC, the damage to Defendants' ability to present a defense is self-inflicted.  *See, e.g.*, *In re Heritage Sw. Medical Grp. PA*, 464 F. App'x. 285, 287 (5th Cir. 2012) (holding that a defendant suffered no prejudice when it "was on notice of the claims, should have retained the documents, should have obtained information regarding witnesses that would be critical in asserting its defenses, and should have taken other means to gather information regarding the validity of the claims").

Defendants complain about the amount of time that has passed since this suit was filed, (CCA Br. at 13; *see also* Securus Br. at 10), but the "[m]ere lapse of time does not warrant dismissal," *Cherry v. Brown-Frazier-Whitney*, 548 F.2d 965, 969 (D.C. Cir. 1976).  Defendants' further assert that they have been prejudiced by the accrual of additional damages during the stay.  Defendants fought, however, *over Plaintiffs' objections*, to have these issues decided by the FCC with full knowledge of the delays often associated with administrative rulemaking.  (DE 25-1 at 29–30)  Accordingly, Defendants cannot demonstrate "any prejudice to [them] from the delay in consideration of [Plaintiffs' claims] when [they] requested the stay of [these] claim[s] over the plaintiffs' objection." *Lockhart*, 905 F. Supp. 2d at 120.

Moreover, Defendants' self-serving decision to continue charging inmates and their families astronomical ICS rates, despite their knowledge that these rates likely violated the FCA, cannot justify dismissal.  *See Rempson*, 262 F.R.D. at 16 (claims by defendants "that they are burdened by having to defend against this case and other similar cases" does not constitute prejudice).  Indeed, if anyone has been prejudiced by the delay, it is Plaintiffs, who have now waited for more than a decade for relief from Defendants' unreasonable rates.  Although Plaintiffs have only requested that the stay on this proceeding be lifted temporarily, to the extent that the Defendants are concerned by the attendant delays, Plaintiffs would welcome the opportunity to have this Court decide with dispatch whether the rates charged by the Defendants were fair and reasonable under the FCA.  This would, of course, prevent further prejudice to both the Plaintiffs and Defendants.

**D.    A Dismissal Would Be Improper Because Plaintiffs Have Been Given No Warnings and No Alternatives Have Been Explored**

A court is required to warn counsel that they have failed to prosecute or violated an order *before* that court may resort to the extreme sanction of dismissing a case.  *Gardner*, 211 F.3d at 1309–10 ("[T]he trial court did not warn [the plaintiff] that the case would be dismissed if he failed to appear.  Absent such advance warning [of the consequences], dismissal to drive a lesson home, we think, is more akin to overkill than judicial discretion." (internal quotation marks and citation omitted)).  In addition, "[a] District Court may dismiss under Rule 41(b) only after less dire alternatives have been explored without success."  *Id*. at 1308 (internal quotation marks and citation omitted).  This is especially true when counsel has not committed any previous misconduct.  *Peterson*, 637 F.3d at 418.[34]  Here, Plaintiffs' counsel have been given no advance

---

[34] Dismissals under Rule 41(b) are frequently reversed when there is no indication that a party has received a prior warning or when less serious alternatives to dismissal have not been

warning that their case is subject to dismissal.   Nor has the Court explored whether any alternatives to dismissal are available.   Accordingly, dismissal under Rule 41(b) would be improper.[35]

### E.      There Is No Need to Deter Future Misconduct

There is no basis for dismissing Plaintiffs' claims in order to deter any future misconduct, an issue which Defendants' briefing does not even address.   A Rule 41(b) dismissal is justified for deterrence only when "there is some indication that the client or attorney consciously fails to comply with a court order cognizant of the drastic ramifications."   *Gardner*, 211 F.3d at 1309. There is no suggestion that Plaintiffs have willfully violated any court orders or will do so in the future.

