**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARTHA WRIGHT, *et al.*, | ) |
| Plaintiffs, | ) )  Civil Action No. 00-293 (TJK) |
|  | ) |
| v. | )  Judge:  Timothy J. Kelly |
|  | ) |
| CORRECTIONS CORPORATION OF AMERICA, *et al.*, | ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**JUNE 6, 2022 STATUS REPORT**

In accordance with this Court's April 7, 2022 and May 17, 2022 Minute Orders, Plaintiffs and Defendants Securus Technologies, LLC ("Securus")[1] and CoreCivic (sometimes referred to herein as "CCA")[2] jointly submit the following status report: (i) informing the Court about any related developments that have occurred since December 2018; and (ii) setting forth the parties' current positions on how the case should proceed.

I.      **Related Developments**

       **A. Plaintiffs' Position**

Following the D.C. Circuit's ruling in and remand following *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017), the FCC has been actively working to reissue final rulemaking, including on inmate calling services ("ICS") rate and fee caps, that complies with the D.C. Circuit's decision.  Defendant Securus represents that "the FCC has completed its rulemaking"—

---

[1] Defendant Securus Technologies, LLC was formerly known as "Securus Technologies, Inc."

[2] Defendant CoreCivic was formerly known as "Corrections Corporation of America."

but this is false.  The FCC is in the process of, but has not yet issued, its rulemaking on permanent

caps of inmate calling services ("ICS") rates.  Plaintiffs describe the FCC's progress below.

On February 4, 2020, the FCC's Wireline Competition Bureau issued a public notice

seeking comment on ancillary service charges.[3]  The *Wright* Petitioners and Defendant Securus

each submitted comments.[4]  On August 6, 2020, the FCC adopted its Report and Order on Remand

and Fourth Further Notice of Proposed Rulemaking.[5]  Responding to an issue raised by the D.C.

Circuit, the FCC found "that ancillary service charges generally cannot be practically segregated

between the interstate and intrastate jurisdictions . . . ."[6]  The FCC ordered that, "[a]s a result,

inmate calling services providers are generally prohibited from imposing any ancillary service

charges other than those permitted by the Commission's rules and providers are generally

prohibited from imposing charges in excess of our applicable ancillary service fee caps."[7]  The

FCC further proposed revised permanent rate caps "us[ing] a methodology that addresses the flaws

underlying the Commission's 2015 and 2016 rate caps and that is consistent with the mandate in

---

[3]    Public    Notice,    WC    Docket    No.    12-375    (filed    Feb.    4,    2020),
https://www.fcc.gov/ecfs/file/download/DOC-5c4c592571c00000-X.pdf?file_name=DA-20-127A1_Rcd.pdf.

[4] Comments of Wright Petitioners, et al., WC Docket No. 12-375 (filed Mar. 20, 2020),
https://www.fcc.gov/ecfs/file/download/DOC-5c3e82220c000000-A.PDF?file_name=01412384.PDF; Reply Comments of Wright Petitioners, et al., WC Docket No.
12-375 (filed Apr. 21, 2020), https://www.fcc.gov/ecfs/file/download/DOC-5c67a18705400000-A.PDF?file_name=01420690.PDF; Reply Comments of Securus Technologies, LLC, WC Docket
No.    12-375    (filed    Apr.    21,    2020),    https://www.fcc.gov/ecfs/file/download/DOC-5c67a93fce000000-A.pdf?file_name=Securus%20-%20Ancillary%20Charge%20Reply%20Comments%20(4-21-2020).pdf.

[5] Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, WC
Docket No. 12-375 (filed Aug. 6, 2020), https://www.fcc.gov/ecfs/file/download/DOC-5d2491ecbb400000-X.pdf?file_name=FCC-20-111A1.pdf.

[6] *Id*. ¶ 2.

[7] *Id*.

section 276 of the Act that inmate calling services providers be fairly compensated for each and every completed interstate call."[8]  Finally, the FCC proposed rates cap for international inmate calling services.[9]  The *Wright* Petitioners and Defendant Securus submitted comments in response.[10]

On May 20, 2021, the FCC adopted its Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking.[11]  The FCC adopted the following measures—some of which are interim pending final rulemaking:

- Adopted revised interim interstate rate caps, regardless of call type, as follows:
  - For all Jails with Average Daily Populations of less than 1,000 Inmates: $0.21 per minute
  - For all Jails with Average Daily Populations of 1,000 Inmates or greater: $0.14 per minute
  - For all Prisons: $0.12 per minute

- Adopted interim international call rate caps as follows:
  - The applicable interstate rate cap plus the average per-minute amount the provider paid its underlying international service provider.

- Adopted interim site commission limits for all prisons and for jails with average daily populations of 1,000 Inmates or greater as follows:

---

[8] *Id*. ¶ 3.

[9] *Id*.

[10] Comments of Wright Petitioners, et al., WC Docket No. 12-375 (filed Nov. 23, 2020), https://www.fcc.gov/ecfs/file/download/DOC-5d7de1c33dc00000-A.pdf?file_name=ICS%20Filing%20Redacted%20FINAL%20AK%20JL%20(11-23-20).pdf; Comments of Securus Technologies, LLC, WC Docket No. 12-375 (filed Nov. 23, 2020), https://www.fcc.gov/ecfs/file/download/DOC-5d7dc1b63a000000-A.pdf?file_name=REDACTED%20FINAL%20Securus%20Fourth%20FNPRM%20Comments%20(Docket%2012-375)%20(11-23-2020).pdf; Reply Comments of Securus Technologies, LLC, WC Docket No. 12-375 (filed Jan. 15, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5dc1d7f366c00000-B.pdf?file_name=FINAL%20-%20Securus%20Fourth%20FNPRM%20Reply%20Comments%20(1-15-2021).pdf.

[11] Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, WC Docket No. 12-375 (Adopted May 20, 2021), https://docs.fcc.gov/public/attachments/FCC-21-60A1.pdf.

