**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARTHA WRIGHT et al.,<br><br>      *Plaintiffs*,<br><br>  v.<br><br>CORECIVIC, INC. et al.,<br><br>      *Defendants*. | Civil Action No. 00-293 (TJK) |

**MEMORANDUM OPINION**

This 25-year-old case was brought to challenge the high cost of inmate calling services.  It was stayed for many years while related events unfolded at the Federal Communications Commission, in Congress, and at the D.C. Circuit; since its beginning, much about the suit has changed, including the parties and their claims.  Now the two remaining defendants, Corecivic, Inc.—formerly known as Corrections Corporation of America—and Securus Technologies, Inc. move to dismiss the remaining claims against them.  For the reasons below, the Court will dismiss all claims against the former, and most against the latter.

## I.     Background and Procedural History

The case has been narrowed substantially over the years, and so much of its background is unnecessary to recount.  A fuller picture can be found in the Court's predecessor's two prior Memorandum Opinions, ECF Nos. 127, 190, as well as the D.C. Circuit's opinion arising from the same topic, *Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).  The Court will set forth only those details necessary to resolve the two pending motions.

Plaintiffs are persons formerly incarcerated at facilities operated by Corecivic, Inc., a corporation that "owns and/or operates prisons and jails," and their family members.[1]  ECF No. 191 ¶¶ 4–12, 15.  And Defendant Securus, Inc. "provides managed telecommunications services at federal, state, and local correctional facilities throughout the United States."  *Id*. ¶ 13.  Back in 2000, Plaintiffs brought a putative class action against several defendants, including current Defendants CoreCivic and Securus, along with several additional telecommunications companies, alleging that Defendants imposed "exorbitant charges" on inmate calling services through a set of "exclusive dealing arrangements" that cost Plaintiffs money and opportunities to communicate with their families.  *See* ECF No. 1 ¶¶ 42–50.  The Court stayed the case under the doctrine of primary jurisdiction, referring the case to the FCC to decide the reasonableness of phone rates for inmate calling services in the first instance.  *See* ECF No. 94 at 4–5, ECF No. 105.

Over the next decade, Plaintiffs filed two petitions for rulemaking with the FCC, culminating first in an Interim Order issued by the FCC in 2013 that imposed a per-minute rate cap for interstate inmate calls.  *See Rates for Interstate Inmate Calling Services*, 28 FCC Rcd. 14107, 14114–15 (Sep. 26, 2013) ("Interim Order").  The Interim Order concluded that "the current [inmate calling services] market structure is not operating to ensure that rates are . . . just, reasonable, and fair."  *Id.* ¶ 12.  The Interim Order was then augmented and superseded in 2015 when the FCC set rate caps for interstate and intrastate inmate calls.  *See Rates for Interstate Inmate Calling Services*, 30 FCC Rcd. 12763, 12770–71 (Nov. 5, 2015) ("Order").

With the prospect of the FCC's rulemaking coming to a close, Plaintiffs moved to lift the stay in October 2014 for the limited purpose of amending their complaint, ECF No. 139, which

---

[1] At the start of this case, CoreCivic was known as Corrections Corporation of America, but its name has now changed.  *See* ECF No. 244 at 1. The Clerk of the Court is directed to update the caption accordingly.

the Court granted, ECF No. 177.  Plaintiffs' Amended Complaint, filed in 2016, brings three counts on behalf of a broad class of "all persons" who have used phone systems at CoreCivic's facilities. ECF No. 191 ¶¶ 1, 49–50, 58–74.

Still, litigation did not restart before this Court then because the FCC's rulemaking was not yet complete.  After the FCC issued the Order in 2015, several regulated parties—including Securus—petitioned the D.C. Circuit for review.  *See Global Tel\*Link*, 866 F.3d at 401.  Several years later, the D.C. Circuit left portions of the Order intact, such as the FCC's "imposition of ancillary fee caps in connection with *interstate* calls," via its authority under 47 U.S.C. § 201(b). *Id.* at 415.  But it vacated and remanded other portions of the Order to the FCC either because they exceeded the agency's statutory authority or were the product of arbitrary and capricious decisionmaking.  *Id.* at 402, 416–17.