## IV.      DEFENDANTS' AFFIRMATIVE DEFENSES AND OTHER EQUITABLE ARGUMENTS DO NOT JUSTIFY DISMISSING PLAINTIFFS' CLAIMS

### A.      Defendants' Affirmative Defenses and Equitable Arguments Are Untimely

---

considered.  *See Gardner*, 211 F.3d at 1310 (reversing where "the record does not show that the District Court considered the availability of a lesser sanction"); *Noble v. U.S. Postal Serv.*, 71 F. App'x 69, 69 (D.C. Cir. 2003) (reversing where there was "no indication the court pursued other alternatives before resorting to the sanction of dismissal, and the court provided no notice" to the plaintiff that it would dismiss); *Nita v. Conn. Dep't of Envtl. Prot.*, 16 F.3d 482, 485 (2d Cir. 1994) (dismissal improper where district court failed, among other things, to give notice that it was considering dismissing for failure to prosecute).

[35] Although Plaintiffs' counsel has prosecuted this suit and complied with court orders, even in other suits where that is not the case, courts are appropriately wary of punishing a party with dismissal of claims on the basis of his or her attorney's deficiencies.  *See Lockhart*, 905 F. Supp. 2d at 114 ("Where the record is unclear whether the client is aware of the attorney's misconduct in failing to comply with a court order, the D.C. Circuit has required the district court to notify the client before dismissing a case pursuant to the deterrence rationale." (internal quotation marks and citation omitted)); *Rempson*, 262 F.R.D. at 15 ("Concerned that a client might be unaware of the attorney's misconduct, this circuit requires a district court to notify the client before dismissing a case pursuant to the deterrence rationale.").  Here, the thousands of inmates and their family members who have been charged excessive rates under the FCA have not been afforded any notice that their claims may be dismissed.

Defendant CCA's efforts to raise a laundry list of affirmative defenses, including waiver, estoppel, and laches, in an opposition to a motion to temporarily reopen are procedurally deficient in several respects.  First, under Federal Rule of Civil Procedure 8(c), "a party must first raise its affirmative defenses in a responsive pleading *before* it can raise them in a dispositive motion." *Gilbert v. Napolitano*, 670 F.3d 258, 261 (D.C. Cir. 2012) (internal quotation marks and citation omitted) (emphasis added); *see also Rare Coin Alliance, Ltd. v. Island Rarities, Inc.*, No. 2:05-cv-891, 2010 WL 4384221, at *2 (S.D. Ohio Oct. 27, 2010) (holding that a defendant had improperly raised the affirmative defense of laches by asserting it in a brief opposing the reopening of a closed case).[36]  CCA would be entitled to file an answer to any amended complaint filed, and because CCA has not yet filed an answer that pleads the affirmative defenses it now raises, it is precluded from asserting those defenses for the first time here.  Second, courts evaluate arguments concerning a plaintiff's purported failure to prosecute or to timely comply with court orders under Rule 41(b)—not under affirmative defenses such as waiver, estoppel, and laches.  CCA has failed to point to a single comparable case in which a court has dismissed claims on the grounds it asserts here.  Third, affirmative defenses are "generally a question for the trier of fact," *Britamco Underwriters, Inc. v. Nishi, Papagjika & Assocs, Inc*., 20 F. Supp. 2d 73, 77 (D.D.C. 1998), and a defendant "bears the burden of proof of establishing the facts supporting its affirmative defenses."  *Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76, 83–84 (D.D.C. 2009) (denying a defendant's summary judgment motion on its equitable affirmative defenses of laches, waiver, and estoppel).  Defendants have failed to attach or otherwise point to any competent record evidence satisfying

---

[36] An exception exists when "the facts that give rise to the defense are clear from the face of the complaint," *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d 72, 80 (D.D.C. 2013), but Defendants have not asserted that their affirmative defenses arise from the allegations in Plaintiffs' complaint.

its burden to prove their affirmative defenses. At minimum, fact issues preclude resolving these defenses at this stage in the litigation.