- o Where site commission payments are mandated by federal, state, or local law, providers may pass these payments through to consumers, without any markup, subject to the limitation that the total rate does not exceed $0.21 per minute.
- o Where site commissions result from contracts with ICS providers, providers may recover commissions up to $.02 per minute.

- Adopted a permanent ancillary third-party transaction fee cap of $6.95 per transaction.[12]

Along with its Third Report and Order, the FCC adopted a Fifth Further Notice of Proposed Rulemaking seeking "comment on what methodology we should use to permanently cap provider related rate components for interstate and international inmate calling services."[13]   Additionally, the FCC ordered a Third Mandatory Data Collection to enable it to obtain data it would use in setting permanent rate caps.[14]   The *Wright* Petitioners and Defendant Securus each submitted comments on the FCC's Fifth Notice of Proposed Rulemaking.[15]

On September 22, 2021, the FCC's Wireline Competition Bureau and Office of Economics and Analytics issued a notice seeking comment on the Third Mandatory Data Collection that the

---

[12] *Id*. ¶  3; *see also* 47 CFR § 64.6020 (limiting ancillary service charges for interstate and international calls as follows: "(1) For Automated Payment Fees - $3.00 per use; (2) For Single-Call and Related Services - $6.95 per transaction, plus the adopted, per-minute rate; (3) For Live Agent Fee - $5.95 per use; (4) For Paper Bill/Statement Fee - $2.00 per use; (5) For Third-Party Financial Transaction Fees - $6.95 per transaction.").

[13] *Id*. ¶ 302.

[14] *Id*. ¶¶ 3, 343.

[15] Reply Comments of Wright Petitioners, et al., WC Docket No. 12-375 (filed Dec. 17, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f72ade012800000-A.pdf?file_name=ICS%20Fifth%20FNPRM%20Reply%20Comments%20(12-17-21).pdf; Comments of Securus Technologies, LLC, WC Docket No. 12-375 (filed Sept. 27, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f0a79e20a000000-A.pdf?file_name=5th%20FNPRM%20Initial%20Comments.pdf; Reply Comments of Securus Technologies, LLC, WC Docket No. 12-375 (filed Dec. 17, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f727b2315c00000-A.PDF?file_name=FCC%205thFNPRM%20Reply%20Comments%20(Redacted)%20(23512023v1).PDF; *see also* Petition for Clarification of Securus Technologies, LLC, WC Docket No. 12-375 (filed Sept. 17, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5efd2b6eb7800000-A.pdf?file_name=Petition%20for%20Clarification.pdf.

FCC had previously indicated it would use in setting permanent rate caps.[16]  The *Wright* Petitioners and Securus submitted comments on the FCC's proposed Third Mandatory Data Collection.[17]  In addition, on December 15, 2021, the FCC's Wireline Competition Bureau sought comment on proposed revisions to the ICS providers' separate Annual Report and Certification requirements.[18]

On January 18, 2022, the FCC adopted an order providing instructions, a reporting template, and a certification form to implement its Third Mandatory Data Collection.[19]  Following that order, the providers' responses to the Third Mandatory Data Collection are due shortly on June 30, 2022.[20]

---

[16] WCB and OEA Seek Comment on Upcoming Third Mandatory Data Collection for Inmate Calling Services, WC Docket No. 12-375, (Sept. 22, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f04d8a7f1000000-X.pdf?file_name=DA-21-1192A1.pdf.

[17] Comments of Wright Petitioners, et al., WC Docket No. 12-375 (filed Nov. 4, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f3b4d87d6c00000-A.pdf?file_name=ICS%20Third%20Mandatory%20Data%20Collection%20Comments%20(11-4-21).pdf; Reply Comments of Wright Petitioners, et al., WC Docket No. 12-375 (filed Nov. 19, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f4ea0d932800000-A.pdf?file_name=ICS%20Third%20Mandatory%20Data%20Collection%20Reply%20Comments%20(11-19-21).pdf; Reply Comments of Securus Technologies, LLC, WC Docket No. 12-375 (filed Nov. 19, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f4e62947f000000-A.PDF?file_name=MDCinstructions%20Reply%20Comments.PDF.

[18] Wireline Competition Bureau Seeks Comment on Revisions to Annual Reporting and Certification Requirements for ICS Providers, WC Docket No. 12-375, (Dec. 15, 2021), https://www.fcc.gov/ecfs/file/download/DOC-5f710befd3800000-X.pdf?file_name=DA-21-1583A1.pdf.

[19] Mandatory Data Collection Order, WC Docket No. 12-375 (Jan. 18, 2022), https://www.fcc.gov/ecfs/file/download/DOC-5f9cdb24dd000000-X.pdf?file_name=DA-22-52A1.pdf.

[20] Wireline Competition Bureau Announces the Due Date For Responses to the Commission's Inmate Calling Services Third Mandatory Data Collection, WC Docket No. 12-375 (Mar. 2, 2022), https://www.fcc.gov/ecfs/file/download/DOC-5fdebc3c3e400000-A.pdf?file_name=DA-22-214A1.pdf.

### B. Defendants' Position

As the parties noted in their December 2018 status report, ECF No. 216, the D.C. Circuit vacated and remanded certain aspects of the rulemaking conducted by the Federal Communications Commission ("FCC") regarding inmate calling services ("ICS").  *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).  The FCC subsequently engaged in further rulemaking that led to a final rule in July 2021.  86 Fed. Reg. 40,682 (July 28, 2021) ("*2021 Order*").  The 2021 Order capped rates separately for three different categories of correctional facilities, covering the entire correctional market.  It also imposed limitations on the amount of site commission payments that can be recovered through ICS call charges.  Securus disagrees with some aspects of the plaintiffs' characterization of the FCC's orders, including the 2021 Order; but it agrees that the 2021 Order comprehensively regulates fees for interstate ICS.

Simultaneously with the 2021 Order, the FCC published a notice of proposed rulemaking seeking comment on various topics related to ICS.  These topics include, among others, the potential for revised caps for small jails; a methodology for analyzing data that ICS providers submit, from which the FCC proposes to develop permanent rate caps; further potential limitations on site commission payments; and potential rules about communications services for incarcerated people with disabilities.  86 Fed. Reg. 40,416 (July 28, 2021).  There is no defined timeline for whether and when the FCC will issue rules based on this notice.