Congress intervened before the FCC could issue a final rule on remand to address the D.C. Circuit's concerns.  Aware of the issues raised in the *Global Tel\*Link* litigation, in 2023, Congress enacted the Martha Wright-Reed Just and Reasonable Communications Act, supplementing the FCC's authority to "use industry-wide average costs of telephone service" when determining just and reasonable rates.  Pub L. No. 117-338, 136 Stat. 6156 (2023).  The Act also directed the FCC to "promulgate any regulations necessary to implement" the Federal Communications Act of 1934 within the next 18 to 24 months.  *Id.*  The FCC complied, issuing an order in July 2024.  *See Incarcerated Peoples' Communication Services; Implementation of the Matha Wright-Reed Act, Rates for Interstate Inmate Calling Services*, 89 Fed. Reg. 77244 (Sept. 20, 2024).

With the FCC's rule finally on the books, the Court, with the parties' consent, fully lifted its stay and terminated its primary jurisdiction referral to the FCC.  *See* Minute Order of December

5, 2024.  Soon after, Defendants CoreCivic and Securus moved to dismiss the Amended Complaint.  *See* ECF Nos. 243, 244.

## II.     Legal Standards

A plaintiff has the burden to establish the Court's subject-matter jurisdiction.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  That includes the burden to establish standing.  *Little v. Fenty*, 689 F. Supp. 2d 163, 166–67 (D.D.C. 2010).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  A court need not accept legal conclusions unsupported by factual allegations.  *Id*. at 679.  In deciding a motion under Rule 12(b)(6), a court may consider the factual allegations in the complaint, documents attached as exhibits, or documents on which the plaintiff's complaint necessarily relies.  *Ward v. D.C. Dep't of Youth Rehab. Servs*., 768 F. Supp. 2d 117, 119 (D.D.C. 2011).  Courts may also consider "matters of which we may take judicial notice."  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## III.    Analysis

### A.      The Court Will Dismiss Plaintiffs' Claims Against CoreCivic

Plaintiffs bring two claims against CoreCivic: one under the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.* (Count III), and the other by invoking the common law of unjust enrichment (Count II). ECF No. 191 ¶¶ 65–74.  For those claims, they seek to represent "all persons who, at any time since February 16, 1997, have paid to use telephone

systems" at a [Corecivic] facility "to make or receive telephone calls involving a person incarcerated in any state in the United States." *Id.* ¶ 50. CoreCivic raises both jurisdictional and merits objections in its motion to dismiss. The Court must assure itself of its jurisdiction first, so it starts there. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

### 1.     Plaintiffs Have Standing to Sue CoreCivic

CoreCivic argues that Plaintiffs lack standing to sue it because their allegations all run against Securus; in other words, they "fail to plausibly show any injury caused by CoreCivic." ECF No. 244 at 25. To have standing to sue, a plaintiff must establish that it has suffered (1) an injury in fact that is (2) caused by the defendant and (3) redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). CoreCivic focuses on the first two prongs of standing: injury in fact and causation.

CoreCivic is wrong on both fronts. The injury-in-fact element of standing requires that the alleged injury be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). CoreCivic contests that the alleged injury here is not concrete because "[a]t most, Plaintiffs allege bare violations of D.C. law," nothing more. ECF No. 244 at 27. But Plaintiffs allege that they have suffered an injury from being charged "excessive and unreasonable charges for inmate calling services." ECF No. 191 ¶ 1.[2] A monetary injury is an "obvious" concrete injury that needs little more explanation: "If a defendant has caused physical *or monetary*

---

[2] Plaintiffs allege that these charges violated by the D.C. CPPA by, among other things, reflecting "unconscionable terms or provisions," ECF No. 191 ¶ 74(c), which are "unfair or deceptive trade practice[s]" under the statute, D.C. Code § 28-3904(r).

*injury* to the plaintiff, the plaintiff has suffered a concrete injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. at 425 (emphasis added).[3]

CoreCivic's standing argument fares little better with respect to causation. To satisfy causation, plaintiffs need not allege that their injuries are solely or even primarily because of the defendant's actions. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Causation requires "only that the plaintiff's injury be fairly traceable to the defendant's conduct"—a standard lower than proximate cause. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). That low bar is satisfied here. It is true that Securus is the Amended Complaint's primary villain, which Plaintiffs allege has "exploit[ed] Plaintiffs . . . by charging them excessive rates for calls." ECF No. 191 ¶ 23. But the Amended Complaint alleges that Securus could charge excessive rates because it had established monopolies over inmate calling services "through exclusive contracts with thousands of correctional facilities"—exclusive contracts provided by CoreCivic in return for "kickbacks" from Securus that "masqueraded as 'commissions.'" *Id.* ¶¶ 21–22. "[A]ccept[ing] as true all material allegations of the complaint," as the Court must, *Warth v. Seldin*, 422 U.S. 490, 501 (1974), Plaintiffs' payment of allegedly excessive rates is at least fairly traceable to CoreCivic. Plaintiffs thus have standing to sue CoreCivic.