**B.      Plaintiffs Have Not Intentionally Abandoned Their Claims**

Even were the Court to determine that Defendants' waiver and other affirmative defenses are properly before the court—which, as explained above, it should not—Defendants have failed to point to any evidence suggesting that Plaintiffs intended to waive their claims. As CCA acknowledges, waiver requires "an *intentional* relinquishment or abandonment of a known right or privilege." (CCA Br. at 10 (quoting *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (emphasis added))). Waiver "involves both knowledge and intent, and is based on the idea of consent, express or implied." *Tech 7 Systems*, 594 F. Supp. 2d at 85 (citation omitted). Defendants' waiver argument is premised exclusively on Plaintiffs' decision to file rulemaking petitions with the FCC prior to submitting complaints with the Enforcement Bureau. The sequencing of Plaintiffs' administrative filings is far from the clear and intentional conduct required to substantiate a waiver defense. Defendants' waiver defense appears even weaker when viewed in the larger context of Plaintiffs' conduct before this Court and the FCC. Plaintiffs filed this class action suit asserting claims arising from Defendants' excessive and unreasonable charges for inmate calling services. As discussed above, after this suit was stayed and administratively closed—preventing Plaintiffs from submitting additional filings in this Court—Plaintiffs continued to vigorously pursue before the FCC regulations preventing Defendants and other members of the ICS industry from charging inmates and their families unjust and unreasonable rates. These efforts are wholly inconsistent with a finding that Plaintiffs intended to abandon their claims.

### C.     Plaintiffs' Claims Are Not Barred by Laches

Defendant CCA has similarly failed to show that Plaintiffs' claims are barred by laches. Laches "attaches only to parties who have *unjustifiably* delayed *in bringing suit*."  *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (quotation marks and citation omitted) (second emphasis added).  CCA does not assert that Plaintiffs delayed in bringing the present suit.  As noted above, CCA's argument is that Plaintiffs failed to prosecute their claims and timely comply with court orders.  Such arguments are evaluated under Rule 41(b)—not through the affirmative defense of laches.  *See, e.g.*, *Aetna Life Ins. Co. v. Kollmeyer*, 448 B.R. 749, 755–56 (N.D. Tex. 2011), *aff'd sub nom In re Heritage*, 464 F. App'x 285 (holding that administrative closures and stays "do not raise . . . diligence issues because the purpose of an administrative closure is to affect the count of active cases pending on the court's docket, and such a closure has no jurisdictional significance").

Additionally, laches applies only where a defendant can show that "there is (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Menominee Indian Tribe*, 614 F.3d at 531 (internal quotation marks and citation omitted).  Laches "turns on whether the party seeking relief delayed inexcusably or unreasonably in filing suit, not simply whether the party delayed."  *Id*. (internal quotation marks and citation omitted).  CCA has failed to demonstrate that any of these elements are satisfied here.  As previously discussed, Plaintiffs diligently pursued their claims before both this Court and the FCC, and reasonably filed their rulemaking petition before submitting enforcement complaints.  Moreover, CCA has failed to point, with any reasonable degree of specificity, to any prejudice it has suffered, beyond mere liability for Plaintiffs' claims.  Finally, even if Defendants had raised questions as to whether laches is appropriate, under the law of this circuit, memoranda

unaccompanied by evidentiary support are not "a useful vehicle for raising the issue of laches . . .

[which] involves more than the mere lapse of time and depends largely upon questions of fact."

*Menominee Indian Tribe*, 614 F.3d at 532 (internal quotation marks, brackets, and citations

omitted).