## II.       The Parties' Current Positions on How the Case Should Proceed

### A. The *Wright* Plaintiffs' Position

Plaintiffs request that the case continue to be stayed and/or be administratively closed pending the FCC's final rulemaking.  By contrast, after *demanding* that this case be referred to the FCC—unhappy with the FCC's current efforts to rein in years of excessive and predatory pricing

practices in the ICS industry—Defendants now seek to short-circuit the FCC's rulemaking at the very point that it approaches completion. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him").

Defendants' positions should be rejected because they ignore the history of this litigation, contradict their previously asserted positions before the Court and the FCC, and would seriously prejudice Plaintiffs who have been vigorously pursuing their claims in the forum Defendants themselves chose. Reopening the case now before the FCC completes its rulemaking would also create a serious risk of conflicting judicial and administrative rulings.

### 1. Background

This case, which challenges under federal and state law the reasonableness of ICS rates and fees, was stayed after both Defendants here successfully argued to the Court that, under the primary jurisdiction doctrine, certain questions should be referred to the FCC in the first instance.[21] Defendants did so with full knowledge (and perhaps with the intention) that the administrative process can be lengthy and byzantine, and that resolution of Plaintiffs' claims in this litigation would be delayed until that process played out.

---

[21] *See, e.g.*, MCI WorldCom Mem. of Point & Authorities in Supp. of MCI WorldCom Communications, Inc. [Mot.] to Dismiss, ECF No. 28-1 at 1–20 ("[T]he Court should . . . refer the dispute to the FCC under the doctrine of primary jurisdiction, so that the FCC can determine whether MCI WorldCom's rates comply with the requirements of the Communications Act." (emphasis added)); Evercom's [now Securus] Mem. in Support of Its Mot. to Dismiss and, Alternatively, to Sever and Transfer Claims, ECF No. 19-1 at 6 (joining MCI-Worldcom's motion); Aug. 9, 2001 Mot. Hearing Trans., ECF No. 93 at 38, 46, 48.

Following the referral order, the Court ordered Plaintiffs to file three status reports (which they did) and, in 2005, administratively closed the case.   In the meantime, Plaintiffs have vigorously pursued their claims before the FCC, including by filing two separate petitions for rulemaking, consulting with FCC staff on numerous occasions, and submitting more than 100 separate filings in several administrative dockets.[22]   Indeed, as this Court previously recognized, "Plaintiffs have consistently pursued their case before this Court and the FCC."   ECF No. 190 at 10.

In response to Plaintiffs' efforts, the FCC has reached a unanimous and bipartisan consensus that ICS rates and fees are, and have long been, unjust and unreasonable as a result due to pervasive "market failure" in the ICS industry:

> While the Commission prefers to rely on competition and market forces to discipline prices, there is little dispute that the ICS market is a prime example of market failure. Market forces often lead to more competition, lower prices, and better services.  Unfortunately, the ICS market, by contrast, is characterized by increasing rates, with no competitive pressures to reduce rates. With respect to the consumers who pay the bills, ICS providers operate as unchecked monopolists. The record indicates that, absent regulatory intervention, ICS rates and associated ancillary fees likely will continue to rise.

> Given this market failure, the Commission has a duty to act to fulfill our statutory mandate of ensuring that ICS rates are just, reasonable, and fair . . . .[23]

---

[22] *See, e.g.*, Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petition of Martha Wright et al. for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking, CC Docket No. 96-128 at 3 (filed Nov. 3, 2003); Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Petitioners' Alternative Rulemaking Proposal, CC Docket No. 96-128 (filed Mar. 1, 2007); FCC, Electronic Comment Filing System, available at http://tinyurl.com/lxjs5fe (reflecting around 130 FCC filings by the *Wright* Petitioners).

[23] Report and Order and Further Notice of Proposed Rulemaking at 107, WC Docket No. 12-375 (Sept. 26, 2013) ¶¶ 2-3; *see also id*. at 111 (dissenting statement of Commissioner Ajit Pai) (recognizing that "we cannot count on market competition to keep prices for inmate calling services just and reasonable" and urging the FCC to "take action to meet our duties under the law, not to mention our obligations of conscience."); Third Report and Order ¶ 1 (adopted without dissent) ("Unlike virtually everyone else in the United States, incarcerated people have no choice

Defendant CCA nevertheless misleadingly represents in its section that the FCC has "declined to prohibit the exclusive contracts or eliminate site commissions." While the FCC has not categorically prohibited either practice, it has concluded that *both* exclusive contracts and certain site commissions drive excessive ICS rates and fees and, for that reason, has sought to limit those rates and fees.[24] Despite these findings, the FCC is working on, but has not yet issued, its final regulations addressing ICS rate caps and the appropriate treatment of site commissions.

In the course of its work, the FCC has repeatedly acknowledged the efforts of Plaintiffs here, explaining: "[t]his all began with one Washington, D.C. grandmother, Mrs. Martha Wright, who spoke truth to power in 2003, and reminded us that one voice can still spur a movement and drive meaningful change."[25] FCC Commissioners have also apologized to Plaintiffs for the

---

in their telephone service provider. Instead, their only option typically is to use a service provider chosen by the correctional facility, and once chosen, that service provider typically operates on a monopoly basis. Egregiously high rates and charges and associated unreasonable practices for the most basic and essential communications capability—telephone service—impedes incarcerated peoples' ability to stay connected with family and loved ones, clergy, and counsel, and financially burdens incarcerated people and their loved ones. Never have such connections been as vital as they are now, as many correctional facilities have eliminated in-person visitation in response to the COVID-19 pandemic.").