---

[3] To the extent that CoreCivic suggests that Plaintiffs' injury in fact for standing purposes must either itself be—or be *directly* caused by—the same act that violated the CPPA, they are mistaken. For example, in *TransUnion*, the plaintiffs sued for a violation of the Fair Credit Reporting Act, which requires credit agencies to "follow reasonable procedures to assure maximum possible accuracy" in credit reports. *TransUnion*, 594 U.S. at 418 (quoting 15 U.S.C. § 1681e(b)). Nothing in the statute restricted the dissemination of the credit reports to third parties. Still, the Supreme Court found that some of the plaintiffs had suffered an injury in fact—but only because their inaccurate credit reports had been disseminated to third parties. *Id.* at 432.

### 2.    Plaintiffs Fail to State a Claim Under the CPPA

Although Plaintiffs have standing, their two claims against CoreCivic falter on the merits. In Count III, Plaintiffs allege that CoreCivic violated several provisions of the D.C. CPPA. ECF No. 191 ¶ 72–74. But the CPPA "only covers 'trade practices arising out of consumer-merchant relationships.'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (quoting *Snow-der v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008)). And Plaintiffs do not have a such a relationship with CoreCivic, so they cannot sue it for violating the CPPA.

The CPPA instructs that it should be "construed and applied liberally to promote its purpose." D.C. Code § 28-3901(c). Still, that liberal construction must be constrained by the statutory text and how courts in the District of Columbia have interpreted that text. And the D.C. Court of Appeals has repeatedly held that a "merchant" is a party whose ordinary business is "connected with the 'supply' side of a consumer transaction." *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981). Further, even on the supply side, it has clarified that "[t]ransactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the [CPPA] seeks to reach." *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989). So a consumer-merchant relationship must arise from "the ultimate retail transaction between the final distributor and the individual member of the consuming public." *Id.*

Thus, for Plaintiffs and CoreCivic to have a consumer-merchant relationship, CoreCivic must play a part in the ultimate sale of a consumer good or service to Plaintiffs. That relationship is "not limited to the actual seller of the goods or services complained of" and can include non-sellers. *Howard*, 432 A.2d at 709. But neither is the relationship so capacious as to encompass all parties that help cause a sale. *See id.* at 710 (holding that the CPPA does not apply to one who merely "recommends the goods or services of a particular merchant"). Rather, the D.C. Court of Appeals has found a consumer-merchant relationship to exist with a non-seller primarily when the

7

non-seller exercises a certain level of control over the details of the ultimate sale. So, for example, an auction house may be considered a merchant of its auctioned goods even when it does not hold title to those goods, *see Adam A. Weschler & Son*, 561 A.2d at 1004, and the District of Columbia may be considered a merchant of apartments when it lends money and exercises substantial control over how the developers build and lease the apartments, even when it does not hold title to the land, *see May v. River E. at Grandview*, 322 A.3d 557, 569 (D.C. 2024).

Here, Plaintiffs argue that CoreCivic was part of the sale of "telecommunication services." ECF No. 248 at 51. CoreCivic counters that it was Securus—not it—that supplied those telecommunication services. ECF No. 244 at 29. CoreCivic has the better of the argument. In the Amended Complaint, Plaintiffs have alleged only that CoreCivic has provided a venue in which Securus can exercise an exploitative monopoly over telecommunication services. They assert that CoreCivic "provide[s] inmates with access to pay telephones from which to make telephone calls," but that it is Securus "which provides and/or has provided pay telephone services." ECF No. 191 ¶¶ 19–20. At no point do Plaintiffs suggest that CoreCivic is itself the seller of those services. And though Plaintiffs repeatedly refer to how "Securus . . . charges exorbitant per minute rates," they do not allege any involvement by CoreCivic beyond its initial establishment of "exclusive contracts" with Securus. *Id.* ¶¶ 21, 26. So there is no allegation that CoreCivic exercises any control over the ultimate sale of inmate calling services.