### D.        Plaintiffs Are Not Judicially Estopped From Pursuing Their Claims

CCA has also not shown that judicial estoppel applies.  Courts may invoke judicial

estoppel only "'[w]here a party assumes a certain position in a legal proceeding . . . succeeds in

maintaining that position . . . [and then,] simply because his interests have changed, assume[s] a

contrary position.'"  *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (quoting *New

Hampshire*, 532 U.S. at 749).  Courts pose three questions in deciding whether to apply judicial

estoppel: (1) "Is a party's later position clearly inconsistent with its earlier position?"; (2) "Has

the party succeeded in persuading a court to accept that party's earlier position, so that judicial

acceptance of an inconsistent position in a later proceeding would create the perception that

either the first or the second court was misled?"; (3) "Will the party seeking to assert an

inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing

party if not estopped?"  *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010).

Here, the answers to all three of these questions are in the negative.  CCA points to

Plaintiffs' characterization of this suit in Plaintiffs' opposition to the motions to dismiss as one

about "access to the free market for telephone services" rather than, simply, about rates.  (CCA

Br. at 12 n.10).  But judicial estoppel cannot apply because, as discussed above, Plaintiffs did not

"succeed in persuading the court to accept" their position.  In referring this case to the FCC, the

Court concluded that this case was a "challenge to the rates" charged by ICS providers.  (DE 94

at 1).

CCA also suggests that judicial estoppel applies because, in order to obtain a stay, Plaintiffs promised the Court in their motion for reconsideration that Plaintiffs would "file a formal complaint for damages with the Enforcement Bureau" and that this process would "only take five months to resolve." (CCA Br. at 12). But CCA, troublingly, misrepresents the contents of Plaintiffs' motion for reconsideration—which does not include any reference to the formal complaint process, much less a promise that such a complaint would be filed within a certain time period (the Court's stay order is similarly devoid of any reference to the filing of a formal complaint). (DE 105). Rather, in the motion for reconsideration, Plaintiffs sought a stay because, without one, "the claims of certain class members will be barred as a result of the running of the statute of limitations." (DE 98 at 2). Plaintiffs also warned that "the matter pending before the FCC brought by inmate telephone service providers regarding local collect calls (FCC Docket 96-128) has been pending before the FCC without decision for two years" and there was "no indication as to how soon a decision is forthcoming." (DE 98 at 2).

CCA points out that—*after* the Court granted Plaintiffs' motion to reconsider and entered an order staying the proceedings—Plaintiffs indicated in the first status report that they intended to file a formal complaint in the event that mediation was unsuccessful. (DE 106). But, given that this Court had already entered the stay when the status reports were filed, CCA has not shown what this statement "persuad[ed the] court to accept." *Moses*, 606 F.3d at 798. Moreover, the status reports reveal a fluid situation, in which neither Plaintiffs nor the FCC had decided on the appropriate method or timing for implementing the Court's referral order. Although, in the first status report, Plaintiffs stated that they intended to file enforcement complaints, (DE 106), in the second status report, Plaintiffs explained that "[t]he FCC staff . . . stated that they were not ready for Plaintiffs to file a complaint" and that Plaintiffs' efforts to do

so were "being frustrated," (DE 119).  In the third status report, Plaintiffs relayed that FCC staff "raised questions regarding the most appropriate vehicle or vehicles to use to bring the referral claims before the FCC."  (DE 132 at 2).  The third report references, for the first time, the FCC's decision to raise through a rulemaking petition "broad policy matters best suited to rulemaking proceedings in which other parties also may comment."  (*Id.*).  Although the third report also mentions Plaintiffs' intention to file a formal complaint, it does not state that Plaintiffs would do so by a particular date.  (*Id.*).  There is no basis for concluding that Plaintiffs either "misled" the Court, or that Plaintiffs adopted a position that was "clearly inconsistent" with a prior position.  *Moses*, 606 F.3d at 798.  Accordingly, judicial estoppel does not apply.