[24] *See, e.g.*, Third Report and Order ¶ 32 ("[I]ncarcerated people have no choice in the selection of their calling services provider. . . . Once the facility makes its choice—often resulting in contracts with providers lasting several years into the future—incarcerated people in such facilities have no means to switch to another provider, even if the chosen provider raises rates, imposes additional fees, adopts unreasonable terms and conditions for use of the service, or offers inferior service.. . . . Therefore, no competitive forces within the facility constrain providers from charging rates that far exceed the costs such providers incur in offering service."); *Id.* ¶ 113 ("[W]e reject the claim that any and all site commission payments that a provider might elect to offer a correctional facility in the course of contract negotiations for the facility's monopoly franchise are "real, required costs [forced] on [inmate calling services] providers . . . .").

[25] *See, e.g.*, Report and Order and Further Notice of Proposed Rulemaking at 107, WC Docket No. 12-375 (Sept. 26, 2013) (statement of Acting Chairwoman Mignon Clyburn).

lengthy rulemaking process.  Indeed, former FCC Chairman Ajit Pai lamented that "the FCC should have acted years ago" and apologized that "Ms. Wright expected and deserved better."[26]

Despite concluding that ICS rates and fees are unreasonable, administrative and judicial resistance from ICS providers (including Defendant Securus) have significantly contributed to delays in the FCC's ability to finalize its rulemaking (which will address, among other issues relevant to this litigation, the permissibility of certain charges and the appropriate treatment of purported costs).  For instance, in October 22, 2015, the FCC adopted "comprehensive reform of all aspects of ICS to correct a market failure, foster market efficiencies, encourage ongoing state reforms, and ensure that ICS rates and charges comply with the Communications Act."[27] This would have concluded the FCC's rulemaking process, but Defendant Securus and others filed petitions for review. A split panel of the D.C. Circuit subsequently granted in part and denied in part the petitions for review, and remanded to the FCC for further rulemaking.  *See generally Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).

Following the D.C. Circuit's remand, the FCC has been actively engaged in rulemaking consistent with the D.C. Circuit's instructions.  Defendant Securus and the Wright Petitioners have both actively participated in this process.

### 2. Administrative Closure Would Adequately Address Any Docket Management Concerns

To the extent that the Court has docket management concerns due to the length of the administrative proceedings, it can address them by administratively closing the case until the FCC completes its rulemaking.  Courts "routinely administratively close cases" when they "would otherwise be stayed for an indefinite period of time," including awaiting agency action.  *Elec.*

---

[26] 2013 Inmate Rate Order at 112 (dissenting statement of Commissioner Ajit Pai).

[27] Second Report and Order, ¶ 9.

*Payment Sys., LLC v. Elec. Payment Sols. of Am., Inc*, No. 14-CV-2624, 2016 WL 11533348, at *1 (D. Colo. Aug. 11, 2016).

"An administrative closure is not a dismissal, and is done for purely administrative and record keeping purposes." *Johnson v. Oldcastle Precast*, Inc., 522 F. Supp. 2d 739, 741 (D. Md. 2007); *see also Lehman v. Revolution Portfolio LLC*, 166 F.3d 389, 392 (1st Cir. 1999 (administrative closure is a way for courts to manage their docket by "shelv[ing] pending, but dormant, cases[]" without a final adjudication.).   "Demonstrating good cause to reopen an administratively closed matter is not onerous; rather, good cause to reopen a case exists where the parties wish to litigate the remaining issues that have become ripe for review." *Clark v. Pacheco*, No. 21-CV-0008, 2021 WL 1340990, at *2 (D. Colo. Mar. 5, 2021), *report and recommendation adopted*, 2021 WL 1339412 (D. Colo. Apr. 9, 2021).

### 3. This Court Previously Twice Rejected Defendants' Arguments that Plaintiffs Did Not Adequately Pursue Relief Before the FCC

Apparently seeking to take advantage of the judicial reassignment of this case, Defendants recycle arguments that this Court previously considered and squarely rejected—*twice*—regarding Plaintiffs' supposed failure to comply with the referral order.   Because the "judicial interest in finality typically disfavors reconsideration," a party seeking reconsideration bears the burden of showing both that: (i) "new information, a misunderstanding, or clear error" and (ii) "harm or injustice would result if reconsideration were denied." *Powell v. Internal Revenue Serv.*, No. 17-cv-278, 2018 WL 10196621, at *1 (D.D.C. Sept. 12, 2018) (quotation marks and citations omitted).   Because Defendants cannot meet either burden here, this Court should decline to reconsider its prior rulings.

This Court's referral order directed Plaintiffs to file "appropriate pleadings" with the FCC (ECF No. 95), which Plaintiffs did by timely filing and vigorously prosecuting two rulemaking

petitions, submitting well over a hundred comments and other filings in the rulemaking dockets, and holding numerous meetings with the FCC.  The referral order did not specify any particular type of administrative proceeding (e.g., rulemaking vs. complaint).

Following this Court's referral order, the parties met with the FCC to discuss the appropriate mechanism for resolving the referral. During those meetings, ***Defendants* represented that the referral should be addressed through *rulemaking*—and that any complaints before the FCC's Enforcement Burau were inappropriate or premature**. And, for more than a decade, Defendants raised no objection with this Court or, to counsel's knowledge, with the FCC to implementing the referral through rulemaking instead of or prior to a complaint with the Enforcement Bureau.  (Had Defendants genuinely believed that Plaintiffs' implementation of the primary jurisdiction referral through rulemaking violated this Court's orders, constituted a failure to prosecute, or otherwise prejudiced them, they could have sought direction from the Court—but they did not)  Yet, a decade later, in November 2014, Defendant CCA suddenly reversed course: in response to Plaintiffs' request to amend the complaint, CCA argued that Plaintiffs had violated the Court's referral order, including because Plaintiffs had not filed a formal complaint for damages in the Enforcement Bureau. ECF No. 152 at 7–8.