To be sure, those exclusive contracts do result in revenue for CoreCivic through the payment of site commissions. But Plaintiffs exaggerate when they argue that these site commissions are essentially payments from Plaintiffs themselves. The Amended Complaint is clear that all rates paid for the ultimate sale of inmate calling services were paid solely to Securus. ECF No. 191 ¶¶ 2, 4–12. And the mere fact that CoreCivic monetarily benefits from the arrangement is

8

insufficient; upstream suppliers often indirectly benefit from downstream sales, for example, and yet the CPPA does not ordinarily reach upstream transactions. *See Adam A. Weschler & Son,* 561 A.2d at 1005. Rather, CoreCivic is like the landlord of a shopping mall and Securus like a store that rents space there. Though the landlord receives revenue from its tenant's rental contract—perhaps even a percentage of the tenant's profit—and though the landlord is indirectly part of the causal chain that leads to the store's sales to customers, the ultimate retail transaction is solely between store and customer. In other words, only the store, not the landlord, sells consumer goods. Likewise, only Securus, not CoreCivic, sells telecommunication services. Because CoreCivic is not in a consumer-merchant relationship with Plaintiffs, it is not liable under the CPPA.

It makes no difference that Plaintiffs allege that CoreCivic "has furnished, made available, and directly and indirectly solicited and offered the sale of inmate calling services." ECF No. 248 at 39 (quoting ECF No. 191 ¶ 73). This language loosely tracks the definition of a "trade practice" under the CPPA, which is defined as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code § 28-3901(a)(6). But a "merchant" is not defined as a party who engages in a trade practice, but as one "who in the ordinary course of business does or *would supply the goods or services which are or would be the subject matter* of a trade practice." *Id.* § 28-3901(a)(3)(A) (emphasis added). And as established above, Plaintiffs have not alleged that CoreCivic supplies telecommunication services to them in a way that establishes a consumer-merchant relationship.

None of the cases Plaintiffs cite suggest otherwise. For example, Plaintiffs rely on *Adler v. Vision Lab Telecom., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005), for the proposition that "providing a recommendation to goods or services is enough to establish a corporation as a

'merchant' under the CPPA." ECF No. 248 at 52. They argue that if a recommendation is enough, then CoreCivic's role in "limiting inmates to the exclusive use of Securus's telecommunications services undoubtedly makes it a 'merchant' as well." *Id.* But *Adler*, far from supporting Plaintiffs' position, stands for the opposite—that parties providing recommendations for goods or services are merchants "*only* when they are involved in supply side of the transaction." *Adler*, 393 F. Supp. 2d at 39 (emphasis added). And the *Adler* Court agreed that "because plaintiff did not purchase, lease, or receive any goods or services from defendants, there [was] no consumer-merchant relationship." *Id.* at 40. So too here.

Plaintiffs also cite *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77 (D.D.C. 2016), but that case does not help them either. True, as Plaintiffs say, "multiple merchants may be responsible under the CPPA for violations stemming from a single transaction." ECF No. 248 at 52 (citing *McMullen*, 164 F. Supp. 3d at 91). But *McMullen* concerned allegations of a "fraudulent scheme to obtain [] unauthorized credit lines" run jointly by two bank branches and a fitness center, and the plaintiff had alleged that all three parties "had an equal right to control the manner in which the joint venture operated." *McMullen*, 164 F. Supp. 3d at 91–92. It was precisely that joint control over the ultimate transaction that was essential to the *McMullen* court finding that all members in the scheme had a consumer-merchant relationship with the plaintiff, and that joint control is lacking here. As described above, Plaintiffs do not allege that CoreCivic exercised control over the rates or specifications for inmate calling services.

For these reasons, Plaintiffs fail to a state a claim against CoreCivic under the D.C. CPPA.

### 3.     Plaintiffs Fail to State a Claim for Unjust Enrichment

Plaintiffs also fail to state a claim against CoreCivic for unjust enrichment, for related reasons. Plaintiffs allege in Count II that "[a]s a direct and proximate result of [CoreCivic's] acts and practices alleged herein, [CoreCivic] has been unjustly enriched and have obtained money,

earnings, profits, and benefits directly from Plaintiffs." ECF No. 191 ¶ 66. But Plaintiffs' allegations do not support the inference that benefits flowed directly from Plaintiffs to CoreCivic. Instead, as described above, all benefits to CoreCivic from the inmate calling services arrangement came from Securus. And that does not suffice to plead an unjust enrichment claim.