### E.      Equitable Estoppel Does Not Apply

The application of equitable estoppel is also inappropriate.  A party claiming equitable estoppel must show that "there was a definite representation to the party claiming estoppel; that the latter relied on its adversary's conduct in such a manner as to change his position for the worse; and that the reliance was reasonable."  *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

In invoking the doctrine of equitable estoppel, CCA attempts to screw a round peg into a square hole.  Equitable estoppel ordinarily applies to prevent "a defendant, because of his own inequitable conduct—such as promising not to raise the statute of limitations defense—from invoking the statute of limitations," *Chung v. DOJ*, 333 F.3d 273, 278 (D.C. Cir. 2003)—a situation that has little relevance to the facts at issue here.  Moreover, as explained above, Plaintiffs expect to file an enforcement complaint after the FCC issues its final ICS regulations, and CCA has not pointed to any "definite representation" by Plaintiffs that they would file such a complaint by a certain date.

CCA also has failed to show how it relied on any representation by Plaintiffs "to change [its] position for the worse," *Graham*, 222 F.3d at 1007. Prior to Plaintiffs' statement that they intended to file an enforcement complaint, Defendants' charged unjust and unreasonable ICS rates. Defendants continued to charge those rates after Plaintiffs' statement. Had Defendants actually relied on Plaintiffs' representations, they presumably would have ensured that their rates complied with the FCA so as to mitigate future damages. Equitable estoppel is not appropriate.

### F.      There Is No Basis for Applying the "Unclean Hands" Doctrine

Plaintiffs' motion to reopen the case and lift the stay temporarily is not barred by the doctrine of unclean hands. The unclean hands defense is appropriate only "where there is a direct link between plaintiffs' unethical behavior and the underlying obligation that formed the basis of the lawsuit." *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 82 (D.D.C. 2008); *see also Hughes v. Abell*, 794 F. Supp. 2d 1, 11 (D.D.C. 2010) ("Unclean hands is a defense available where the plaintiff's misconduct occurred in connection with the same transaction that is the subject of her claim. . . . [A] plaintiff's misdeeds [will] not excuse [a] defendant's unrelated unlawful behavior." (internal quotation marks and citation omitted)). Plaintiffs' claims in the present suit arise from the excessive and unreasonable rates that the Defendants charged for inmate calling services. Because the Defendants do not claim (nor could they) that Plaintiffs were responsible for these high rates, Defendants have failed to properly advance an unclean hands defense.

Additionally, "[t]he unclean hands defense closes the doors of a court of equity to a party tainted with inequitableness or bad faith relative to the matter in which she seeks relief and derives from the equitable maxim that one 'who comes into equity must come with clean hands.'" *Ass'n of Am. Med. Colls. v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 17 n.2 (D.D.C.

2004) (citation omitted).   The doctrine of unclean hands does not apply here because Plaintiffs'

motion does not seek any equitable relief from the court.

Finally, the unclean hands defense applies only in extreme circumstances.  In order to

avail itself of the "unclean hands" defense, CCA "bears the burden of showing" that Plaintiffs

engaged in "truly unconscionable and brazen behavior." *Saint-Jean v. District of Columbia*, 846

F. Supp. 2d 247, 258 (D.D.C. 2012) (internal quotation marks and citation omitted).  CCA has

not met its burden.  As discussed above, Plaintiffs fully complied with this Court's orders, and,

regardless, certainly have not been "truly unconscionable and brazen." *Id.*

Accordingly, Defendants' attempts to assert affirmative defenses in response to

Plaintiffs' motion to reopen fail.