This Court forcefully rejected Defendants' argument, stating: "**Nothing could be further from the truth**."  ECF No. 177 at 4.  The Court explained: "What Plaintiffs were doing . . . was participating very actively in the deliberations of the FCC during those 13 long years.  For example, Plaintiffs filed two separate petitions with the FCC for Rulemaking, and submitted dozens of other filings in several administrative dockets . . . ."  *Id*.  And the Court concluded: "Obviously, all of these efforts conflict with Defendants' allegations that Plaintiffs had abandoned their interest

and/or participation in this litigation. Rather, they were using the referral to obtain a fair and appropriate Rule for their clients." *Id.*

The following year, this Court rejected the same arguments *again*, explaining that "an enforcement claim is not a prerequisite to seeking damages and CCA fails to cite any case law indicating that a formal complaint with the Enforcement Bureau is a prerequisite to filing a damages claim." ECF. No. 190 at 11-12. The Court further found that, "as Plaintiffs note, classwide relief is unavailable before the Enforcement Bureau and therefore an enforcement action would not have resolved Plaintiffs' class damages claims." *Id.* at 12.

Now that the FCC is finalizing its rulemaking, Defendants seek to raise this same argument a third time. But Defendants fail to provide any explanation for why the Court should reverse course to reach a different result now. And Plaintiffs have spent *years* relying on the Court's prior rulings in continuing to advance their rulemaking petition. *Cf. Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 113 (D.D.C. 2012) (stating that misconduct warranting dismissal arises only when a plaintiff either "repeatedly fails to heed" court orders or "conspicuously disregards clear instructions to take certain steps" by a court).

### 4. Defendants' Request to Address Plaintiffs' Claims on a Piecemeal Basis Should Be Rejected

Defendants have asked that the stay be lifted in whole or in part so that they can challenge aspects of Plaintiffs' complaint. But proceeding now with a *judicial* review of the merits of Plaintiffs' claims is wholly inconsistent with Defendants' demand that this case should be referred to the FCC in the first instance on primary jurisdiction grounds. Indeed, addressing Plaintiffs' claims on the merits now would put the Court at risk of reaching a decision that is inconsistent with the FCC's rulemaking. This would frustrate the primary jurisdiction referral, which was intended to avoid such inconsistencies.

It would also be an inefficient use of the parties' and the Court's time and resources. While "Federal policy disfavors piecemeal litigation," that is essentially what Defendants now request. *Elkins v. D.C.*, 685 F. Supp. 2d 1, 8 (D.D.C. 2010). They ask for an opportunity to seek the dismissal of certain of Plaintiffs' claims now, and will presumably request another opportunity to do so once the FCC finalizes its rulemaking and the primary jurisdiction referral ends. Rather than forcing the Court and the parties to engage in a wasteful and expensive process involving two rounds of Fed. R. Civ. P. 12 briefing, Plaintiffs propose that Defendants be provided an opportunity to present all of their legal arguments, at one time, after the rulemaking process is complete.[28]

### 5. Plaintiffs Would be Prejudiced Were the Court to Reconsider Its Prior Ruling that the Case Should Be Stayed, Rather than Dismissed

Finally, Defendants suggest that they may ask this Court to reconsider its prior ruling that the case should be stayed (rather than dismissed) pending resolution of the primary jurisdiction referral. The Court should decline Defendants' invitation. This case was properly stayed because

---

[28] Defendant Securus's counsel indicated during conversations with Plaintiffs' counsel that they would seek the dismissal of (or to strike) at least certain of Plaintiffs' ***intra***state (but not Plaintiffs' ***inter***state) claims against it under the FCA based on the D.C. Circuit's vacating of the FCC's prior intrastate rate caps. *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). Plaintiffs note, however, that the D.C. Circuit found that the FCC *has* authority to order ancillary fee caps where those fees cannot "be segregated between interstate and intrastate calls." *Id.* at 415. Accordingly, on remand from the D.C. Circuit, the FCC:

> found that ancillary service charges generally are jurisdictionally mixed and cannot be practicably segregated between the interstate and intrastate jurisdictions except in the limited number of cases where, at the time a charge is imposed and the consumer accepts the charge, the call to which the service is ancillary is clearly an intrastate call. As a result, the Commission concluded that inmate calling services providers are generally prohibited from imposing any ancillary service charges other than those permitted by the Commission's rules, and providers are generally prohibited from imposing charges in excess of our applicable ancillary service fee caps.

Given that FCC rulemaking is ongoing, Plaintiffs suggest that the parties and the Court address these issues at one time at the conclusion of the rulemaking process.

a dismissal would effectively deprive Plaintiffs of their claims—a fact which has not changed since this Court's original ruling staying this case.

In 2001, at Defendants' request, this Court referred Plaintiffs' claims to the Federal Communication Commission ("FCC") under the doctrine of primary jurisdiction. Docket Entry No. 94 at 10–11. The Court then stayed the case. Docket Entry No. 105. The Court did so after the Plaintiffs noted that if the Court were to dismiss (rather than stay the case), "the statute of limitations will run on the claims of plaintiffs and class members while the matter is being reviewed at the FCC," which would prejudice class members who claims would "be barred as a result of the running of the statute of limitation." ECF No. 98.[29]

The Court's original decision to stay the case was not only correct; it was required under the relevant law. Despite its name, a referral under the doctrine of primary jurisdiction "does not deprive the court of jurisdiction"—it involves an exercise of judicial prudence to refer claims that are nonetheless "cognizable in court." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). The Supreme Court has recognized that, although a court has discretion to either stay or dismiss claims during the pendency of a primary jurisdiction referral, it should dismiss claims only "if the parties would not be unfairly disadvantage." *Id*.; *see also Carnation Co. v. Pac. Westbound Conf*., 383 U.S. 213, 222–23 (1966) (reversing an appellate court's dismissal of action referred on primary jurisdiction grounds because the plaintiffs' "damage actions for past conduct cannot be easily reinstated at a later time" due to the running of the "Statute of Limitations").

Numerous courts—including the Supreme Court—have expressly recognized that dismissal under the primary jurisdiction doctrine is inappropriate when "when there is a

---

[29] Although the Court originally dismissed the case, ECF No. 95, it quickly reversed course after learning of the prejudice to Plaintiffs of a dismissal.