In the District of Columbia, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Comms., Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). Plaintiffs stumble right out of the gate, because they have not alleged that they conferred a benefit on CoreCivic. Indeed, the Amended Complaint makes clear that Plaintiffs allege that they all "paid unjust and unreasonable telephone charges *to Defendant Securus*." ECF No. 191 ¶¶ 4–12 (emphasis added). Plaintiffs allege that the only benefit received by CoreCivic was conferred by Securus through "kickbacks, masqueraded as 'commissions.'" *Id.* ¶ 22. And no factual allegations in the Amended Complaint support the bare assertion that CoreCivic "benefit[ted] *directly* from Plaintiffs." *Id.* ¶ 66 (emphasis added).

Granted, a plaintiff may bring an unjust enrichment claim against a defendant even if the plaintiff never conferred a benefit on the defendant in the rare case when "a third person makes a payment to the defendant to which . . . [the plaintiff] has a better legal or equitable right." Restatement (Third) of Restitution and Unjust Enrichment § 48 (2011). For example, if Alice owes Bob $500 but accidentally wires payment of the debt to Charlie, Bob may bring an unjust enrichment claim against Charlie. *See id.* illus. 1. But that does not describe the relationship between the parties here. Plaintiffs allege that Securus's payments of site commissions to CoreCivic were made under contracts between the two; they do not allege that Securus has paid the wrong party. And at bottom, Plaintiffs allege that they should not have paid such high rates to Securus, not that

11

Securus should have paid the site commissions to them.  Whatever the status or legality of the site commissions themselves, Plaintiffs have not alleged that they "conferred a benefit" on CoreCivic.[4] *News World Comms.*, 878 A.2d at 1222.

For these reasons, Plaintiffs fail to a state a claim against CoreCivic for unjust enrichment.

**B.      The Court Will Dismiss Plaintiffs' Claims Against Securus in Part**

Plaintiffs bring two claims against Securus, both under the Federal Communications Act, 47 U.S.C. § 201 *et seq.* (Count I).  First, they allege that "[t]he telephone rates and fees charged by Securus . . . are unjust and unreasonable."  ECF No. 191 ¶ 61.  And second, also in Count I, they say that "Securus's failure to make full and adequate disclosures to their customers of these charges violates 47 C.F.R. § 64.2401," the "truth-in-billing" requirement.  *Id.* ¶ 62.  For these claims, they seek to represent "all persons in the United States who, at any time since February 16, 1998, have paid to use telephone systems" provided by Securus at a Corecivic facility or who, "at any time since May 15, 2013, have paid to use telephone systems" provided by Securus at a non-Corecivic facility, "to make or receive telephone calls involving a person incarcerated in any state in the United States."  *Id.* ¶ 49.  Securus, like CoreCivic, raises both jurisdictional and merits objections in its motion, and again, the Court starts with jurisdiction.

**1.      The Court Has Jurisdiction Over Plaintiffs' Claims**

Securus challenges the Court's jurisdiction in two ways.  The first, directed solely at Plaintiffs' truth-in-billing claim, is that Plaintiffs have not suffered an injury in fact from the lack of adequate disclosures and thus lack standing to sue Securus.  This argument can be disposed of

---

[4] With respect to the site commissions, the D.C. Circuit has noted that "[i]n some instances, commissions are mandated by state statute, and in other instances commissions are required by state correctional institutions as a condition of doing business with ICS providers."  *Global Tel\*Link*, 866 F.3d at 413 (internal citations omitted).

quickly. As the Court determined earlier, Plaintiffs' alleged monetary harm is sufficient to establish an injury in fact traceable to CoreCivic. That same harm establishes an injury in fact traceable to Securus too—and even more straightforwardly, because Securus is alleged to have directly charged the excessive rates. And as discussed earlier, it does not matter that the monetary harm is not itself—or directly caused by—the same acts that allegedly violated the "truth-in-billing" requirement, so long as it is fairly traceable to those acts.

Securus also contends that the Court lacks personal jurisdiction over the claims against it brought by "at least seven Plaintiffs" who "do[] not identify a single call made to or from the District of Columbia or any other contact with the forum" using Securus's services. ECF No. 243 at 49. In response, Plaintiffs argue that Securus has waived any objection to personal jurisdiction. ECF No. 248 at 31–34. Plaintiffs are right.