## V.    PLAINTIFFS' CLAIMS ARE NOT FUTILE

In referring this case to the FCC, this Court previously rejected Defendants' efforts to

dismiss Plaintiffs' claims.   Defendants now attempt to use Plaintiffs' motion to reopen—a

procedural motion that does implicate the merits of this case—as a vehicle to reassert the same

arguments that this Court declined to rule on years ago.  The cases Defendants cite to justify their

effort to place the merits of Plaintiffs' claims before the Court, are plainly distinguishable from

the present case.  *See Redmond v. Fifth Third Bank*, 624 F.3d 793, 803 (7th Cir. 2010)

(addressing a motion to reopen a closed bankruptcy case in which a discharge injunction had

previously issued); *Nesmith v. Gen. Motors Corp.*, No. 03-CV-6494, 2006 WL 2786840, at *3

(W.D.N.Y. Aug. 9, 2006) (addressing a motion to amend a final judgment under Rule 60(b));

*A123 Sys., Inc. v. Hydro–Quebec*, 626 F.3d 1213, 1216 (Fed. Cir. 2010) (affirming a denial of a

motion to reopen on procedural grounds because the plaintiff had failed to join an indispensable

party); *Am. Family Mut. Ins. Co. v. Teamcorp, Inc.*, 835 F. Supp. 2d 1083, 1086 (D. Colo. 2011)

(denying a motion to reopen under a "good cause" standard mandated under a local rule that does not apply in this district and because the only purpose for reopening was to obtain attorney's fees that were plainly not available). Other courts in circumstances more analogous to those here have refused to deny a motion to reopen based on arguments concerning the merits of a plaintiff's claims. *See, e.g.*, *Rare Coin Alliance*, 2010 WL 4384221, at *3.

This Court should also reject Defendants' invitation to rule on the merits of Plaintiffs' claims on the grounds that the merits have not been adequately briefed by any party. CCA devotes less than two pages of its brief to discussing the merits of Plaintiffs' many claims and cites only a single case; Securus's addresses the merits in less than one page; and AT&T does not brief the merits at all. Moreover, the lone case cited by CCA, *Arsberry v. Illinois*, 244 F.3d 558 (7th Cir. 2001), was brought to the Court's attention more than a decade ago, before this Court decided to enter a stay and refer Plaintiffs' claims to the FCC. (DE 9–10, 35–36).

Even if the *Arsberry* decision were correctly decided in all respects, it would not justify denying for futility Plaintiffs' motion to reopen. The Seventh Circuit, in *Arsberry*, did not address the merits of Plaintiffs' claims under §§ 201 and 202 of the FCA that Defendants charged "unjust and unreasonable" ICS rates. *See* 244 F.3d at 563. CCA impliedly acknowledges this fact, claiming only that *Arsberry* counsels the dismissal of Plaintiffs' "constitutional and anti-trust claims." (CCA Br. at 20). Securus also acknowledges that claims under the FCA may be "viable." (Securus Br. at 17). To be sure, Securus asserts that Plaintiffs' particular claims under the FCA have failed because the FCC has not banned exclusive contracts. But this Court referred to the FCC both "the reasonableness of the rates charged *and* the feasibility of alternative telephone arrangements in CCA facilities." (DE 94 at 10–11 (emphasis added)). Although the FCC has not chosen to issue regulations banning exclusivity

arrangements, as Securus well knows, the FCC is in the process of determining the reasonableness of ICS rates and implementing rate caps. At minimum, given their complexity, these arguments are not appropriately considered in response to a motion to reopen and are not adequately addressed in Defendants' briefs.

## CONCLUSION

For these reasons, Plaintiffs respectfully move this Court to reopen the present case and to lift the stay on a temporary basis.


December 17, 2014                              Respectfully submitted,


                                              /s/ Deborah Golden
                                              Deborah Golden (Bar No. 470578)
                                              Elliot Mincberg (Bar No. 941575)
                                              Matthew K. Handley (Bar. No. 489946)
                                              Washington Lawyers Committee for Civil
                                              Rights and Urban Affairs
                                              11 Dupont Circle, N.W., Suite 400
                                              Washington, D.C. 20036
                                              Telephone: (202) 319-1000
                                              Facsimile: (202) 319-1010
                                              deborah_golden@washlaw.org

                                              *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2014, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which in turn sent notice to all counsel of record who are registered with that system.

_/s/ Deborah Golden_ _____

Deborah Golden