'possibility' that the running of the statute of limitations during administrative proceedings could affect the parties' rights." *Astiana v. Hain Celestial Grp*., Inc., 783 F.3d 753, 760 (9th Cir. 2015). Indeed,dismissal under such circumstances has been held to be reversable error.  *See, e.g*., *TON Servs., Inc. v. Qwest Corp*., 493 F.3d 1225, 1244 (10th Cir. 2007) ("[B]ecause [the plaintiff] may be prejudiced by dismissal rather than a stay of its action pending primary jurisdiction referral, the district court abused its discretion in dismissing [its] claims, albeit without prejudice.") ; *Brown v. MCI WorldCom Network Services, Inc*., 277 F.3d 1166, 1173 (9th Cir. 2002) ("[B]ecause the two-year statute of limitations for Brown's federal action has expired, . . . Brown may be 'unfairly disadvantaged' in the event the district court does not retain jurisdiction pending resolution by the FCC"); *AT&T v. Delta Communications Corp*., 590 F.2d 100, 102-03 (5th Cir. 1979) (vacating dismissal without prejudice based on primary jurisdiction doctrine and requiring a stay where "the actual effect because of limitations is likely a dismissal With prejudice"); *cf. Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc*., 965 F.2d 1118, 1123 (D.C. Cir. 1992) (permitting a dismissal instead of a stay only where the defendant "agreed to waive its statute of limitations defense").

This Court has previously determined that, while the FCC will be able to provide essential guidance on core issues, it will not be able to finally resolve the litigation; as a result, additional proceedings in this Court will likely be necessary after the primary jurisdiction referral is resolved. For instance, the Court previously recognized that, while the FCC can weigh in on the reasonableness of rates, only this Court can order classwide damages relief.  *See, e.g*., ECF No. 190 at 11 ("[A]s Plaintiffs note, classwide relief is unavailable before the Enforcement Bureau and therefore an enforcement action would not have resolved Plaintiffs' class damages claims."); *see also* ECF No. 95 at 13-14 ("Importantly, the primary jurisdictional referral would mean only that

the FCC will exercise its regulatory authority in the first instance."). Accordingly, even were Plaintiffs' claims dismissed nominally "without prejudice," such a dismissal would have the effect of forever barring Plaintiffs' damages claims *with prejudice*. *See AT&T Corp.*, 590 at 102-03 (holding that dismissal is inappropriate under such circumstances). As such, this Court should decline to reconsider its prior ruling that a stay (and not a dismissal) is appropriate while the FCC completes its rulemaking.

### B.  Defendant CoreCivic's Position

CoreCivic (formerly Corrections Corporation of America) requests that the stay be lifted temporarily so that CoreCivic has an opportunity to respond to the allegations and move to dismiss all claims against it.

In August 2001, this Court initially dismissed this entire case, finding that the FCC had primary jurisdiction because all claims were based on the same premise "that the rates contained in the exclusive dealing contracts between CCA and Defendant phone companies are unreasonable" due, in part, to the site commissions that CoreCivic allegedly received. (ECF 94 at 5–6.) Any remedy would therefore require the Court to order: (1) "that the exclusive dealing contracts contain lower phone rates"; or (2) that CoreCivic "offer inmates a choice of phone carriers or calling options." (*Id.* at 6.) It found that either arrangement depends on determinations that the FCC should make, such as whether to prohibit long-distance carriers from considering site commissions in the cost-basis, and whether the competitive alternatives Plaintiffs sought were even feasible in the correctional environment. (ECF 94 at 6–7, internal footnotes and citations omitted.) It further found that the FCC not only had the authority to regulate ICS, but it was already addressing the "very same rates and practices challenged by Plaintiffs" in *In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the*

*Telecommunications Act of 1996*, Public Notice, CC Docket No. 96-128, 14 F.C.C. Rcd. 7086 (rel. May 6, 1999).  (ECF 94 at 9.)

In September 2001, Plaintiffs moved for reconsideration, arguing that the case should be stayed instead of dismissed because the statute of limitations on their claims might expire during the FCC proceedings, and "there [would be] no prejudice to the defendants by the issuance of a stay."  (ECF 98 at 2, ¶ 3.)  Over Defendants' objections, the Court granted reconsideration and stayed the case in November 2002, directing Plaintiffs to report on the status of the FCC proceedings.  (ECF 105 at 1.)  In referring the case to the FCC, however, the Court did not anticipate an indefinite stay, stating that it "expects the agency to move with dispatch to conclude its ongoing proceedings so as to provide both courts and parties with meaning analysis and guidance on these issues."  (ECF 94 at 15.)

Despite the Court's expectations for only a short, temporary stay, Plaintiffs have allowed this case to languish in the FCC for the vast majority of the past 22 years.  In the FCC proceedings, however, Plaintiffs have repeatedly acknowledged that the FCC has refused to eliminate exclusive dealing arrangements or prohibit site commissions.  In Plaintiffs' First Status Report in May 2002, they admitted that the FCC upheld the legality of the exclusive contracts between ICS providers and correctional facilities, finding "that 'legitimate security considerations preclude reliance on competitive choices,' thereby justifying such exclusive arrangements and the blocking of alternative carriers."  (ECF 106 at 3).  Plaintiffs thus altered their strategy and directed all their efforts to *changing* FCC policy through rulemaking petitions in the Wireline Competition Bureau. Despite Plaintiffs' efforts to change the law, the FCC has never issued an order that prohibited the alleged "exclusive dealing contracts" between ICS providers and correctional facilities or payment of site commissions.  In 2013, 2015, and 2016 the FCC issued orders that expressly permitted the

exclusive contracts between ICS providers and correctional facilities and the payment of site commissions that Plaintiffs' claim were illegal in this case.  In 2017, the D.C. Circuit vacated the FCC's attempt to categorically exclude site commissions from ICS providers' cost-bases in calculating rate caps as having defied reasoned decision-making. *See Global Tel*Link v. FCC*, 866 F.3d 397, 413–16 (D.C. Cir. 2017).  On remand to the FCC, nothing has changed.  In the 2020 and 2021 orders, the FCC has again declined to prohibit the exclusive contracts or eliminate site commissions. Indeed, it even specifically permitted ICS providers to include some amount of site commissions in their cost-bases, which permits those providers to seek relief from the FCC rate caps on the basis that they are not fairly compensated for each any every completed call as required by 42 U.S.C. § 276(b)(1).  And nothing will change.  Even if Plaintiffs were to persuade the FCC to reverse longstanding policy and implement new rules to prohibit exclusive dealing arrangements or site commissions, it would have only prospective effect.