Federal Rule of Civil Procedure 12 provides that "[a] party waives any defense listed in Rule 12(b)(2)–(5)"—which includes "lack of personal jurisdiction," Fed. R. Civ. P. 12(b)(2)—if it "omit[s] it from a motion in the circumstances described in Rule 12(g)(2)." *Id.* 12(h)(1). In turn, Rule 12(g)(2) states that a party cannot make a motion or assert a defense "raising a defense or objection that was available to the party but omitted from its earlier motion." Thus, Securus long ago waived any objection to the exercise of personal jurisdiction over it with respect to these claims when it omitted such an argument in its motion to dismiss the original complaint. The seven Plaintiffs whose claims Securus argues "do not adequately allege contacts with the District of Columbia," ECF No. 243 at 50, were included in this suit from the outset. *See* ECF No. 1 ¶ 15 (Laurie Lamancusa); *id.* ¶ 27 (Ulandis Forte, Charles Wade, Earl Peoples, Darrell Nelson, Jackie Lucas, Melvin Taylor). And Securus has long been aware of the nature of the Federal Communications Act claim brought by these seven Plaintiffs. *See id* ¶¶ 127–131. Nothing prevented Securus (then

13

Evercom Systems) from challenging the Court's personal jurisdiction over these claims when it moved to dismiss the original complaint in 2000. *See* ECF No. 19. Indeed, as Plaintiffs point out, other defendants in the case at the time raised personal jurisdiction defenses, but Securus did not. ECF No. 248 at 33 n.17.

Securus's counterarguments are unavailing. First, it argues that "[b]y filing an amended complaint, Plaintiffs have reopened the opportunity to make personal jurisdiction arguments." ECF No. 250 at 25–26. Not so. Such a conclusion would contradict the plain text of Rule 12(g)(2), which asks only whether the defense was previously available and makes no exception for amended complaints. And Securus cites no case for that proposition, and substantial persuasive authority holds otherwise. The Second Circuit, for example, has long held that "[d]efenses that 'involve[ ] the core issue of a party's willingness to submit a dispute to judicial resolution,' such as lack of personal jurisdiction . . . are 'not automatically revived by the submission of an amended complaint' if initially waived." *Carroll v. Trump*, 88 F.4th 418, 432 (2d Cir. 2023) (internal citations omitted). Instead, consistent with Rule 12(g)(2), a party seeking to revive a personal jurisdiction objection "must show that the amended complaint contains charges that, in fairness, should nullify its earlier waiver and allow it to reassess its strategy." *Id.* (quotation omitted).

Second, Securus argues that it should be permitted to reassess its earlier waiver because circumstances changed. It argues that the Amended Complaint bears a "crucial difference" from the original complaint—the original included Evelyn Minor as a plaintiff, but Minor was dropped in the Amended Complaint—such that the lack of personal jurisdiction is only apparent now. ECF No. 250 at 26. Hardly. Personal jurisdiction over a defendant is assessed on a claim-by-claim basis, and "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis

14

for jurisdiction" over a separate claim brought by a separate plaintiff. *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 265 (2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). Thus, nothing about whether the Court might have had personal jurisdiction over Minor's claims against Securus has anything to do with whether Securus could have raised a personal jurisdiction defense as to the claims brought by the other seven Plaintiffs at that time.

### 2. Plaintiffs Fail to State a Claim Under the Federal Communications Act in Part

To repeat, in Count I, Plaintiffs sue Securus for two violations of the Federal Communications Act. One of their claims alleges that "Securus's failure to make full and adequate disclosures to their customers of these charges violates 47 C.F.R. § 64.2401," the "truth-in-billing" requirement. ECF No. 191 ¶ 62. That regulation requires that "[c]harges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered." 47 C.F.R. § 64.2401(b). The Amended Complaint fails to state such a "truth-in-billing" claim.

To survive a motion to dismiss for failure to state a claim, a plaintiff's complaint "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Sufficient factual matter must be something more than "mere conclusory statements" and "[t]hreadbare recitals of the elements of a cause of action." *Id.* But conclusory statements are all Plaintiffs have alleged in support of this claim. The Amended Complaint merely recites that Securus has charged "undisclosed fees," "failed to fully and adequately disclose to Plaintiffs and the Class telephone rates and fees," and "fail[ed] to make full and adequate disclosures." ECF No. 191 ¶¶ 23, 53(c), 62. At no point are these "threadbare recitals" fleshed out through *any* factual allegations about what fees Securus failed to disclose, how or when any disclosures were made to Plaintiffs, how those disclosures were inadequate, or

15

even which named Plaintiffs were affected.  Securus is right that what Plaintiffs *have* alleged amounts to only an "unsupported one-liner."  ECF No. 243 at 48.  That is not enough, and so this claim against Securus must be dismissed in its entirety.