Moreover, Plaintiffs have significantly narrowed their claims against CoreCivic.  In amending the Complaint, Plaintiffs dismissed all federal claims against CoreCivic, including claims under the Federal Communications Act, seeking to proceed solely on claims against CoreCivic under D.C. law.  Although Plaintiffs raise violations of certain provisions of the D.C. Consumer Protection Procedures Act and unjust enrichment under D.C. common law, their claims challenge the legality of the same exclusive dealing contracts and site commissions that the FCC has—for the past 22 years—repeatedly upheld.  Notwithstanding Plaintiffs' continued attempts to change FCC policy and the law, more than two decades of technological and operational advancements in the ICS industry have rendered obsolete the collect and/or long-distance wireline calls that form the bases of Plaintiffs' claims.  Nothing the FCC might do based on current

technology and operations can impact Plaintiffs' claims against CoreCivic.  Thus, there is no good cause to further deprive CoreCivic of the opportunity to obtain final resolution of this matter.

Mindful of the Court's limitations during the COVID-19 pandemic, CoreCivic has remained patient. But now that the pandemic is in the rearview mirror, CoreCivic should be allowed its due process right to respond to Plaintiffs' allegations by temporarily lifting the stay so that it may file a motion to dismiss all claims against it and to avoid the prejudice to Defendants that will inevitably result from a continuance of the stay.

### C.  Defendant Securus's Position

The plaintiffs filed this case in 2000, over two decades ago.  Securus (previously known as Evercom) moved to dismiss because the plaintiffs' case depended, and depends, on a central question of policy and fact.  At the time, that question was whether the rates charged by Securus for the phone service it provided at facilities operated by Corrections Corporation of America ("CCA")[30] were or were not "just and reasonable," as that concept is used in section 201 of the Communications Act.  That question—assessing whether specific Securus rates for specific CCA facilities were just and reasonable—is best addressed in the first instance by the FCC, the expert agency that implements the section 201 requirements within its overall oversight of the Communications Act.  This is a matter of "primary jurisdiction," in which the Court should not undertake that complex assessment of fact and policy before hearing the FCC's own assessment of the matter.  Accordingly, the Court dismissed the complaint, so that the plaintiffs could seek an FCC adjudication in the matter.  The Court subsequently reconsidered that dismissal and stayed the case, but the justification for the stay was the same, namely to let the plaintiffs ask the FCC "to resolve the core issues in this case, namely the reasonableness of the rates charged . . . in CCA

---

[30] CCA is now known as CoreCivic.

facilities." ECF No. 94, at 10-11. The Court had the "discretion . . . to dismiss the case," *Reiter v. Cooper*, 507 U.S. 258, 268 (1993), but it chose a stay "to give the parties a *reasonable opportunity* to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (emphasis added).

This the plaintiffs promised to do. In a 2004 status report, the plaintiffs informed the Court that they planned to file an enforcement complaint at the FCC to initiate exactly that determination. ECF No. 132, at 3 ("Plaintiffs also intend to file a formal complaint with EB [Enforcement Bureau] so that the FCC can consider their unreasonable rate and unlawful rebate claims.")

What the plaintiffs actually did in the 18 years following this promise was something very different. Rather than seek the necessary FCC determination about Securus's specific rates at specific CCA facilities, they instead chose to file multiple petitions for rulemaking with the FCC and then participate extensively in the rulemaking processes that followed over the next two decades. To give one example, according to the relevant FCC dockets, Plaintiffs (or others on their behalf) have submitted 201 filings with the FCC over the last nearly 19 years. *See* FCC Docket Nos. CC 96-128 and WC 12-375.

The FCC's rulemaking effort was not without significant setbacks, including decisions from the D.C. Circuit that stayed large portions of the FCC's 2013 rule on ICS, and later vacated large portions of the FCC's 2015 rule[31], but it is now effectively complete. The plaintiffs say the FCC has more to do, and indeed there is a proposed rule pending. But the FCC now has in place

---

[31] Plaintiffs characterize Securus as having "significantly contributed to delays." *Supra* at 10. In truth, the D.C. Circuit at first issued a preliminary stay of much of the 2013 rule pending review, an unusual step taken because the rule overstepped the FCC's authority; and the D.C. Circuit then vacated much of the 2015 rule, which also exceed the agency's authority. When a party is forced to seek judicial intervention to hold an agency to its statutory bounds, the delay to the agency's policy is not the *party's* fault.

rate caps covering the entirety of the ICS market, and that regulation is not undergoing any judicial review.  The FCC may revise its rules in the future, as any agency might; or it might not. Meanwhile, the plaintiffs' twenty-year engagement with the FCC, including their 201 written filings, and the FCC's own completion of multiple rounds of rulemaking (including two rounds of judicial review), over that time period in response to a process initiated by the plaintiffs, demonstrates many things, chief among them that the plaintiffs have had the required "reasonable opportunity" to seek and obtain FCC input on the actual question in this case, namely whether the rates charged by Securus at the various facilities were unreasonable.