Plaintiffs' second Federal Communications Act claim—really, the core of the Amended Complaint—alleges that Securus violated § 201(b) of that law, which requires "common carrier[s]" who are "engaged in interstate or foreign communication by wire or radio" to ensure that their "charges, practices, classifications, and regulations for and in connection with such communication service" are "just and reasonable."  47 U.S.C. § 201.  To the contrary, Plaintiffs allege, "[t]he telephone rates and fees charged by Securus . . . are unjust and unreasonable."  ECF No. 191 ¶ 61.  "Communications Act language links § 201(b) to § 207, which authorizes any person 'damaged' by a violation of § 201(b) to bring a lawsuit to recover damages in federal court." *Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 47 (2007).  So far, so good.  As explained below, for much of the time at issue, Plaintiffs have not alleged a plausible claim against Securus under § 207 for a violation of § 201(b).

Neither the Supreme Court nor the D.C. Circuit have squarely addressed what is required for a common carrier to violate § 201(b).  But both courts have suggested that it is the FCC's purview to establish what qualifies as such a violation.  The Supreme Court, for example, has remarked that "§ 201(b)'s prohibitions have long been thought to extend to rates that diverge from *FCC prescriptions*, as well as rates or practices that are 'unreasonable' in light of their failure to reflect rules *embodied in an agency regulation*." *Global Crossing Telecomm.*, 550 U.S. at 58 (emphasis added).  And the D.C. Circuit has stated that "the [Federal Communications Act] statute explicitly directs *the FCC* to ensure that interstate rates are 'just and reasonable.'" *Global Tel\*Link*, 866 F.3d at 409 (emphases modified).  Still, neither of these passages excludes the

16

possibility that a litigant could allege a violation of § 201(b) even in the absence of a relevant FCC regulation.

That said, three other Courts of Appeal have considered this question, and each concluded that it is the FCC—and the FCC alone—that must set the governing standard for what is just and reasonable under § 201(b).  In other words, without such a standard in place, a plaintiff cannot bring a claim under § 207.  "A plaintiff is not entitled to a cause of action under § 207 simply on the basis of its own determination that conduct was 'unjust or unreasonable.'"  *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 89 (3d Cir. 2016).  Instead, "this charge of unreasonable practices is a determination that Congress has placed squarely in the hands of the FCC."  *N. Cnty. Comm. Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010) (cleaned up).  "Allowing [] plaintiffs to proceed with a claim alleging unreasonable rates without action by the FCC would place those decisions 'squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission.'"  *Stuart v. Global Tel\*Link Corp.*, 956 F.3d 555, 562 (8th Cir. 2020) (quoting *New England Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 742 F.2d 1, 6 (1st Cir. 1984)).  The Third, Eighth, and Ninth Circuits have thus concluded that permitting individual plaintiffs to take enforcement of the Federal Communications Act into their own hands "would be contrary to the congressional design."  *Id.*  This Court agrees.

Thus, for Plaintiffs to bring suit under § 207 against Securus for a violation of § 201(b), they must "allege[] that a carrier has violated a rule or regulation promulgated by the FCC."  *Stuart*, 956 F.3d at 561–62.  That does not mean, as Securus argues, that Plaintiffs must have received an individualized adjudication from the FCC concluding that Securus violated § 201(b).  *See* ECF No. 243 at 25–27.  Agency rulemaking, untethered from carrier-specific adjudications, can set the boundaries of unjust or unreasonable conduct.  *See, e.g.*, *Global Crossing Telecomms.*, 550 U.S.

17

at 53. And Plaintiffs seem, at least implicitly, to allege that Securus violated one FCC rule: the Interim Order promulgated on September 26, 2013. *See* ECF No. 191 ¶¶ 43–47.

To the extent that Plaintiffs allege that Securus violated the Interim Order, though, such an allegation presents a timing problem for them. Plaintiffs seek to hold Securus liable during the "Class Period," which the Amended Complaint defines as running from "February 16, 1998" for some putative class plaintiffs and from "May 15, 2013" for others. ECF No. 191 ¶¶ 30, 49. But it was impossible for Securus to violate the Interim Order, and thus § 201(b), until after the Interim Order went into effect on February 11, 2014. *See Rates for Interstate Inmate Calling Services*, 78 Fed. Reg. 67,956 ¶ 72 (Nov. 13, 2013); *see Stuart*, 956 F.3d at 562 ("[P]laintiffs can identify no violation of an FCC rule during the time in which they claim to have been injured."). For that reason, the Amended Complaint fails to state a claim against Securus under § 201(b) for any time before February 11, 2014—indeed, for much of the Class Period.