Yet this they have not done.  While the plaintiffs urged the FCC to make industry-wide policy and participated heavily in the 20-year policy-making process that resulted, they never sought – and therefore never obtained – the FCC's determination of the reasonableness of Securus's specific rates, at specific facilities, and during the class period.  The plaintiffs' recitation in this status report confirms that they did not ask for that determination.  Not only did they fail to take advantage of a twenty-two year "reasonable opportunity" to do that, they failed to respond to an express invitation issued by the FCC after the D.C. Circuit stayed most of the FCC's 2013 rule, when the FCC issued a public notice expressly inviting consumers to file complaints about particular companies' ICS rates.  Public Notice DA 14-1206 (F.C.C. Aug. 20, 2014). Notably, that notice also stated explicitly that if a rate was in excess of the rate levels (from the 2013 rule) that the D.C. Circuit had stayed, it *might* be unreasonable.  *Id.* at 3.  That is, the plaintiffs were on notice that the FCC's rules up to that point did not determine that any particular provider's rates were unreasonable, much less that Securus's specific rates at CCA facilities were unreasonable. Despite this warning and the FCC's invitation for consumers to invoke FCC processes, the plaintiffs did nothing to obtain an FCC decision about the topic of this case.  And, the FCC has not

made any such decision.  As the 2014 press release noted, a rate above the FCC's 2013 regulatory rate levels "may be unreasonable," *id.,* but it takes substantial work by the FCC to decide whether it actually *is*, in any given circumstance.

Having failed to fulfill their original commitment to the Court, in January 2016 the plaintiffs instead amended their complaint to significantly expand the scope of the litigation. Whereas the original complaint involved only facilities operated by CCA, the amended complaint seeks to represent a class of consumers with calls at any facility where Securus provides phone service—CCA or otherwise.  This amendment fundamentally transformed the case, from a relatively targeted inquiry about Securus's rates for calls at a limited group of facilities, to a nationwide inquiry into the rates charged by Securus during the last decade.

After the D.C. Circuit vacated most of the FCC's 2015 rule, the Court asked the parties for a status report.  In that report, filed three and a half years ago, Securus asked for the stay to be lifted so it could move to dismiss the complaint.  The Court has not responded to that suggestion.

The parties now are filing another status report.  Since the last report, the FCC has completed its rulemaking; three and a half more years have elapsed; and the theoretical scope of Securus's liability continues to expand.  Since the last report (and the 18 years that preceded it), the plaintiffs did not seek, and therefore have not received, the necessary determination from the FCC. And yet the plaintiffs now insist (again) that they need even more time to complete their task at the FCC.  Twenty-two years is long enough.  The FCC repeatedly showed itself willing to engage in the ICS market.  The FCC engaged in nearly two decades of successive rulemakings that have substantially altered the ICS market, all with the plaintiffs' active participation.  That, in the course of these efforts, the FCC has not made a determination about Securus's rates in

particular is not for lack of time or resources.  The plaintiffs simply never asked for that assessment, on the question that is the sole issue for *this* case.

Given the circumstances, Securus respectfully requests that the Court lift the stay for the limited purpose of letting Securus file a motion to dismiss or otherwise narrow the complaint. This limited opening of the case would be only the mirror image of the limited opening of seven years ago, in which the Court permitted the plaintiffs to amend their complaint.  ECF No. 177.  Given that the D.C. Circuit has already rejected one of the plaintiffs' main contentions, that it is inherently improper for an ICS provider to pay some amount to the facility operator (known as "site commissions") and then to recover the cost of those payments through rates, the complaint is unquestionably infirm and overbroad. *See Global Tel\*Link v. FCC*, 866 F.3d 397, 412 (D.C. Cir. 2017) ("[S]ite commissions obviously are costs of doing business incurred by ICS providers."). The plaintiffs say that a stay for FCC adjudication is what the defendants asked for.  It is not. Securus (formerly Evercom) asked the Court, 22 years ago, to dismiss the case; and then the plaintiffs would have been forced to make diligent application to the FCC for its review of the rates at issue in this case.  Instead, the Court stayed the case; and it maintained the stay even while the plaintiffs dramatically increased the scope with new claims as to which Securus has never briefed the Court about its concerns.  The opportunity that the plaintiffs have thus enjoyed, to keep the case parked at court, expanding the claims far beyond those originally pleaded, while not making any effort to obtain the agency determination that would have long ago resolved the matter, is fundamentally unfair to Securus.  Securus deserves the opportunity that any ordinary defendant should have, to contest the sufficiency of the allegations against it.

Securus recognizes that this status report is unusually long—reflecting the depth of the disagreements and, indeed, the consequence of the fact that the case has lingered for so long

without judicial intervention.  If the Court has any doubt about the wisdom of simply allowing

motions to test the complaint, the Court should allow briefing on a motion to lift the stay.


June 6, 2022                              Respectfully submitted,


                                          */s/ Robert A. Braun*
                                          Benjamin D. Brown (D.C. Bar No. 495836)
                                          Robert A. Braun (D.C. Bar No. 1023352)
                                          COHEN MILSTEIN SELLERS & TOLL, PLLC
                                          1100 New York Avenue, NW
                                          Suite 500 W
                                          Washington, D.C. 20005
                                          (202) 408-4600
                                          Fax: 202-408-4699
                                          bbrown@cohenmilstein.com
                                          rbraun@cohenmilstein.com

                                          *Attorneys for Plaintiffs*


                                          /s/ Daniel P. Struck
                                          Daniel P. Struck, Bar No. CO0037
                                          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                                          3100 East Ray Road, Suite 300
                                          Chandler, AZ  85226
                                          Telephone:  (480) 420-1600
                                          Facsimile:   (480) 420-1695

                                          *Attorneys for Defendant CoreCivic*


                                          */s/ Gabriel Colwell*
                                          Gabriel Colwell (Admitted *Pro Hac Vice*)
                                          SQUIRE PATTON BOGGS (US) LLP
                                          555 S. Flower St., Suite 3100
                                          Los Angeles, California 90071
                                          (213) 689-5126
                                          Fax: (213) 623-4581
                                          gabriel.colwell@squirepb.com

Keith Bradley (D.C. Bar No. 252505)
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
(303) 830-1776
Fax: (303) 894-9239
keith.bradley@squirepb.com

*Attorneys for Defendant Securus Technologies,
LLC (f/k/a Securus Technologies, Inc.)*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which in turn sent notice to all counsel of record who are registered with that system.

*/s/ Robert A. Braun*
Robert A. Braun