As for the rest of the Class Period, however, the Court concludes that Plaintiffs have alleged enough in the Amended Complaint to state a claim against Securus under § 201(b). Securus raises three arguments in favor of dismissal that apply to the rest of the period, but none are convincing.

Securus first argues that the D.C. Circuit's decision in *Global Tel*Link v. FCC* somehow forecloses Plaintiffs' claims both as a matter of binding precedent and issue preclusion. *See* ECF No. 243 at 28–33, 45–48. But most of the Circuit's decision in that case was about how the FCC's subsequent Order was procedurally flawed. *Global Tel*Link*, 866 F.3d at 416–17. To be sure, some portions of the Order were also held to exceed the FCC's statutory authority. *Id.* at 417. But at no point did the D.C. Circuit hold that Securus's rates for inmate calling services were just and reasonable. So it is not a precedent that binds the Court with respect to Plaintiffs' § 201(b) claim. Nor has the question of Securus's liability under § 201(b) ever been "actually and necessarily

18

determined by a court of competent jurisdiction," so issue preclusion does not apply either. *Montana v. United States*, 440 U.S. 147, 153 (1979).

Securus also spills much ink arguing that "Plaintiffs have failed to prosecute their case" and thereby deserve to have their case dismissed under Federal Rule of Civil Procedure 41(b). ECF No. 243 at 40. This wrongfully discounts all the time Plaintiffs spent pursuing remedies at the FCC under the primary jurisdiction referral ordered by this Court. *See* ECF No. 94. Securus points out that Plaintiffs never sought an adjudication from the FCC of the unlawfulness of Securus's rates, specifically. ECF No. 243 at 41–44. But for reasons explained above, that does not matter. Plaintiffs' vigor in pursuing rulemaking is sufficient, and the Court declines to exercise its discretion to punish those efforts.

Securus also mentions in passing that Plaintiff Lamancusa's § 201(b) claim alone should be dismissed under the "filed rate doctrine," which Securus argues "bars courts from hearing a challenge to rates that a common carrier has filed with the appropriate regulator and which the regulator has blessed as lawful." ECF No. 243 at 33. Securus asserts that Lamancusa has only complained of *intrastate* inmate calls within Ohio, and that Securus had a valid intrastate rate on file with the appropriate Ohio regulator. *Id.* at 34–35. But Securus cites no case applying the filed rate doctrine to rates filed with a *state* regulator. Instead, all of them involve rates filed with a *federal* regulator. *See Montana-Dakota Utils. Co. v. N.W. Pub. Serv. Co.*, 341 U.S. 246, 248 (1951) (Federal Power Commission); *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 481 (2d Cir. 1998) (Federal Communications Commission); *Marcus v. AT&T Corp.*, 138 F.3d 46, 51 (2d Cir. 1998) (Federal Communications Commission); *Evanns v. AT&T Corp.*, 229 F.3d 837, 839 (9th Cir. 2000) (Federal Communications Commission). Because Securus does not allege that it

19

had a rate filed with any federal regulator, Lamancusa's claim is not barred by the filed rate doctrine.[5]

## IV.    Conclusion

For all the above reasons, the Court will grant CoreCivic's Motion to Dismiss and dismiss Counts II and III.  The Court will also grant Securus's Motion to Dismiss in part, and dismiss Count I, to the extent that it alleges (1) a Federal Communications Act "truth in billing" claim predicated on a violation of 47 C.F.R. § 64.2401; and (2) a Federal Communications Act claim predicated on a violation of § 201(b) for "unjust or unreasonable" charges, before February 11, 2014.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 4, 2026

---

[5] Securus bears the burden of persuading the Court that Plaintiffs' claims must be dismissed. *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 48 n.10 (D.D.C. 2014). And while Securus has not met that burden with respect to the rest of Plaintiffs' § 201(b) claim as alleged, the Court notes that several issues, unaddressed by the parties in their briefing, could ultimately pose barriers to Plaintiffs' recovery for this claim.  The parties did not specifically address whether or how developments *after* the Interim Order—the FCC's Order promulgated in 2015, the D.C. Circuit's vacatur and remand of portions of that Order in *Global Tel*Link*, and the FCC's latest rulemaking under its authority stemming from the Martha Wright-Reed Just and Reasonable Communications Act, might affect Plaintiffs' ability to recover for damages under § 207.  Nor did the parties address how the Federal Communications Act's statute of limitations, 47 U.S.C. §§ 207, 415(c), applies to the Amended Complaint.